# Exhibit F



**Premises Pollution Liability Insurance Policy**

**ACE American Insurance Company**
**Philadelphia, Pennsylvania**

### *Declarations*

**This Policy is issued by the stock insurance company identified above (hereinafter *the Insurer*).**

**THIS POLICY PROVIDES LIABILITY COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS, WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER, UNLESS AN EXTENDED REPORTING PERIOD APPLIES. THIS POLICY ALSO PROVIDES FIRST-PARTY COVERAGES ON A DISCOVERED AND REPORTED BASIS, WHICH COVERS ONLY POLLUTION CONDITIONS AND INDOOR ENVIRONMENTAL CONDITIONS, AS APPLICABLE, FIRST DISCOVERED DURING THE POLICY PERIOD AND FOR WHICH A FIRST-PARTY CLAIM IS REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER.  FINALLY, THIS POLICY PROVIDES COVERAGE FOR EMERGENCY RESPONSE COSTS THAT IS LIMITED BY MORE SPECIFIC REPORTING CRITERIA AND COVERS ONLY EMERGENCY RESPONSE COSTS INCURRED, AND REPORTED TO THE INSURER, IN WRITING, WITHIN THE SPECIFIC TIMING REQUIREMENTS IDENTIFIED IN THIS POLICY.  PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES.  LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION.**

**THE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, THIS POLICY, AND ANY ENDORSEMENTS OR SCHEDULES ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.**

| **Policy No.:** PPL G24870388 014 | **Renewal of:** PPL G24870388 013 |
|---|---|
| **Item 1.**  **First Named Insured:**  Aluminum Shapes, LLC | |
| **Address:**  9000 River Road  Delair, New Jersey 08110 | |

**Coverages Purchased: Coverage A. -** [X]   **Coverage B. -** [ ]   **Coverage C. -** [ ]

| **Item 2.** | **Policy Period:**  (Local Time of the Address Shown in Item **1.**, above.) | **Policy Inception Date:**  05/01/2021 12:01 A.M. | **Policy Expiration Date:**  05/01/2022 12:01 A.M. |
|---|---|---|---|
| **Item 3.** | **Limits of Liability:**  In U.S. Dollars | **a. $2,000,000** | Per Pollution Condition or Indoor Environmental Condition Limit of Liability |
| | | **b. $4,000,000** | Total Policy and Program Aggregate Limit of Liability for all Pollution Conditions and Indoor Environmental Conditions |
| **Item 4.** | **Self-Insured Retention / Deductible Period:**  In U.S. Dollars | **a. $25,000** | Per Pollution Condition or Indoor Environmental Condition |
| | | **b.  3** | Days Per Pollution Condition or Indoor Environmental Condition |

| Item 5. | Retroactive Dates: | ☐ if checked  Exposure-Specific  Retroactive Dates are designated via endorsement. |
|---|---|---|
| | | **Coverage A** |
| | | Premises Pollution Condition Liability:  08/07/2009 |
| | | Premises Indoor Environmental Condition Liability:  05/01/2018 |
| | | Premises Pollution Condition First-Party Claims:  08/07/2009 |
| | | Premises Indoor Environmental Condition First-Party Claims: 05/01/2018 |
| | | **Coverage B** |
| | | Transportation Liability:  05/01/2018 |
| | | Transportation First-Party Claims:  05/01/2018 |
| | | **Coverage C** |
| | | Non-Owned Disposal Sites Liability :  05/01/2018 |
| | | If **"FULL RETRO"** is indicated in the Retroactive Date column above, then retroactive coverage is afforded pursuant to this Policy for that specific exposure, subject to any other corresponding exposure-specific Retroactive Date added to this Policy by endorsement. |

| Item 6. | **Premium:** In U.S. Dollars | $20,878 |
|---|---|---|
| | New Jersey Property Liability Insurance Association (PLIGA) Surcharge | 0.600 $125.27 % |
| | **Total Premium:** | $21,003.27 |
| | | (The entire amount of this premium shall be 25% minimum earned as of the first day of the Policy Period indicated in Item **2.**, above) |

| Item 7. | **Producer:** Name & Address | Conner Strong & Buckelew Companies Llc Triad1828 Centre 2 Cooper Street 18Th Floor Camden, New Jersey 08102 |
|---|---|---|

| Item 8. | **a. Notice of Claim or Pollution Condition** | **b. All other Notices** |
|---|---|---|
| **Notices** | CHUBB Environmental Risk Claims Manager CHUBB USA Claims P.O. Box 5103 Scranton, PA 18505-0510 Fax: (866) 635-5687  First Notice Fax:  (800) 951-4119 First Notice Email: CasualtyRiskEnvironmentalFirstNotice@chubb.com | Environmental Risk Underwriting Officer CHUBB Environmental Risk P.O. Box 1000 436 Walnut Street – WA 07A Philadelphia,  PA 19106 |
| | **Environmental Incident Alert - 24 Hour Emergency Response Hotline** | **1-888-310-9553** |

| Item 9. | Covered Locations: | 8600 & 9000 River Road, Delair, NJ |
| --- | --- | --- |
| | | ☐ if checked here, schedule of Covered Locations is designated via endorsement. |

**Policy Form No.** PF-44887b (08/18) Premises Pollution Liability Insurance Policy

**Endorsements and Notices Attached at Policy Issuance:**

| Endorsement Number: | Form Number: | Form Name: |
|---|---|---|
| 001 | PF-32460 (11/10) | Schedule of Named Insured Endorsement |
| 002 | PF-48605 (01/17) | Asbestos and/or Lead-Based Paint Coverage (Inadvertent Disturbance) Endorsement |
| 003 | PF-44963 (09/14) | Other Insurance (Primary) Endorsement |
| 004 | PF-44967 (09/14) | Premium Earn-Out (Staggered - One Year - Acceleration) Endorsement |
| 005 | PF-44999 (09/14) | Waiver of Subrogation (By Contract) Endorsement |
| 006 | MS-218735.1 | Exposure-Specific Dedicated Limits for Financial Responsibility (New Jersey Spill Act- Via General Aggregate Limit - Annual) Endorsement |
| 007 | PF-55008 (03/21) | Communicable, Infectious Or Contagious Diseases Exclusionary Endorsement |
| 008 | MS-218735.3 | Non-Financial Responsibility Condition Sublimit (Per) Endorsement |
| 009 | MS-218735.2 | Non-Financial Responsibility Exposures Limitation (Pre-Existing Conditions) Endorsement |
| 010 | ALL-21101 (11/06) | Trade Or Economic Sanctions Endorsement |
| 011 | LD-2S76 (03/92) | New Jersey Changes - Cancellation And Nonrenewal |
| 012 | CC-1K11i (02/18) | Signatures |
| | TRIA24a (08/20) | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| | ALL-20887a (03/16) | Chubb Producer Compensation Practices & Policies |
| | ILP 001 01 04 | U. S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders |

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be countersigned by a duly authorized representative of the Insurer.**

JOHN J. LUPICA, President

**DATE:** _05/01/2021_
            MO/DAY/YR                         AUTHORIZED REPRESENTATIVE



**Premises Pollution Liability
Insurance Policy**

**This Policy is issued by the stock insurance company identified in the Declarations (hereinafter *the Insurer*).**

**THIS POLICY PROVIDES LIABILITY COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS, WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER, UNLESS AN EXTENDED REPORTING PERIOD APPLIES. THIS POLICY ALSO PROVIDES FIRST-PARTY COVERAGES ON A DISCOVERED AND REPORTED BASIS, WHICH COVERS ONLY POLLUTION CONDITIONS AND INDOOR ENVIRONMENTAL CONDITIONS, AS APPLICABLE, FIRST DISCOVERED DURING THE POLICY PERIOD AND FOR WHICH A FIRST-PARTY CLAIM IS REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER. FINALLY, THIS POLICY PROVIDES COVERAGE FOR EMERGENCY RESPONSE COSTS THAT IS LIMITED BY MORE SPECIFIC REPORTING CRITERIA AND COVERS ONLY EMERGENCY RESPONSE COSTS INCURRED, AND REPORTED TO THE INSURER, IN WRITING, WITHIN THE SPECIFIC TIMING REQUIREMENTS IDENTIFIED IN THIS POLICY. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION**.

Throughout this Policy the words *the Insurer* shall refer to the company providing this insurance. Other words and phrases that appear in quotation marks have special meanings and are defined in Section **V., DEFINITIONS**.

In consideration of the payment of the premium and in reliance upon all statements made in the Application to this Policy, including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Policy, the Insurer agrees to provide insurance coverage to the "insured" as described herein.

## I.  INSURING AGREEMENTS

Solely to the extent that the coverages below are identified on the Declarations to this Policy as being underwritten by the Insurer, the Insurer agrees to pay on behalf of the "insured" for "loss", in excess of the "self-insured retention" or deductible period (as applicable), resulting from:

**A.** POLLUTION CONDITIONS OR INDOOR ENVIRONMENTAL CONDITIONS COVERAGE (Coverage **A.**)

"Claims" and "first-party claims" arising out of: **1)** a "pollution condition" on, at, under or migrating from a "covered location"; or **2)** an "indoor environmental condition" at a "covered location", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" or "indoor environmental condition" that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **A.** only applies to "pollution conditions" or "indoor environmental conditions" that first commence, in their entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

**B.** TRANSPORTATION COVERAGE (Coverage **B.**)

"Claims" and "first-party claims" arising out of a "pollution condition" resulting from "transportation", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **B.** only applies to "pollution conditions" that first commence, in their entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".



**Premises Pollution Liability
Insurance Policy**

**C.** NON-OWNED DISPOSAL SITE COVERAGE (Coverage **C.**)

"Claims" arising out of a "pollution condition" on, at, under or migrating from a "non-owned disposal site", provided the "claim" is first made during the "policy period". Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **C.** only applies to "pollution conditions" that are attributable to a "named insured's" waste generated at a "covered location" and received at the "non-owned disposal site", in its entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

## II.  LIMITS OF LIABILITY AND SELF-INSURED RETENTION

**A.** It is expressly agreed that the Insurer's obligation to pay for any covered "loss" (exclusive of "business interruption loss") pursuant to this Policy shall attach to the Insurer only after the "first named insured" has paid, or has provided evidence to the Insurer that another "named insured" has paid, the full amount of the "self-insured retention" with respect to any covered "pollution condition" or "indoor environmental condition". Under no circumstances, including, but not limited to, an "insured's" insolvency and/or bankruptcy, shall the Insurer be liable to pay any amount within the "self-insured retention". In the event that the "first named insured" cannot provide satisfactory evidence that a "named insured" has paid the full amount of the "self-insured retention" with respect to any covered "pollution condition" or "indoor environmental condition", the "first named insured" shall remain responsible to pay the "self-insured retention" before the Insurer's payment obligation pursuant to this Policy shall attach with respect to coverage sought by any "insured".

Notwithstanding the foregoing, if the "insured" agrees with the Insurer to use "mediation" to successfully resolve any "claim" for which "legal defense expenses" have been incurred, then the "self-insured retention" applicable to the "pollution condition" or "indoor environmental condition" that corresponds to such "claim" shall be reduced by fifty percent (50%), subject to a maximum reduction in the "self-insured retention" of twenty-five thousand dollars ($25,000).

In addition to the foregoing, it is expressly agreed that the Insurer's obligation to pay for any covered "business interruption loss" pursuant to this Policy shall attach to the Insurer only after the relevant "insured" has also borne the full amount of the "business interruption loss" within the deductible period identified in Item **4.** of the Declarations to this Policy.

**B.** One "self-insured retention" shall apply to all "loss" (exclusive of "business interruption loss") arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition". If the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" triggers coverage pursuant to multiple coverage parts, or otherwise involves multiple exposures that have been assigned exposure-specific "self-insured retention" amounts by endorsement to this Policy, the single largest of the associated "self-insured retention" amounts identified in: **1)** Item **4.** of the Declarations; **2)** any Supplemental Coverage added by endorsement to this Policy; or **3)** any exposure-specific "self-insured retention" endorsement identified as part of this Policy, shall apply to all "loss" and other covered exposures arising out of such "pollution condition" or "indoor environmental condition", except for any "catastrophe management costs" that are assigned an exposure-specific "self-insured retention" by endorsement to this Policy, if any (hereinafter Catastrophe Management-Specific SIR Obligation). Amounts within any such Catastrophe Management-Specific SIR Obligation shall be independent of, and shall not otherwise erode, the single largest "self-insured retention" applicable to all other covered exposures arising out of the same "pollution condition" or "indoor environmental condition" as contemplated herein.

**C.** One deductible period shall apply to all "business interruption loss" arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition".

**D.** Subject to Subsections **E.** and **F.**, below, the most the Insurer shall pay for all "loss" arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" is the Per Pollution Condition or Indoor Environmental Condition Limit of Liability identified in Item **3.a.** of the Declarations to this Policy.



**Premises Pollution Liability
Insurance Policy**

E.   Subject to Subsection **D.**, above, and Subsection **F.**, below, **$250,000** shall be the maximum amount the Insurer shall pay for all "catastrophe management costs" arising out of all "pollution conditions" and "indoor environmental conditions".

F.   Subject to Subsections **D.** and **E.**, above, the Total Policy and Program Aggregate Limit of Liability identified in Item **3.b.** of the Declarations shall be the maximum liability of the Insurer pursuant to this Policy with respect to all "loss".

G.   If the Insurer or an affiliate has issued pollution liability coverage afforded on a discovered and reported basis or claims-made and reported basis consistent with coverage afforded pursuant to this Policy in one or more policy periods, and a "pollution condition" or "indoor environmental condition" is first discovered and reported to the Insurer, or a "claim" is first made and reported to the Insurer with respect to a "pollution condition" or "indoor environmental condition", in accordance with the terms and conditions of this Policy, then:

1.   Any continuous, repeated, or related "pollution condition" or "indoor environmental condition" that is subsequently reported to the Insurer during later policy periods shall be deemed to be one "pollution condition" or "indoor environmental condition" discovered during this "policy period"; and

2.   All "claims" arising out of:

a.   The same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" that was discovered during this "policy period"; or

b.   The same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" that was the subject of a "claim" first made and reported in accordance with the terms and conditions of this Policy,

shall be deemed to have been first made and reported during this "policy period" and no other policy shall respond.

## III. DEFENSE AND SETTLEMENT

A.   The Insurer shall have the right and, subject to the "self-insured retention" obligation, the duty to defend the "insured" against a "claim" to which this insurance applies.  The Insurer shall have no duty to defend the "insured" against any "claim" to which this insurance does not apply.  The Insurer's duty to defend the "insured" ends once the Limits of Liability are exhausted or are tendered into a court of applicable jurisdiction, or once the "insured" refuses a settlement offer as provided in Subsection **E.,** below.

B.   The Insurer shall have the right to select legal counsel to: **1)** represent the "insured" for the investigation, adjustment, and defense of any "claims" covered pursuant to this Policy; and **2)** assist the "insured" with clarifying the extent of, and to help minimize, any "first-party remediation costs".  Selection of legal counsel by the Insurer shall not be done without the consent of the "insured"; such consent shall not be unreasonably withheld.

In the event the "insured" is entitled by law to select independent counsel to defend itself at the Insurer's expense, the attorney fees and all other litigation expenses the Insurer shall pay to that counsel are limited to the rates the Insurer actually pays to counsel that the Insurer normally retains in the ordinary course of business when defending "claims" or lawsuits of similar complexity in the jurisdiction where the "claim" arose or is being defended.  In addition, the "insured" and the Insurer agree that the Insurer may exercise the right to require that such counsel: **1)** have certain minimum qualifications with respect to their competency, including experience in defending "claims" similar to those being asserted against the "insured"; **2)** maintain suitable errors and omissions insurance coverage; **3)** be located within a reasonable proximity to the jurisdiction of the "claim"; and **4)** agree in writing to respond in a timely manner to the Insurer's requests for information regarding the "claim".  The "insured" may at any time, by its signed consent, freely and fully waive its right to select independent counsel.

C.   The "insured" shall have the right and the duty to retain a qualified environmental consultant or "catastrophe management firm" to: **1)** perform any investigation and/or remediation of any "pollution condition" or "indoor environmental condition" covered pursuant to this Policy; or **2)** perform "catastrophe management services" covered pursuant to this Policy, respectively.  The "insured" must



**Premises Pollution Liability
Insurance Policy**

receive the consent of the Insurer prior to the selection and retention of such consultant or "catastrophe management firm", except in the event of a "first-party claim" that results in "emergency response costs".

**D.** "Legal defense expenses" reduce the Limits of Liability identified in the Declarations to this Policy, and, unless specifically stated otherwise herein, any applicable Limits or Sublimits of Liability identified in any endorsement hereto. "Legal defense expenses" shall also be applied to the "self-insured retention".

**E.** The Insurer shall present all settlement offers to the "insured". If the Insurer recommends a settlement which is acceptable to a claimant, exceeds any applicable "self-insured retention", is within the Limits of Liability, and does not impose any additional unreasonable burdens on the "insured", and the "insured" refuses to consent to such settlement offer, then the Insurer's duty to defend shall end. Thereafter, the "insured" shall defend such "claim" independently and at the "insured's" own expense. The Insurer's liability shall not exceed the amount for which the "claim" could have been settled if the Insurer's recommendation had been accepted, exclusive of the "self-insured retention".

## IV. COVERAGE TERRITORY

The coverage afforded pursuant to this Policy shall only apply to "pollution conditions" or "indoor environmental conditions" located, and "claims" made, within the United States of America.

## V. DEFINITIONS

**A.** **"Additional insured"** means any person or entity specifically endorsed onto this Policy as an "additional insured", if any. Such "additional insured" shall maintain only those rights that are specified by endorsement to this Policy.

**B.** **"Adverse media coverage"** means national or regional news exposure in television, radio, print or internet media that is reasonably likely to have a negative impact on the "insured" with respect to its income, reputation, community relations, public confidence or good will.

**C.** **"Bodily injury"** means physical injury, illness, disease, mental anguish, emotional distress, or shock, sustained by any person, including death resulting therefrom, and any prospective medical monitoring costs that are intended to confirm any such physical injury, illness or disease.

**D.** **"Business income"** means:

**1.** Net profit or loss, before income taxes, including "rental income" from tenants, that would have been realized had there been no "business interruption";

**2.** The "insured's" continuing operating and payroll expense (excluding payroll expense of officers, executives, department managers and contract employees);

**3.** Costs incurred by the "insured" as rent for temporary premises when a portion of a "covered location" becomes untenantable due to a "pollution condition" or "indoor environmental condition" and temporary premises are required to continue the "insured's" operations. Such rental costs cannot exceed the fair rental value of the untenantable portion of the "covered location" immediately preceding the "pollution condition" or "indoor environmental condition".

**E.** **"Business interruption"** means the necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage **A.** of this Policy applies. Such period of time shall extend from the date that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

**F.** **"Business interruption loss"** means:

**1.** "Business income";

**2.** "Extra expense"; and

**3.** "Delay expense".

CHUBB®

**Premises Pollution Liability**
**Insurance Policy**

G. **"Catastrophe management costs"** means reasonable and necessary expenses approved by the Insurer, in writing, except for those expenses incurred during the same seven (7) day period associated with "emergency response costs", which have been incurred by the "insured" for the following:

1. Responsive consulting services rendered by a "catastrophe management firm";

2. Printing, advertising, mailing of materials of public relations materials;

3. Travel by directors, officers, employees or agents of the "insured", or the "catastrophe management firm", incurred at the direction of a "catastrophe management firm";

4. To secure the scene of a "pollution condition" or "indoor environmental condition"; or

5. Sums advanced to third-parties directly harmed by the "pollution condition" or "indoor environmental condition" for their medical costs; funeral costs; psychological counseling; travel expenses costs; temporary living costs or other necessary response costs,

but solely in those instances when, in the good faith opinion of a "key executive", the associated "pollution condition" or "indoor environmental condition" has resulted in or is reasonably likely to result in: **a)** "loss" (exclusive of "catastrophe management costs") that will exceed the applicable "self-insured retention"; and **b)** a need for "catastrophe management services" due to "adverse media coverage".

**"Catastrophe management costs"** do not include any "legal defense expense".

H. **"Catastrophe management firm"** means any firm that is approved, in writing, except for firms retained for the same seven (7) day period associated with "emergency response costs", by the Insurer to perform "catastrophe management services" in connection with a "pollution condition" or "indoor environmental condition".

I. **"Catastrophe management services"** means advising the "insured" with respect to minimizing potential harm to the "insured" from a covered "pollution condition" or "indoor environmental condition" by managing "adverse media coverage" and maintaining and restoring public confidence in the "insured", and its services or products.

J. **"Claim"** means the written assertion of a legal right received by the "insured" from a third-party, or from another "insured" that is party to an "environmental indemnity obligation", including, but not limited to, a "government action", suits or other actions alleging responsibility or liability on the part of the "insured" for "bodily injury", "property damage" or "remediation costs" arising out of "pollution conditions" or "indoor environmental conditions" to which this insurance applies.

K. **"Covered location"** means:

1. Any location specifically identified in Item **9.** of the Declarations to this Policy;

2. Any location that is specifically identified on a Schedule of Covered Locations attached to this Policy; and

3. Any location that meets the prerequisites to coverage identified in the Automatic Acquisition and Due Diligence Endorsement attached to this Policy, if any.

L. **"Delay expense"** means, for a "covered location" under development where a "pollution condition" or "indoor environmental condition" causes a delay in the completion or development during the "business interruption", any of the following expenses:

1. Additional interest on money the "insured" has borrowed to finance the construction, development, or remediation of a project at a "covered location";

2. Additional realty taxes and other assessments;

3. Additional advertising or promotional expense;

4. Additional expenses incurred resulting from the renegotiation of leases, including associated usual and customary legal representation expense; and

5. Additional engineering, architectural, and consulting fees.



**Premises Pollution Liability**
**Insurance Policy**

**M.** **"Emergency response costs"** means "first-party remediation costs" incurred within seven (7) days following the discovery of a "pollution condition" or "indoor environmental condition" by a "responsible person" in order to abate or respond to an imminent and substantial threat to human health or the environment arising out of:

**1.** A "pollution condition" or "indoor environmental condition" on, at, under or migrating from a "covered location"; or

**2.** A "pollution condition" resulting from "transportation",

provided such "emergency response costs" are reported to the Insurer within fourteen (14) days of when that "responsible person" first became aware of such "pollution condition" or "indoor environmental condition".

**N.** **"Environmental indemnity obligations"** means an "insured's" obligations to defend or indemnify a third-party with respect to a "pollution condition" or "indoor environmental condition" to which this insurance otherwise applies, provided that such defense or indemnity obligation is explicitly included within a contract identified or described on the Schedule of Insured Contracts Endorsement attached to this Policy, if any.

**O.** **"Environmental law"** means any Federal, state, commonwealth, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an "environmental professional" acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the "insured" with respect to a "pollution condition" or "indoor environmental condition".

**P.** **"Environmental professional"** means a licensed professional that is:

**1.** Mutually agreed upon by the Insurer and the "insured", except with respect to "emergency response costs"; and

**2.** Qualified by licensure, knowledge, skill, education and training to perform an assessment, prepare an investigation protocol, interpret the results and prepare a scope of work to remediate a "pollution condition" or "indoor environmental condition".

**Q.** **"Extended reporting period"** means the additional period of time in which to report a "claim" first made against the "insured" during or subsequent to the end of the "policy period".

**R.** **"Extra damages"** means punitive, exemplary or multiplied damages, and civil fines, penalties and assessments, but solely to the extent that the punitive, exemplary or multiplied damages, and civil fines, penalties and assessments:

**1.** Are insurable under applicable law; and

**2.** Arise out of a "pollution condition" or "indoor environmental condition" that results in "bodily injury", "property damage", "remediation costs" or "first-party remediation costs" to which this insurance otherwise applies.

**S.** **"Extra expense"** means costs incurred by the "insured" due to a "pollution condition" or "indoor environmental condition" that are necessary to avoid or mitigate any "business interruption". Such costs must be incurred to actually minimize the amount of foregone "business income" that would otherwise be covered pursuant to this Policy.

**T.** **"First named insured"** means the person or entity as identified in Item **1.** of the Declarations to this Policy. The "first named insured" is the party responsible for the payment of any premiums and the payment of, or evidencing payment of, any applicable "self-insured retention" amounts. The "first named insured" shall also serve as the sole agent on behalf of all "insureds" with respect to the provision and receipt of notices, including notice of cancellation or non-renewal, receipt and acceptance of any endorsements or any other changes to this Policy, return of any premium, assignment of any interest pursuant to this Policy, as well as the exercise of any applicable "extended reporting period", unless any such responsibilities are otherwise designated by endorsement.

# CHUBB®

## Premises Pollution Liability Insurance Policy

**U.** **"First-party claim"** means the first-party discovery of a "pollution condition" or an "indoor environmental condition" during the "policy period" by an "insured" to which this insurance applies.

**V.** **"First-party remediation costs"** means reasonable and necessary "remediation costs" incurred by an "insured" resulting from a "first-party claim". If no applicable laws exist that govern the remediation, investigation, quantification, monitoring, removal, disposal, treatment, neutralization, or immobilization of such "pollution condition" or "indoor environmental condition" in the jurisdiction of the "covered location", necessary "remediation costs" may be established by securing the written professional recommendations of an "environmental professional".

**"First-party remediation costs"** also means reasonable and necessary expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a "pollution condition" or "indoor environmental condition". Such expenses shall not include costs associated with betterments or improvements, except to the extent that such betterments or improvements are exclusively associated with the use of building materials which are environmentally superior to those materials which comprised the original damaged property. Any such environmentally superior material must be: **a)** certified as such by an applicable independent certifying institution, where such certification is available; or **b)** in the absence of any such certification, based solely on the judgment of the Insurer and at its sole discretion.

**W.** **"Fungi"** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents, or byproducts produced or released by "fungi".

**X.** **"Government action"** means action taken or liability imposed by any Federal, state, commonwealth, municipal or other local government agency or body acting pursuant to the authority of "environmental law".

**Y.** **"Illicit abandonment"** means:

**1.** Solely with respect to coverage for "covered locations", the intentional placement or abandonment of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including contaminated soil, contaminated silt, contaminated sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, including "low-level radioactive waste", "mixed waste" and medical, red bag, infectious and pathological wastes, on, at or into a "covered location", by a person or entity that:

    **a.** Is not an "insured"; and

    **b.** Is not affiliated by common ownership with an "insured", and,

**2.** Solely with respect to coverage for "transportation", the intentional placement or abandonment of any waste, goods, materials or product beyond the boundaries of a "covered location" during "transportation" by a person or entity that:

    **a.** Is not an "insured"; and

    **b.** Is not affiliated by common ownership with an "insured".

**"Illicit abandonment"** does not mean any such placement or abandonment, above, which takes place, in whole or in part, prior to the inception date identified in Item **2.** of the Declarations of this Policy.

**Z.** **"Indoor environmental condition"** means:

**1.** The presence of "fungi" in a building or structure, or the ambient air within such building or structure; or

**2.** The discharge, dispersal, release, escape, migration or seepage of *legionella pneumophila* in a building or structure, or the ambient air within such building or structure,

provided that such "fungi" or *legionella pneumophila* are not naturally occurring in the environment in the amounts and concentrations found within such building or structure.



**Premises Pollution Liability
Insurance Policy**

AA. **"Insured"** means the "first named insured", any "named insured", any "additional insured", and any past or present director or officer of, partner in, employee of, temporary or leased worker of, or, with respect to a limited liability company, a member of, any of the foregoing while acting within the scope of his or her duties as such.

BB. **"Key executive"** means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel, general partner or managing partner (if the "insured" is a partnership), managing member (if the "insured" is a limited liability company) or sole proprietor (if the "insured" is a sole proprietorship) of the "insured". A "key executive" also means any other person holding a title designated by the "first named insured", approved by the Insurer, and identified by endorsement to this Policy.

CC. **"Legal defense expense"** means reasonable legal costs, charges, and expenses, including expert charges, incurred by the "insured":

1. In the investigation, adjustment or defense of "claims"; or,

2. Solely with respect to those instances where the "insured" has secured the prior consent of the Insurer, except in the event of a "first-party claim" that results in "emergency response costs", in order to clarify the extent of, minimize, and effect resolution of, any obligation to incur "first-party remediation costs".

DD. **"Loss"** means:

Coverage **A.**

1. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";

2. "Legal defense expense";

3. "First-party remediation costs";

4. "Emergency response costs";

5. "Business interruption loss"; and

6. "Catastrophe management costs".

Coverage **B.**

7. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";

8. "Legal defense expense";

9. "First-party remediation costs";

10. "Emergency response costs"; and

11. "Catastrophe management costs".

Coverage **C.**

12. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages" and "legal defense expense"; and

13. "Catastrophe management costs".

Supplemental Coverages

Any other liability or first-party exposure insured pursuant to any Supplemental Coverage added by endorsement to this Policy.

EE. **"Low-level radioactive waste"** means waste that is radioactive but not classified as the following: high-level waste (spent nuclear fuel or the highly radioactive waste produced if spent fuel is reprocessed),



**Premises Pollution Liability
Insurance Policy**

uranium milling residues, and waste with greater than specified quantities of elements heavier than uranium.

FF. **"Mediation"** means a conciliatory, non-binding attempt to resolve a "claim" using a neutral, third-party facilitator.

GG. **"Mixed waste"** means waste containing both radioactive and hazardous components as defined pursuant to United States law within the Atomic Energy Act and the Resource Conservation and Recovery Act, as either may be amended.

HH. **"Named insured"** means the "first named insured" and any other person or entity specifically endorsed onto this Policy as a "named insured", if any. "Named insureds" shall maintain the same rights pursuant to this Policy as the "first named insured", except for those rights specifically: **1)** reserved to the "first named insured" as defined herein; or **2)** limited by endorsement to this Policy.

II. **"Natural resource damage"** means injury to, destruction of, or loss of, including the resulting loss of value of, fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States of America (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. § 1801 et. seq.)), any state, commonwealth or local government, or any Native American Tribe, or, if such resources are subject to a trust restriction on alienation, any members of any Native American Tribe, including the reasonable costs of assessing such injury, destruction or loss resulting therefrom.

JJ. **"Non-owned disposal site"** means:

**1.** Any treatment, storage, transfer, disposal or recycling site or facility located within the United States of America that has not at any time been owned or operated, in whole or in part, by any "insured", which receives, or has historically received, a "named insured's" waste for disposal; provided that such treatment, storage, transfer, disposal or recycling site or facility:

    **a.** Was properly permitted and licensed pursuant to "environmental law" to accept the "named insured's" waste at the time of such disposal by the Federal, state, commonwealth, municipal or other local government agencies or bodies with applicable jurisdiction;

    **b.** Was not owned or operated by any person, corporation or unincorporated association that was in bankruptcy at the time the "named insured's" waste was received for disposal; and

    **c.** Has not, prior to the time the "named insured's" waste was received for disposal, been identified on the United States EPA (CERCLA) National Priorities List or pursuant to any functional equivalent of that list made by Federal, state, commonwealth, municipal or other local government agency or body with applicable jurisdiction pursuant to "environmental law", or

**2.** Any treatment, storage, transfer, disposal or recycling site or facility specifically identified on a Schedule of Non-Owned Disposal Sites Endorsement attached to this Policy, if any.

KK. **"Policy period"** means:

**1.** The period of time specifically identified in Item **2.** of the Declarations to this Policy; or,

**2.** Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item **2.** of the Declarations to the Policy, if any, the period of time following the effective date of such addition through the expiration date of the Policy identified in Item **2.** of the Declarations to this Policy; or

**3.** Any shorter period of time resulting from the cancellation of this Policy.

LL. **"Pollution condition"** means:

**1.** "Illicit abandonment"; or

**2.** The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors,



fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

MM. **"Property damage"** means:

**1.** Physical injury to, or destruction of, tangible property of a third-party, including all resulting loss of use of that property;

**2.** Loss of use of tangible property of a third-party, that is not physically injured or destroyed;

**3.** Diminished value of tangible property owned by a third-party; or

**4.** "Natural resource damages".

**"Property damage"** does not mean "remediation costs".

NN. **"Remediation costs"** means expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize "pollution conditions" or "indoor environmental conditions" to the extent required by "environmental law" in the jurisdiction of such "pollution conditions" or "indoor environmental conditions".

OO. **"Rental income"** means the actual rental fees lost as a result of a "suspension" of a rented "covered location".

PP. **"Responsible person"** means any employee of an "insured" responsible for environmental affairs, control, or compliance at a "covered location", or any "key executive" of, officer or director of, or partner in, an "insured".

QQ. **"Self-insured retention"** means the largest applicable dollar amount among triggered coverage parts identified in Item **4.** of the Declarations to this Policy, or as otherwise designated by endorsement to this Policy, if any.

RR. **"Suspension"** means that part of, or all of, a rented "covered location" is rendered untenantable for the purposes identified to the Insurer prior to the inception date of this Policy due to a "pollution condition" or "indoor environmental condition".

SS. **"Terrorism"** means activities against persons, organizations or property of any nature:

**1.** That involve the following or preparation for the following:

    **a.** Use or threat of force or violence; or

    **b.** Commission or threat of a dangerous act; or

    **c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**2.** When one or both of the following applies:

    **a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to  disrupt any segment of the economy; or

    **b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology**.**

TT. **"Transportation"** means the movement of an "insured's" waste, materials, goods or products to or from a "covered location" by automobile, aircraft, watercraft, railcar or other conveyance, including any associated loading or unloading thereof, by an "insured", or any third-party vendor engaged by an "insured" in the business of transporting property for hire, provided that any such movement, and associated loading and unloading activities, are performed beyond the boundaries of a "covered location".

UU. **"Underground storage tank"** means any tank and associated piping and appurtenances connected thereto which tank has more than ten percent (10%) of its volume below ground.



**Premises Pollution Liability
Insurance Policy**

**"Underground storage tank"** does not mean:

**1.** Any flow-through process tank, including, but not limited to, a septic tank, oil/water separator, sump, or any stormwater or wastewater collection/treatment vessel or system; or

**2.** Any tank that is located below ground, provided that such tank is located on or above the floor of a basement of a building or on or above the floor of any shaft or tunnel.

VV. **"War"** means war, whether or not declared, civil war, martial law, insurrection, revolution, invasion, bombardment or any use of military force, usurped power or confiscation, nationalization or damage of property by any government, military or other authority.

## VI. EXCLUSIONS

This insurance shall not apply to:

### A. Asbestos

"Loss" arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater.

### B. Contractual Liability

"Loss" arising out of or related to liability of others assumed by any "insured" through contract or agreement, except if the liability would have attached to the "insured" in the absence of such contract or agreement.

This exclusion shall not apply to "environmental indemnity obligations".

### C. Criminal Fines and Criminal Penalties

"Loss" arising out of or related to criminal fines, criminal penalties or criminal assessments.

### D. Divested Property

"Loss" arising out of or related to a "pollution condition" on, at, under or migrating from, or "indoor environmental condition" at, any "covered location":

**1.** That had been sold, abandoned, or given away by any "insured", or was condemned (collectively hereinafter Divested), prior to the "policy period"; or

**2.** When such "pollution condition" or "indoor environmental condition" first commenced after the "covered location" had been Divested.

This exclusion shall not apply to any "pollution conditions" or "indoor environmental conditions" that first commenced, in whole or in part, prior to the effective date that any such "covered location" was Divested as identified on the Divested Properties Coverage Endorsement attached to this Policy, if any.

### E. Employers Liability

"Claims" arising out of or related to "bodily injury" to:

**1.** Any "insured" or any employee of its parent corporation, subsidiary or affiliate:

**a.** Arising out of, or in the course of, employment by any "insured", its parent corporation, subsidiary or affiliate; or



**Premises Pollution Liability
Insurance Policy**

    **b.** Performing duties related to the conduct of the business of any "insured", its parent corporation, subsidiary or affiliate.

**2.** The spouse, child, parent, brother or sister of any "insured" or employee of its parent corporation, subsidiary or affiliate as a consequence of Paragraph **1.,** above.

This exclusion applies:

**1.** Whether any "insured" may be liable as an employer or in any other capacity; and

**2.** To any obligation to share damages with or repay someone else who must pay damages because of such "bodily injury".

#### F. First-Party Property Damage

"Loss" arising out of or related to damage to real or personal property owned by, leased to, loaned to, or rented by any "insured", or otherwise in the care, custody, or control of any "insured".

This exclusion shall not apply to "first-party remediation costs", "emergency response costs", "business interruption loss" and "catastrophe management costs".

#### G. Fraud or Misrepresentation

"Loss" arising out of or related to:

**1.** Fraudulent acts or material misrepresentations on the part of the "first named insured" made:

    **a.** Within an Application to this Policy; or

    **b.** During the Application or underwriting process prior to the inception date of this Policy,

    which would have affected the Insurer's decision to either issue this Policy, or issue this Policy and its endorsements pursuant to the financial terms identified in the Declarations to this Policy; or

**2.** Fraudulent acts or material misrepresentations on the part of any "responsible person" during the "policy period".

#### H. Insured's Internal Expenses

"Loss" arising out of or related to expenses incurred by any "insured" for services performed by its salaried staff and any employees.

This exclusion shall not apply to:

**1.** "Emergency response costs", along with any associated "catastrophe management costs" incurred during that same seven (7) day period; or

**2.** Any other costs, charges or expenses incurred with the prior approval of the Insurer at its sole discretion.

#### I. Insured vs. Insured

"Claims" made by any "insured" against any other "insured".

This exclusion shall not apply to:

**1.** "Claims" initiated by third-parties, including cross claims, counterclaims or claims for contribution by such parties against any "insured"; or

**2.** "Claims" that arise out of an indemnification provided by one "insured" to another "insured" in an "environmental indemnity obligation".

#### J. Intentional Non-Compliance

"Loss" arising out of or related to the intentional disregard of, or knowing, willful, or deliberate non-compliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or any executive, judicial or administrative order, by, or at the direction of, any "responsible person".



**Premises Pollution Liability**
**Insurance Policy**

### K. Known Conditions

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" in existence and reported to a "responsible person":

**1.** Prior to the "policy period"; or,

**2.** Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item **2.** of the Declarations to the Policy, if any, prior to the effective date of coverage for such "covered location",

and not affirmatively disclosed to the Insurer in an Application or supplemental underwriting materials provided to the Insurer to secure coverage for such "covered location" pursuant to this Policy.

### L. Lead-Based Paint

"Loss" arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs" , or any associated "extra damages" or "legal defense expenses", arising out of lead-based paint discovered in soil or groundwater; and

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of lead-based paint discovered in soil or groundwater.

### M. Material Change in Risk

"Loss" arising out of or related to a change in the use or operations at a "covered location" that materially increases the likelihood or severity of a "pollution condition", "indoor environmental condition", "claim" or "first-party claim" from the intended uses or operations identified:

**1.** By the "first named insured" for the Insurer in an Application or supplemental underwriting materials provided prior to the effective date of coverage for such "covered location", if any; or

**2.** Solely with respect to "covered locations" added to the Policy pursuant to an Automatic Acquisition and Due Diligence Endorsement attached to this Policy, if any, as part of the due diligence materials and supplemental underwriting materials provided to the Insurer as part of the notice required pursuant to that endorsement, if any.

This exclusion shall only apply to the "covered location" associated with the change in use or operations and shall not limit coverage for other "covered locations" to which this insurance applies.

### N. Non-Owned Disposal Sites

"Loss" arising out of or related to "pollution conditions" on, at, under or migrating from any treatment, storage, disposal, transfer or recycling site or facility that is not a "non-owned disposal site".

### O. Underground Storage Tanks

"Loss" arising out of or related to "pollution conditions" emanating from an "underground storage tank" located at a "covered location", when the existence of such "underground storage tank" was known to a "responsible person":

**1.** Prior to the "policy period"; or,

**2.** Solely with respect to "underground storage tanks" situated at "covered locations" added to this Policy during the "policy period", prior to the effective date of coverage for such "covered location".

This exclusion shall not apply to any "underground storage tank" that:



**Premises Pollution Liability
Insurance Policy**

    **1.** Is identified on the Schedule of Underground Storage Tanks Endorsement or Schedule of Covered Storage Tanks (Financial Responsibility) Endorsement attached to this Policy, if any; or

    **2.** Has been removed or closed-in-place prior to the inception date of this Policy and such removal or closure was conducted in accordance with "environmental law".

**P. Vehicle Damage**

"Claims" or associated "legal defense expense" for "property damage" to any automobile, aircraft, watercraft, railcar or other conveyance utilized for "transportation".

**Q. War or Terrorism**

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" attributable, whether directly or indirectly, to any acts that involve, or that involve preparation for, "war" or "terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**R. Workers' Compensation**

"Loss" arising out of or related to any obligation of any "insured" pursuant to the Jones Act or any workers' compensation, unemployment compensation, or disability benefits law or related laws.

## VII. REPORTING AND COOPERATION

**A.** Without limiting the specific requirements contained in any Insuring Agreement or any other exposure-specific reporting requirements contained within this Policy, the "insured" shall also see to it that the Insurer receives notice of any "claim" or "first-party claim", as soon as practicable, by one or more of the following:

    **1.** Provide written notice to the address, fax number, or email address identified in Item **8.a.** of the Declarations to this Policy; or

    **2.** Provide verbal or electronic notice utilizing the **Environmental Incident Alert 24-hour Emergency Response and Incident Reporting System** by calling the telephone number identified in Item **8.** of the Declarations to this Policy or by using the associated telephone web application, respectively.

Such notice should include reasonably detailed information as to:

    **1.** The identity of the "insured", including contact information for an appropriate person to contact regarding the handling of the "claim" or "first-party claim";

    **2.** The identity of the "covered location";

    **3.** The nature of the "claim" or "first-party claim"; and

    **4.** Any steps undertaken by the "insured" to respond to the "claim" or "first-party claim".

**B.** The "insured" must:

    **1.** As soon as practicable, send the Insurer copies of any demands, notices, summonses or legal papers received in connection with any "claim";

    **2.** Authorize the Insurer to obtain records and other information;

    **3.** Cooperate with the Insurer in the investigation, settlement or defense of the "claim";

    **4.** Assist the Insurer, upon the Insurer's request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of "loss" to which this Policy may apply; and

    **5.** Provide the Insurer with such information and cooperation as it may reasonably require.

**C.** No "insured" shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any "claim", without the written consent of the Insurer.  Nor shall any "insured" retain any consultants or



**Premises Pollution Liability
Insurance Policy**

"catastrophe management firms", or incur any "first-party remediation costs" or "catastrophe management costs" with respect to a "first-party claim", without the prior consent of the Insurer, except for "emergency response costs".

**D.** Upon the discovery of a "pollution condition" or "indoor environmental condition", the "insured" shall make every attempt to mitigate any loss and comply with applicable "environmental law". The Insurer shall have the right, but not the duty, to mitigate such "pollution conditions" or "indoor environmental condition" if, in the sole judgment of the Insurer, the "insured" fails to take reasonable steps to do so. In that event, any "remediation costs" or "catastrophe management costs" incurred by the Insurer shall be deemed incurred by the "insured", and shall be subject to the "self-insured retention" and Limits of Liability identified in the Declarations to this Policy.

For the purposes of fulfilling the notice requirements contained in the Insuring Agreements to this Policy, notice supplied pursuant to one or more of the verbal or electronic notice mechanisms specifically contemplated in Subsection **A.**, above, or on the Declarations, shall constitute written notice to the Insurer.

## VIII. EXTENDED REPORTING PERIOD

**A.** Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall be entitled to a basic "extended reporting period", and may purchase an optional supplemental "extended reporting period", following Cancellation, as described in Subsection **A.**, Paragraph **1.** of Section **IX., GENERAL CONDITIONS**, or nonrenewal of this Policy, in accordance with the terms and conditions described in Subsections **B.** through **D.**, below.

**B.** "Extended reporting periods" shall not reinstate or increase any of the Limits of Liability. "Extended reporting periods" shall not extend the "policy period" or change the scope of coverage provided. A "claim" first made against an "insured" and reported to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, shall be deemed to have been made and reported on the last day of the "policy period". In addition, if an "insured" first discovers a "pollution condition" or "indoor environmental condition" during the "policy period" and reports such "first-party claim" to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, then such "first-party claim" shall also be deemed to have been first discovered and reported on the last day of the "policy period".

**C.** The "first named insured" shall have a ninety (90) day basic "extended reporting period" without additional charge.

**D.** The "first named insured" shall also be entitled to purchase a supplemental "extended reporting period" of up to thirty-three (33) months for not more than two hundred percent (200%) of the full premium identified in Item **6.** of the Declarations to this Policy, and any additional premiums resulting from coverage added during the "policy period". Such supplemental "extended reporting period" starts when the basic "extended reporting period" ends. The Insurer shall issue an endorsement providing a supplemental "extended reporting period" provided that the "first named insured":

**1.** Makes a written request, to the address identified in Item **8.b.** of the Declarations to this Policy, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

**2.** Pays the additional premium when due. If that additional premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

## IX. GENERAL CONDITIONS

### A. Cancellation

**1.** This Policy may be cancelled only by the "first named insured", or through the "first named insured's" agent, by mailing to the Insurer at the address identified in Item **8.b.** of the Declarations to this Policy, written notice stating when such cancellation shall be effective.

**2.** This Policy may be cancelled by the Insurer for the following reasons:

**a.** Non-payment of premium; or



**Premises Pollution Liability
Insurance Policy**

**b.** Fraud or material misrepresentation on the part of any "insured",

by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than sixty (60) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation. This exception shall not apply to any "insured" that is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured".

**3.** In the event of cancellation, the premium percentage identified in Item **6.** of the Declarations to this Policy shall be the minimum-earned premium upon the inception date of this Policy. Thereafter, the remaining unearned premium, if any, shall be deemed earned by the Insurer on a *pro rata* basis over the remainder of the "policy period". Any unearned premium amounts due the "first named insured" upon cancellation of this Policy shall be calculated on a *pro rata* basis and refunded within thirty (30) days of the effective date of cancellation.

## B.  Inspection and Audit

To the extent of the "insured's" ability to provide such access, and with reasonable notice to the "insured", the Insurer shall be permitted, but not obligated, to inspect and sample the "covered locations". The "insured" shall have the concurrent right to collect split samples. Neither the Insurer's right to make inspections, the making of said inspections, nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the "insured" or others, to determine or warrant that such property or operations are safe or in compliance with "environmental law", or any other law.

The Insurer may examine and audit the "insured's" books and records during this "policy period" and extensions thereof and within three (3) years after the final termination of this Policy.

## C.  Legal Action Against the Insurer

No person or organization other than an "insured" has a right pursuant to this Policy:

**1.** To join the Insurer as a party or otherwise bring the Insurer into a suit against any "insured"; or

**2.** To sue the Insurer in connection with this insurance unless all of the Policy terms have been fully complied with.

A person or organization may sue the Insurer to recover after an agreed settlement or on a final judgment against an "insured". However, the Insurer shall not be liable for amounts that are not payable pursuant to the terms of this Policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by the Insurer, the "insured", and the claimant or the claimant's legal representative.

## D.  Bankruptcy

The insolvency or bankruptcy of any "insured", or any "insured's" estate, shall not relieve the Insurer of its obligations pursuant to this Policy. However, any such insolvency or bankruptcy of the "insured", or the "insured's" estate, shall not relieve the "insured" of its "self-insured retention" or deductible period obligations pursuant to this Policy. This insurance shall not replace any other insurance to which this Policy is excess, nor shall this Policy drop down to be primary, in the event of the insolvency or bankruptcy of any underlying insurer.

## E.  Subrogation

In the event of any payment pursuant to this Policy by the Insurer, the Insurer shall be subrogated to all of the rights of recovery against any person or organization, and the "insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. All "insureds" shall do nothing to prejudice such rights. Any recovery as a result of subrogation proceedings arising pursuant to this Policy shall accrue first to the "insureds" to the extent of any payments in excess of the limit of coverage; then to the Insurer to the extent of its payment pursuant to the Policy; and then to the "insured"



**Premises Pollution Liability
Insurance Policy**

to the extent of the "self-insured retention".  Expenses incurred in such subrogation proceedings shall be apportioned among the interested parties in the recovery in the proportion that each interested party's share in the recovery bears to the total recovery.

## F.   Representations

By accepting this Policy, the "first named insured" agrees that:

**1.**   The statements in the Declarations, schedules and endorsements to, and Application for, this Policy are accurate and complete;

**2.**   Those statements and representations constitute warranties that the "first named insured" made to the Insurer; and

**3.**   This Policy has been issued in reliance upon the "first named insured's" warranties.

## G.   Separation of Insureds

Except with respect to the Limits of Liability, Cancellation condition **2.a.**, and any applicable exclusions, this Policy applies:

**1.**   As if each "named insured" were the only "insured"; and

**2.**   Separately to each "named insured" against whom a "claim" is made,

and any fraud, misrepresentation, breach of a condition or violation of any duty (hereinafter Breach) by an "insured" shall not prejudice coverage for any "named insured" pursuant to this Policy, provided that: **1)** such "named insured' did not participate in, know of or assist in such Breach; and **2)** such "named insured" is not a parent, subsidiary, partner, member, director, officer of, employer of or otherwise affiliated with, the "insured" that committed such Breach.

## H.   Other Insurance

If other valid and collectible insurance is available to any "insured" covering "loss" also covered by this Policy, other than a policy that is specifically written to apply in excess of this Policy, the insurance afforded by this Policy shall apply in excess of and shall not contribute with such other insurance.

## I.   Changes and Assignment

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the Insurer from asserting any right pursuant to the terms of this Policy. The terms, definitions, conditions, exclusions and limitations of this Policy shall not be waived or changed, and no assignment of any interest in this Policy shall bind the Insurer, except as provided by endorsement and attached to this Policy.

## J.   Headings

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

## K.   Consent

Where the consent of the Insurer, or an "insured", is required pursuant to this Policy, such consent shall not be unreasonably withheld, delayed, conditioned, or denied.

## SCHEDULE OF NAMED INSUREDS ENDORSEMENT

| Named Insured<br>Aluminum Shapes, LLC | | | Endorsement Number<br>001 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G24870388 014 | Policy Period<br>05/01/2021  to  05/01/2022 | Effective Date of Endorsement<br>05/01/2021 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The persons or entities identified in the Schedule of Named Insureds, below, are "named insureds" pursuant to this Policy.

### Schedule of Named Insureds

1. Shapes/ Arch Holdings, LLC
2. Shapes, LLC
3. Delair, LLC
4. Shapes Realty New Jersey, LLC
5. Delair Aluminum, LLC
6. Arch Acquisition Holdings, Inc.
7. Aluminum Acquisition Holdings, LLC

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-32460 (11/10)                                                                                     Page 1 of 1

## ASBESTOS AND/OR LEAD-BASED PAINT COVERAGE (INADVERTENT DISTURBANCE) ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| Aluminum Shapes, LLC | 002 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Solely to the extent that there is an **X** indicated in either Section **I.** or Section **II.** of this Endorsement, below, the "insured" and the Insurer hereby agree to the following corresponding changes to this Policy:

**I.** ☒ Section **VI., EXCLUSIONS,** Subsection **A., Asbestos**, of this Policy is hereby deleted in its entirety and replaced with the following:

   **A. Asbestos**

   "Loss" arising out of or related to asbestos or asbestos-containing materials.

   This exclusion shall not apply to:

   **1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

   **2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater;

   **3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

   **4.** "First-party remediation costs" and "emergency response costs", arising out of asbestos or asbestos-containing material, provided such "remediation costs" are the result of a "pollution condition" that:

      **a.** First commence, in their entirety, during the "policy period" or within <u>six</u> (6) calendar days preceding the "policy period";

      **b.** Do not arise out of or relate to any "pollution conditions" which existed, in whole or in part, prior to 05/01/2018 ;

      **c.** Are unintended and unexpected from the standpoint of the "insured";

      **d.** Are sudden, direct, and immediate;

      **e.** Are first discovered by the "insured" within <u>seven</u> (7) calendar days of commencement and during the "policy period"; and

      **f.** Are reported to the Insurer within <u>twenty-one</u> (21) calendar days following the discovery of such "pollution conditions" by the "insured".

   <u>Notwithstanding any reporting obligations contained in Section **I., INSURING AGREEMENTS**, or Section **VII., REPORTING AND COOPERATION**, of this Policy, generally, it is a condition precedent to coverage pursuant to this Exception **4.** that the "insured" also provide conclusive documentation of strict compliance with requirements **a.** through **f.,**</u>

<u>above, regardless of whether the Insurer was prejudiced by the failure to meet these requirements.</u>

Notwithstanding anything stated in this Exception **4.**, above, coverage is not afforded pursuant to this Policy for any "first-party remediation costs" arising out of or related to asbestos or asbestos-containing material abatement, removal, or disposal, resulting from, in whole or in part, the maintenance, renovation, or physical improvement of a "covered location" where asbestos or asbestos-containing material was known to be present by a "responsible person".

**II.** ☒ Section **VI.**, **EXCLUSIONS**, Subsection **L.**, **Lead-Based Paint**, of this Policy is hereby deleted in its entirety and replaced with the following:

**L. Lead-Based Paint**

"Loss" arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of lead-based paint materials discovered in soil or groundwater;

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of lead-based paint discovered in soil or groundwater; and

**4.** "First-party remediation costs" and "emergency response costs", arising out of lead-based paint, provided such "remediation costs" are the result of a "pollution condition" that:

    **a.** First commence, in their entirety, during the "policy period" or within <u>six</u> (6) calendar days preceding the "policy period";

    **b.** Do not arise out of or relate to any "pollution conditions" which existed, in whole or in part, prior to 05/01/2018 ;

    **c.** Are unintended and unexpected from the standpoint of the "insured";

    **d.** Are sudden, direct, and immediate;

    **e.** Are first discovered by the "insured" within <u>seven</u> (7) calendar days of commencement and during the "policy period"; and

    **f.** Are reported to the Insurer within <u>twenty-one</u> (21) calendar days following the discovery of such "pollution conditions" by the "insured".

    <u>Notwithstanding any reporting obligations contained in Section **I.**, **INSURING AGREEMENTS**, or Section **VII.**, **REPORTING AND COOPERATION**, of this Policy, generally, it is a condition precedent to coverage pursuant to this Exception **4.** that the "insured" also provide conclusive documentation of strict compliance with requirements **a.** through **f.**, above, regardless of whether the Insurer was prejudiced by the failure to meet these requirements.</u>

Notwithstanding anything stated in this Exception **4.**, above, coverage is not afforded pursuant to this Policy for any "first-party remediation costs" arising out of or related to lead-based paint abatement, removal, or disposal, resulting from, in whole or in part, the maintenance, renovation, or physical improvement of a "covered location" where lead-based paint was known to be present by a "responsible person".

**III.** <u>Sublimits of Liability</u> ( ☒ Not applicable if **X** indicated herein)

    **Per Asbestos/Lead Condition Sublimit of Liability: $**

    **Aggregate Asbestos/Lead Conditions Sublimit of Liability:  $**

    The amount that the Insurer shall pay pursuant to this Policy for the coverage afforded pursuant to Exception **4.**, of each exclusion above (as applicable) is subject to the Per Asbestos/Lead Condition Sublimit of Liability and Aggregate Asbestos/Lead Conditions Sublimit of Liability identified above.  These Sublimits of Liability shall be subject to, and payments made within these Sublimits of Liability shall erode, the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto.  Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Limit or Sublimit of Liability.

All other terms and conditions of this Policy remain unchanged.

 

_____
                                              Authorized Representative

## OTHER INSURANCE (PRIMARY) ENDORSEMENT

| Named Insured<br>Aluminum Shapes, LLC | | | Endorsement Number<br>003 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G24870388 014 | Policy Period<br>05/01/2021  to  05/01/2022 | Effective Date of Endorsement<br>05/01/2021 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **H.**, **Other Insurance**, of this Policy is hereby deleted in its entirety and replaced with the following:

**H.  Other Insurance**

If other valid and collectible insurance is available to the "insured" covering any exposure also covered by this Policy, the insurance afforded by this Policy shall apply as primary insurance.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## PREMIUM EARN-OUT (STAGGERED – ONE YEAR – ACCELERATION) ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| Aluminum Shapes, LLC | 004 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX., GENERAL CONDITIONS,** Subsection **A., Cancellation,** Paragraph **3.,** of this Policy is hereby deleted in its entirety and replaced with the following:

**3.** Premium Earn-Out

    **a.** Subject to Subparagraph **b.**, below, in the event of cancellation, twenty-five percent (25 %) of the premium identified in Item **6.** of the Declarations shall be minimum earned upon the inception date identified in Item **2.** of the Declarations. Thereafter, the remaining premium shall be deemed earned by the Insurer on a *pro rata* basis over the first year of the "policy period".

    **b.** In the event a "claim" is first made against an "insured", or a "pollution condition" or "indoor environmental condition" is first discovered by an "insured", during the "policy period", to which this insurance may apply, in whole or in part, the premium identified in Item **6.** of the Declarations shall be immediately deemed one hundred percent (100%) earned upon such event.

    Subject to the foregoing, any unearned premium amounts due the "first named insured", if any, shall be refunded within thirty (30) days of the effective date of cancellation.

All other terms and conditions of this Policy remain unchanged.

_____
                           Authorized Representative

## WAIVER OF SUBROGATION (BY CONTRACT) ENDORSEMENT

| Named Insured<br>Aluminum Shapes, LLC | | | Endorsement Number<br>005 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G24870388 014 | Policy Period<br>05/01/2021  to  05/01/2022 | Effective Date of Endorsement<br>05/01/2021 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **E.**, **Subrogation**, of this Policy is hereby amended by addition of the following:

Notwithstanding the foregoing, the Insurer hereby waives its rights to subrogate against all counterparties of a "named insured" where such waiver is required by written contract executed between a "named insured" and such counterparty prior to the relevant "claim" or discovery of a "pollution condition" or "indoor environmental condition" to which this insurance applies.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

PF-44999 (09/14)                                                                                                    Page 1 of 1



## EXPOSURE-SPECIFIC DEDICATED LIMITS FOR FINANCIAL RESPONSIBILITY
### (New Jersey Spill Act - Via General Aggregate Limit - Annual) ENDORSEMENT

| Named Insured<br>Aluminum Shapes, LLC | | | Endorsement Number<br>006 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G24870388 014 | Policy Period<br>05/01/2021  to  05/01/2022 | Effective Date of Endorsement<br>05/01/2021 |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

*Solely with respect to coverage for "pollution conditions" related to a specific regulated New Jersey Spill Act facility situated at a "covered location" for which the Insurer has issued a NJ Spill Act Certificate of Liability Insurance identifying this Policy (hereinafter Spill Act Facility),* the "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.  *Non- Financial Responsibility Aggregate Sublimit of Liability: $2,000,000***

Notwithstanding anything identified in the Declarations of this Policy, or Section **II., LIMITS OF LIABILITY AND SELF INSURED-RETENTION,** of this Policy to the contrary, the Non-Financial Responsibility Aggregate Sublimit of Liability, above, shall be the most the Insurer shall pay for any and all "loss", or any other amounts or payments of any kind or category, which are paid for all risk exposures covered pursuant to this Policy, <u>except for indemnity payments made specifically for: **1)** "first-party remediation costs"; and **2)** monetary judgments, awards or settlements of compensatory damages arising from "remediation costs", including associated "extra damages", which arise out of "pollution conditions" on, at, under or migrating from a Spill Act Facility pursuant to the state financial responsibility program for which the Insurer has issued a NJ Spill Act Certificate of Liability Insurance identifying this Policy (hereinafter Financial Responsibility Requirements).</u> Moreover, this Non-Financial Responsibility Aggregate Sublimit of Liability shall also be the most that the Insurer will pay for "legal defense expense" for risk exposures within the Financial Responsibility Requirements. This Non-Financial Responsibility Aggregate Sublimit of Liability is subject to, and payments made within this Sublimit of Liability shall erode, the Limits of Liability identified in Item 3. of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto. Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Limit or Sublimit of Liability.

**II.**  <u>Effectively Dedicated Aggregate Sublimit for the Spill Act Facility</u>

For the purposes of further clarity, the Insurer and the "insured" agree that the aforementioned Non-Financial Responsibility Aggregate Sublimit of Liability has been specifically instituted in order to effectively dedicate **$2,000,000** exclusively for indemnity payments for risk exposures within the Financial Responsibility Requirements. Subject to the excess indemnity payments specifically contemplated in Section **IV.** of this Endorsement, below, this Effectively Dedicated Aggregate Sublimit for the Spill Act Facility shall be the most that the Insurer shall pay for risk exposures within the Financial Responsibility Requirements arising out of all "pollution conditions" on, at under or migrating from the Spill Act Facility.

**III.**  <u>Dedicated Per Pollution Condition Sublimit for the Spill Act Facility</u>

The "insureds" and the Insurer also agree that this Policy contains a Dedicated Per Pollution Condition Sublimit for the Spill Act Facility in the amount of **$1,000,000**, which, subject to the excess indemnity payments specifically contemplated in Section **IV.** of this Endorsement, below, shall be the most that the Insurer shall pay for risk exposures within the Financial Responsibility Requirements arising out of the same, continuous, repeated or related "pollution condition" on, at, under or migrating from a Spill Act Facility.

**IV.** **Exhaustion of Dedicated Sublimits for the Spill Act Facility (Excess Payments Erosion of Remaining Limits)**

Once the Dedicated Per Pollution Condition Sublimit for the Spill Act Facility in Section **III.** of this Endorsement, above, or the Effectively Dedicated Aggregate Sublimit for the Spill Act Facility identified in Section **II.** of this Endorsement, above, have been exhausted with respect to indemnity payments made for risk exposures within the Financial Responsibility Requirements, then any additional indemnity payments shall begin to erode the amounts identified in the *Non-Financial Responsibility Aggregate Sublimit of Liability*, above, and shall continue to be subject to, and shall erode, the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto.

**V.**   All references to the phrase "self-insured retention" within this Policy that are not otherwise     specifically modified within this Endorsement are hereby changed to the word *deductible*.

**VI.**  Section **II., LIMITS OF LIABILITY AND SELF-INSURED RETENTION,** Subsection **A.,** of this Policy is hereby deleted in its entirety and replaced with the following:

   **A.**   The Insurer's obligation to pay for risk exposures within the Financial Responsibility Requirements to which this insurance applies shall be reduced by the deductible amount identified in the Exposure–Specific Dedicated Limits for Financial Responsibility (NJ Spill Act - Via General Aggregate Sublimit – Annual) Endorsement attached to this Policy. The Insurer may, at its sole discretion, pay all or part of the deductible amount to effect settlement of any "claim" involving risk exposures within the Financial Responsibility Requirements. Upon notification of the Insurer's payment of such deductible amount, the "first named insured" shall reimburse the Insurer for the deductible amount that the Insurer has paid on its behalf within thirty (30) calendar days.

**VII.** Section **VIII., EXTENDED REPORTING PERIOD,** Subsections **C.** and **D.,** of this Policy are hereby deleted in their entirety and replaced with the following:

   **C.**   Provided the "first named insured" has not purchased any other insurance to replace this Policy that has corresponding retroactive dates that are equal to or more generous that the retroactive dates contained within this Policy, the "first named insured" shall have a six (6) month basic "extended reporting period" without additional charge.

   **D.**   Provided the "first named insured" has not purchased any other insurance to replace this Policy that has corresponding retroactive dates that are equal to or more generous that the retroactive dates contained within this Policy, the "first named insured" shall also be entitled to purchase a supplemental "extended reporting period" of up to thirty (30) months for not more than two hundred percent (200%) of the full premium identified in Item 6. of the Declarations to this Policy, and any additional premiums resulting from coverage added during the "policy period". Such supplemental "extended reporting period" starts when the basic "extended reporting period" ends. The Insurer shall issue an endorsement providing a supplemental "extended reporting period" provided that the "first named insured":

   **1.**   Makes a written request, to the address identified in Item **8.b.** of the Declarations to this Policy, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

   **2.**   Pays the additional premium when due. If that additional premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

**VIII.** Section **IX., GENERAL CONDITIONS,** Subsection **A., Cancellation.,** of this Policy, is hereby deleted in its entirety and replaced with the following:

   **A. Cancellation and Non-Renewal**

      **1.**   This Policy may be cancelled only by the "first named insured", or through the "first named insured's"

agent, by mailing to the Insurer at the address identified in Item **8.b.** of the Declarations to this Policy, written notice stating when such cancellation shall be effective.

**2.** This Policy may be cancelled by the Insurer for the following reasons:

    **a.** Non-payment of premium; or

    **b.** Fraud or material misrepresentation on the part of any "insured",

**3.** In the event of cancellation, the premium percentage identified in Item **6.** of the Declarations to this Policy shall be the minimum-earned premium upon the inception date identified in Item **2.** of the Declarations to this Policy. Thereafter, the remaining unearned premium, if any, shall be deemed earned by the Insurer on a *pro rata* basis over the remainder of the "policy period". Any unearned premium amounts due the "first named insured" upon cancellation of this Policy shall be calculated on a *pro rata* basis and refunded within thirty (30) days of the effective date of cancellation.

**4.** <u>Non-Renewal</u>
This Policy may be non-renewed by the Insurer for any reason by mailing to the "first named insured" at the "first named insured's" last known address, and **NJDEP**, written notice confirming non-renewal, which is received by the "first named insured" and **NJDEP** at least sixty (60) days prior to the policy expiration date in Item **2.** of this Policy. The mailing of notice by certified mail shall be sufficient proof of notice.

**IX.** Section **IX., GENERAL CONDITIONS,** Subsection **D., Bankruptcy,** of this Policy is hereby deleted in its entirety and replaced with the following:

    **D. Bankruptcy**

The insolvency or bankruptcy of any "insured" or any "insured's" estate shall not relieve the Insurer of its obligations pursuant to this Policy. This insurance shall not replace any other insurance to which this Policy is excess, nor shall this Policy drop down to be primary, in the event of the insolvency or bankruptcy of any underlying insurer.

**X.** Section **IX., GENERAL CONDITONS,** of this Policy is hereby amended by addition of the following:
    **Financial Responsibility Coverage Scope**

The "insureds" and the Insurer acknowledge that this Policy has been issued to, in part, secure the "insured's" compliance with Financial Responsibility Requirements. Regardless of any provisions contained in this Policy that might otherwise be interpreted to the contrary, the coverage for which Limits of Insurance are dedicated pursuant to this Endorsement shall be no broader than that required by Financial Responsibility Requirements and associated implementing regulations reflected in the accompanying Certificate(s) of Insurance issued in conjunction with this Policy. Thus, dedicated coverage provided pursuant to this Policy is expressly limited to that which is required pursuant to those statutes and/or regulations. This limitation shall not apply to "legal defense expenses" necessarily incurred to respond to "claims" or "first-party claims" covered pursuant to this Policy.

Notwithstanding the fact that this Policy is issued to secure the "insureds'" compliance with Financial Responsibility Requirements, the "insured" agrees to reimburse the Insurer for any

payment made by the Insurer on behalf of the "insured", which the Insurer would not have been obligated to make pursuant to the terms of this Policy but for the Insurer's issuance of any accompanying Certificate(s) of Insurance evidencing that this Policy satisfies Financial Responsibility Requirements.

    **Direct Action Litigation**

In the event a direct legal action is taken by a third-party against the Insurer related to a "claim" that is, or may be afforded coverage pursuant to this Policy, the Insurer shall

provide prompt notice to the "first named insured" of such action. Costs incurred to defend the Insurer and the payment of any such "claims" against the Insurer shall be subject to the deductible and shall erode the Limits of Liability. If any applicable Limit of Liability is exhausted, the "first named insured" shall assume the defense of the Insurer and such costs shall be borne by the "first named insured". The Insurer maintains the right to retain independent counsel; however, if the Insurer elects to retain independent counsel, the Insurer shall provide the "first named insured" with copies of estimated defense costs, prior to such costs being incurred, and all invoices received by the Insurer, related to such defense.

**XI.**   Cancellation

The "insured" and the Insurer acknowledge that collateral may be required to secure the "first named insured's" reimbursement obligations identified in Sections **VI.** and **X.** of this Endorsement, above. In the event that collateral is required from the "first named insured", and notwithstanding anything in Section **IX., GENERAL CONDITIONS**, Subsection **A., Cancellation**, of this Policy, the Insurer may also cancel this Policy if the "first named insured" fails to meet any such collateral obligations, which may be specified pursuant to a separate agreement.

**XII.**   Deductible

Notwithstanding anything identified in Item **4.** of the Declarations of this Policy, or any Aggregated Self- Insured Retention Endorsement attached to this Policy, if any, **$25,000** shall be the deductible applicable to each "pollution condition" related to the Financial Responsibility Requirements to which this Endorsement applies.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative



## COMMUNICABLE, INFECTIOUS OR CONTAGIOUS DISEASES EXCLUSIONARY ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| Aluminum Shapes, LLC | 007 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI., EXCLUSIONS,** of this Policy is hereby amended by addition of the following:

**Communicable, Infectious or Contagious Diseases**

"Loss" arising out of or related to any communicable, infectious or contagious disease, including, but not limited to, any disease caused by, in whole or in part, bacteria, viruses, microorganisms, pathogens or prions (hereinafter Microbial Matter), whether deemed living or not.

This exclusion applies regardless of the means of transmission of such Microbial Matter, whether direct or indirect, including, but not limited to, airborne transmission, bodily fluid or discharge transmission, or transmission from or to any surface, object, solid, liquid or gas, or between or among humans and other organisms.

This exclusion shall not apply to any such disease exclusively caused by "fungi" or *legionella pneumophilia*.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative



## NON-FINANCIAL RESPONSIBILITY CONDITION SUBLIMIT (PER) ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| Aluminum Shapes, LLC | 008 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

### Per Non-FR Condition Sublimit of Liability: $1,000,000

The amount that the Insurer shall pay pursuant to this Policy for "loss" arising out of or related to:

1. "Indoor environmental conditions" at a "covered location";

2. "Pollution conditions" resulting from "transportation"; or

3. "Pollution conditions" on, at, under or migrating from a "non-owned disposal site"

(collectively Non-FR Conditions), is subject to the Per Non-FR Condition Sublimit of Liability identified above. Therefore, the Per Non-FR Condition Sublimit of Liability, above, shall be the maximum amount the Insurer shall pay for all "loss" arising out of or related to the same, continuous, repeated, or related Non-FR Condition to which this insurance applies. This Sublimit of Liability is subject to, and payments made within this Sublimit of Liability shall erode, the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto, including, but not limited to, the *Non-Financial Responsibility Aggregate Sublimit of Liability*. Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Limit or Sublimit of Liability.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



## NON-FINANCIAL RESPONSIBILITY EXPOSURES LIMITATION (PRE-EXISTING CONDITIONS) ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| Aluminum Shapes, LLC | 009 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI., EXCLUSIONS**, of this Policy is amended by addition of the following:

**Pre-Existing Non-Financial Responsibility Exposures**

1. Monetary judgments, awards or settlements of compensatory damages for "bodily injury" or "property damage", including associated "extra damages" or "legal defense expense";

    2. "Business interruption loss"; and

    3. "Catastrophe management costs",

arising out of or related to a "pollution condition" on, at, under or migrating from or onto a "covered location", provided that such "pollution condition" first commenced, in whole or in part, prior to **5/1/2018**.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Aluminum Shapes, LLC | | | 010 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative

## NEW JERSEY CHANGES - CANCELLATION AND NONRENEWAL

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Aluminum Shapes, LLC | | | 011 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021  to  05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

If the policy or coverage part to which this endorsement applies contains cancellation or nonrenewal provisions more favorable to the Named Insured than this endorsement, then those provisions apply.

**Any cancellation or non-renewal provisions contained in the policy to which this endorsement is attached are deleted and replaced by the following:**

**I.** Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The under- writing reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the in- surer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

### A. CANCELLATION

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first Named Insured and any person entitled to notice under this policy written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium; or

**(2)** Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f) as follows:

**(a)** "The risk, danger or probability that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds.  Any change in the circumstances of an insured that will increase the probability of such a destruction may be considered a 'moral hazard'; and

**(b)** The substantial risk, danger or probability that the character, circumstances or personal habits of the insured may increase the possibility of loss or liability for which an insurer will be held responsible. Any change in the character or circumstances of an individual, corporate, partnership or other insured that will increase the probability of such a loss or liability may be considered a 'moral hazard.'"

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation.  The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due.  If the first Named Insured cancels, the refund may be less than pro rata.  The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

LD-2S76 (03/92)                                                                                          Page 1 of 3

**7.** Cancellation of Policies in Effect For 60 Days or More.

    **a.** If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

        **(1)** Nonpayment of premium;

        **(2)** Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f);

        **(3)** Material misrepresentation or nondisclosure to us of a material fact at the time of acceptance of the risk;

        **(4)** Increased hazard or material change in the risk assumed which we could not have reasonably contemplated at the time of assumption of the risk;

        **(5)** Substantial breaches of contractual duties, conditions or warranties that materially affect the nature and/or insurability of the risk;

        **(6)** Lack of cooperation from the insured on loss control matters materially affecting insurability of the risk;

        **(7)** Fraudulent acts against us by the insured or its representative that materially affect the nature of the risk insured;

        **(8)** Loss of or reduction in available insurance capacity;

        **(9)** Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract or any subsequent renewal;

        **(10)** Loss of or substantial changes in applicable reinsurance;

        **(11)** Failure by the insured to comply with any Federal, State or local fire, health, safety or building or construction regulation, law or ordinance with respect to an insured risk which substantially increases any hazard insured against within 60 days of written notification of a violation of any such law, regulation or ordinance;

        **(12)** Failure by the insured to provide reasonable and necessary underwriting information to us upon written request therefor and a reasonable opportunity to respond;

        **(13)** Agency termination, provided:

            **a.** We document that replacement coverage at comparable rates and terms has been provided to the first Named Insured, and we have informed the first Named Insured, in writing, of the right to continue coverage with us; or

            **b.** We have informed the first Named Insured, in writing, of the right to continue coverage with us and the first Named Insured has agreed, in writing, to the cancellation or nonrenewal based on the termination of the first Named Insured's appointed agent.

        **(14)** Any other reasons in accordance with our underwriting guidelines for cancellation of commercial lines coverage.

    **b.** If we cancel this policy based on paragraph 7.a.(1) or (2) above, we will mail a written notice, stating the reason for cancellation, to the first Named Insured and any person entitled to notice under this policy, at least 10 days before the effective date of cancellation. For cancellation due to the nonpayment of premium, the notice will state the effect of nonpayment by the due date.  Cancellation for nonpayment of premium will not be effective if payment of the amount due is made before the effective date set forth in the notice. If we cancel this policy for any other reason listed above, we will mail a written notice, stating the reason for cancellation, to the first Named Insured and any person entitled to notice under this policy, not more than 120 days nor less than 30 days before the effective date of such cancellation.

    **c.** Notice will be sent to the last mailing addresses known to us, by:

        **(1)** Certified mail; or

        **(2)** First class mail, if we have obtained from the post office a date stamped proof of mailing showing names and addresses.

**d.** We need not send notice of cancellation if you have:

    **(1)** Replaced coverage elsewhere; or

    **(2)** Specifically requested termination.

## B. NONRENEWAL

**1.** We may elect not to renew this policy for any reason permitted to cancel it. If we elect not to renew this policy, we will mail a notice of nonrenewal, stating the reasons for nonrenewal, to the first Named Insured at least 30 days but not more than 120 days before the expiration date of this policy. If this policy does not have a fixed expiration date, it shall be deemed to expire annually on the anniversary of its inception.

**2.** This notice will be sent to the first Named insured at the last mailing address known to us by:

    **a.** Certified mail; or

    **b.** First class mail, if we have obtained from the post office a date stamped proof of mailing showing the first Named Insured's name and address.

**3.** We need not mail or deliver this notice if you have:

    **a.** Replaced coverage elsewhere; or

    **b.** Specifically requested termination.

_____
Authorized Agent



# SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Aluminum Shapes, LLC | | | 012 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G24870388 014 | 05/01/2021 to 05/01/2022 | 05/01/2021 |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

THE ONLY COMPANY APPLICABLE TO THIS POLICY IS THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**BANKERS STANDARD INSURANCE COMPANY** (A stock company)
**ACE AMERICAN INSURANCE COMPANY** (A stock company)
**ACE PROPERTY AND CASUALTY INSURANCE COMPANY** (A stock company)
**INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**PACIFIC EMPLOYERS INSURANCE COMPANY** (A stock company)
**ACE FIRE UNDERWRITERS INSURANCE COMPANY** (A stock company)
**WESTCHESTER FIRE INSURANCE COMPANY** (A stock company)

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President



| ACE American Insurance Company |
|---|
| Insurance Company |
| Aluminum Shapes, LLC |
| Policyholder |
| PPL G24870388 014 |
| Policy Number |
| Conner Strong & Buckelew Companies Llc |
| Broker/Producer |

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY YOUR POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 80% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM THAT WOULD BE CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.**

**YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.**

You elected **NOT** to purchase terrorism coverage under the Act at the price indicated. ACCORDINGLY, WE WILL **NOT** PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of $1,044 , however you elected to decline such coverage.



## Chubb Producer Compensation
## Practices & Policies

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.