**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

*Caption in Compliance with D.N.J. LBR 9004-1(b)*
**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
(pro hac vice pending)
Turner Falk, Esquire
1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
Telephone: (856) 795-3300
Facsimile: (856) 482-0504
E-mail:   edmond.george@obermayer.com
          michael.vagnoni@obermayer.com
          turner.falk@obermayer.com

Proposed Counsel to the Debtor
and Debtor in Possession

| | |
|---|---|
| In re:<br><br>ALUMINUM SHAPES, L.L.C.,<br><br>           Debtor. | Chapter 11<br><br>Case No. 21- _____ - (   ) |

**COMBINED MOTION OF ALUMINUM SHAPES, L.L.C. FOR THE ENTRY
OF AN ORDER GRANTING (A) AUTHORITY TO OBTAIN POST-PETITION
FINANCING, (B) LIENS AND SUPER PRIORITY ADMINISTRATIVE EXPENSE
STATUS PURSUANT TO 11 U.S.C. §§ 364(c)(1), (2) AND (3) AND 364(d)(1), (C)
RELIEF FROM THE AUTOMATIC STAY (D) AUTHORITY TO ENTER INTO
AGREEMENTS WITH TIGER FINANCE, LLC, (E) AUTHORIZATION TO USE
CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361 AND 363, BANKRUPTCY
RULE 4001 AND D.N.J. LBR 4001-4 AND TO PROVIDE ADEQUATE PROTECTION
TO PARTIES WITH AN INTEREST IN CASH COLLATERAL AND (F) RELATED
RELIEF**

      Aluminum Shapes, L.L.C., the debtor and debtor in possession (the "Debtor"), by and

through its counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby seeks the entry of an

Interim and Final Order (a "DIP Order") granting (a) the Debtor authority to obtain post-petition

financing on the terms described herein, (b) granting priming liens and super-priority

administrative expense status pursuant to 11 U.S.C. §§ 364(c)(1), (2) and (3) and 364(d)(1) of

title 11 of the United States Code (the "Bankruptcy Code"), (c) granting relief from the automatic stay pursuant to section 362 of the Bankruptcy Code and (d) authorizing the Debtor to enter into agreements with the lender, Tiger Finance, LLC (the "Lender" or "Tiger"), (e) authorizing the use of cash collateral and providing adequate protection to parties with an interest in cash collateral and (f) related relief and in support thereof (the "Motion"), and respectfully represents as follows:

## I.    PARTIES AND JURISDICTION

1.    On August 15, 2021, (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code and relief was ordered.

2.    This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 361, 362, 363, 364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code, Rules 4001(c) and 4001(a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule 4001-4.

## II.    BACKGROUND

### a.    The Debtor's Business.

4.    The Debtor is a New Jersey limited liability company. The Debtor is presently engaged in the business of fabrication and processing of aluminum by extrusion (the "Business") and is the owner of certain commercial/industrial real estate located at 9000 River Road, Delair, New Jersey 08110, consisting of an industrial building nearly 500,000 square feet in size, situated on 25.337 +/- acres, with a state of the art cast house, and all improvements thereon (the

"Real Property"), along with related furniture, fixtures, machinery and equipment ("FFE", and collectively with the Real Property and all other assets of the Debtor, the "Assets").

5.      The Debtor is one of the only aluminum extruders on the East Coast, and at its peak, processed in excess of 30 million pounds of aluminum a year.

6.      As set forth in the Declaration of Jordan Meyers in Support of First Day Motions, filed contemporaneously and incorporated herein, the Debtor has suffered recently from the skyrocketing price of metals, the lack of working capital and the devastating economic effects of COVID-19.

**b.      The Prepetition Tiger Finance LLC obligations.**

7.      The Debtor is obligated to the Lender on a certain prepetition loan (the "Prepetition Credit Agreement") made by the Lender from time to time (collectively the "Prepetition Obligations").

8.      The Debtor executed the Prepetition Credit Agreement, a UCC-1 in favor of the Lender, and a mortgage on 8600[1]-9000 River Road, Delair, New Jersey, in order to secure the Prepetition Obligations of the Lender (the "Tiger Loan Documents") and asserting liens in, on and to all of the Debtor's prepetition collateral (collectively, the "Pre-Petition Collateral").

9.      On June 18, 2019, Tiger recorded that certain Mortgage, Security Agreement, Fixture Filings and Assignment of Leases and Rents, with a maximum principal amount of $7,685,000.00 (the "Mortgage").

10.      Tiger made additional subsequent advances to the Debtor, and on July 27, 2021, the Lender and the Debtor entered into a Seventh Forbearance Agreement and Seventh Amendment to Credit Agreement, pursuant to which the acknowledged the Lender's increased advances.   In connection therewith, the Debtor and the Lender entered into that certain First

Amendment to Mortgage, Security Agreement, Fixture Filings and Assignment of Leases and Rents, dated as of August 2, 2021, with a maximum principal amount of $9,435,000, and Lender subsequently recorded the same filed an amended mortgage in (the "Mortgage Amendment"). True and correct copies of the Mortgage and the Mortgage Amendment are attached hereto as **Exhibit "A"**.

11.     As of the Petition Date, the total of the Lender's Prepetition Obligations is no less than 9,270,525.89.

12.     The Lender has duly filed and recorded first priority security interests and liens in, on and to all of the Pre-Petition Collateral to secure the Prepetition Obligations.

13.     As part of the Tiger Loan Documents, the Lender filed a valid first position UCC-1 filing on "all assets" of the Debtor, and the proceeds thereof.

14.     The Lender holds both a first position on all assets, based upon its UCC-1 Financing Statement, and on the Real Property based on the Mortgage**.**

**c.     The Debtor's Financing Needs.**

15.     The Debtor will rely on the Declaration of Justin Magner, filed contemporaneously and incorporated herein.

16.     The Debtor, in the normal course of its Business, incurs obligations to employees, suppliers and other vendors essential to the continued existence of the Debtor, and the continued viability of its Business as a going concern.

17.     At present, the Debtor has a shortage of available cash to operate its Business.

---

[1] This property was subsequently sold.

18.     As a consequence of its cash flow shortages, and lack of available vendor credit, many creditor disputes were resolved by the Debtor granting liens or allowing judgments to be entered by certain claimants (collectively, the "Junior Lienholders").[2]

19.     In order to continue its Business and operations, the Debtor requires post-petition financing.  Since the Debtor has not had success in obtaining commitments for post-petition financing, the Lender has agreed to commit funds in addition to those advanced prepetition, and to fund a debtor-in-possession loan to the Debtor in connection with the Debtor's efforts to achieve a sale of its Business or substantially all its Assets.[3]

20.     Lender has agreed to provide a secured loan of up to $15,500,000.00[4] (the "Loan") to (a) provide working capital and fund operations post-petition, as well as the payment of certain administrative expenses; and (b) allow the Debtor to conduct a sale process for its Business or Assets.

21.     Absent the immediate availability of cash and post-petition financing, the Debtor would not have the funds with which to conduct its Business.  An abrupt cessation of the Debtor's Business would cause extreme hardship to the Debtor, its employees, customers and creditors.

22.     Post-petition financing will help not only the Debtor's cash needs but will instill a sense of confidence in the Debtor's creditors and vendors.  Simply stated, in order to

---

[2] The Debtor disputes many of the Junior Lienholder liens as voidable.  Nothing herein shall be construed to limit or waive the Debtor's right to object to the Junior Lienholder's claims on any basis in order to obtain allowance or disallowance.

[3] A participant in the Prepetition Obligations and the DIP Facility is Align Business Finance LLC (f/k/a Reich Bros Business Solutions LLC) is 100% owned by ABF Intermediate Holdings LLC which is then 100% owned by ABF Ultimate Holdings LLC. ABF Ultimate Holdings LLC is 50% owned by Jonathan and Adam Reich, who own [___%] of Reich Brothers, the proposed Stalking Horse under the forthcoming Sale Motion.

[4] With a rollup of the Prepetition Obligations into the Loan, the total Loan amount is intended to be $15,500,000.00.

continue the operation of the Debtor's Business, which faltered as a result of earlier financial issues, it is necessary for the Debtor to immediately borrow money and otherwise obtain credit.

23.　　The Debtor has negotiated a loan agreement (the "Loan Agreement")[5] pursuant to which Lender will extend Debtor the Loan.  A true and correct copy of the Loan Agreement is attached as **Exhibit "B"** and incorporated herein.  The final versions of the Loan Agreement and loan documents relating thereto will be provided in advance of the hearing on the Motion.  The Debtor requests authority to enter into the Loan Agreement and related documents (the "Financial Agreements").  The final versions of the Loan Agreement and the other Financial Agreements will be provided in advance of the hearing on the Motion.

24.　　The Debtor and the Lender request authority to borrow and advance on both the prepetition and post-petition Assets, and for Lender to continue to have a first priority lien on all of Debtor's Assets, superior to any existing properly perfected and unavoidable liens existing as of the Petition Date.

25.　　The Debtor and Lender further request that the liens of the Junior Lienholders must be subordinated to the Lenders new Loan pursuant to Section 364(d)(1), and that Lender be granted a "priming lien".

26.　　The Debtor avers that the equity in Debtor's Real Property adequately protects the Junior Lienholder's interests, if any, in the Debtor's Assets.  Many of the claims of Junior Lien holders are disputed, and potentially avoidable.

27.　　Finally, the Debtor requests that the Lender be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, a "super priority" administrative expense claim in the Debtor's case with priority over all administrative expenses.

---

[5] Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Agreement.

28.     The Debtor requires the use of its cash and accounts to continue operations during the pendency of this Chapter 11 case.

29.     As set forth in the Declaration of Jordan Meyers in Support of First Day Motions, the Debtor has an urgent and critical need for the use of cash.  Without the use of cash collateral ("Cash Collateral"), the Debtor's reorganization efforts will fail.

30.     The Lender has consented to the use of Cash Collateral consistent with a budget (the "Budget") attached as **Exhibit "C"**.

### III.     RELIEF REQUESTED

**A.     This Court Should Grant the Debtor Authority to Obtain Post Petition Financing; Approve Liens and Super Priority Administrative Expense Status Pursuant to Sections 364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code; and Grant Relief From the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code**

31.     The Lender has indicated its willingness to extend post-petition financing to the Debtor in accordance with and on the terms set forth in the Loan Agreement, the relevant terms of which are summarized as follows:

Borrower: Aluminum Shapes, L.L.C.

Maximum Advance: Up to the amount of $15,500,000.00, subject to the entry of an Order approving the Debtor's proposed post-petition financing, funding in accordance with compliance with the Budget (as defined in the Loan Agreement).

Interest Rate:   LIBOR (1% floor) plus fourteen percent (14%) per annum. Interest calculated on a 360-day year for actual days elapsed.  Default interest at 14% plus 5%, and a $250,000.00 "Default Fee."

Term:  Terminates the earlier of (i) November 1, 2021, (ii) the Closing under the Asset Purchase Agreement, (iii) the termination of the Asset Purchase Agreement, (iv) the occurrence of an Event of Default , or (v) if financing from a replacement debtor-in-possession lender is approved by the Court post-petition.

Availability/Use of Proceeds: Borrowings are available to Debtor's expenses of operations and administrative expenses, as well as the expense connected to the Sale process, including those fees required to be paid to the United States Trustee, and to provide cash flow

for operations (all subject to the Budget), including, without limitation, payment of employees' wages and benefits.

Security/Priority: Pursuant to sections 364(c)(1),(2) and (c)(3) and 364(d) of the Bankruptcy Code, the Debtor's obligations are to be secured by a first priority lien on and security interest in all of the Debtor's property and assets whether now owned or hereafter acquired, and all of the Lender's claims are to receive super-priority treatment.

Closing Fee: 4% of the Maximum Advance

Milestones (subject to Court approval):
(i)     Debtor shall execute an Asset Purchase Agreement by August 28, 2021
(ii)    Bid Deadline by October 11, 2021
(iii)   Auction by October 15, 2021
(iv)    Sale Hearing by October 18, 2021
(v)     Closing by November 1, 2021

Conditions:
(i)     Interim and Final orders approving DIP
(ii)    363 Sale Motion filed
(iii)   Equity contribution of $50,000.00 per week by existing equity

Exit Fee: 2% of Maximum Advance

32.     The terms of the Loan are fair and reasonable considering the Debtor's credit history.  The Debtor has sought alternate funding on better terms but has been unsuccessful.

33.     In accordance with section 364(c) of the Bankruptcy Code, the Debtor represents that it is unable to obtain credit for its operations on an (a) unsecured basis; (b) on the basis of a general administrative claim; or (c) on any basis more favorable to the Debtor than proposed in this Motion, and that after diligent efforts the Debtor is unable to obtain credit from any other source.

34.     As noted, the Debtor has requested that (i) Lender extend post-petition credit secured by a super priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) liens, pursuant to sections 364(c)(1),(2) and (3) of the Bankruptcy Code, to finance the Debtor's post-petition operations in accordance with the Loan Agreement and

(iii) a lien under section 364(d)(1) of the Bankruptcy Code with priority over the liens of all parties, existing as of the Petition Date.

35.     The Lender's liens and security interests pursuant to sections 364(c)(1),(2) and (c)(3) of the Bankruptcy Code to secure repayment of all loans and advances shall attach to and be perfected against all of the Debtor's Assets upon the entry of an Order approving this Motion.

36.     The statutory requirement for obtaining post-petition credit under section 364(c)(2) of the Bankruptcy Code is a finding, made after notice and hearing, that the Debtor is "unable to obtain unsecured credit allowable under § 503(b)(1) of the [Bankruptcy Code]." Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit under Section 364(a) of the Bankruptcy Code, or unsecured credit allowable as an ordinary administrative claim.  In re Crouse Group, Inc.., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under § 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

37.     Courts have articulated a three-prong test to determine whether a Debtor is entitled to financing under section 364(c) of the Bankruptcy Code, namely that:

a.     Debtor is unable to obtain financing by other means i.e., by allowing a lender only an administrative claim;

b.     the financing is necessary to preserve the assets of the estate; and

c.     the terms of the financing are fair, reasonable, and adequate, given the circumstances by the Debtor-Borrower and the proposed Lender.

11 U.S.C. § 364(c).

33.     The evidence that will be presented at the hearing will show that a loan of the type and magnitude needed in this case could not have been obtained on an unsecured basis.  Under these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Bray v Shenandoah Federal Sav. and Loan Ass'n. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

34.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  Id; see also In re Plabell Rubber Prods. Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Where there are few lenders likely to be able and/or willing to extend the necessary credit to the Debtor, "it would be unrealistic and unnecessary to require [the Debtor] to conduct an exhaustive search for financing."  In re Ski Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988)), aff'd sub nom, Anchor Sav. Bank TSB v. Sky Valley, 99 B.R. 117, 120 N.4 (N.D. Ga. 1989).  Thus, the evidence introduced at the hearing will satisfy the requirement of section 364(c) of the Bankruptcy Code that unsecured credit was unavailable to the Debtor.

35.     As set forth above, the Loan is necessary to continue the Debtor's operations, pay employees' wages and benefits, and allow the Debtor to continue on to the sale of its assets.  Without approval of the Loan, the Debtor would be unable to obtain sufficient funds to ensure the viability of its Business.

36.     The Loan is sufficient to allow the debtor to continue operations of the Debtor's Business and proceed to a sale of its Business or Assets.  Without the Loan, the Debtor's efforts would be hampered, and the value of the Assets diminished.

37.     The Debtor has negotiated the terms of the Loan with Lender at arm's length and in good faith (as that term is defined in section 364(e) of the Bankruptcy Code), with all

parties represented by experienced counsel. Such negotiations were extensive and time-consuming and involved a lively "give and take" between the Debtor and the Lender.

38.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtor's management has concluded that the Loan is the only viable alternative available in the circumstances of this case. Bankruptcy courts routinely defer to the Debtor's business judgment on most businesses decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. R y., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D.Colo.1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

38.     The Motion also requires that the Lender receive a first priority position under and pursuant to 11 U.S.C. Section 364(d)(1) in the Assets of the Debtor, and in that regard, the Debtor requests that the Order entered herein specifically provide that the Junior Lienholder's judgment liens, some of which are avoidable, be subordinated to the Loan.

39.     To the extent these liens are to be subordinated, the Debtor avers that the Real Property has substantial equity, which will permit the Junior Lienholders to maintain the same equity in the Debtor's Assets. In addition, the Debtor owns FF&E valued at approximately $7,575,000.00.00. In other words, because of the equity in the Debtor's Assets, the Loan will not impair the liens of the Junior Lienholders.

40.    As provided in the Declaration of Jordan Meyers in Support of First Day Motions, the Junior Lienholders as follows:

- Palmer (Local 837) v. Aluminum Shapes LLC, 2:21-cv-00326-RBS – Judgment amount: $4,470,122.86
- Eastern Lift Truck Co. v. Aluminum Shapes LLC, BUR-L-1685-20 – Judgment amount:  $73,122.61
- General Chemical & Supply v. Aluminum Shapes LLC, CAM SC-000770-20 – Judgment amount:  $2,948.83
- A.C. Shultes, Inc. v. Aluminum Shapes LLC, CAM L-003398-20 – Judgment amount:  $30,176.56
- UGI Energy Services, LLC v. Aluminum Shapes LLC, CAM L-000671-20 – Judgment amount: $395,345.43
- Talen Energy Marketing LLC v. Aluminum Shapes LLC, 5:19-cv-04303-HSP – Judgment amount:  $1,711,955.03
- Combined Metal Industries Inc. v. Aluminum Shapes LLC, CAM L-002982-20 – Judgment amount:  $320,780.87
- Direct Energy Business Marketing LLC v. Aluminum Shapes LLC, CAM L-003390-19 – Judgment amount:  $834,252.47
- Euler Hermes North America Ins. v. Aluminum Shapes LLC, CAM L-003551-20 – Judgment amount:  $184,195.37
- IFM Efector Inc v. Aluminum Shapes LLC, CAM DC-002545-21 – Judgment amount:  $4,302.15
- Equipment Depot Pennsylvania, Inc. et al v. Aluminum Shapes LLC, CAM L-2360-20 – Judgment amount:  $30,039.20
- Pyrotek Inc. v. Aluminum Shapes LLC, CAM L-003963-20 – Judgment amount:  $97,658.54
- Mardinly Industrial Power, LLC v. Aluminum Shapes LLC, MJ-32124-cv-0000007-2021 – Judgment amount:  $6,599.51
- Melton Truck Lines Inc. v. Aluminum Shapes "Inc.", CJ-2020-1276 – Judgment amount:  $47,277.90

41.    In addition, there is a Tax Certificate in the amount of $113,100.00 for water and sewer, which will not be primed but must be taken into account as a first lien on the Real Estate only.

42.    The Debtor's Real Property is presently valued at $20,900,000.00.  The Debtor's FF&E is valued at approximately $7,572,000.00. Combined the Debtor's assets are valued at $28,472,000.00.   See Declaration of Jordan Meyers; Declaration of Justin Magner.

43.     Following Closing on the Loan, there will be, $113,100 in liens before the Loan

on the Real Estate only with respect to the water and sewer Tax Certificate, the $15,500,000.00

Loan from the Lender, which is the subject of this Motion, Junior liens of $8,208,777, for a total

of $23,821,877 on the entire Collateral package of $26,900,000.00, leaving a substantial equity

cushion.

44.     After considering the Lender's liens related to the Prepetition Obligations, and

the advances under the Loan, there remains an equity cushion for the Junior Lienholders of

several million dollars.   The Debtor avers that this substantial equity cushion should be

evidence of the Debtor's ability to adequately protect Junior Lienholders.

45.     The Debtor believes that the request to obtain post-petition credit secured by a

priming lien on all of the Debtor's Assets that is first in priority as to all other creditors, is

proper, reasonable, and necessary to continue the Debtor's Business.

46.     Most courts reviewing the issue have found an equity cushion as the best form of

adequate protection.  An "equity cushion" seems to be the preferred adequate protection required

to prime a first mortgage under 11 U.S.C. § 364(d)(1).  See In re Strug-Division Ltd. Liab. Co.,

380 B.R. 505 (Bankr. N.D. Ill. 2008). However, an opinion in In re Aqua Assoc., 123 B.R. 192,

196-97 (Bankr. E.D. Pa. 1991) adopted a "holistic" or flexible approach:  The important

question, in determination of whether the protection to a creditor's secured interest is adequate, is

whether that interest, whatever it is, is being unjustifiably jeopardized. Id, at 196-7.

47.     The issue of adequate protection is measured by an analysis of all the relevant

facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate

or appreciate over time, the prospects for successful reorganization of the debtor's affairs by

means of the plan, and the debtor's performance in accordance with the plan.  Here, there is no indication that the value of the Collateral is decreasing,

48.     No additional financing statements or mortgages shall be required to be filed to perfect the post-petition super priority administrative claim, liens, and security interests granted to Lender under this Motion.  However, should Lender elect to file or record financing statements, financing agreements or other documents, the Debtor requests Court permission to do so and also requests modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to allow for the recording of the same.

49.     The granting of the super priority administrative claims, security interests, and liens to Lender will enable Lender to provide post-petition financing to the Debtor through the Loan Agreement, and in turn permit the Debtor to continue operations and proceed with its sale efforts.

50.     Approval of the Debtor's request to obtain post-petition credit from Lender secured by the requested liens in the Debtor's Assets, is in the best interest of the Debtor and creditors of the estate.

51.     The terms and provisions of the Loan described herein, including the Loan Agreement and the provisions of the proposed Order, are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Consequently, the Debtor requests that the Court find that any loans or advances made by Lender pursuant to the Financial Agreement are made in good faith for the purposes of section 364(e) of the Bankruptcy Code.

52.     With respect to the Debtor's request for the granting of priming liens, the Debtor avers that the Junior Lienholders are adequately protected by the Debtor's equity cushion in its Assets.

53.     The Debtor has exercised sound business judgment in determining that the Loan is appropriate and has satisfied the legal prerequisites to borrow.  The terms are fair and reasonable and are in the best interests of the Debtor's estate.

54.     As set forth more fully in the proposed Order, the proposed Loan contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to implement the terms and conditions of the Loan Agreement and the provisions of the Order and to allow the Lender to exercise any and all of its rights and remedies under the Order and the Loan, in the event of Default or otherwise.

55.     The Court accordingly should modify the automatic stay to the extent contemplated by the Loan and the DIP Order.

56.     The Debtor requests entry of the DIP Order substantially in the form attached hereto.

**B.      Authorization to Use Cash Collateral and Provide Adequate Protection**

57.     Section 363(c) of the Bankruptcy Code allows a debtor to use, sell, or lease cash collateral if each entity that has an interest in cash collateral consents, or the Court authorizes the use.  See, 11 U.S.C. §363(c)(2).

58.     The Debtor has concluded from its review of the Tiger UCC-1 filing that it appears to have been properly perfected and that its "all asset" terms extend to the proceeds of the Debtor's Collateral. The Debtor reserves that right to contest the validity, extent, or priority of any rights granted pursuant to Tiger Loan Documents or any security interest arising out of or related to prepetition agreements with the Lender.

59.    In order to adequately protect the Lender during the period of the interim use of Cash Collateral, the Debtor will offer replacement liens to the Lender, in and to the same extent as existed prior to the Petition Date.

60.    Additionally, in order to avoid any diminution in value, the Debtor will ensure that, with respect to the Real Property, the Debtor will pay all post-petition obligations and will maintain and insure the Real Property post-petition.

61.    Pursuant to section 361(2) of the Bankruptcy Code, the providing of a replacement lien can constitute adequate protection. It is well settled that adequate protection must be applied in light of the peculiar facts of each case and upon any equitable considerations arising therefrom.  Although the Bankruptcy Code does not specifically define "adequate protection," section 361 of the Bankruptcy Code provides for three, nonexclusive forms of adequate protection, which are: (1) periodic cash payment; (2) additional or replacement liens; and (3) the "indubitable equivalent" of the secured creditor's interest in the property.  11 U.S.C. § 361. See Rocco v. J.P. Morgan, (In re: Joseph Rocco), 319 B.R. 411, 418 (Bankr. W.D. Pa. 2005), citing In re Swedeland Development Group, Inc., 16 F.3d 552 (3d Cir. 1994). "Adequate protection is provided to ensure that a secured creditor receives the value of its bargain." In re Rocco, 319 B.R. at 418. What constitutes the appropriate "value" is to be determined by the court on a case by case basis. In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987).

62.    "Since 'value' is the linchpin of adequate protection and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact." Id.  See also,In re Ritz Carlton, 98 B.R. 170, 173 (Bankr. S.D.N.Y. 1989).  In this case, the granting of replacement liens will provide adequate protection of the Lender's asserted

security interest in Cash Collateral, while at the same time allowing the Debtor to continue to operate its Business.

63.      The Budget lists the Debtor's expected monthly expenses and revenues. It should be noted, however, that the Budget makes certain assumptions about the Debtor's ability to obtain a Debtor in Possession Loan as well as future expenses to be incurred by the Debtor and the professionals retained in the case by the Debtor, or others.

64.      In order to maintain the Debtor's operations, the Debtor requires the use of Cash Collateral for the payment of expenses as more specifically set forth in the Budget. Through the payment of the above-referenced expenses, the Debtor will not only be able to maintain the status quo, but also to facilitate its reorganization and enhance the Prepetition Collateral.

65.      The Debtor must pay its vendors and employees in order to achieve success in this Chapter 11 case. The continued use of Cash Collateral will allow the Debtor to continue operating so that the Debtor can continue with its sale process and file a plan of reorganization to address claims of creditors.

66.      Approval of the Debtor's request to use Cash Collateral on both an interim and then permanent basis is in the best interest of the Debtor and creditors of the estate.

67.      Unless the Debtor can continue to operate its Business, it will be unable to reorganize and enhance the value of the Prepetition Collateral, to the detriment of the Debtor and its creditors.

68.      The entry of any Order authorizing the use of Cash Collateral is without prejudice to the rights of the Debtor, creditors, any trustee appointed herein, or other parties in interest to contest the validity, extent, or priority of any rights granted pursuant to Tiger Loan

Documents or any security interest arising out of or related to prepetition agreements with the Lender.

69.     Neither the Debtor's use of Cash Collateral nor any payments that may be authorized by the Court to any creditor asserting a security interest shall constitute a waiver by such creditor or the Debtor or any other party in interest of any right or claim each may now have or in the future have with respect to any issue relating to the validity, extent or priority of such creditor's security interest.

70.     Accordingly, the Debtor believes, and therefore avers, that it should be permitted to use Cash Collateral in the ordinary course of operations.

C.      **Request for Waiver of the Application of Rules 4001, 6003, 6004**

71.     In accordance with Bankruptcy Rule 4001(b)(2), the Debtor requests that the use of Cash Collateral be approved as part of the Debtor's First Day Motions, on an interim basis to prevent irreparable harm to the Debtor, with final approval be granted at a subsequent hearing upon further notice to parties in interest.

72.     In accordance with Bankruptcy Rule 4001(b)(2), the Debtor requests that the final hearing on this Motion be scheduled so that at least fifteen (15) days' notice is provided to parties in interest.

73.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting a "motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b).

74.     The Debtor requires interim access to the DIP Loan and authorization to use Cash Collateral to pay its ongoing expenses, and to pay wages, maintain insurance, and other first-day matters discussed in contemporaneously-filed first day motions.

75.     Disruptions regarding these pre-and-post-petition costs and expenses could severely prejudice the Debtor's chance for reorganization, cause the Debtor to violate state law or applicable U.S. Trustee guidelines, harm the Debtor's ability to retain employees, and expose the Debtor to risks from uninsured liabilities.

76.     Late payments could frustrate the Debtor's relationships with employees and cause other severe and irreparable disruptions to the Debtor's Business which would have a negative impact on all parties-in-interest. Accordingly, the Debtor has satisfied the requirements of Bankruptcy Rule 6003.

77.     To implement the foregoing successfully, the Debtor requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

WHEREFORE, the Debtor requests that this Court enter an Order in the forms attached hereto (i) approving the proposed secured and super priority post-petition financing on an interim basis, (ii) approving the use of Cash Collateral on an interim basis, (iii) granting relief from the automatic stay for cause (iv) waiving the application of Rules 4001, 6003, 6004 and (v) granting such other and further relief as this Court deems just.

Respectfully Submitted,

Dated: August 15, 2021        By: */s/ Edmond M. George*
                              Edmond M. George, Esquire
                              Michael D. Vagnoni, Esquire (*pro hac vice* pending)
                              Turner N. Falk, Esquire
                              OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
Telephone: (856) 795-3300
Facsimile: (856) 482-0504
E-mail:  edmond.george@obermayer.com
         michael.vagnoni@obermayer.com
         turner.falk@obermayer.com

*Proposed Counsel to Chapter 11 Debtor, Aluminum
Shapes, L.L.C.*