# Exhibit B

**EXECUTION VERSION**

**$15,500,000**

### SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**Dated as of August 15, 2021**

**among**

**ALUMINUM SHAPES L.L.C.,**
**as debtor and debtor-in-possession,**
**as the Administrative Borrower**

**For**

**The Borrowers Named Herein,**
**(each as a debtor and debtor-in-possession)**

**The Guarantors Named Herein,**

**and**

**TIGER FINANCE, LLC**

**as the Lender**

## TABLE OF CONTENTS

SECTION 1.    DEFINITIONS ...............................................................................................5

    1.1    Defined Terms. ..................................................................................................5
    1.2    Interpretative Provisions.................................................................................22
    1.3    Accounting Terms............................................................................................23
    1.4    Rounding. .........................................................................................................23
    1.5    Designation of Administrative Borrower as Borrowers' Agent.....................24

SECTION 2.    CREDIT FACILITY ....................................................................................24

    2.1    Term Loans.......................................................................................................24
    2.2    Power of Attorney. ...........................................................................................24
    2.3    Certain Bankruptcy Matters. ...........................................................................25

SECTION 3.    INTEREST AND FEES ...............................................................................26

    3.1    Rates and Payment of Interest. .......................................................................26
    3.2    Computation of Interest and Fees....................................................................27
    3.3    Closing Fee.......................................................................................................27
    3.4    Minimum Interest and Fees..............................................................................27
    3.5    Default Fee. ......................................................................................................27
    3.6    Exit Fee.............................................................................................................27
    3.7    Maximum Interest. ...........................................................................................27

SECTION 4.    CONDITIONS PRECEDENT......................................................................28

    4.1    Conditions Precedent to Effectiveness of this Agreement. .............................28
    4.2    Conditions Precedent to each Term Loan........................................................30

SECTION 5.    PAYMENTS AND ADMINISTRATION ....................................................30

    5.1    Payments Generally, Allocation of Proceeds; Collection Account Proceeds...................30
    5.2    Indemnity for Returned Payments....................................................................31
    5.3    Repayments. .....................................................................................................31
    5.4    Prepayments. ....................................................................................................31
    5.5    Statements. .......................................................................................................32
    5.6    Borrowers' Loan Account; Evidence of Debt. ................................................32
    5.7    Taxes. ...............................................................................................................32

SECTION 6.    REPRESENTATIONS AND WARRANTIES .............................................33

    6.1    Organization; Powers. ......................................................................................33
    6.2    Authorization; Enforceability..........................................................................33
    6.3    No Conflicts. ....................................................................................................33
    6.4    Governmental Approvals..................................................................................34
    6.5    Financial Statements; No Material Adverse Effect..........................................34
    6.6    Properties; No Liens.........................................................................................34
    6.7    Litigation. .........................................................................................................34
    6.8    Compliance with Laws.....................................................................................34
    6.9    Environmental Condition. ................................................................................34
    6.10    No Defaults.......................................................................................................35
    6.11    Material Contracts. ...........................................................................................35
    6.12    Restrictive Agreements. ...................................................................................35
    6.13    Taxes. ...............................................................................................................35
    6.14    ERISA. ..............................................................................................................35
    6.15    Insurance. .........................................................................................................35

6.16    Capitalization and Subsidiaries. ....................................................................35
6.17    Security Interest in Collateral. .......................................................................35
6.18    Brokers. ..........................................................................................................36
6.19    Intellectual Property. ......................................................................................36
6.20    [RESERVED].................................................................................................36
6.21    Labor Relations. .............................................................................................36
6.1    [RESERVED].................................................................................................36
6.23    Margin Regulations, Investment Company Act, Etc. .....................................36
6.24    OFAC. .............................................................................................................36
6.25    Complete Disclosure. .....................................................................................36

SECTION 7.    AFFIRMATIVE COVENANTS ......................................................................36

7.1    Financial Statements and Other Information. ................................................36
7.2    Notices of Material Events. ...........................................................................37
7.3    Existence. ........................................................................................................37
7.4    Payment of Obligations and Taxes.................................................................37
7.5    Maintenance of Properties. ............................................................................37
7.6    Compliance with Laws. ..................................................................................37
7.7    Insurance. ........................................................................................................37
7.8    Inspection Rights. ...........................................................................................38
7.9    Use of Proceeds. .............................................................................................38
7.10    Cash Management; Collection of Proceeds of Collateral................................38
7.11    Costs and Expenses. .......................................................................................38
7.12    Equity Contribution. .......................................................................................38
7.13    Chief Restructuring Officer / Chief Financial Officer....................................38
7.14    Retention of and Communication with Consultants, Liquidators and Financial Advisors39
7.15    Bankruptcy Related Affirmative Covenants...................................................39
7.16    Performance Within Budget ...........................................................................40
7.17    Additional Information....................................................................................41

SECTION 8.    NEGATIVE COVENANTS .............................................................................41

8.1    Indebtedness. ...................................................................................................41
8.2    Liens. ...............................................................................................................41
8.3    Fundamental Changes. ....................................................................................41
8.4    Asset Sales.......................................................................................................41
8.5    Investments. .....................................................................................................41
8.6    Transactions with Borrower Affiliates. ..........................................................42
8.7    Change in Business. ........................................................................................42
8.8    Restricted Payments. .......................................................................................42
8.9    Restrictive Agreements. ..................................................................................42
8.10    Certain Payments of Indebtedness, Etc. .........................................................42
8.11    Amendment of Material Documents. ..............................................................42
8.12    Sale and Leasebacks. ......................................................................................42
8.13    Chapter 11 Claims. .........................................................................................43
8.14    Bankruptcy-Related Negative Covenants.......................................................43
8.15    Chapter 11 Claims. .........................................................................................43
8.16    Use of Collateral.............................................................................................43

SECTION 9.    FINANCIAL COVENANTS ...........................................................................44

9.1    [RESERVED]...................................................................................................44

SECTION 10.    EVENTS OF DEFAULT AND REMEDIES .................................................................44

    10.1    Events of Default.................................................................................................44
    10.2    Remedies. ...........................................................................................................47

SECTION 11.    JURY TRIAL WAIVER; OTHER WAIVERS  CONSENTS; GOVERNING LAW ......48

    11.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.......................48
    11.2    Waiver of Notices................................................................................................50
    11.3    Amendments and Waivers.....................................................................................50
    11.4    Waiver of Counterclaims.......................................................................................50
    11.5    Indemnification...................................................................................................50

SECTION 12.    NOTICES; MISCELLANEOUS ....................................................................................51

    12.1    Notices..............................................................................................................51
    12.2    Partial Invalidity. ................................................................................................52
    12.3    Successors. .........................................................................................................52
    12.4    Entire Agreement.................................................................................................52
    12.5    USA Patriot Act...................................................................................................52
    12.6    Counterparts, Etc. ...............................................................................................53

<u>INDEX</u>
<u>TO</u>
<u>EXHIBITS AND SCHEDULES</u>

Exhibit A                    Form of Interim Order


Schedule 1.1                 Initial Budget

Schedule 6.1                 Loan Party Particulars

Schedule 6.6                 Properties

Schedule 6.7                 Litigation

Schedule 6.9                 Environmental Matters

Schedule 6.11                Material Contracts

Schedule 6.12                Restrictive Agreements

Schedule 6.15                Insurance

Schedule 6.16                Subsidiaries

Schedule 6.18                Brokers

Schedule 6.19                Intellectual Property

Schedule 6.21                Collective Bargaining Agreements

Schedule 7.10                Bank Accounts

Schedule 8.1                 Permitted Indebtedness

Schedule 8.2                 Existing Liens

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This CREDIT AGREEMENT (this "Agreement") is dated as of August 15, 2021, between **TIGER FINANCE, LLC**, a Delaware limited liability company, as the lender (together with its successors and assigns in such capacity, "Lender"), **ALUMINUM SHAPES L.L.C.**, a New Jersey limited liability company ("Aluminum Shapes" or "Borrower"; and individually and collectively with any additional Person joined hereto as a borrower, jointly and severally, "Borrowers").

## W I T N E S S E T H:

WHEREAS, Borrowers and Lender are parties to that certain Credit Agreement, dated as of June 5, 2019 (as amended, modified, supplemented or restated and in effect from time to time prior to the date hereof, collectively the "Existing Credit Agreement").

WHEREAS, on August 15, 2021 (the "Petition Date"), each of the Borrowers (collectively, the "Debtors") filed a voluntary petition for relief (collectively, the "Case") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), and the Debtors are continuing in the possession of their assets and continuing to operate their respective businesses (the "Business") and manage their respective properties as debtors and debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code (as hereinafter defined);

WHEREAS, the Debtors have requested that Lender make available to Borrowers, from and after the date of entry of the Interim Order (as hereinafter defined), a senior secured, super-priority debtor-in-possession term credit facility; and

WHEREAS, to provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents, and in addition to all other property of any Loan Party that is subject to the Liens (as hereinafter defined) granted on the "Collateral" (as defined in the Existing Credit Agreement) in favor of Lender securing the Existing Liabilities, as hereinafter defined (such Liens, the "Existing Liens"), each of the Debtors will provide to Lender the DIP Liens (as defined in the Orders).

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agree as follows:

## SECTION 1.   DEFINITIONS

1.1   Defined Terms.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"9000 Mortgage" means, collectively, that certain Mortgage, Security Agreement, Fixture Filings and Assignment of Leases of Rents, dated as of June 5, 2019, made by the Administrative Borrower in favor of the Lender, as amended, modified, supplemented or restated and in effect from time to time on the 9000 Property.

"9000 Property" means that certain real property owned by the Borrowers located at 9000 River Road, Delair (Pennsauken Township), NJ 08110.

"Accounts" means "accounts" as defined in the UCC, including all present and future rights of Borrowers to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation

incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Administrative Borrower" means Aluminum Shapes.

"APA" has the meaning provided therefor in Section 7.15(b)(ii)

"Applicable Margin" means with respect to Term Loans that are LIBOR Rate Loans, fourteen percent (14%).

"Availability" means, at any time of determination thereof by Lender, the result, if a positive number, of:

      (a)      the Maximum Term Loan Amount,

                  minus

      (b)      the Total Outstandings.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, (a) the Carve Out Reserve, (b) a reserve in an amount sufficient to fund in full all amounts required to be on deposit in the Pre-Petition Indemnity Account (as defined in an Order) in accordance with the Interim Order or the Final Order, as applicable, and (c) such reserves as Lender from time to time determines in its Permitted Discretion as reflecting (v) any impediments to Lender's ability to realize upon the Collateral, (w) claims and liabilities that Lender determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Collateral, (x) criteria, events, conditions, contingencies or risks which adversely affect the assets, business, financial performance or financial condition of Borrowers, (y) that a Default or an Event of Default then exists, or (z) reserves to reflect the amount of any priority or administrative expense claims that, in Lender's reasonable determination, require payment during the Case. Without limiting the generality of the foregoing, by way of example and not limitation, Availability Reserves may include (but are not limited to), in Lender's Permitted Discretion, reserves based on, without duplication: (i) rent; (ii) customs duties, freight charges, taxes, tariffs insurance charges and other charges that may reasonably be expected to come due; (iii) outstanding Taxes and other governmental charges due and owing by Borrowers but unpaid, including, without limitation, ad valorem, real estate, personal property, sales, goods and services, harmonized sales, claims of PBGC and other Governmental Authorities in respect of Plans and other Taxes due and owing by Borrowers which may be subject to Liens that have priority over or are pari passu with the Liens of Lender in the Collateral; (iv) salaries, wages, vacation pay and benefits due and owing to employees of any Borrower but unpaid; (v) unpaid warehousemen's or bailee's charges due and owing by Borrowers, and other Permitted Encumbrances which may have priority over or are pari passu with the Liens of Lender in the Collateral; and/or (vi) [RESERVED].

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Borrower Affiliate" means, with respect to Borrowers, any other Person (excluding any Subsidiary) which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person. For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power either (a) to vote more than fifty percent (50%) or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies, whether through the ownership of Equity Interests, by agreement or otherwise.

"<u>Budget</u>" means the financial projections for the Loan Parties covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and Inventory for the period covered thereby, substantially in the form of the initial Budget annexed hereto as Schedule 1.1, and any subsequent projections furnished pursuant to Section 7.1 hereof, in each case, in form and substance reasonably satisfactory to Lender.

"<u>Business</u>" has the meaning set forth in the recitals hereto.

"<u>Business Day</u>" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York, and a day on which Lender is open for the transaction of business.

"<u>Carve Out</u>" has the meaning specified therefor in the Orders.

"<u>Carve Out Reserve</u>" means an Availability Reserve established by Lender in the amount of the Carve Out.

"<u>Case Professionals</u>" has the meaning specified therefor in the Orders.

"<u>Case</u>" has the meaning set forth in the recitals hereto.

"<u>Cash Management Order</u>" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Agent, (i) approving and authorizing the Debtors to use existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code, and (v) authorizing the Debtors to use existing bank accounts and existing business forms, as such order may be amended or modified with the consent of the Agent.

"<u>Change in Law</u>" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u>, <u>that</u>, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Change of Control</u>" means an event or series of events by which the Permitted Holders shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in Borrowers representing 100% of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of Borrowers on a fully-diluted basis.

"<u>Closing Date</u>" means the date all conditions set forth in <u>Section 4.1</u> have been satisfied or waived by Lender.

"<u>Closing Fee</u>" has the meaning provided therefor in Section 3.3.

"Code" means the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Security Documents and any and all other property of Borrowers, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or lien in favor of Lender to secure the Obligations pursuant to this Agreement and/or the Orders.

"Collateral Access Agreement" means an agreement in writing, in form and substance satisfactory to Lender, from any lessor of premises to Borrowers or any other person who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of Lender.

"Collection Account" means the deposit account of Borrowers identified on Schedule 7.10 as the Collection Account and such other accounts as may be established after the date hereof in accordance with the terms hereof used to receive payments on Accounts and proceeds of other Collateral.

"Commitment" means, for Lender, its obligation to make Term Loans subject to, and in accordance with, the terms hereof.

"Committee" means any statutory committee of unsecured creditors appointed in the Case pursuant to Section 1102 of the Bankruptcy Code.

"Committee Investigation Budget" has the meaning provided therefor in Section 8.16(b).

"Cost" means the lower of cost or market value of Inventory, based upon Borrowers' accounting practices, known to Lender, which practices are in effect on the Closing Date, or otherwise approved by Lender in its Permitted Discretion or required by GAAP, as such calculated cost is determined from invoices received by Borrowers, Borrowers' purchase journals or Borrowers' stock ledger.

"Credit Facility" means the Term Loans provided to or for the benefit of Borrowers pursuant to Section 2.1 hereof.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by Lender and any Lender Affiliate in connection with this Agreement, the other Loan Documents, and such other transactions as between Lender and Borrowers, including, without limitation, (i) the reasonable fees, charges and disbursements of (A) counsel for Lender (including, without limitation, local bankruptcy counsel in the State of New Jersey), (B) outside consultants for Lender, (C) appraisers, (D) commercial finance examinations, (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the preparation, negotiation, administration, management, execution and delivery of the Existing Credit Agreement, this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (B) the enforcement or protection of the rights of Lender in connection with this Agreement or the Loan Documents or efforts to monitor, preserve, protect, collect, or enforce the Collateral; and (b) upon the occurrence and during the continuance of an Event of Default, all reasonable out-of-pocket expenses incurred by Lender, or any Lender Affiliate of any of them.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debtors" has the meaning set forth in the recitals hereto.

"Default" means an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

"Default Fee" has the meaning provided therefor in Section 3.5.

"Default Rate" means, for any Obligation (including, to the extent permitted by law, interest not paid when due), five (5%) percent plus the Interest Rate otherwise applicable thereto.

"Designated Deposit Account" means such checking, savings or other demand deposit accounts maintained by Borrowers, as same are identified in Schedule 7.10 hereof and in existence on the Closing Date.

"DIP Superpriority Claim" means the allowed superpriority administrative expense claim granted to the Credit Parties in the Case and any Successor Case pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; provided, however, that the DIP Superpriority Claim shall be subject to the Carve Out.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity, ownership or profit interests at any time outstanding, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), but excluding any interests in phantom equity plans and any debt security that is convertible into or exchangeable for such shares, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Borrowers, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of

Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Borrowers or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Borrowers or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Borrowers or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal of Borrowers or any of its ERISA Affiliates from any Plan or Multiemployer Plan; or (g) the receipt by Borrowers or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrowers or any ERISA Affiliate of any notice, concerning the imposition upon Borrowers or any of its ERISA Affiliates of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), and (b) any U.S. Federal withholding Taxes imposed under Sections 1471 through 1474 of the Code.

"Existing Credit Agreement" has the meaning set forth in the recitals hereto.

"Existing Credit Parties" means the "Lender" and the other "Credit Parties" under (and as defined in) the Existing Credit Agreement.

"Existing Loan Documents" means the "Loan Documents" under (and as defined in) the Existing Credit Agreement.

"Existing Liabilities" means (i) the "Obligations", as defined in the Existing Credit Agreement, and (ii) all other obligations under the Loan Documents delivered in connection with the Existing Credit Agreement.

"Existing Liens" has the meaning set forth in the recitals hereto.

"Existing Security Agreement" means the Security Agreement, dated as of June 5, 2019, among Borrowers and Lender for the benefit of the Existing Credit Parties, as amended and in effect from time to time.

"Exit Fee" has the meaning provided therefor in Section 3.6.

"Final Order" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Case substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to Lender, which order shall (a) have been entered on such prior notice to

such parties as may be satisfactory to Lender and (b) not have been vacated, reversed, modified, amended or stayed.

"Final Order Date" means the date of the entry of the Final Order.

"Final Roll-Up" has the meaning set forth in the Interim Order.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such function, such as the European Union or the European Central Bank).

"Guarantor" means Parent Shareholder, pursuant to the terms of that certain Limited Recourse Guaranty by and between Parent Shareholder and Lender, dated as of June 5, 2019, and any other Person who has or may enter into any agreement providing for Guaranty Obligations in favor of the Lender.

"Guaranty Obligations" means, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, and including, without limitation, any obligation, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting security therefor, (b) to advance or provide funds or other support for the payment or purchase of any such Indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, keep-well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Indebtedness of such other Person, (c) to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such Indebtedness, or (d) to otherwise assure or hold harmless the holder of such Indebtedness against loss in respect thereof. The amount of any Guaranty Obligation hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the outstanding principal amount (or maximum principal amount, if larger) of the Indebtedness in respect of which such Guaranty Obligation is made.

"Hazardous Materials"  means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedge Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Indebtedness" means, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or

accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person, and including, without limitation, customary indemnification, adjustment of purchase price or similar obligations, earn-outs or other similar obligations, (but excluding trade debt and accrued expenses incurred in the ordinary course of business on normal trade terms and not overdue by more than ninety (90) days), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any security interest in, lien or other encumbrance upon, or payable out of the proceeds of production from property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guaranty Obligations of such Person with respect to Indebtedness of another Person, (h) all obligations of such Person under Hedge Agreements, (i) the maximum amount of all standby letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (j) all preferred Equity Interests issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration prior to the date which is ninety-one (91) days after the Maturity Date, (k) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product and (l) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer, but only to the extent such Person is liable for such Indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrowers under any Loan Document and (b) to the extent not otherwise described in subsection (a), Other Taxes.

"Independent Consultant" means Winter Harbor, LLC.

"Insolvency Proceeding" means a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any Debtor Relief Law, any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity).

"Intellectual Property" means Borrowers' now owned and hereafter arising or acquired:  patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable law with respect to Borrowers' use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Interest Rate" means as to all LIBOR Rate Loans, a rate equal to the LIBOR Rate plus the Applicable Margin then in effect.  Lender may, at its option, increase the Interest Rate to the Default Rate at any time after the occurrence and during the continuation of an Event of Default hereunder.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Case substantially in the form of Exhibit A hereto and otherwise acceptable to Lender, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by Borrowers of secured indebtedness on an interim basis in accordance with this Agreement, and (b) subject to the terms thereof, approving the payment by Borrowers of the fees and other amounts contemplated by this Agreement, which order shall not have been vacated, reversed, modified, amended or stayed.

"Interim Order Period" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"Investment" shall have the meaning set forth in Section 8.5 hereof.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lender Affiliate" means, with respect to Lender, any other Person (excluding any Subsidiary) which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power either (a) to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies, whether through the ownership of Equity Interests, by agreement or otherwise.

"Lender Consultant" has the meaning provided therefor in Section 7.14(c).

"LIBOR Rate" means with respect to a LIBOR Rate Loan, the 90 day "Libor Rate" as published in the Wall Street Journal as of 11:00 a.m., London time, on the second London Business Day preceding the Closing Date and as otherwise in effect from time to time (or if such rate does not appear in the Wall Street Journal, then the rate as determined by Lender from another recognized source or interbank quotation), for a term, and in an amount, comparable to Term Loans constituting LIBOR Rate Loans (and, if any such rate is below one percent (1%), the LIBOR Rate shall be deemed to be one percent (1%)), which determination shall be made by Lender and shall be conclusive in the absence of manifest error.  If at any time Lender determines (which determination shall be conclusive absent manifest error) that (i) the "Libor Rate" is not available and such circumstances are unlikely to be temporary or (ii) the supervisor for the administrator of the LIBOR Rate or a Governmental Authority having jurisdiction over Lender has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be used for determining interest rates for loans, then Lender and the Administrative Borrower shall endeavor to establish an alternate rate of interest to the LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable.

"LIBOR Rate Loans" means any Term Loans, or portion thereof, on which interest is payable based on the LIBOR Rate in accordance with the terms hereof.

"Loan Documents" means, collectively, this Agreement, the Security Documents, the Orders, the Subordination Agreement, and all notes, guarantees, intercreditor agreements and all other agreements, documents and instruments, now or at any time hereafter executed and/or delivered by Borrowers in connection with this Agreement.

"Loan Party" or "Loan Parties" means, individually or collectively, as the context requires, Borrowers and each Guarantor.

"Material Adverse Effect" means a material adverse effect on (a) business, assets, liabilities, results of operations, prospects, property or financial condition of Borrowers; (b) the ability of Borrowers to perform its obligations, when such obligations are required to be performed under this Agreement or any of the other Loan Documents or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of Lender hereunder or thereunder or the perfection or priority of any security interest or lien in favor of Lender.

"Material Contract" means (a) any contract or other agreement (other than the Loan Documents), written or oral, of Borrowers involving monetary liability of or to any Person in an amount in excess of $200,000 in any fiscal year (but excluding for this purpose contracts or other agreements for the purchase and sale of goods or services where the other party thereto has no obligation to purchase or sell such goods or services under such contract or other agreement), and (b) any other contract or other agreement (other than the Loan Documents), whether written or oral, to which Borrowers is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto has or could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means each Indebtedness (other than the Term Loans and trade payables) of Borrowers having in the aggregate an outstanding principal amount exceeding $50,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Borrowers in respect of any Hedge Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Borrowers would be required to pay if such Hedge Agreement were terminated at such time.

"Maturity Date" means November 1, 2021.

"Maximum Interest Rate" means the maximum non-usurious rate of interest under applicable Federal or State law as in effect from time to time that may be contracted for, taken, reserved, charged or received in respect of the indebtedness of Borrowers to Lender, or to the extent that at any time such applicable law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate.

"Maximum Term Loan Amount" means the amount of $15,500,000.00.

"Milestones" has the meaning provided therefor in Section 7.15(b).

"Multiemployer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by Borrowers or any ERISA Affiliate or with respect to which Borrowers or any ERISA Affiliate may incur any liability.

"Net Cash Proceeds" means the aggregate cash proceeds received by Borrowers in respect of any sale, lease, transfer or other disposition of any assets or properties, or interest in assets and properties or as proceeds of any loans or other financial accommodations provided to it or as proceeds from the issuance and/or sale of any Equity Interests or Indebtedness, in each case net of the reasonable and customary direct costs relating to such sale, lease, transfer or other disposition or loans or other financial accommodation or

issuance and/or sale (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and taxes paid or payable as a result thereof and in the case of a sale of any assets or properties or interest in assets and properties, amounts applied to the repayment of Indebtedness secured by a valid and enforceable lien (other than a lien created under the Loan Documents) on the asset or assets that are the subject of such sale or other disposition required to be repaid in connection with such transaction.

"Net Orderly Liquidation Value" means the value that is estimated to be recoverable in an orderly liquidation, net of liquidation expenses; such value to be as determined from time to time by Lender in its reasonable credit judgment or by a qualified appraisal company selected by Lender.

"Obligations" means any and all Term Loans, Credit Party Expenses, and all other obligations, liabilities and indebtedness of every kind, nature and description owing by Borrowers to Lender, including, without limitation, principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under any of the Loan Documents, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Orders" means, collectively, the orders entered by the Bankruptcy Court in the Case on the Debtors' First Day Motions, the Debtors' Motion for Debtor in Possession Financing, and in connection with the Debtors' Sale Motion, whether Interim or Final in nature.

"Organization Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Other Taxes" means present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made hereunder or under any of the other Loan Documents or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any of the other Loan Documents.

"Parent Shareholder" means Jacky Cheung, an individual.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which Borrowers sponsors, maintains, or to which Borrowers or an ERISA Affiliate makes, is making, or is obligated to make contributions, other than a Multiemployer Plan.

"Permitted Discretion" means as used in this Agreement with reference to Lender, a determination made in good faith in the exercise of its reasonable business judgment based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.

"Permitted Dispositions" means each of the following:

(a)   the sale or other disposition of inventory in the ordinary course of business;

(b)   a disposition of Inventory that is obsolete, unmerchantable or otherwise unsalable in the ordinary course of business;

(c)   the sale or other disposition of Borrowers' interest in Equipment that is used, worn-out, obsolete, and/or no longer used or useful in the conduct of the business of Borrowers; provided, that, as to any such sale or other disposition, each of the following conditions is satisfied: (i) the transaction is an arm's-

length transaction, (ii) the consideration to be received by Borrowers shall be paid or payable in cash and shall be paid contemporaneously with consummation of the transaction; (iii) the consideration paid or payable shall be in an amount not less than the fair market value of the property disposed of; and (iv) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing; provided, further, that all Net Cash Proceeds in excess of $10,000 realized upon such sale or other disposition shall be deposited into the Collection Account for repayment of any Term Loans, interest and/or any Credit Party Expenses then outstanding, if any;

(d)     the sale of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business consistent with the practices of Borrowers as of the date hereof;

(e)     the abandonment or other disposition of Intellectual Property that is not material and is no longer used or useful in any material respect in the business of Borrowers and does not appear on is or otherwise not affixed to or incorporated in any Inventory or necessary in connection with the Records or have any material value;

(f)     any transfer of property or assets that is a Restricted Payment permitted under Section 8.8 or Permitted Investment permitted under Section 8.5;

(g)     the transfer of cash for the payment of Indebtedness to the extent such payments are permitted hereunder and for the payment of other payables in the ordinary course of the business of Borrowers;

(h)     [RESERVED];

(i)     [RESERVED]; and

(j)     sales or other dispositions of assets of Borrowers not otherwise subject to the provisions set forth in this definition, provided, that, as to any such sale or other disposition, each of the following conditions is satisfied: (i) the consideration to be received by Borrowers shall be paid or payable in cash and shall be paid contemporaneously with consummation of the transaction; (ii) the consideration paid or payable shall be in an amount not less than the fair market value of the property disposed of; (iii) such transaction does not involve the sale or other disposition of any Accounts or Equity Interest; (iv) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing.]

(k)   dispositions of other assets as reasonably consented to by Lender or as may be approved by the Bankruptcy Court.

"Permitted Holders" means Jacky Cheung, whether directly or indirectly.

"Permitted Indebtedness" means:

(a)     the Existing Liabilities and the Obligations;

(b)     Indebtedness incurred in the ordinary course of business for (i) acquiring goods, supplies and merchandise on normal trade credit, (ii) the employment of employees or consultants, and (iii) the lease of premises from which Borrowers conduct their Businesses;

(c)     other Indebtedness outstanding on the date hereof and listed on Schedule 8.1 and any refinancings, refundings, renewals or extensions thereof; provided, that, (i) the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to accrued but unpaid interest plus the premium or other amount paid, and fees and expenses

incurred, in connection with such refinancing and by an amount equal to any utilized commitments thereunder, (ii) the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, refunding, renewing or extending Indebtedness, and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to Borrowers or Lender than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended, and (iii) the weighted average life of the principal payments pursuant to such refinanced, refunded, renewed or extended Indebtedness shall be no shorter than the weighted average life of such payments pursuant to such Indebtedness immediately prior to such refinancing, refunding, renewal or extension;

(d)      [RESERVED];

(e)      Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, that, such Indebtedness is extinguished within five (5) Business Days of incurrence;

(f)      Guaranty Obligations in respect of Indebtedness of Borrowers to the extent that such Indebtedness is otherwise permitted pursuant to this definition of Permitted Indebtedness;

(g)      Indebtedness of Borrowers in respect of bid, payment and performance bonds, workers' compensation claims, unemployment insurance, health, disability and other employee benefits or property, casualty or liability insurance, or guarantees of the foregoing types of Indebtedness, in the ordinary course of business and consistent with current practices as of the date hereof;

(h)      unsecured Indebtedness incurred after the Closing Date provided for under the Budget; and

(i)      [RESERVED].

"Permitted Investments" means each of the following:

(a)      Investments consisting of accounts receivables owing to Borrowers if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(b)      the endorsement of instruments for collection or deposit in the ordinary course of business;

(c)      Investments in cash or cash equivalents acceptable to Lender; provided, that, no Term Loans are then outstanding; except that notwithstanding that any Term Loans are outstanding, Borrowers may from time to time in the ordinary course of business consistent with its current practice as of the date hereof make deposits of cash or other immediately available funds in operating demand deposit accounts used for disbursements to the extent required to provide funds for amounts drawn or anticipated to be drawn shortly on such accounts and such funds may be held in cash equivalents consisting of overnight investments until so drawn (so long as such funds and cash equivalents are not held more than two (2) Business Days from the date of the initial deposit thereof);

(d)      deposits of cash for leases, utilities, worker's compensation and similar matters in the ordinary course of business;

(e)      payroll, travel, commission and similar advances to cover matters that in good faith are expected at the time of such advances to be treated as expenses for accounting purposes in accordance with GAAP and that are made in the ordinary course of business consistent with current practices as of the date hereof;

(f)      stock or obligations issued to Borrowers by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to Borrowers in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the debts of such Person; and

(g)      obligations of account debtors to Borrowers arising from Accounts which are past due evidenced by a promissory note made by such account debtor payable to Borrowers.

"Permitted Liens" means:

(a)      the security interests and liens of Lender securing the Existing Liabilities and the rights of setoff of Lender provided for herein or under applicable law;

(b)      liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or that constitute prepetition claims;

(c)      non-consensual statutory liens (other than liens arising under ERISA or securing the payment of taxes) arising in the ordinary course of Borrowers' Business that do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's suppliers', repairmen's and mechanics' liens, to the extent: (i) such liens do not in the aggregate materially detract from the value of the property of Borrowers and do not materially impair the use thereof in the operation of Borrowers, (ii) such liens secure Indebtedness which is not overdue or is fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to Borrowers, in each case prior to the commencement of foreclosure or other similar proceedings, which proceedings (or orders entered in connection with such proceeding) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(d)      zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of Borrowers as presently conducted thereon or materially impair the value or marketability of the Real Property which may be subject thereto;

(e)      pledges and deposits of cash by Borrowers after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of Borrowers as of the date hereof;

(f)      pledges and deposits of cash by Borrowers after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of Borrowers as of the date hereof;

(g)      liens on fixed or capital assets acquired by any Borrower which are permitted under clause (d) of the definition of Permitted Indebtedness so long as (i) such liens and the Indebtedness secured thereby are incurred prior to or within thirty (30) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such liens shall not extend to any other property or assets of Borrowers;

(h)     liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment or other materials which are not owned by Borrowers located on the premises of Borrowers (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of Borrowers and the precautionary UCC financing statement filings in respect thereof;

(i)     statutory or common law liens or rights of setoff of depository banks with respect to funds of Borrowers at such banks to secure fees and charges in connection with returned items or the standard fees and charges of such banks in connection with the deposit accounts maintained by Borrowers at such banks (but not any other Indebtedness or obligations);

(j)     judgments and other similar liens arising in connection with court proceedings that are identified in Schedule 8.2;

(k)     leases or subleases of Real Property granted by Borrowers in the ordinary course of business and consistent with current practices of Borrowers to any Person so long as any such leases or subleases do not interfere in any material respect with the ordinary conduct of the business of Borrowers as presently conducted thereon;

(l)     liens on goods in favor of customs and revenue authorities arising as a matter of law to secure custom duties in connection with the importation of such goods; and

(m)     Permitted Prior Liens and Liens created prior to the Petition Date and set forth on Schedule 8.2; and

"Permitted Prior Liens" has meaning provided therefor in the Orders.

"Permitted Variances" has the meaning provided therefor in Section 7.16(b) hereof.

"Person" or "person" means any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which Borrowers sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a Multiemployer Plan has made contributions at any time during the immediately preceding six (6) plan years or with respect to which Borrowers may incur liability.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Pledge Agreement" shall mean that certain Pledge Agreement, dated as of June 5, 2019, made by Parent Shareholder in favor of Lender, and acknowledged by Borrowers.

"POR" means a definitive plan of reorganization in respect of the Case.

"Provision for Taxes" means an amount equal to all taxes imposed on or measured by net income, whether Federal, State, county or local, and whether foreign or domestic, that are paid.

"Ratification Agreement" means the Ratification Agreement, dated as of the Closing Date, by and among the Borrowers, the Guarantors and Lender, in form reasonably satisfactory to Lender, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Real Property" means all now owned and hereafter acquired real property of Borrowers, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Records" means all of Borrowers' present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrowers with respect to the foregoing maintained with or by any other person).

"Reported Fee Accruals" means all accrued and unpaid fees, disbursements, costs and expenses, allowed by the Bankruptcy Court and incurred by the Case Professionals.

"Reserves" means as of any date of determination, such amounts as Lender may from time to time establish and revise in its Permitted Discretion reducing the amount of Term Loans which would otherwise be available to Borrowers under the lending formula(s) provided for herein: (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in its Permitted Discretion, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Collateral or any other property which is security for the Obligations, its value or the amount that might be received by Lender from the sale or other disposition or realization upon such Collateral, or (ii) the assets or business of Borrowers, or (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), or (b) to reflect Lender's good faith belief that any Collateral report or financial information furnished by or on behalf of Borrowers to Lender is or may have been incomplete, inaccurate or misleading in any material respect or (c) in respect of any Default or an Event of Default, or (d) Availability Reserves. The amount of any Reserves shall bear a reasonable relationship to the circumstance, condition, event or other contingency that is the basis therefor, and no reserve shall duplicate any other reserves or items that are otherwise addressed or excluded through eligibility criteria.  In the event that the event, condition or other matter giving rise to the establishment of any Reserve shall cease to exist, Borrowers may request in writing that Lender discontinue the Reserve established pursuant to such event, condition or other matter, and Lender will have a reasonable period of time to evaluate such request and will be available to discuss such request with Borrowers.

"Responsible Officer" means the chief executive officer, president, chief restructuring officer, chief financial officer, treasurer or assistant treasurer of Borrowers or any of the other individuals designated in writing by an existing Responsible Officer of Borrowers as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of Borrowers shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of Borrowers and such Responsible Officer shall be conclusively presumed to have acted on behalf of Borrowers.

"Restricted Payment" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of Borrowers, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to Borrowers' stockholders, partners or members (or the equivalent Person thereof Borrowers), or payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests of Borrowers, or any setting apart of funds or

property for any of the foregoing, and/or (b) the payment by Borrowers of any management, advisory or consulting fee to any Person or the payment of any extraordinary salary, bonus or other form of compensation to any Person who is directly or indirectly a significant partner, shareholder, owner or executive officer of any such Person, to the extent such extraordinary salary, bonus or other form of compensation is not included in the corporate overhead of Borrowers.

"Sale and Leaseback Transaction" shall have the meaning set forth in Section 8.12.

"Sale Motion" has the meaning provided therefor in Section 7.15(b).

"Sanctioned Entity" means an agency of the government of, or an organization directly or indirectly controlled by, or a person resident in, a country that is subject to Sanctions, or a country or territory that is at any time subject to Sanctions.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC.

"Sanctions" means (a) economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government and administered by OFAC and (b) economic or financial sanctions imposed, administered or enforced from time to time by the U.S. State Department, the U.S. Department of Commerce or the U.S. Department of the Treasury.

"Security Agreement" means the Security Agreement, dated June 5, 2019, by and between Borrowers and Lender.

"Security Documents" means, collectively, the Orders, the Security Agreement, the 9000 Mortgage, the Ratification Agreement and any other agreements, instruments and documents at any time executed by Borrowers or any other Person in connection with this Agreement that are intended to create, perfect or evidence security interests or liens to secure the Obligations.

"Solvent" means, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the date hereof, and (b) the assets and properties of such Person at a fair valuation (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities computed at the amount which, such person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

"Subordinated Debt" means any Indebtedness of Borrowers that is subject to, and subordinate in right of payment to, the right of Lender to receive payment in full of all of the Obligations and is otherwise on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Lender.

"Subordination Agreement" shall mean that certain Subordination Agreement, dated as of June 5, 2019, by and among Lender, Parent Shareholder, Perfectus Aluminum Acquisitions, LLC and Perfectus Aluminum Inc., and acknowledged by Borrowers.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Equity Interests or other

interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Equity Interests of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

"Successor Case" means any case under Chapter 7 of the Bankruptcy Code upon the conversion of any the Case, or in any proceedings superseding or related to any of the foregoing.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loans" means loans now or hereafter made by Lender pursuant to the Credit Facility as set forth in Section 2.1 hereof.

"Termination Date" means the earliest to occur of (i) the Maturity Date or (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) in accordance with Article 10 hereof.

"Total Outstandings" means the aggregate outstanding amount of all Term Loans.

"UCC" means the Uniform Commercial Code as in effect in the State of New York and any successor statute, as in effect from time to time (except that terms used herein which are not otherwise defined herein and defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Lender may otherwise determine).

1.2    Interpretative Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    General.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" has the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, supplemented, extended, renewed, restated or replaced (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.  An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 11.3 or is cured.  Borrowers shall have the burden of

establishing any alleged negligence, misconduct or lack of good faith by Lender under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Reference to a Borrower's "knowledge" or similar concept means actual knowledge of a Responsible Officer, or knowledge that a Responsible Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.

(b) <u>UCC Terms</u>. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; <u>provided</u>, <u>that</u>, to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

(c) <u>Time References</u>. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern Daylight Saving Time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; <u>provided</u>, <u>that</u>, with respect to a computation of fees or interest payable to Lender, such period shall in any event consist of at least one full day.

(d) <u>Payment in Full</u>. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the payment in full in cash of the principal and accrued and unpaid interest with respect to the Term Loans, (ii) the payment in full of all fees, charges and expenses that have accrued and are unpaid regardless of whether payment has been demanded or are otherwise due, (iii) other contingent Obligations for which a claim or demand for payment has been made at such time or in respect of matters or circumstances known to Lender at the time, and which are reasonably expected to result in any loss, cost, damage or expense (including attorneys' fees and legal expenses) to Lender for which Lender would be entitled to indemnification by Borrowers hereunder (or the delivery to Lender of a letter of credit payable to Lender issued by a bank acceptable to Lender, and in form and substance satisfactory to Lender), and (iv) the termination of the Commitment of Lender and the financing arrangements provided by Lender to Borrowers hereunder.

1.3    <u>Accounting Terms</u>. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of Borrowers delivered to Lender. Borrowers shall deliver to Lender at the same time as the delivery of any financial statements given in accordance with the provisions of <u>Section 7.1</u> hereof (a) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding monthly, quarterly or annual financial statements and (b) a reasonable estimate of the effect on the financial statements on account of such changes in application. Notwithstanding anything to the contrary contained herein, (i) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, and (ii) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is (A) unqualified, and (B) does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.4    <u>Rounding</u>. Any financial ratios required to be maintained by Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the

result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5    Designation of Administrative Borrower as Borrowers' Agent.

a)    Each Borrower hereby irrevocably designates and appoints the Administrative Borrower as such Borrower's agent to obtain Loans hereunder, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to Lender on account of Loans, notwithstanding the manner by which such Loans are recorded on the books and records of the Administrative Borrower and of any other Borrower.  In addition, each Loan Party other than Borrowers hereby irrevocably designates and appoints the Administrative Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

c)    The Administrative Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Administrative Borrower has requested a Loan.  Lender shall have no obligation to see to the application of such proceeds therefrom.

## SECTION 2.    CREDIT FACILITY

2.1    Term Loans.  Lender agrees, on the terms and conditions hereinafter set forth, to make a term loan or term loans to Borrowers as follows (each a, "Term Loan", and collectively, the "Term Loans"):

Upon entry of the Interim Order, Lender shall make an initial Term Loan to Borrowers in an aggregate amount equal to $9,270,525.89 (which amount shall be applied by the Lender to repay the Existing Liabilities in full), plus the first advance under the Budget.  After the entry of the Interim Order, upon the written request of the Borrowers, and if no Event of Default shall have occurred, the Lenders shall make additional Term Loans to the Borrowers in accordance with the applicable provisions of the Budget as determined in the sole discretion of the Lender; provided that any cash receipts received by the Borrowers shall reduce the amounts of such Term Loans on a dollar-for-dollar basis.  No portion of any Term Loan repaid may be readvanced or reborrowed.  At no time shall the aggregate amount of the Term Loans exceed the Maximum Term Loan Amount.

2.2    Power of Attorney. Subject to the Orders, each Borrower hereby irrevocably (where applicable, subject to the existence and continuation of a Default and Event of Default, as indicated below) makes, constitutes and appoints Lender (and any of Lender's officers, employees or agents designated by Lender) as such Borrower's true and lawful attorney with power:

(i)    to sign the name of such Borrower on any of the documents pertaining to any Collateral, or on any other similar documents that need to be executed, recorded and/or filed in order to perfect or continue perfected Lender's Liens upon any of the Collateral, if such Borrower fails or refuses to comply, or delays in complying, with its undertakings hereunder;

(ii)    after the occurrence of an Event of Default, to endorse such Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Lender's possession;

(iii)     after the occurrence of an Event of Default, to sign such Borrower's name on drafts against account debtors, on schedules and assignments of Accounts, on notices to account debtors and on any invoice or bill of lading relating to any Account;

(iv)     to do all things necessary to carry out this Agreement;

(v)     to send requests for verification of Accounts, and to contact account debtors in any other manner in order to verify the Accounts; and

(vi)     after the occurrence of an Event of Default, to notify the post office authorities to change the address for delivery of such Borrower's mail to any address designated by Lender, to receive and open all mail addressed to such Borrowers, and to retain all mail relating to the Collateral (provided, that, Lender shall return to Borrowers any mail addressed to Borrowers that does not relate to the Collateral).

The appointment of Lender as Borrowers' attorney and each and every one of Lender's rights and powers, being coupled with an interest, are irrevocable until such time as all of the Obligations have been indefeasibly fully paid and performed. Each Borrower ratifies and approves all acts of the attorney consistent herewith. Neither Lender nor its employees, officers, or agents shall be liable for any acts or omissions or for any error in judgment or mistake of fact or law made in good faith except for gross negligence or willful misconduct.

2.3     <u>Certain Bankruptcy Matters</u>.

(a)     Except to the extent expressly provided otherwise in an Order, the Borrowers hereby agree that, subject only to the Carve Out, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Orders.

(b)     In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     the parties hereto agree, and the Orders shall provide, that the Lender shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Loan Document.  If the Lender (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of Lender's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded

or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this <u>Section 2.3(c)</u> or of the perfection of any other Liens in favor of the Lender on the Collateral; and

(ii)     except as otherwise agreed to by the Lender, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Lender pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Case, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     subject only to the Carve Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender against the Borrowers in respect of any Obligations;

(ii)     other than as provided in the Orders or the Loan Documents, the Lender's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out and Permitted Prior Liens (and as otherwise set forth in the Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the parties hereto agree, and the Orders shall provide, that the Lender's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect Lender's Liens under applicable non-bankruptcy law.

(e)   In connection with any sale or other disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Borrowers hereby gives the Lender the power and right, without assent by such Borrower, to "credit bid" the full amount of all Obligations and any Existing Liabilities then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## SECTION 3.    INTEREST AND FEES

3.1   <u>Rates and Payment of Interest.</u>

(a)   All Obligations (including, to the extent permitted by law, interest not paid when due) shall bear interest at the LIBOR Rate as in effect from time to time plus the Applicable Margin for LIBOR Rate

Loans.  At any time an Event of Default exists or has occurred and is continuing, Obligations shall bear interest at the Default Rate (whether before or after any judgment).

(b)   Interest shall accrue from the date the Term Loan is made or Obligation is incurred or payable until paid in full by Borrowers.  If the Term Loan is repaid on the same day made, one day's interest shall accrue.  Interest accrued on the Term Loan shall be due and payable in arrears, (i) on the first day of each month and (ii) on the Maturity Date.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on earlier of the first day of the month after incurred or demand or the Maturity Date.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand.  All amounts shall be remitted to Lender in immediately available funds via wire transfer.

3.2   <u>Computation of Interest and Fees</u>.  Interest and fees calculated on a per annum basis shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.  The Interest Rate on non-contingent Obligations shall increase or decrease as of the first day of calendar month during the life of each Term Loan by an amount equal to each increase or decrease in the LIBOR Rate since its determination for the applicable period (as determined hereunder), and shall remain in effect until the end of the then current monthly period.  Each determination by Lender of any interest, fees or Interest Rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.

3.3   <u>Closing Fee</u>. Borrowers shall pay to Lender (or Lender shall have charged any loan account of a Borrower, including by effecting a setoff or deduction from the Term Loan advanced on the Closing Date), a closing fee (the "<u>Closing Fee</u>") in an aggregate amount equal to $620,000, it being understood and agreed that the Closing Fee shall (x) be fully earned by Lender and payable by Borrowers on the Closing Date, (y) not be subject to refund or rebate under any circumstances, and (z) not be subject to reduction by way of setoff or counterclaim.

3.4   <u>Minimum Interest and Fees</u>. Notwithstanding anything to the contrary set forth herein or in any of the other Loan Documents, on the earlier to occur of the Maturity Date or the Termination Date, Borrowers shall pay to Lender the sum of all accrued and unpaid interest, fees and reimbursements due and payable hereunder.

3.5   <u>Default Fee</u>.  Upon the occurrence of an Event of Default, the Borrowers shall incur a default fee (the "<u>Default</u> Fee") to the Lenders in the amount of $250,000.00, it being understood and agreed that the Default Fee shall (y) not be subject to refund or rebate under any circumstances, and (z) not be subject to reduction by way of setoff or counterclaim.

3.6   <u>Exit Fee</u>. The Borrowers shall pay to the Lender an exit fee in an amount equal to $310,000.00, <u>plus</u> twenty-five percent (25.0%) of the gross sale proceeds in excess of $30,000,000.00 resulting from the consummation of the Section 363 sale process (the "<u>Exit Fee</u>").  The entire Exit Fee shall (i) be deemed fully earned by Lender on the Closing Date, (ii) be payable upon the earlier to occur of the following: (x) payment in full of the Obligations or (y) the Termination Date, (iii) not be subject to refund or rebate under any circumstances, and (iv) not be subject to reduction by way of setoff or counterclaim

3.7   <u>Maximum Interest</u>. Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, in no event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any of the other Loan Documents and that are deemed interest under applicable law exceed the Maximum Interest Rate (including, to the extent applicable, the provisions of Section 5197 of the Revised Statutes of the United States of America as amended, 12 U.S.C. Section 85, as amended).  In the event any interest is charged or received in excess of the Maximum Interest Rate ("<u>Excess</u>"), Borrowers acknowledge and stipulate that any

such charge or receipt shall be the result of an accident and bona fide error, and that any Excess received by Lender shall be applied, first, to the payment of the then outstanding and unpaid Term Loan hereunder; second, to the payment of the other Obligations then outstanding and unpaid; and third, returned to Borrowers by depositing same in a Designated Deposit Account maintained for such purposes.  All monies paid to Lender hereunder or under any of the other Loan Documents, whether at maturity or by prepayment, shall be subject to any rebate of unearned interest as and to the extent required by applicable law.

## SECTION 4.   CONDITIONS PRECEDENT

4.1   <u>Conditions Precedent to Effectiveness of this Agreement</u>.   The obligation of Lender to effectuate the Closing on the Closing Date, including the agreement of Lender to make the Term Loan, is subject to the satisfaction of each of the following conditions precedent:

(a)   <u>Know Your Customer; Patriot Act</u>.   Lender shall have received all documentation and information as is requested by Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(b)   [RESERVED].

(c)   <u>Legal Due Diligence</u>. Lender and its counsel shall have completed all legal due diligence, the results of which shall be satisfactory to Lender.

(d)   [RESERVED].

(e)   <u>Good Standing Certificates</u>.  Lender shall have received, if applicable, a certificate of status with respect to each Borrower, dated within thirty (30) days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Borrower, which certificate shall indicate that such Borrower is in good standing in such jurisdiction.

(f)   <u>Certificate of Directors' Resolutions, Incumbency, Etc.</u>   Lender shall have received a certificate of a Responsible Officer of each Borrower, in form and substance satisfactory to it, certifying (i) that attached copies of the Organization Documents of such Borrower are true and complete, and in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution, delivery and performance of the Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this Credit Facility; and (iii) to the title, name and signature of each Person authorized to sign the Loan Documents.

(g)   <u>Closing Certificate</u>.   Lender shall have received a certificate, signed by a Responsible Officer of Administrative Borrower, dated as of the Closing Date, stating (i) that no Default or Event of Default exists or has occurred and is continuing, (ii) all of the conditions to the closing of the Credit Facility have been satisfied, (iii) the representations and warranties contained in the Loan Documents are true and correct as of the Closing Date, (iv) each Borrower has complied with all agreements and conditions to be satisfied by it under the Loan Documents as of the Closing Date and (iv) certifying any other factual matters as may be reasonably requested by Lender.

(h)   [RESERVED].

(i)   <u>Lien Searches</u>.   Lender shall have received the results of a recent lien search in each jurisdiction where Borrowers are organized and where the assets of Borrowers are located, and such search shall reveal no security interests, liens or other encumbrances on any of the assets of Borrowers except for

Permitted Liens or security interests, liens or other encumbrances to be discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to Lender.

(j)    Insurance.  Lender shall have received evidence of insurance coverage in form, scope and substance reasonably satisfactory to Lender, and certificates of insurance policies naming Lender as loss payee and additional insured; provided, that, notwithstanding the foregoing, endorsements in form and substance satisfactory to Lender shall be delivered no later than 15 days after the Closing Date.

(k)    Tax Withholding.  Lender shall have received a properly completed and signed IRS Form W-8 or W-9, as applicable, for Borrowers.

(l)    No Material Changes in Governmental Regulations or Policies.  The closing is subject to the condition that no material changes in governmental regulations or policies affecting Borrowers involved in the transaction have occurred prior to the Closing Date.

(m)    Perfected Security Interest.  Lender shall have received evidence, in form and substance reasonably satisfactory to Lender, that Lender has a valid perfected first priority security interest in all of the Collateral (except as to priority, subject to the liens permitted under the definition of Permitted Liens, to the extent that such liens have priority over the liens of Lender under applicable law and except for such items of Collateral as Lender may determine not to perfect its security interest in) and none of the Collateral shall be subject to any other pledges, security interests, mortgages or assignments as security, except for Permitted Liens.

(n)    [RESERVED].

(o)    [RESERVED].

(p)    Credit Agreement and other Loan Documents.  Lender shall have received each of the following documents, in form and substance reasonably satisfactory to Lender, in each case duly executed and delivered by the parties thereto, and each such document shall be in full force and effect and the parties thereto other than Lender shall be in compliance with the terms thereof:

(i)    the Credit Agreement;

(ii)    the Term Note;

(iii)    the Security Documents;

(iv)    Lender shall have received and shall be reasonably satisfied with Borrowers' business plan and such other information (financial or otherwise) reasonably requested by Lender;

(v)    Borrowers shall have paid to Lender all costs, fees and expenses required to be paid on or prior to the Closing Date pursuant to Section 7.11 hereof;

(vi)    all consents required from any Governmental Authority or any third party, licenses or other approvals necessary and/or incident to the conduct of Borrowers' Businesses in the ordinary course have been obtained on terms reasonably satisfactory to Lender and are in full force and effect;

(vii) all legal (including tax implications) and regulatory matters shall be satisfactory to Lender, including, but not limited to, compliance with all applicable requirements of Regulations T, U and X of the Board of Governors of the Federal Reserve System;

(viii) the Interim Order shall have been entered by the Bankruptcy Court, substantially in the form of <u>Exhibit A</u> hereto;

(ix)  all "first day" motions and proposed orders have been filed with and submitted to the Bankruptcy Court, in each case in form and substance reasonably satisfactory to the Lender and otherwise consistent with the Budget;

(x)  Borrowers shall have delivered to Lender a letter of intent executed by a third party providing for the sale of its Business or substantially all of the assets of the Borrowers pursuant to Section 363 of the United States Bankruptcy code, on terms (including without limitation the adherence to the Milestones) acceptable to the sole satisfaction of the Lender;

(xi)  copies of the engagement letter with the Independent Consultant; and

(xii)  such other and additional documents and instruments as shall be required by Lender.

4.2   <u>Conditions Precedent to each Term Loan</u>.  The obligation of Lender to make each Term Loan on the Closing Date and thereafter, is subject to the further satisfaction of, or waiver of, immediately prior to or concurrently with the making thereof, of each of the following conditions precedent:

(a)  all representations and warranties contained herein and in the other Loan Documents that are qualified as to materiality or Material Adverse Effect shall be true and correct and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct to the extent required hereunder or under the other Loan Documents on and as of such earlier date);

(b)  no Default or Event of Default shall exist or have occurred and be continuing;

(c)  Lender shall have received a request for the Term Loan and related disbursement advice and information as Lender may require in accordance with the requirements of this Agreement, and in each case the use of the proceeds of the Term Loan shall be consistent with the Budget and the Orders;

(d)  the use of the proceeds of the Term Loan, and after giving effect to any of the foregoing, no event, condition or circumstance that has or individually or in the aggregate could reasonably be expected to have a Material Adverse Effect shall have occurred; and

(e)  after giving effect to any of the foregoing, the aggregate principal amount of the Term Loan shall not exceed the Maximum Term Loan Amount.

The request for the Term Loans submitted by Borrowers shall be deemed to be a representation and warranty by Borrowers that the conditions specified in <u>Section 4.2</u> have been satisfied on and as of the Closing Date. The making of the Term Loans shall not be deemed a modification or waiver by Lender of any of the terms of this Agreement or any Default or Event of Default.

## SECTION 5.   PAYMENTS AND ADMINISTRATION

5.1   <u>Payments Generally, Allocation of Proceeds; Collection Account Proceeds.</u>

(a)  All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any Taxes, and in immediately available

funds, not later than 12:00 noon on the due date. Any payment after such time shall be deemed made on the next Business Day. If any payment is due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. All Obligations shall be payable to an account Lender may designate in writing to Borrowers from time to time for receipt of payments.

(b)  Subject to the other terms and conditions contained herein, in the event an Event of Default has occurred, exists and is continuing, Lender shall apply payments received or collected from Borrowers or for the account of Borrowers (including the monetary proceeds of collections or of realization upon any Collateral), and proceeds deposited in the Collection Account in such manner and in such order as Lender shall determine in its exclusive discretion.

(c)  For purposes of calculating the amount of the Term Loans available to Borrowers, such payments will be applied (conditional upon final collection) to the Obligations on the first Business Day after receipt by Lender of immediately available funds provided such payments and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit the applicable loan account on such day, and if not, then on the next Business Day.

5.2  <u>Indemnity for Returned Payments</u>. If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Lender. Borrowers shall be liable to pay to Lender, and does hereby agree to indemnify and hold Lender harmless for the amount of any payments or proceeds surrendered or returned. This <u>Section 5.2</u> shall remain effective notwithstanding any contrary action which may be taken by Lender in reliance upon such payment or proceeds. The preceding two sentences of this <u>Section 5.2</u> shall survive the payment of the Obligations and the termination of this Agreement.

5.3  <u>Repayments</u>.

(a)  Term Loans shall be due and payable in full on the Maturity Date. All Obligations other than Term Loans, and fees and reimbursement for expenses, including, without limitation, Credit Party Expenses, shall be paid by Borrowers as provided herein and in the other Loan Documents or, if no payment date is specified, on demand. Borrowers shall make payment in full of the Obligations on the Maturity Date or upon the acceleration of any of the Obligations in connection with the occurrence of an Event of Default.

(b)  [RESERVED].

5.4  <u>Prepayments.</u>

(a)  Borrowers may, upon irrevocable notice from the Administrative Borrower to Lender at any time or from time to time voluntarily prepay the Term Loans in whole or in part; <u>provided</u>, <u>that</u>, (i) such notice must be received by Lender not later than 11:00 a.m. three (3) Business Days prior to any date of prepayment of Term Loans; (ii) any prepayment of Term Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

(b)  In the event that the aggregate principal amount of the Term Loans outstanding at any time exceeds the Maximum Term Loan Amount, such event shall not limit, waive or otherwise affect any rights of Lender in such circumstances or on any future occasions and Borrowers shall, upon demand by Lender, which may be made at any time or from time to time, immediately repay to Lender the entire amount of any such excess(es) for which payment is demanded.

(c)    Upon receipt by Borrowers of any Net Cash Proceeds in excess of $10,000 from any Dispositions described in subclause (c) or (i) of the definition of Permitted Dispositions or from any Sale and Leaseback Transaction permitted under Section 8.12, Borrowers shall immediately prepay the Term Loans in an amount equal to 100% of such Net Cash Proceeds in excess of $10,000.

(d)    [RESERVED].

5.5    Statements.    Upon written request from Administrative Borrower, Lender shall render to Borrowers a statement setting forth the balance in Borrowers' loan account(s) maintained by Lender for Borrowers pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses.    Each such statement shall be subject to subsequent adjustment by Lender but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrowers and conclusively binding upon Borrowers as an account stated except to the extent that Lender receives a written notice from Administrative Borrower of any specific exceptions of Borrowers thereto within thirty (30) days after the date such statement has been received by Administrative Borrower.    Until such time as Lender shall have rendered to Administrative Borrower a written statement as provided above, the balance in Borrowers' loan account(s) shall be presumptive evidence of the amounts due and owing to Lender by Borrowers, absent manifest error.

5.6    Borrowers' Loan Account; Evidence of Debt.    Lender shall maintain an account or accounts evidencing the Obligations of Borrowers to Lender, including the amounts of the Term Loans made by it and each repayment and prepayment in respect thereof, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.    Any such records shall be presumptively correct, absent manifest error; provided, that, the failure to make any entry or any error in such records, shall not affect any of the Obligations in respect of any applicable Term Loans.    Lender may request that Term Loans made by it be evidenced by a promissory note.    In such event, Borrowers shall execute and deliver to Lender one or more promissory notes payable to the order of Lender (or, if requested by Lender, to Lender and its registered assigns) and in a form approved by Lender.    Thereafter, the Term Loans evidenced by such promissory note(s) and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and it's registered assigns).

5.7    Taxes.

(a)    Withholding of Taxes; Gross-Up.    Any and all payments by or on account of any obligation of Borrowers under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.    If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall, on ten (10) days' prior written notice to Administrative Borrower, be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 5.7) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Borrowers.    Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lender timely reimburse it for, Other Taxes.

(c)    Evidence of Payments.    As soon as practicable after any payment of Taxes by Borrowers to a Governmental Authority pursuant to this Section 5.7, Borrowers shall deliver to Lender the original or a

certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(d)  Indemnification by Borrowers.  Borrowers shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Administrative Borrower by Lender shall be conclusive absent manifest error.

(e)  Survival.  Each party's obligations under this Section 5.7 shall survive the termination of the making of the Term Loans and the repayment, satisfaction or discharge of all obligations under any Loan Document.

## SECTION 6.  REPRESENTATIONS AND WARRANTIES

Each Borrower hereby represents and warrants to Lender the following:

6.1  Organization; Powers.  Each (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 6.1 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

6.2  Authorization; Enforceability.  The execution, delivery and performance by each Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which Borrowers are a party has been duly executed and delivered by Borrowers and constitutes a legal, valid and binding obligation of Borrowers, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

6.3  No Conflicts.  The execution, delivery, and performance by Borrowers of the Loan Documents to which they are a party do not and will not (a) violate any material provision of Federal, State, or local law or regulation applicable to Borrowers, the Organization Documents of Borrowers, or any order, judgment, or decree of any court or other Governmental Authority binding on Borrowers or its property, (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of Borrowers where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (c) result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of Borrowers, other than Permitted Liens, or (d) require any approval of any holder of Equity Interests of Borrowers or any approval or consent of any Person under any Material Contract of Borrowers, other than consents or approvals that have been obtained and that are still in force and effect and except, in

the case of Material Contracts, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

6.4   <u>Governmental Approvals</u>.   The execution, delivery, and performance by Borrowers of the Loan Documents to which Borrowers is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Lender for filing or recordation, as of the Closing Date.

6.5   <u>Financial Statements; No Material Adverse Effect</u>. The balance sheets, and related statements of income, cash flow and shareholders' equity, of Borrowers that have been and are hereafter delivered to Lender, have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the financial condition of Borrowers as of the date thereof and results of operations for the period then ended.   No financial statement delivered to Lender at any time contains any knowingly untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading.

6.6   <u>Properties; No Liens</u>.   (a)   Borrowers have (i) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (ii) good and marketable title to (in the case of all other personal property), all of their assets reflected in its most recent financial statements delivered pursuant to <u>Section 7.1</u>, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.

(b)   Except as otherwise set forth on <u>Schedule 6.6</u>, all of such assets are free and clear of Liens except for Permitted Liens.

6.7   <u>Litigation</u>.   Except as set forth on <u>Schedule 6.7</u>, there are no actions, suits, proceedings or investigations pending or, to best of Borrowers' knowledge, threatened against Borrowers, or their Businesses or assets, that (a) relate to any Loan Documents or transactions contemplated thereby or (b) either individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect.

6.8   <u>Compliance with Laws</u>.   Borrowers are in compliance with the requirements of all applicable laws, rules, regulations, executive orders or codes (including Environmental Laws) and all final judgments, orders, writs, injunctions, decrees, rules or regulations of any court or any Governmental Authority, in each case where the failure to comply individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect.   There are no outstanding citations, notices or orders of material noncompliance issued to Borrowers under any applicable laws, rules, regulations, executive orders or codes, in each case where the failure to comply individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect other than as set forth on Schedule 6.9 hereof.

6.9   <u>Environmental Condition</u>.   Except as set forth on <u>Schedule 6.9</u>, (a) Borrowers' assets have not been used by Borrowers, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) Borrowers' assets have not been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) Borrowers have not received notice that a security interest, lien or other encumbrance arising under any Environmental Law has attached to any assets of Borrowers, and (d) Borrowers and their assets are not subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or

34

liability thereunder that, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect.  Borrower is a party in an ISRA Action in New Jersey which is continuing, and with respect to which the Borrower has fully funded a New Jersey Department of Environmental Protection Remediation Trust Fund to address that claim.

6.10  <u>No Defaults</u>.  No event or circumstance has occurred or exists that constitutes a Default or Event of Default.

6.11  <u>Material Contracts</u>.  <u>Schedule 6.11</u> sets forth all Material Contracts to which Borrowers is a party or is bound as of the date hereof.  Borrowers is not in breach or in default in any material respect under any Material Contract and has not received any notice of the intention of any other party thereto to terminate any Material Contract.

6.12  <u>Restrictive Agreements</u>.  Except as set forth on <u>Schedule 6.12</u>, as of the date hereof, Borrowers are not party or subject to any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of Borrowers to create, incur or permit to exist any security interest, lien or other encumbrance on any of their property or assets, or (b) the ability of Borrowers to make or repay loans or advances to Borrowers or to transfer assets.

6.13  <u>Taxes</u>.  Borrowers have timely filed or caused to be filed all Tax returns and reports required to have been filed and have paid or caused to be paid all Taxes required to have been paid by them, except Taxes that are being contested in good faith by appropriate proceedings and for which Borrowers have set aside on their books adequate reserves.  Except as set forth on <u>Schedule 6.13</u>, as of the date hereof, no tax liens have been filed and no claims are being asserted with respect to any such Taxes.

6.14  <u>ERISA</u>.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to have a Material Adverse Effect.

6.15  <u>Insurance</u>.  <u>Schedule 6.15</u> sets forth a description of all insurance maintained by or on behalf of Borrowers as of the date hereof.  As of the date hereof, all premiums in respect of such insurance have been paid.  Borrowers maintain with financially sound and reputable insurance companies, insurance on all of their property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

6.16  <u>Capitalization and Subsidiaries</u>.  <u>Schedule 6.16</u> sets forth (a) a correct and complete list of the name and relationship to Borrowers of each Subsidiary, (b) a true and complete listing of each class of each of Borrowers' authorized Equity Interests, all of which membership interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on <u>Schedule 6.16</u>, and (c) the type of entity of each Borrower and each Subsidiary. There are no outstanding commitments or other obligations of Borrowers to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of Borrowers.

6.17  <u>Security Interest in Collateral</u>.  The Security Documents create legal and valid security interests in all of the Collateral in favor of Lender, and such security interests constitute perfected and continuing security interests on the Collateral, securing the Obligations, enforceable against Borrowers and having priority over all other security interests, liens or other encumbrances on the Collateral except (a) Permitted Liens, to the extent any such Permitted Liens would have priority over the security interests of Lender pursuant to any applicable law and (b) security interests perfected only by possession or the notation of the security interest on the certificate of title with respect thereto to the extent Lender has not obtained or does not maintain possession of such Collateral or has not had its security interest noted on the certificate of title.

6.18 <u>Brokers</u>.   Except as set forth on <u>Schedule 6.18</u>, there are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

6.19 <u>Intellectual Property</u>.   Borrowers own, or are licensed to use, all Intellectual Property necessary to their businesses as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on <u>Schedule 6.19</u>, and the use thereof by Borrowers does not infringe on the rights of any other Person, and except as set forth on such Schedule, Borrowers' rights thereto are not subject to any licensing agreement or similar arrangement. No material trademark, servicemark, copyright or other material Intellectual Property at any time used by Borrowers which is owned by another person, or owned by Borrowers subject to any security interest, lien or other encumbrance, is affixed to or incorporated in any Collateral, except (a) to the extent permitted under the terms of the license agreements listed on <u>Schedule 6.19</u> and (b) to the extent to which such Intellectual Property is affixed or incorporated is permitted by Borrowers under applicable law (including the United States Copyright Act of 1976).

6.20 [RESERVED].

6.21 <u>Labor Relations</u>.   Except as described on <u>Schedule 6.21</u>, Borrowers is not party to or bound by any collective bargaining agreement, management agreement or consulting agreement.  There are no material grievances, disputes or controversies with any union or other organization of Borrowers' employees or any threatened strikes, work stoppages or demands for collective bargaining.

6.1 [RESERVED].

6.23 <u>Margin Regulations, Investment Company Act, Etc.</u>  Borrowers is not engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No proceeds of Term Loans will be used by Borrowers to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.  Borrowers is not (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940, or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

6.24 <u>OFAC</u>.   Borrowers are not, and no directors, officers, employees, agents or representatives acting or benefiting in any capacity in connection with this Agreement (i) is a Sanctioned Person; (ii) is a Person that is owned or controlled by a Sanctioned Person; (iii) is located, organized or resident in a country or territory that is subject to Sanctions; or (iv) has directly or indirectly engaged in, or is now directly or indirectly engaged in, any dealings or transactions with any Sanctioned Person or Sanctioned Entity or is otherwise in violation of any Sanctions.

6.25 <u>Complete Disclosure</u>.   No Loan Document contains any knowingly untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading.  There is no fact or circumstance that Borrowers have failed to disclose to Lender in writing that has, or could reasonably be expected to have, a Material Adverse Effect.

**SECTION 7.   AFFIRMATIVE COVENANTS**

7.1 <u>Financial Statements and Other Information</u>.   Borrowers (a) will deliver to Lender the internal financial statements, reports, and other items set forth on <u>Schedule 7.1</u> no later than the times specified therein, (b) maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP, and (c) will (i) keep a reporting system that shows all additions, sales, claims,

returns, and allowances with respect to its sales, and (ii) maintain its billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Lender.

7.2 <u>Notices of Material Events</u>. Borrowers will promptly notify Lender in writing of: (a) the occurrence of any Default or Event of Default; (b) any matter that has, or could reasonably be expected to have, a Material Adverse Effect; (c) any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of Borrowers thereof; (d) any dispute, litigation, investigation, proceeding or suspension between Borrowers and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting Borrowers, including pursuant to any applicable Environmental Laws; (e) the occurrence of any ERISA Event; (f) any material change in accounting policies or financial reporting practices of Borrowers; (g) any change in Borrowers' senior executive officers; (h) the filing of any lien for unpaid Taxes against any Borrowers; (i) any loss, damage, or destruction to, or commencement of any action or proceeding for the taking under eminent domain, condemnation or similar proceeding, of Collateral, whether or not covered by insurance; and (j) any transaction occurring after the Closing Date consisting of: (1) the incurrence of Material Indebtedness, and/or (2) the voluntary or involuntary grant of any Lien other than a Permitted Lien upon any property of Borrowers; <u>provided</u>, <u>that</u>, each such notice under these clauses (1) and (2) (as to a voluntary grant) shall be received by Lender not later than ten (10) Business Days thereafter, together with such other information with respect thereto as Lender may request. Each notice pursuant to this <u>Section 7.2</u> shall be accompanied by a statement of a Responsible Officer of Borrowers setting forth details of the occurrence referred to therein and stating what action Borrowers has taken (or proposes to take) with respect thereto.

7.3 <u>Existence</u>. Borrowers will do or cause to be done all things necessary to preserve, renew and keep in full force and effect their respective legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of their Businesses, and maintain all requisite authority to conduct their businesses in each jurisdiction in which such business is conducted.

7.4 <u>Payment of Obligations and Taxes</u>. Subject to any applicable provisions in any Debtor Relief Law, Borrowers will pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) Borrowers has set aside on its books adequate reserves with respect thereto in accordance with GAAP; <u>provided</u>, <u>that</u>, Borrowers will remit withholding taxes and other payroll taxes to the appropriate Governmental Authority as and when claimed to be due, notwithstanding the foregoing exceptions.

7.5 <u>Maintenance of Properties</u>. Borrowers will keep and maintain all property material to the conduct of their businesses in good working order and condition, ordinary wear and tear excepted.

7.6 <u>Compliance with Laws</u>. Borrowers will (a) comply with all laws, rules, regulations, licenses, approvals and orders applicable to them and duly observe all requirements of any foreign, Federal, State or local Governmental Authority applicable to them or their property (including without limitation Environmental Laws) and (b) perform in all material respects its obligations under Material Contracts to which it/they is/are a party.

7.7 <u>Insurance</u>. Borrowers will maintain with financially sound and reputable carriers (a) insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Security Documents. Borrowers will from time to time upon Lender's request furnish to Lender information in reasonable detail as to the insurance so maintained.

7.8   <u>Inspection Rights</u>. Upon the request of Lender, after reasonable prior notice to Borrowers, Borrowers will permit representatives and other professionals engaged by Lender for such purpose to visit and inspect any of its properties, to examine their corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss their affairs, finances and accounts with its directors, officers, and accountants, all at the expense of Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired.

7.9   <u>Use of Proceeds</u>.  Borrowers shall use the proceeds of the Term Loans hereunder (a) to repay the Existing Liabilities in full, (b) only for general operating, working capital and other corporate purposes of Borrowers, in each case subject to and as limited by the Budget and as may be permitted by the Orders, (c) to fund the Carve Out, and (d) in a manner that is not otherwise prohibited by the terms of the Organization Documents of Borrowers, hereunder or under the Orders.

7.10   <u>Cash Management; Collection of Proceeds of Collateral.</u>

(a)   [RESERVED].

(b)   The Bankruptcy Court shall have entered the Cash Management Order, providing, inter alia, authorization for Borrowers continued use and maintenance of its existing cash management system, and otherwise upon terms acceptable to Lender.

7.11   <u>Costs and Expenses</u>.  Subject to the Orders, Borrowers shall pay to Lender on demand all reasonable and customary costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, the other Loan Documents and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including: (a) all costs and expenses of filing or recording (including UCC financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable), (b) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, together with Lender's customary charges and fees with respect thereto; (c) actual costs and expenses of preserving and protecting the Collateral; (d) actual costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Lender in the Collateral, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Loan Documents or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (e) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations, plus a per diem charge at Lender's then standard rate for Lender's examiners in the field and office; and (f) the reasonable fees and disbursements of counsel (including legal assistants) to Lender in connection with any of the foregoing.

7.12   <u>Equity Contribution</u>.  On Wednesday of each week following the Closing Date, Borrowers shall deliver to Lender evidence of an additional equity contribution to Borrowers in an amount not less than $50,000.00 on terms and conditions acceptable to the sole satisfaction of Lender.

7.13   <u>Chief Restructuring Officer / Chief Financial Officer</u>.  At all times, Borrowers shall continue to engage the Independent Consultant to serve as its chief restructuring officer and chief financial officer, with such duties to be shared by Dalton Edgecomb and Jordan Meyers from the Independent Consultant, all on terms reasonably acceptable to Lender and Debtors.

7.14   <u>Retention of and Communication with Consultants, Liquidators and Financial Advisors</u>.

(a)   Each Loan Party will continue to retain the Independent Consultant, the scope and terms of such engagement to be reasonably satisfactory to the Lender (subject to Bankruptcy Court approval).  Until such time as all Existing Liabilities and all Obligations have been paid in full, the Loan Parties shall continue to retain the Independent Consultant to assist the Loan Parties with the preparation of the Budget and the other financial and Collateral reporting required to be delivered to the Lender pursuant to this Agreement.

(b)   The Loan Parties authorize the Lender and Lender Consultant to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Independent Consultant), which have been engaged from time to time by the Loan Parties, and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Lender and Lender Consultant information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party. Senior management of the Loan Parties and such financial and restructuring consultants shall (unless the Lender otherwise consents, which consent may be by e-mail) participate in weekly telephonic calls with the Lender (and/or their advisors and counsel) to discuss various matters, including the Budget and Permitted Variances.

(c)   Each Loan Party acknowledges that the Lender shall be permitted to engage such outside consultants and advisors (each, a "<u>Lender Consultant</u>"), for the sole benefit of the Lender and the other Credit Parties, as the Lender may determine to be necessary or appropriate in their sole discretion.  Each Loan Party and agrees that (i) such Loan Party shall provide its complete cooperation during business hours with any Lender Consultant (including, without limitation, providing reasonable access to such Loan Party's business, books and records; <u>provided</u> that no Loan Party shall be required to disclose to the Lender Consultant any information (x) restricted by a third party confidentiality agreement, (y) in respect of which disclosure to the Lender Consultant is prohibited by applicable law, or (z) that is subject to attorney-client or similar privilege or constitutes attorney work product; (ii) all reasonable costs and expenses of any such Lender Consultant shall be Credit Party Expenses; and (iii) all reports, determinations and other written and verbal information provided by any Lender Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

7.15   <u>Bankruptcy Related Affirmative Covenants</u>.

(a)   On or before the date that is twenty (20) days after the Petition Date, the Loan Parties shall have filed a motion under Section 365 of the Bankruptcy Code requesting extension of the date on which the Loan Parties must assume or reject leases to two hundred ten (210) days after the entry of the order for relief, with an order so extending that deadline to be have been entered by the Bankruptcy Court within thirty (30) days after the filing of the motion.  The Loan Parties may not, without the prior written consent of the Lender, assume, assume and assign, or reject leases. The Loan Parties shall use their best efforts to obtain an order from the Bankruptcy Court granting such extension motion.

(b)   Within five (5) Business Days of the Petition Date, the Borrower shall file a motion or series of motions (collectively, a "<u>Sale Motion</u>") requesting approval of a Section 363 sale process the purpose of which is to sell all of the Borrowers' Businesses and/or assets as either a going concern, as a partial going concern and a partial liquidation, or any combination of the foregoing, which shall include a motion seeking authority to establish bidding procedures (and to engage the Liquidator, if necessary, to conduct the sale as the so-called "stalking horse" and enter an APA (as defined below), to the extent no going concern sale is achieved). In furtherance of the above-described Section 363 sale process, the following additional milestones (collectively, the "<u>Milestones</u>") shall be applicable:

(i)     On or before five (5) Business Days after the Petition Date, the Borrowers shall distribute so called "bid packages" from its investment banker to all potential buyers;

(ii)     On or before August 28, 2021, Borrowers shall have received an enforceable asset purchase agreement ("APA") in respect of the sale of all or substantially all of the assets of the Borrowers;

(iii)     The Bankruptcy Court shall hold a hearing in respect of the Sale Motion at the earliest date consistent with the court's calendar and shall enter an order, in form and substance reasonably satisfactory to the Lender, establishing bidding procedures, which shall include, without limitation, a bid deadline of October 11, 2021;

(iv)     On or before October 15, 2021, the Borrowers shall conduct an auction among all qualified bidders (the "Auction"), with the highest and best bid or combination of bids being selected, in consultation with the Lender and any Committee appointed in the Case (collectively, the "Successful Bids");

(v)     On or before October 18, 2021 (provided that the court calendar can accommodate), the Bankruptcy Court shall hold a hearing (the "Sale Approval Hearing") in respect of the Successful Bids and shall enter one or more orders, each in form and substance reasonably satisfactory to the Lender, approving the Successful Bids (each a "Sale Approval Order"); and

(vi)     On or before November 1, 2021, the closing of the transactions contemplated by the Successful Bids and approved pursuant to the Sale Approval Order shall be consummated and the Borrowers and/or other Loan Parties shall have indefeasibly paid in full in cash all Loans (and to the extent not previously paid in full, all Existing Liabilities), plus any accrued and unpaid interest and fees thereon, and irrevocably terminated the Commitments.

(c)     The Loan Parties shall promptly, punctually, and faithfully perform all of the terms and conditions of the Orders.

(d)     On or before the date that is thirty (30) days following the Petition Date, the Bankruptcy Court shall have entered the Final Order acceptable to the Lender, including authorization and approval of the Final Roll-Up.

(e)     The APA and/or the letter of intent referenced in Section 4.1(p)(x) with respect to the sale of all or substantially all of the assets of the Borrowers, shall not be terminated, rescinded or revised for any reason.

7.16     Performance Within Budget.   At all times following the Closing Date, Borrowers will strictly perform in accordance with the Budget (subject to Permitted Variances (as defined below)), including having made all scheduled payments to the Existing Credit Parties and Credit Parties as applicable as and when required.  Furthermore:

(a)     [RESERVED];

(b)     Total Disbursements on a cumulative basis shall not exceed in the aggregate 5% of the projected amounts set forth in the Budget with respect thereto (the "Permitted Variances"), although in each case the variances under a weekly Variance Report shall be reported on a line-item (and not an aggregate) basis and tested on an aggregate basis; and

(c)   The foregoing shall be reported on Wednesday of each week on a cumulative basis commencing with the first such day to occur after the second full calendar week following the Closing Date, and thereafter on a weekly and a cumulative basis (each of the foregoing periods, a "Testing Period") pursuant to the Variance Report delivered by the Borrowers to the Lender.

7.17   Additional Information.  Each Loan Party will, and will cause each of its Subsidiaries to:

(a)   as soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings related to the Orders or this Agreement, deliver to the Lender all such documents to be filed and provide the Lenders with a reasonable opportunity to review and comment on all such documents;

(b)   deliver to the Lender promptly after the same are available, copies of all pleadings, applications, judicial information, financial information and other documents filed on behalf of any Loan Party with the Bankruptcy Court in the Case, or distributed by or on behalf of any Loan Party to any Committee; and

(c)   allow the Lender access to, upon reasonable notice during normal business hours, all financial professionals engaged by the Loan Parties, including, but not limited to, the Independent Consultant (which engagement, with respect to any financial professionals engaged after the Closing Date, shall be on terms and conditions reasonably satisfactory to the Lender).

## SECTION 8.    NEGATIVE COVENANTS

8.1   Indebtedness.  Borrowers shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except for the Permitted Indebtedness.

8.2   Liens.   Borrowers shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except Permitted Liens.

8.3   Fundamental Changes.   No Borrower shall, directly or indirectly, (a) change its name or conduct business under any fictitious name; (b) change its tax, charter or other organizational identification number; (c) change its form or state of organization; or (d) merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions.

8.4   Asset Sales.   Except as otherwise provided by the Sale Motion, Borrowers shall not sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of their assets to any other Person, except for Permitted Dispositions or agree to do any of the foregoing, except to the extent that such agreement contains a condition requiring the consent of Lender if the agreement to do any of the foregoing is otherwise prohibited by the terms hereof.

8.5   Investments.  Borrowers shall not, directly or indirectly, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any capital contribution or other investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person

constituting a business unit or all or a substantial part of the assets or property of any other Person (whether through purchase of assets, merger or otherwise), or form or acquire any Subsidiaries, or agree to do any of the foregoing (each of the foregoing an "Investment"), except Permitted Investments.

8.6     Transactions with Borrower Affiliates.  Borrowers shall not, directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Borrower Affiliates, except pursuant to the reasonable requirements of Borrowers' Businesses and upon fair and reasonable terms no less favorable to Borrowers than Borrowers would obtain in a comparable arm's length transaction with an unaffiliated person, except for the following: (a) any employment or compensation arrangement or agreement, employee benefit plan or arrangement, officer or director indemnification agreement or any similar arrangement or other compensation arrangement entered into by Borrowers in the ordinary course of business and payments or awards pursuant thereto, and (b) Restricted Payments permitted under Section 8.8 hereof.

8.7     Change in Business.  Borrowers shall not engage in any business other than the business of Borrowers on the date hereof and any business reasonably related, ancillary or complimentary to the business in which Borrowers is engaged on the date hereof.

8.8     Restricted Payments.  Borrowers shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except Borrowers may declare and make dividend payments or other distributions payable solely in the Equity Interests of Borrowers.

8.9     Restrictive Agreements.  Borrowers shall not, directly, or indirectly, create or otherwise cause or suffer to exist any agreement or other arrangement that prohibits, restricts or imposes any condition on the ability of Borrowers to pay dividends or make other distributions or pay any Indebtedness owed by or to Borrowers or make loans or advances or grant security interests in or liens on any of its assets or transfer any of its assets, except such an agreement or other arrangement that (a) is in effect on the Closing Date, (b) relates to secured Indebtedness permitted hereunder, as long as the restrictions apply only to collateral for such Indebtedness or (c) constitute customary restrictions on assignment in leases and other contracts.

8.10    Certain Payments of Indebtedness, Etc.  Borrowers shall not make or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness.

8.11    Amendment of Material Documents.  Borrowers shall not amend, modify or waive any of the terms of: (a) its Organization Documents except for amendments, modifications or other changes that do not affect the rights and privileges of Borrowers and do not affect the ability of Borrowers to amend, modify, renew or supplement the terms of this Agreement or any of the other Loan Documents, or otherwise affect the interests of Lender and so long as at the time of any such amendment, modification or waiver, no Default or Event of Default shall exist or have occurred and be continuing or (b) any agreement, document or instrument evidencing or governing any Material Indebtedness, except, that, Borrowers may, after prior written notice to Lender, amend or modify the terms thereof to forgive, or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or to make the terms thereof less restrictive or burdensome to Borrowers.

8.12    Sale and Leasebacks.  Borrowers shall not enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except for any such sale of any fixed or capital assets by Borrowers that is made for cash

42

consideration in an amount not less than the fair value of such fixed or capital asset and (a) is consummated within ninety (90) days after Borrowers acquire or complete the construction of such fixed or capital asset, (b) the obligations of Borrowers under such lease constitute Permitted Indebtedness, and (c) the Net Cash Proceeds realized by Borrowers upon the sale or transfer of such property is paid to Lender in accordance with the terms and conditions of this Agreement.

8.13   Chapter 11 Claims.  The Loan Parties shall not, until payment in full of the Obligations and the Existing Liabilities, except with respect to the Existing Liabilities and the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Lender and the Credit Parties hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

8.14   Bankruptcy-Related Negative Covenants  The Loan Parties shall not consent to or permit to exist any of the following:

(a)   any modification, stay, vacation or amendment to the Orders to which the Lender has not consented in writing;

(b)   a priority claim or administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations, except with respect to the Existing Liabilities, Permitted Prior Liens and the Carve Out;

(c)   except as agreed to by the Lender, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(d)   any order which authorizes the payment of any Indebtedness (other than the Existing Liabilities, Indebtedness reflected in the Budget, and other Indebtedness approved by the Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget) except that the Debtor may provide security to any utility providing utility service to the Debtor under Section 366 of the Bankruptcy Code; or

(e)   any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

8.15   Chapter 11 Claims.  The Loan Parties shall not, until payment in full of the Obligations and the Existing Liabilities, except with respect to the Existing Liabilities and the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Lender and the Credit Parties hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

8.16   Use of Collateral.  The Loan Parties shall not use or permit the use of Collateral, proceeds of Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, any Committee, if any, or any trustee or other estate representative appointed in the Case (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)   other than as expressly permitted in the Orders, to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Lenders in "full" in cash; or

(b)   to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Lender, the other Credit Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation: (i) any avoidance actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the Existing Credit Agreement, the Existing Liabilities or the Existing Liens; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Lender hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Orders).  Notwithstanding anything to the contrary herein, the Committee may use up to $50,000.00 in the aggregate amount of the Carve Out, any cash collateral, or proceeds of the Loans to investigate the Existing Credit Parties (the "Committee Investigation Budget"); provided, that the Borrowers' stipulations as to validity, priority and security of the Existing Liabilities shall be binding upon each other party in interest, including any Committee, unless such party in interest commences a challenge by (x) with respect to the Committee, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Order.

## SECTION 9.   FINANCIAL COVENANTS

9.1   [RESERVED]

## SECTION 10.  EVENTS OF DEFAULT AND REMEDIES

10.1   Events of Default.  The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)   (i) Borrowers fail to make any principal payment hereunder when due or fail to pay interest, fees or any of the other Obligations on the due date thereof, or (ii) a Borrower fails to perform any of the covenants contained in Sections 7.1, 7.2, 7.7, 7.10, 7.12, 7.13, 7.14, 7.15, 7.16, 7.17, Section 8 and Section 9, or the statements made in Section 6.9 become incorrect, false or misleading, and, in all instances, such failure(s) and/or issue(s) shall continue for one (1) Business Day following written notice thereof from Lender to Administrative Borrower, or (iii) Borrowers fail to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Loan Documents other than those described in Sections 10.1(a)(i) and 10.1(a)(ii) above and such failure shall continue for five (5) days following written notice thereof from Lender to Administrative Borrower;

(b)   any representation, warranty or statement of fact made by Borrowers to Lender in this Agreement, the other Loan Documents or any other written agreement, schedule, confirmatory assignment or otherwise that are qualified as to materiality or Material Adverse Effect shall when made or deemed made be

incorrect, false or misleading in any material respect and any other such representation, warranty or statement of fact made by Borrowers to Lender shall when made or deemed made be incorrect, false or misleading in any material respect;

(c)    following the petition date, any judgment (other than a judgment that is an Existing Liability) for the payment of money is rendered against Borrowers in excess of $100,000 in the aggregate (to the extent not covered by independent third party insurance where the insurer has not declined or disputed coverage) and shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against Borrowers or any of the Collateral having a value in excess of $100,000;

(d)    [RESERVED];

(e)    [RESERVED];

(f)    [RESERVED];

(g)    except as a result of the commencement of the Case or unless payment, acceleration and/or the exercise of rights and remedies as a result thereof (as applicable) is stayed by the Bankruptcy Court any default under or in respect of any other Material Indebtedness or Material Contract (which default continues for more than the applicable cure period, if any, with respect thereto), or the subordination provisions contained in any agreement related to any Subordinated Debt shall cease to be in full force and effect or to give Lender the rights, powers and privileges purported to be created thereby;

(h)    any material provision hereof or of any of the other Loan Documents shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Lender) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Loan Documents has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Loan Documents shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein);

(i)    an ERISA Event shall occur which results in or could reasonably be expected to result in liability of Borrowers in an aggregate amount in excess of $100,000;

(j)    Borrowers shall be prohibited or otherwise restrained from conducting the business theretofore conducted by them in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

(k)    any Borrower shall take any action, or shall make a determination, whether or not yet formally approved by any Borrower's management or board of directors, to (i) suspend the operation of all or a material portion of its business in the ordinary course, (ii) suspend the payment of any material obligations in the ordinary course or suspend the performance under material contracts in the ordinary course, (iii) solicit proposals for the liquidation of, or undertake to liquidate, all or a material portion of its assets or business;

(l)    any Change of Control

(m)    any of the following shall occur in any Case:

(i)        the filing by the Borrowers of a plan of reorganization other than (i) a plan of reorganization that provides for the payment in full of the Obligations and the Existing Liabilities on the effective date of such plan of reorganization, or (ii) as approved by the Lender, or the filing by the Borrowers of any motion or pleading that is inconsistent with the prosecution of any such plan of reorganization;

(ii)        without the prior consent of the Lender, the Borrowers shall file a pleading seeking to vacate or modify any of the Orders in a manner adverse to the Lender and/or the other Credit Parties;

(iii)        without the prior consent of the Lender, entry of an order amending, supplementing or otherwise modifying any Order in a manner adverse to the Lender and/or the other Credit Parties;

(iv)        without the prior consent of the Lender, entry of any order that authorizes any of the following:

1.        a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve Out;

2.        any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except (a) with respect to the Carve Out, or (b) Permitted Prior Liens;

3.        except as consented to by the Lender, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code; or

4.        the payment of any Indebtedness (other than Indebtedness reflected in the Budget) or as permitted by the Orders;

(v)        reversal, vacation or stay of the effectiveness of any Order;

(vi)        any violation of the terms of any Order;

(vii)        without the prior consent of the Lender, the dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Loan Party; or

(viii)        without the prior consent of the Lender, appointment of a trustee or an examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party; or

(ix)        without the prior consent of the Lender, the filing by the Borrowers of, or the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code, or the occurrence of any such sale without the Net Proceeds thereof being remitted, contemporaneously therewith, to the Lender for payment in full of the Obligations and the Existing Liabilities;

(x)     except as provided for herein or in the Orders, granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of the Borrowers;

(xi)     the Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein or in the Orders) that is senior to or pari passu with the Lender's claims under the Loan Documents and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(xii)     payment of or granting adequate protection with respect to prepetition Indebtedness, other than as expressly set forth in the Orders and the Budget; or

(xiii)     any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;

(n)   any variance to a Budget shall occur, other than Permitted Variances;

(o)   the failure to meet any of the Milestones, and/or the following additional milestones:

(i)     file the Chapter 11 Case on the Petition Date;

(ii)     obtain entry of the Interim Order on the DIP Loan on or before one (1) Business Day after the Petition Date; or

(iii)     obtain entry of the Final Order on or before the date that is thirty (30) days after the entry of the Interim Order; or

(p) any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Credit Agreement or the Existing Loan Documents or the Liens securing the Existing Credit Agreement or the Existing Loan Documents, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing Credit Agreement; or any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Existing Credit Parties;

(q) without the prior consent of the Lender, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Sections 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

(r)  (i) one or more final judgments for the payment of money in an aggregate amount in excess of $10,000 shall be entered after the Petition Date against any Loan Party or any of its Subsidiaries and the same is not satisfied, discharged, vacated, bonded or stayed pending appeal within a period of thirty (30) consecutive days following the date of entry.

10.2  <u>Remedies.</u>

(a)   Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders, in case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Loans shall have been accelerated pursuant hereto, the Lender may proceed to protect and enforce its rights and remedies (at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens with respect to the Collateral, the Lender shall provide the Borrower with five (5) days' written notice (with a copy to

counsel for any Committee and to the United States Trustee) prior to taking the action contemplated thereby) under this Agreement, the Notes or any of the other Loan Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Lender. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

(b)   Without limiting the generality of the foregoing, at any time an Event of Default exists or has occurred and is continuing, Lender may (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender (provided, that, upon the occurrence of any Event of Default described in Sections 10.1(e) and 10.1(f), all Obligations shall automatically become immediately due and payable and any obligations of Lender hereunder shall automatically terminate), (iii) cease making Term Loans or reduce the lending formulas or amounts of Term Loans available to Borrowers and/or (iv) establish such Reserves as Lender determines, without limitation or restriction, notwithstanding anything to the contrary contained herein.

(c)   Neither the Loan Parties, any Committee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Lender in the exercise of rights and remedies, whether against the Collateral or otherwise. The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Lender set forth in the Orders and in the Loan Documents.

(d)   Subject to the Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Lender may proceed to protect and enforce the Lender's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrowers agree that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Lender shall be indemnified by the Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

(e)   Without limiting the generality of the foregoing, at any time the Lender may establish such Reserves as Lender determines, without limitation or restriction, notwithstanding anything to the contrary contained herein.

## SECTION 11.  JURY TRIAL WAIVER; OTHER WAIVERS CONSENTS; GOVERNING LAW

11.1   Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)   The validity, interpretation and enforcement of this Agreement and the other Loan Documents (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the

application of the law of any jurisdiction other than the laws of the State of New York, without regard to the Bankruptcy Code.

(b)   The Loan Parties agree that any suit for the enforcement of this Agreement or any other Loan Document may be brought in the Bankruptcy Court and, to the extent the Bankruptcy Court declines or is otherwise unable to exercise jurisdiction, any court of the State of New York sitting in the Borough of Manhattan or any federal court sitting therein as the Lender may elect in its sole discretion and consent to the non-exclusive jurisdiction of such courts.  The Loan Parties hereby waive any objection which they may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum. The Loan Parties agree that any action commenced by any Loan Party asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely in the Bankruptcy Court or, to the extent the Bankruptcy Court declines or is otherwise unable to exercise jurisdiction, a court of the State of New York sitting in the Borough of Manhattan or any federal court sitting therein as the Lender may elect in its sole discretion, and the Loan Parties consent to the exclusive jurisdiction of such courts with respect to any such action.  Nothing contained herein shall be deemed to constitute a Credit Party's consent to (i) the jurisdiction of the Bankruptcy Court for any purposes other than the enforcement of this Agreement and the Orders, or (ii) jurisdiction before any bankruptcy court in the Case.

(c)   Borrowers hereby waive personal service of any and all process upon them and consent that all such service of process may be made by certified mail (return receipt requested) directed to Administrative Borrower at the address set forth herein for service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon Borrowers in any other manner provided under the rules of any such courts.  Within thirty (30) days after such service, Borrowers shall appear in such process, failing which Borrowers shall be deemed in default and judgment may be entered by Lender against Borrowers for the amount of the claim and other relief requested.

(d)   BORROWERS, LENDER, AND EACH GUARANTOR EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  EACH BORROWER AND LENDER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWERS, LENDER, OR ANY GUARANTOR MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)   Lender shall not have any liability to Borrowers (whether in tort, contract, equity or otherwise) for losses suffered by Borrowers in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Lender, that the losses were the result of its acts or omissions constituting gross negligence or willful misconduct.  Each Borrower: (i) certifies that neither Lender nor any representative, agent or attorney acting for or on behalf Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Loan Documents and (ii) acknowledges that in entering into this Agreement and the other Loan Documents,

Lender is relying upon, among other things, the waivers and certifications set forth in this <u>Section 11.1</u> and elsewhere herein and therein.

11.2   <u>Waiver of Notices</u>.  To the fullest extent permitted by applicable law, each Borrower hereby waives; (a) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all of the Obligations, the Loan Agreement, this Note or any other Loan Documents; (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral; and (c) the benefit of all valuation, appraisal and exemption laws, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein or required by applicable law and cannot be waived thereunder.  No notice to or demand on Borrowers which Lender may elect to give shall entitle Borrowers to any other or further notice or demand in the same, similar or other circumstances.

11.3   <u>Amendments and Waivers</u>.  Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by Lender, and as to amendments to any of the Loan Documents, by Administrative Borrower and such amendment, waiver, discharge or termination shall be effective and binding as to Lender only in the specific instance and for the specific purpose for which given. Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its or their rights, powers and/or remedies unless such waiver shall be in writing and signed as provided herein. Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender would otherwise have on any future occasion, whether similar in kind or otherwise.

11.4   <u>Waiver of Counterclaims</u>.  Each Borrower waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

11.5   <u>Indemnification</u>.  Borrowers shall indemnify and hold Lender, and its officers, directors, agents, employees, advisors and counsel and its Lender Affiliates (each such person being an "<u>Indemnitee</u>"), harmless from and against any and all losses, claims, damages, penalties, liabilities, reasonable costs or expenses (including attorneys' fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Loan Documents, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement and approved by Borrowers (which approval shall not be unreasonably withheld and/or delayed), court costs, and the reasonable fees and expenses of counsel except Borrowers shall not have any obligation under this <u>Section 11.5</u> to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the obligations of Borrowers as to any other Indemnitee).  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers shall pay the maximum portion which it is permitted to pay under applicable law to Lender in satisfaction of indemnified matters under this Section.  To the extent permitted by applicable law, Borrowers shall not assert, and Borrowers hereby waives, any claim against any Indemnitee, on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Loan Documents or any undertaking or transaction contemplated hereby.  No Indemnitee referred to above shall be liable for any damages arising from the use

50

by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Loan Documents or the transaction contemplated hereby or thereby.  All amounts due under this Section shall be payable upon demand. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

## SECTION 12.  NOTICES; MISCELLANEOUS

12.1  <u>Notices.</u>

(a)  Except in the case of notices and other communications expressly permitted to be given by telephone or electronic method of transmission (and subject in each case to clause (c) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

|  |  |
|---|---|
| If to Administrative Borrower: | Aluminum Shapes L.L.C. |
|  | 9000 River Road |
|  | Pennsauken, NJ 08110 |
|  | Attention: Solomon Rosenthal |
|  | Tel:  (856) 662-5500 |
|  | Email:  solomon@shapesllc.com |
|  |  |
|  | With a copy to (which shall not constitute notice): |
|  |  |
|  | Obermayer Rebmann Maxwell & Hippel LLP |
|  | Centre Square |
|  | 1500 Market Street |
|  | Philadelphia, PA 19102 |
|  | Attention: Edmond George, Esquire |
|  | Tel: (215) 665-3140 |
|  | Email: Edmond.George@obermayer.com |
|  |  |
| If to Lender: | Tiger Finance, LLC |
|  | 60 State Street, 11th Floor |
|  | Boston, Massachusetts 02109 |
|  | Tel:  (212) 315-1748 |
|  | Email: ababcock@tigergroup.com |
|  |  |
|  | With a copy to (which shall not constitute notice): |
|  |  |
|  | Riemer & Braunstein LLP |
|  | Times Square Tower |
|  | Seven Times Square, Suite 2506 |
|  | New York, NY  10036 |
|  | Attention:  Anthony B. Stumbo, Esquire |
|  | Tel:  (212) 789-3153 |
|  | Email: astumbo@riemerlaw.com |

Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(b)   All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent; provided, that, if not given during normal business hours of the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through an electronic method of transmission to the extent provided in clause (c) below shall be effective as provided in such clause.

(c)   Notices and other communications to Lender hereunder may be delivered or furnished by e-mail or any internet or extranet-based site providing for access to data protected by passcodes or other security systems approved by Lender for such purpose and in each case to the extent that Lender may approve a pursuant to procedures approved by Lender; provided, that, the foregoing shall not apply to notices pursuant to Section 2 or Section 7.2 or such other notices as Lender may specifically hereafter agree. Unless otherwise specified by Lender, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided, that, if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or extranet-based site shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

12.2   Partial Invalidity.   If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

12.3   Successors.   This Agreement, the other Loan Documents and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Lender and Borrowers and their respective successors and assigns, except that Borrowers may not assign their rights under this Agreement, the other Loan Documents and any other document referred to herein or therein without the prior written consent of Lender, which consent may be delayed, conditioned, withheld or denied in Lender's exclusive discretion.  Any such purported assignment without such express prior written consent shall be void.  The terms and provisions of this Agreement and the other Loan Documents are for the purpose of defining the relative rights and obligations of Borrowers and Lender with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Loan Documents.

12.4   Entire Agreement.   This Agreement, the other Loan Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

12.5   USA Patriot Act.   Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act"), it is required to obtain, verify and record information that identifies each person or corporation who opens an account

and/or enters into a business relationship with it, which information includes the name and address of Borrowers and other information that will allow Lender to identify such person in accordance with the Act and any other applicable law.  Borrowers are hereby advised that any Term Loans hereunder are subject to satisfactory results of such verification.

12.6  <u>Counterparts, Etc.</u>  This Agreement or any of the other Loan Documents may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any of the other Loan Documents by fax or other electronic method of transmission shall have the same force and effect as the delivery of an original executed counterpart of this Agreement or any of such other Loan Documents. Any party delivering an executed counterpart of any such agreement by fax or other electronic method of transmission shall in a timely manner also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of such agreement.

[Remainder of Page Intentionally Left Blank; Signatures Appear Next Page]

     IN WITNESS WHEREOF, Lender and Borrowers have caused these presents to be duly executed as of the day and year first above written.

**BORROWER:**

**ALUMINUM SHAPES L.L.C.**

By: _____

Name: <u>Solomon Rosenthal</u>

Title: <u>CEO</u>

**LENDER:**

**TIGER FINANCE, LLC**

By: _____

Name: _____

Title: _____

SCHEDULE 6.1

Loan Party Particulars

| Loan Party | Jurisdiction of Formation | Formation Date | Organization Type | Organization Number | Federal Employer Identification Number |
|---|---|---|---|---|---|
| Aluminum Shapes L.L.C. | New Jersey | November 16, 2012 | Limited liability company | 0600392925 | 46-1406288 |
| Jacky Cheung | N/A | N/A | Individual | N/A | N/A |

<u>SCHEDULE 6.6</u>

<u>Properties</u>

None.

SCHEDULE 6.7

Litigation

| Loan Party | Name of Plaintiff | Court and Case Number | Brief Description of Claim |
|---|---|---|---|
| ALUMINUM SHAPES, L.L.C. | Warren Alexander | N/A | Teamsters Local 107 and Aluminum Shapes (Gr: W Alexander Demotion) – Labor arbitration related to denial of grievance concerning removal of "Lead Man" designation from Foundry employee (active). |
| ALUMINUM SHAPES, L.L.C. | James Deatore | N/A | Former employee has sent Aluminum Shapes a letter asserting alleged claims for disability discrimination in connection with termination related to failed drug test (active). |
| ALUMINUM SHAPES, L.L.C. | Secretary of Labor v. Aluminum Shapes LLC | OSHRC Docket Nos. 17-1380 & 17-0646 | The Company is contesting fines imposed by OSHA. |
| ALUMINUM SHAPES, L.L.C. | Paul Harris | N/A | Former employee has sent Aluminum Shapes a letter asserting alleged violations of law for retaliation for filing a workers compensation claim in connection with termination related to failed drug test (active). |
| ALUMINUM SHAPES, L.L.C. | | | Workers Compensation cases outstanding consistent with the past experience of Borrower |
| ALUMINUM SHAPES, L.L.C. | Direct Energy Business, LLC | Superior Court of New Jersey; L-003390-19 | Failure to pay natural gas bills |
| ALUMINUM SHAPES, L.L.C. | Talen Energy Marketing, LLC | US District Court for Eastern District of PA; Civil Action No. 19-4303 | Breach of contract claim for unpaid balances under a Retail Electricity Agreement |
| ALUMINUM SHAPES, L.L.C. | Teamsters Local 837 | US District Court for Eastern District of PA; Civil Action No. 19-4739 | Failure to make Health Fund contributions |
| ALUMINUM SHAPES, L.L.C. | PSE&G | ESX-L-005144-21 & ESX-L005145-21 | Failure to pay invoices |

| | | | |
|---|---|---|---|
| ALUMINUM SHAPES, L.L.C. | Eastern Lift Truck | BUR-L-1685-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | General Chemical & Supply | CAM SC-000770-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | AC Shultes, Inc. | CAM L-003398-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | UGI Energy Services, LLC | CAM L-000671-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Combined Metal Industries Inc. | CAM L-002985-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Euler Hermes North America Ins | CAM L-003551-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Lfm Efector inc. | CAM DC-002545-21 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Equipment Depot Pennsylvania, Inc. | CAM-L-2360-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Pyrotek Inc. | CAM L-003963-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Mardinly Industrial power | MJ-32124-CV-0000007-2021 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Melton Truck Lines Inc. | CJ-2020-1276 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | MSC Industrial Direct | CAM DC-010901-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Wharton Hardware & Supply Corp | CAM DC-001961-20 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Airgas USA, LLC | CAM L-001574-21 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | American Express travel Related Services Company, Inc. | 654146-2021 | Failure to pay invoices |
| ALUMINUM SHAPES, L.L.C. | Nathan Kelman | 1:21-cv-13385-JHR-MJS | Failure to pay invoices |

<u>SCHEDULE 6.9</u>

<u>Environmental Matters</u>

(a)      N/A

(b)      N/A

(c)      A Notice of Lien was filed by the New Jersey Department of Environmental Protection on July 27, 2018.  Administrative Borrower filed a Notice of Lien Contest on October 25, 2018 and is still waiting for a decision from the NJDEP.

(d)      N/A

<u>SCHEDULE 6.11</u>

<u>Material Contracts</u>

None.

<u>SCHEDULE 6.12</u>

<u>Restrictive Agreements</u>

Agreements in favor of Lender

## SCHEDULE 6.13

### Taxes

Water/Sewer Tax Certificate in the amount of $113,000

SCHEDULE 6.15

Insurance

## Program Schematic

| Premises Pollution Liability | Executive Protection (D&O, EPL, FID, Crime, K&R) | Commercial Umbrella Liability | | | | Property |
|---|---|---|---|---|---|---|
| | | Limit: $15,000,000 Each Occ. / General Agg. / Products Completed Carrier: Allied World National Assurance Company Policy # 0309-3283 | | | | Limit: |
| (5/1/19-20) | | Self Insured Retention: $10,000 | | | | $250M All Coverages $217.1M Prop. Damage |
| Limits: $2M Per Condition $4M Agg. | Limits: $5M Shared D&O and EPL; $1M FID; Except K&R and Crime; $3M Per Occ. Crime; $1M Per Occ. K&R | Workers Compensation | Foreign Package | Commercial General Liability | Business Automobile | $45M Time Element $250M Named Storm $250M Equipment Breakdown $25M Flood $25M Earth Movement Agg. |
| Retroactive Date - Premises Pollution Condition Liability & Premises First-Party Claims: 8/7/2009 Indoor, Transport and NODS (5/1/18) | Retroactive Date: 12/4/2012 | Limits: Employer's Liability Bodily Injury – Each Occurrence $1M Bodily Injury – Disease $1M Bodily Injury – Disease – Each Employee $1M | Limits: $2M General Agg. $2M Products / Completed Ops. Agg. $1M Each Occ. $1M Pers. / Advertising Injury $1M Damage to Premises Rented to You $10,000 Medical Expense $1M EB Errors or Omissions Each Claim / Agg. Employee Benefits Retroactive Date: 12/4/2014 | Limit: $2M General Agg. $2M Products/Completed Operations Agg. $1M Per Occ. $1M Pers. / Advertising Injury $1M Damage to Premises Rented to you $10,000 Medical Expenses $1M EB Errors or Omissions Each Claim / Agg. | Limit: $1M CSL Guaranteed Cost Liability | Carrier: Zurich American Insurance Company Policy #: ERP 0164396-02 |
| Carrier: ACE American Insurance Company Policy #: PPL G24870388 012 | Carrier: Federal Insurance Company. Policy #: 8255-5284 | Carrier: Insurance Company of the West Policy #: WPH 5038375 | WC: $1M International Statutory, State of Hire, Country of Origin EL $1M CSL Auto $25,000 Medical Expenses Carrier: Great Northern Insurance Company Policy #: 9950-35-95 PHL | Employee Benefits Retroactive Date: 12/4/2012 Carrier: Chubb Insurance Company of New Jersey Policy #: 3603-87-65 | Carrier: CHUBB Insurance Company of New Jersey Policy #: 9949-99-79 | Deductible: $100K – Combined PD, TE $100K – Quake $100K – Flood $100K Named Storm $100K Equipment Breakdown, Except as follows: $250K PD & 3 times Average Daily Value TE for all Presses over 5,000 Ton; $100K PD & 3 times Average Daily Value TE for all other Presses |
| Self Insured Retention: $25,000 Per Condition / 3 Days BI | Deductible: $50K D&O; $25K EPL; $0 Fiduciary & K&R; $50K Crime | Guaranteed Cost | Deductible: $250 – Excess Med Exp. | Deductible: $1,000 – EB Each Claim | Deductible: $1,000 Comp & Collision | |

■ CONNER STRONG & BUCKELEW

<u>SCHEDULE 6.16</u>

<u>Subsidiaries</u>

(a)      Borrower has no subsidiaries.

(b)      Borrower's sole member is Jacky Cheung.

(c)      Borrower is a New Jersey limited liability company.

<u>SCHEDULE 6.18</u>

<u>Brokers</u>

None

<u>SCHEDULE 6.19</u>

<u>Intellectual Property</u>

<u>Trademarks</u>:

None

<u>Patents:</u>

None

<u>Copyright:</u>

None

<u>License Agreements:</u>

Ordinary course of business software licenses

<u>SCHEDULE 6.21</u>

<u>Collective Bargaining Agreements</u>

Agreement dated January 9, 2016 between Borrower and Teamsters Local No. 107

<u>SCHEDULE 7.1</u>

<u>Financial Reporting</u>

***<u>Monthly financials</u>***:

Within 20 days after end of each month, unaudited balance sheets of Borrower as of the end of such month and the related unaudited consolidated statements of income and cash flow for such month and for the portion of Borrower's Fiscal Year then elapsed, on a consolidated and consolidating basis setting forth in each case in comparative form the corresponding figures for the preceding Fiscal Year and certified by the principal financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations of Borrower and subsidiaries for such month and period subject only to changes from audit and year-end adjustments and except that such statements need not contain notes.

SCHEDULE 7.10

Bank Accounts

| Account Holder | Bank | Account No. | Account Type |
|---|---|---|---|
| Borrower | M&T Bank | Checking Account | #9875444169 |
| Borrower | M&T Bank | Operating Account | #9875444151 |

SCHEDULE 8.1

Permitted Indebtedness

| Name of Lender | Amount of Loan* | Purpose | Collateral |
|---|---|---|---|
| Wells Fargo Bank, N.A. | $32,270 | Equipment finance | Specific Equipment |
| Citibank, N.A. | $0 | Factoring receivables from Stanley Black & Decker, Inc. | Factored receivables from Stanley Black & Decker, Inc. |
| Caterpillar Financial Services Corporation | $0 | Equipment finance | Specific Equipment |
| VFS US LLC | $77,094 | Equipment finance | Specific Equipment |
| HYG Financial Services, Inc. (formerly NMHG Financial Services, Inc.) | $63,890 | Equipment lease | Specific Equipment |
| HYG Financial Services, Inc. | $0 | Equipment lease | Specific Equipment |
| Air Liquide Industrial U.S. LP | $0 | Equipment finance | Specific Equipment |
| Indebtedness to Vendors | $14,000,000 | Operation of Business | None |
| Wabash National Corporation | $1,000,000.00 | | Set off of contract rights |
| Jacky Cheung | $79,257,728.00 | Operation of Business | None |
| Signature Aluminum Canada Inc. | $3,330,741.00 | Operation of Business | None |
| Alston International, Inc. | $1,000,000.00 | Operation of Business | None |
| Wells Fargo Bank, N.A. | $4,951,241.00 | PPP | None |
| Customers Bank | $1,918,774.00 | PPP | None |

<u>SCHEDULE 8.2</u>

<u>Existing Liens</u>

| Name of Lien Holder | Collateral |
|---|---|
| Wells Fargo Bank, N.A. | Specific Equipment |
| Citibank, N.A. | Factored receivables from Stanley Black & Decker, Inc. |
| Caterpillar Financial Services Corporation | Specific Equipment |
| VFS US LLC | Specific Equipment |
| HYG Financial Services, Inc. (formerly NMHG Financial Services, Inc.) | Specific Equipment |
| HYG Financial Services, Inc. | Specific Equipment |
| Air Liquide Industrial U.S. LP | Specific Equipment |

| Name of Lien Holder and Civil Docket Number | Judgment Amount |
|---|---|
| Palmer (Local 837) 2:21-cv-00326-RBS | $4,470,122.86 |
| Eastern Lift Truck Co. BUR-L-1685-20 | $73,122.61 |
| General Chemical & Supply CAM SC-000770-20 | $2,948.83 |
| A.C. Shultes, Inc. CAM L-003398-20 | $30,176.56 |
| UGI Energy Services, LLC CAM L-000671-20 | $395,345.43 |
| Talen Energy Marketing LLC 5:19-cv-04303-HSP | $1,711,955.03 |
| Combined Metal Industries Inc. CAM L-002985-20 | $320,780.87 |
| Direct Energy Business Marketing LLC CAM L-003390-19 | $834,252.47 |

| | |
|---|---|
| Euler Hermes North America Ins.<br>CAM L-003551-20 | $184,195.37 |
| IFM Efector Inc<br>CAM DC-002545-21 | $4,302.15 |
| Equipment Depot Pennsylvania, Inc. et al<br>CAM L-2360-20 | $30,039.20 |
| Pyrotek Inc.<br>CAM L-003963-20 | $97,658.54 |
| Mardinly Industrial Power, LLC<br>MJ-32124-cv-0000007-2021 | $6,599.51 |
| Melton Truck Lines Inc.<br>CJ-2020-1276 | $47,277.90 |

<u>EXHIBIT A</u>

<u>Form of Interim Order</u>

(see attached)

2772960.7
4835-1093-9638.v3