| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** <br> *Caption in Compliance with D.N.J. LBR 9004-1(b)* <br> **OBERMAYER REBMANN MAXWELL & HIPPEL LLP** <br> Edmond M. George, Esquire <br> Michael D. Vagnoni, Esquire <br> (pro hac vice pending) <br> Turner Falk, Esquire <br> 1120 Route 73, Suite 420 <br> Mount Laurel, NJ 08054-5108 <br> Telephone: (856) 795-3300 <br> Facsimile: (856) 482-0504 <br> E-mail:  edmond.george@obermayer.com <br>             michael.vagnoni@obermayer.com <br>             turner.falk@obermayer.com <br><br> Proposed Counsel to the Debtor <br> and Debtor in Possession |

| | |
|---|---|
| In re: <br><br> ALUMINUM SHAPES, L.L.C., <br><br>                         Debtor. | Chapter 11 <br><br> Case No. 21-_____ - (   ) |

**DECLARATION OF JUSTIN MAGNER OF COWEN AND COMPANY, LLC IN SUPPORT OF COMBINED MOTION OF ALUMINUM SHAPES, L.L.C. FOR THE ENTRY OF AN ORDER GRANTING (A) AUTHORITY TO OBTAIN POST-PETITION FINANCING, (B) LIENS AND SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 364(c)(1), (2) AND (3) AND 364(d)(1), (C) RELIEF FROM THE AUTOMATIC STAY (D) AUTHORITY TO ENTER INTO AGREEMENTS WITH TIGER FINANCE, LLC, (E) AUTHORIZATION TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361 AND 363, BANKRUPTCY RULE 4001 AND D.N.J. LBR 4001-4 AND TO PROVIDE ADEQUATE PROTECTION TO PARTIES WITH AN INTEREST IN CASH COLLATERAL AND (F) RELATED <u>RELIEF</u>**

I, Justin Magner, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I submit this declaration (this <u>"Declaration"</u>) in support of Motion of Aluminum

Shapes, L.L.C. for the Entry of: an Interim and Final Order (a "<u>DIP Order</u>") granting (a) the Debtor

authority to obtain post-petition financing on the terms described herein, (b) granting priming liens and super-priority administrative expense status pursuant to 11 U.S.C. §§ 364(c)(1), (2) and (3) and 364(d)(1) of title 11 of the United States Code (the "Bankruptcy Code"), (c) granting relief from the automatic stay pursuant to section 362 of the Bankruptcy Code and (d) authorizing the Debtor to enter into agreements with the lender, Tiger Finance, LLC (the "Lender" or "Tiger"), (e) authorizing the use of cash collateral and providing adequate protection to parties with an interest in cash collateral and (f) related relief and in support thereof (the "DIP Motion").[1]

2.      I am a Director in Cowen's Special Situations and Restructuring practice.

3.      Cowen is a leading global financial advisory firm with more than 30 offices. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. Cowen is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including representing both debtors and lenders in the procurement and providing of post-petition financing. Cowen restructuring professionals have been particularly active in large, complex and high-profile bankruptcies and restructurings, including, among others: In re Mishti Holdings, LLC, No. 19-11813 (CSS) (Bankr. D. Del. Dec. 16, 2019) (advising debtors) [Docket No. 333]; In re Sienna Biopharmaceuticals, Inc., No. 19-12051 (MFW) (Bankr. D. Del. Oct. 15, 2019) (advising debtor) [Docket No. 122]; In re Jagged Peak Canada, Inc., No. 20-12599 (MKN) (Bankr. D. Nev. Sept. 16, 2019) (advising debtor); In re TradeGlobal LLC, No. 19-15960 (MKN) (Bankr. D. Nev. Sept. 16,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms below or in the DIP Motion, as applicable. The material terms of the proposed DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by the terms of DIP Agreement, the DIP Orders, and the other DIP Loan Documents. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents shall control.

OMC\4840-3015-6534.v3-8/15/21

2019) (advising debtor); <u>In re PhaseRx, Inc.</u>, No. 17- 12890 (CSS) (Bankr. D. Del. Dec. 11, 2017); <u>In re Atoptech, Inc.</u>, No. 17-10111 (MFW) (Bankr. D. Del. Jan 13, 2017) (advising debtor); <u>In re Xtera Communications, Inc.</u>, No. 16-12577 (KJC) (Bankr. D. Del. Nov. 15, 2016) (advising debtor); <u>In re Bind Therapeutics, Inc.</u>, No. 16-11084 (BLS) (Bankr. D. Del. May 26, 2016) (advising debtor) [Docket No. 165]; <u>In re Wire Company Holdings, Inc.</u>, No. 15-12097 (LSS)(Bankr. D. Del. Nov. 24, 2015) (advising debtors) [Docket No. 114].

4. Since June 2021, Cowen has been providing advisory services to the Debtor. The Debtor retained Cowen, originally, in connection with finding strategic purchasers for the Debtor's Business and/or Assets under an initial engagement letter. In that capacity I, and members of the Cowen team, have been directly involved in the matters leading up to the Debtor's Chapter 11 filing and in the negotiation of the debtor-in-possession financing.

5. I am not being specifically compensated for this testimony and Cowen is receiving compensation only as part of its engagement letter with the Debtor, which includes a capital raising fee for certain financings arranged by Cowen as set forth in its engagement letter (however debtor-in-possession financing sourced from the prepetition senior secured lender is excluded from this fee arrangement), subject to approval by this Court. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtor.

6. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with other members of the Cowen team, the Debtor's management team, and the Debtor's other advisors, my review of information concerning the Debtor's operations, financial affairs, and restructuring initiatives, and my opinions based upon my experience and knowledge. If called as a witness, I could and would

testify competently to the facts set forth in this Declaration on that basis. I am authorized to submit this Declaration on behalf of the Debtor.

### The Debtor's Need for DIP Financing and Access to Cash Collateral

7. Over the last few months, I and other Cowen professionals have had a substantial number of discussions and meetings with the Debtor's management team and advisors regarding the need for financing. I am generally familiar with the Debtor's current liquidity, the Prepetition Credit Facility and its impact on liquidity, and I understand the Debtor's cash needs during this Chapter 11 case (the "Case").

8. I am also generally familiar with the cash flow forecasts prepared by the Debtor's management. I understand that these forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the Chapter 11 filing on business operations, fees and interest expenses associated with post-petition financing, professional fees, payroll costs, customer and vendor relationships, and other required operational payments.

9. Based on those discussions and meetings, my experience in restructuring, and my familiarity with the Debtor, I believe the Debtor requires immediate access to the DIP Facility to fund the costs of administering the Case, fund the near-term working capital needs and ongoing business operations, and satisfy all outstanding obligations under the Prepetition Credit Facility.

10. I also believe it is imperative for the Debtor to demonstrate that the Case is well-capitalized and that the Debtor (a) has the liquidity to fund the Case, (b) conduct a sale of its Business or Assets, (c) demonstrate to customers, vendors and other stakeholders that the Debtor is adequately capitalized to continue its operations as a viable going concern, and (d) file a plan of reorganization..

OMC\4840-3015-6534.v3-8/15/21

11. Based on my familiarity with the Debtor's operations and experience as a restructuring professional, I do not believe the Debtor can either achieve these goals or prudently operate its Business solely on a "cash collateral" basis at this time. Accordingly, I believe that the Debtor's proposed DIP Facility is necessary and will provide the liquidity not available on a "cash collateral" basis alone.

## The Debtor's Efforts to Secure Financing

12. Beginning around May 2021, the Debtor entered into restructuring negotiations with its Prepetition lender Tiger Finance, LLC ("Lender"). Following significant engagement with the Lender through in-person and telephonic meetings, the Lender indicated that it would be willing to provide the Debtor with access to a post-petition term loan financing facility on a priming, senior secured basis. Following additional discussions between the Debtor and the Lender, Lender offered a Debtor in Possession Financing (the "Loan") to fund the Debtor's ongoing Business operations and the Chapter 11 process.

13. The terms of the Loan are extensively set forth in the Debtor's DIP Motion.

14. In consultation with the Debtor and their advisors, Cowen developed a list of parties that could be interested in providing a DIP financing to create a competitive environment for raising the necessary capital on the best terms available in the market. Because substantially all of the Debtor's assets are encumbered and subject to validly perfected first priority liens, Cowen's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtor's existing capital structure. In other words, Cowen evaluated: (a) the possibility of refinancing or extending the Debtor's Prepetition Credit Facility; (b) engaging in a priming fight with the Lender whose prepetition liens would be primed.

5

15. The Debtor and its advisors spent a significant amount of time considering their options with respect to whether to refinance the Prepetition Credit Facility in conjunction with the Chapter 11 proceedings. Absent being refinanced by the DIP Facility, I understand that without negotiating an amendment, the Prepetition Credit Facility would be in default as a result of the Chapter 11 filing, shutting off the Debtor's access to the cash from the Business. Even if a further amendment of the Prepetition Credit Facility was negotiated that permitted it to operate post-petition, the Prepetition Credit Facility Lender could likely still limit the Debtor's access to the cash from the collection of the accounts receivable. Accordingly, in the ordinary course, the Debtor's liquidity is constrained.

16. Whether or not the Prepetition Credit Facility were further amended prepetition, I understand that, in either circumstance, the Lender would, upon an event of default thereunder, be allowed to assert control over all collections, and allocate such funds to satisfy outstanding and subsequently accrued obligations under the Prepetition Credit Facility. This would materially impact the Debtor's liquidity.

17. Accordingly, by entering into the DIP Loan, the Debtor would avoid such risks in addition to avoid potentially having to provide the Lender with a comprehensive and onerous adequate protection package. The Debtor will have access to cash from the DIP Facility, further enhancing the Debtor's go-forward liquidity position. In consideration of the foregoing, the Debtor made the business decision to enter into the DIP Loan, which I believe is reasonable under the circumstances.

18. Based on this analysis, the Debtor determined that it would require liquidity of approximately $15,500,000.00 to satisfy all outstanding obligations under the Prepetition Credit Facility, operate smoothly post-petition, satisfy all administrative costs and expenses, and remain

adequately capitalized through emergence. Cowen relied on these projections in its conversations with potential financing providers.

19. Considering these circumstances, my team and I contacted parties Cowen believed, in our experience and judgment, were most likely to fund a post-petition financing facility. Cowen contacted parties that were likely to be interested in providing a DIP Facility for raising the necessary capital on the best terms available in the market. I, and others on my team under my supervision, solicited interest from more than twenty (20) financial institutions to determine the extent to which third-parties would be willing to provide post-petition financing to the Debtor.

20. In its solicitation, Cowen provided potential lenders an overview of the situation and described the financing opportunity. The result of the outreach to date is that no third-party lenders at the time of filing were interested in providing a DIP Facility on a junior or non-consensual priming basis.

21. In developing the terms of the DIP Facility, I understand that the Debtor was able to rely on the Lender's familiarity with the Debtor's business and capital structure, thereby avoiding significant legal fees associated with negotiation, memorializing, and reviewing new financing documents from any alternative third-party lender. Additionally, I understand that the proposed DIP Facility allows the Debtor to avoid the need to engage in a costly and time-consuming priming fight at the outset of the Case. I also understand that the DIP Facility serves as an important component of the Debtor's overall restructuring efforts because it provides the Debtor with a clear source of financing during the pendency of the Case, and funds administrative expenses and the sale of its Business or Assets.

22. Finally, I believe at the time of this filing that there are no alternative sources of financing reasonably available and no alternative sources of financing available on both better and

executable terms than those being provided by the DIP Facility. No party that Cowen communicated with as part of the marketing process, and no other party that Cowen is aware of, was interested in providing, or willing to provide, post-petition financing to the Debtor on an unsecured basis. Indeed, no party was willing to provide post-petition financing on anything other than a "priming" basis with respect to substantially all of the Debtor's assets, which "priming" liens would not have been consented to by the Lender and would have subjected the Debtor to a protracted and expensive priming dispute under section 364(d)(1) of the Bankruptcy Code. Since Lender is already in a first position on the Debtor's assets, a priming fight is avoided.

23. Accordingly, I believe that the DIP Facility pending approval before the Court is reasonable and appropriate and is the Debtor's best – and only – option currently available.

## The Proposed DIP Facility

24. After extensive, arm's-length negotiations with the Lender, the Debtor was able to secure the proposed $15,500,000.00 million DIP Facility with the Lender. The DIP Facility allows Debtor to draw $10120525.00 upon entry of the Interim Order. . A portion of such initial Term Loan shall be applied by the Lender to repay the Prepetition Liabilities in full. The Lender shall then make additional Term Loans to the Borrowers in accordance with the applicable provisions of the Budget. The proceeds of the DIP Facility will be used for: (a) satisfying all outstanding obligations under the Prepetition Credit Facility; (b) working capital needs; (c) administrative expenses; and (d) funding of DIP Facility fees and expenses. Specifically, I believe that the DIP Facility will also reassure the Company's clients and employees that the Company will be able to continue to meet its commitments during the Case and the Businesses will be appropriately financed. Obtaining access to the DIP Facility, including the use of Cash Collateral, on the first day of the Cases is critical for the success of the Debtor's reorganization efforts.

OMC\4840-3015-6534.v3-8/15/21

**The DIP Facility Was Negotiated in Good Faith and At Arm's Length**

25. My team and I, along with the Debtor's other advisors, actively negotiated the terms and provisions of the DIP Facility on behalf of the Debtor over approximately the last several weeks. My team worked to ensure that the process was rigorous and marked by hard bargaining to achieve the best available terms for the Debtor for what ultimately became the DIP Facility. During that time, the parties exchanged term sheets and mark-ups in an effort to reach the best available material terms under the circumstances.

26. The fees and rates to be paid under the proposed DIP Facility were the subject of arm's-length and good-faith negotiation between the Debtor and the DIP Lender, are an integral component of the overall terms of the proposed DIP Facility, and were required by the Lender as consideration for extending post-petition financing. Moreover, the Debtor was unable to obtain other DIP financing on similar or more favorable terms. Indeed, no third-party presented indicative terms for a competing DIP financing. Under the current circumstances, I believe that the fees, rates, and other economics provided for in the DIP Facility are reasonable.

27. The DIP Facility also contains certain milestones that the Debtor must meet throughout the Cases. The milestones that are part of the DIP Loan, were negotiated by the Lender as a condition to providing the DIP Facility and provide the Debtor with adequate time to implement a value-maximizing restructuring. The DIP Facility milestones are reasonable and should be met by the Debtor. Accordingly, I believe these milestones are appropriate under the circumstances.

**The DIP Facility Is Fair and Reasonable Under the Circumstances**

28. Based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facility and pursuit of alternative post-petition financing

9

proposals, the DIP Facility is the best and only financing option available to the Debtor in the circumstances.

29. The proposed DIP Facility maximizes the value of the enterprise by providing the Debtor with access to crucial liquidity at the outset of the Case and facilitating a sale process, which is the precursor to a consensual Chapter 11 plan of reorganization. In short, the proposed DIP Facility will allow the Debtor to maximize value by continuing operations with minimal disruption.

30. The Lender agreed to provide the DIP Facility to the Debtor on terms that I consider to be reasonable under the circumstances. As noted above, the DIP Facility was the result of exceptional efforts on behalf of the Debtor and its advisors to ensure that the Debtors obtained DIP financing that would enable the Debtor to continue to operate its Business in the ordinary course and maximize the value of its estate. At the time of the filing, no third-party was willing to submit a proposal for a priming facility (and engage in a priming fight) to meet the Debtor's liquidity needs and support a sale and plan.

31. The Lender expressly conditioned its DIP proposal on, among other things, a "roll up" of the Prepetition Indebtedness, customary forms of adequate protection as well as post-petition priming liens pursuant to Section 364(d)(1) on all of the Debtor's assets and post-petition liens on any of the Debtor's prepetition Assets (as defined in the DIP Motion) as part of the collateral package securing the DIP Facility.

32. In addition to providing the Debtor with incremental liquidity, the DIP Facility will provide the Debtor with access to the use of cash collateral on a consensual basis and will allow the Debtor to fund its Business in the ordinary course during the Case, ensuring continued, uninterrupted operations and preserving the value of the estate for the benefit of all stakeholders.

OMC\4840-3015-6534.v3-8/15/21

33. Finally, and perhaps most importantly, the DIP Facility provides the Debtor with a path towards a sale of its Assets and ultimately, a successful and expeditious reorganization. The proposed DIP Facility provides the Debtor with the opportunity for an expeditious and adequately capitalized exit from Chapter 11 by late 2021, which will best preserve the value of the Debtor's Business.

34. In summary, it is my professional opinion that the terms of the DIP Facility are reasonable under the circumstances and were the product of good faith, arm's-length negotiations, and that the DIP Facility will benefit the Debtor's stakeholders in the Case. For all of the reasons included in this Declaration, I submit it would be appropriate for the Court to approve the DIP Facility and the use of cash collateral as contemplated by the Motion.

## Conclusion

35. I believe that, absent the interim relief requested by the DIP Motion, the Debtor will suffer significant, and potentially permanent, impairment to their business operations to the material detriment of their stakeholders. Under the circumstances, I believe that, through the proposed DIP Facility, (a) the Debtor will achieve the best outcome reasonably available to address their liquidity needs while preserving value for all stakeholders and (b) the relief requested in the DIP Motion is in the best interests of the Debtor and its estate.

[Remainder of This Page Intentionally Left Blank]

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

Dated: August 15, 2021		By:	*/s/ Justin Magner*
				Justin Magner
				Director, Cowen and Company, LLC