| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>*Caption in Compliance with D.N.J. LBR 9004-1(b)*<br>**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**<br>Edmond M. George, Esquire<br>Michael D. Vagnoni, Esquire<br>(pro hac vice pending)<br>Turner Falk, Esquire<br>1120 Route 73, Suite 420<br>Mount Laurel, NJ 08054-5108<br>Telephone: (856) 795-3300<br>Facsimile: (856) 482-0504<br>E-mail:   edmond.george@obermayer.com<br>           michael.vagnoni@obermayer.com<br>           turner.falk@obermayer.com<br><br>Proposed Counsel to the Debtor<br>and Debtor in Possession |

| | |
|---|---|
| In re:<br><br>ALUMINUM SHAPES, L.L.C.,<br><br>Debtor. | Chapter 11<br><br>Case No. 21- _____ - (  ) |

### DECLARATION OF JORDAN MEYERS IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Jordan Meyers, make this declaration (this "Declaration") under 28 U.S.C. §1746.

1.   I am a Senior Director at Winter Harbor LLC, part of Riveron Consulting, ("Winter Harbor"), a financial consulting firm. Winter Harbor was first retained by Aluminum Shapes, L.L.C., the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), to serve as financial advisors on or about May 24, 2021.

2.   Prior to the commencement of this Chapter 11 case, I was appointed Interim Chief Financial Officer ("ICFO") of the Debtor. In connection with providing financial advisory and ICFO services, I have become familiar with the Debtor's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of the

Debtor's Chapter 11 case (the "Chapter 11 Case"). Winter Harbor's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance, frequently in situations involving underperforming and distressed businesses. Professionals employed at Winter Harbor have experience working with debtor companies and secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court engagements.

3. I have 12 years of experience in the restructuring industry, serving as an advisor to private equity firms, corporations, lenders, and boards of directors of underperforming businesses and companies in transition. I have previously worked at two other restructuring firms, two international accounting firms, and as an investment banker. I have provided guidance to financially challenged entities maneuvering through both out-of-court and court-supervised restructurings. I have also been involved in several M&A transactions and have experience servicing both debtors and senior secured lenders. I earned my Bachelor of Science degree in Accounting from Binghamton University and my Master of Business Administration degree in Finance from the Goizueta Business School at Emory University. I am a Certified Public Accountant ("CPA") and Certified Insolvency and Restructuring Advisor ("CIRA").

4. On August 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage (the "Court"). The Debtor continues to operate its business and manage its properties as Debtor in Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. To enable the Debtor to operate effectively, maximize the benefits of the reorganization process and minimize potential adverse effects in the Chapter 11 Case, the Debtor

has requested certain relief in "first day" motions and applications (collectively, the "First Day Motions"), filed with the Court concurrently herewith.

6. The First Day Motions, summarized below, seek, among other things, to (a) allow the Debtor to continue using cash collateral to fund a sales process for the Debtor's assets, (b) allow the Debtor to obtain Debtor-In-Possession financing, (c) ensure the continuity of the Debtor's business operations without interruption during the sales process, (d) preserve the Debtor's valuable relationships with suppliers, vendors, customers, and other interested parties, (e) maintain employee morale and confidence, and (f) implement certain administrative procedures that will promote a seamless transition into Chapter 11. This relief is critical to the Debtor's efforts to maximize the value of its assets for the benefit of all stakeholders.

7. This Declaration is submitted in support of the First Day Motions. Except as otherwise indicated herein, the facts and opinions set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's employees, or my opinion based upon my experience, knowledge, and information obtained about the Debtor's operations and the aluminum processing industry.

8. I am authorized to submit this Declaration on the Debtor's behalf. If called upon to testify, I can and will testify competently to the facts set forth in this Declaration.

9. This Declaration provides a summary overview of the Debtor's business operations and the need for its restructuring pursuant to Chapter 11 of the Bankruptcy Code. Section I of this Declaration is a brief history of the Debtor, Section II presents an overview of the Debtor's business operations, Section III discusses the need for Chapter 11 relief and the events leading to the commencement of this bankruptcy case, and Section IV describes the anticipated course of the

Chapter 11 Case and a summary of the First Day Motions and the factual bases for the relief requested therein.

## I. THE DEBTOR'S HISTORY

10. The Debtor is an aluminum processor (the "Business"). The Debtor was founded by Ben Corson in 1948 and began operations as a supplier of extruded aluminum for his aluminum windows and doors. The Debtor has since grown to become a predominant fabricator of aluminum east of the Mississippi, and one of only a few processors in the country capable of, and in possession of, a completely vertically integrated plant and operations for the processing, annealing, cutting, fabricating, welding, and extruding of aluminum. The Debtor became incorporated in 1956 and subsequently acquired fifty-five (55) acres of land at its current location in Delair, New Jersey upon which it developed and built its aluminum processing facilities. As the United States economy blossomed in the 1960s, the Debtor began extruding aluminum for the trucking and trailer industry. At that time, the Debtor underwent a significant capital investment program by commissioning four new state-of-the-art extrusion presses. These acquisitions greatly increased capacity. Later, the Debtor would construct a "cast house" foundry for processing aluminum into billets, substantially reducing its raw material costs. In 1995, the Debtor underwent a further capital program, acquiring the Danieli Press, which was, at the time, the most sophisticated press in the industry. The addition of the Danieli Press increased aluminum processing capacity to nearly 30 million pounds annually. The Debtor's substantial machinery, fixtures, and equipment, including a valuable cast house and foundry furnace, several presses, and processing equipment (the "FFE"), are state of the art.

11. The Debtor is internationally known for some of its projects, including its fabrication and provision of the scaffolding for the reconstruction of the Statue of Liberty, for

4

which it received recognition by the *Guinness Book of World Records* for what was then the largest free-standing aluminum structure. In 1998, it provided scaffolding for the Washington monument rehabilitation. Some seventy years after its founding, the Debtor has become and continues to be an industry leader in the fabrication, processing, and extruding of aluminum metals.

12. The Debtor owns and operates a single location at 9000 River Road, Delair, NJ, consisting of approximately 500,000 square feet of industrial space, including a cast house, foundry, and processing area (the "Real Property"). Located on the Real Property are buildings and the Debtor's FFE. (FFE together with the Real Property, the "Assets"). At present, the Debtor is not operating the cast house.

## II.  OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

### A. The Debtor's Ownership and Management

13. The Debtor is a privately held New Jersey limited liability company. Jacky Cheung, an Australian national and resident of Vietnam, owns 100% of the membership interests and is the sole member of the Debtor.

14. The Debtor's current managers ("Managers") are Jacky Cheung, Charles Pok, and Solomon Rosenthal (CEO), who runs the day-to-day operations for the Debtor.

15. As of the Petition Date, the officers of the Debtor are Solomon Rosenthal, (CEO), Doug Bathhuar (COO), Gerry Leimkuhler (as Chief Plan and Transaction Officer), Dalton Edgecomb (Chief Restructuring Officer); and myself as ICFO.

### B. The Debtor's Employees

16. As of the Petition Date, the Debtor employed approximately 111 employees, including approximately 50 full-time salaried employees (the "Salaried Employees") and 61 hourly employees (the "Hourly Employees," and collectively with the Salaried Employees, the

"Employees"). The Debtor's Employees perform a variety of critical functions, including line work (fabrication and processing), sales, customer service, information technology, purchasing, human resources, accounting, finance, and management-related tasks. Some of the Debtor's Employees have been covered by collective bargaining agreements ("CBA") with Teamster's Local 107. The CBA expires on June 30, 2022.

### C. Capital and Debt Structure

#### (i). Prepetition secured debt

17. As of the Petition Date, the Debtor had outstanding debt obligations in the aggregate principal amount of no less than $9,270,525.89 to Tiger Finance, LLC ("Tiger" or "Prepetition Lender"), pursuant to the prepetition Tiger Credit Agreement (the "Prepetition Credit Agreement").

18. Obligations under the Prepetition Credit Agreement are secured by a first priority lien on substantially all of the Debtor's Assets, including, without limitation, a first priority lien on the Debtor's accounts (including receivables), inventory, machinery and equipment, real estate, deposit accounts, cash, and cash equivalents.

19. From time to time over the past year, the Debtor has entered into forbearance agreements with Tiger. The Debtor is presently party to that certain Seventh Forbearance Agreement and Seventh Amendment to Credit Agreement dated July 27, 2021 ("Seventh Forbearance").

20. The Seventh Forbearance modifies the Prepetition Credit Agreement and provides as follows: (i) Tiger continues to forbear through the Seventh Amended Forbearance Termination Date, or August 16, 2021; (ii) Tiger agrees to increase the Maximum Term Loan Amount and make Discretionary Advances up to $2,250,000.00 to the Debtor; and (iii) the Debtor is directed

to provide an executed Stalking Horse offer by a date certain. In exchange, the Debtor agrees to undertake certain obligations and to begin in earnest to find a purchaser for the Business or Assets.

### (ii). General unsecured creditors

21. The Debtor estimates that unsecured claims against the Debtor as of the Petition Date exceed $13,000,000.00. Unsecured claims against the Debtor include: (i) accrued, and unpaid amounts owed to the Debtor's trade vendors and other unsecured debt incurred in the ordinary course of the Debtor's Business, (ii) accrued employee related expenses, (iii) loans received under the Small Business Associations' Paycheck Protection Program ("PPP"), and (iv) claims for unpaid union pension and health and benefit obligations.

### (iii). Judgments and pending litigation

22. The Debtor also has a number of judgments entered against it from utility suppliers and vendors which in total exceed $7,000,000.00. These judgments are as follows[1]:

a) Palmer (Local 837) v. Aluminum Shapes LLC, 2:21-cv-00326-RBS – Judgment amount: $4,470,122.86

b) Eastern Lift Truck Co. v. Aluminum Shapes LLC, BUR-L-1685-20 – Judgment amount: $73,122.61

c) General Chemical & Supply v. Aluminum Shapes LLC, CAM SC-000770-20 – Judgment amount: $2,948.83

d) A.C. Shultes, Inc. v. Aluminum Shapes LLC, CAM L-003398-20 – Judgment amount: $30,176.56

e) UGI Energy Services, LLC v. Aluminum Shapes LLC, CAM L-000671-20 – Judgment amount: $395,345.43

---

[1] The amounts listed are the face amounts of the judgments. The current amounts may be higher due to interest accumulating since each judgment was entered.

   f) <u>Talen Energy Marketing LLC v. Aluminum Shapes LLC</u>, 5:19-cv-04303-HSP – Judgment amount sought: $1,711,955.03

   g) <u>Combined Metal Industries Inc. v. Aluminum Shapes LLC</u>, CAM L-002982-20 – Judgment amount: $320,780.87

   h) <u>Direct Energy Business Marketing LLC v. Aluminum Shapes LLC</u>, CAM L-003390-19 – Judgment amount: $834,252.47

   i) <u>Euler Hermes North America Ins. v. Aluminum Shapes LLC</u>, CAM L-003551-20 – Judgment amount: $184,195.37

   j) <u>IFM Efector Inc v. Aluminum Shapes LLC</u>, CAM DC-002545-21 – Judgment amount: $4,302.15

   k) <u>Equipment Depot Pennsylvania, Inc. et al v. Aluminum Shapes LLC</u>, CAM L-2360-20 – Judgment amount: $30,039.20

   l) <u>Pyrotek Inc. v. Aluminum Shapes LLC</u>, CAM L-003963-20 – Judgment amount: $97,658.54

   m) <u>Mardinly Industrial Power, LLC v. Aluminum Shapes LLC</u>, MJ-32124-cv-0000007-2021 – Judgment amount: $6,599.51

   n) <u>Melton Truck Lines Inc. v. Aluminum Shapes "Inc."</u>, CJ-2020-1276 – Judgment amount: $47,277.90

23. With respect to the Real Property, there is a pending environmental case with New Jersey DEP (the "NJDEP") relating to historical conditions on the Real Property. The clean-up is fully funded by trust moneys contained in an NJDEP Remediation Trust Fund.

### III. THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

24. Following years of adverse market trends, including increased competition from overseas manufacturers, the general downturn in the United States economy caused by COVID-19, has forced the Debtor into a sale process. The COVID-19 shut down occurred during a time when the Debtor was experiencing strong demand but lacked adequate capital to complete fabrication.

25. The Debtor is the latest victim of the skyrocketing price of metal, supply chain issues, the lack of available credit, and the lack of cash flow necessary to compete. Both the increased cost of raw materials and foreign competition have adversely impacted the Debtor's cash flow in recent years. Inadequate cash flow has caused the Debtor to delay accepting new work orders.

26. In response to the aforementioned challenges, the Debtor, in consultation with its advisors, has taken steps to preserve liquidity and develop a comprehensive, value-maximizing transaction that would inure to the benefit of creditors. In 2020, the Debtor, with the help of its advisors, implemented key strategic initiatives, including: (i) attempts to deleverage operations and generate capital; (ii) increasing customer engagement, including allowing customers to purchase their own metals for processing, thereby reducing raw material costs; (iii) looking for other market opportunities and products; (iv) optimizing the Debtor's operations and reducing the cash burn rate; and (v) exploring opportunities for a sale of the Business to a strategic purchaser. The Debtor has significant capacity that could be captured for a moneyed purchaser. The Debtor has strong demand and a wide and loyal customer body.

27. The Debtor has made significant reductions in expenses to meet its current obligations. There have been a number of cost-cutting measures, including a workforce reduction to the current level of 111 union and non-union Employees. The Debtor has curtailed operations to

about ten percent (10%) of capacity. Where possible, the Debtor is processing material purchased by the customer, which enables processing to continue without the delay and expense involved with sourcing raw materials and alleviates the financial strain of purchasing and retaining inventory.

28. Despite the significant efforts to reduce costs and curtail operations during the COVID-19 downturn, the operating losses will continue to significantly impair the Debtor's liquidity.

29. For the year 2020, the Debtor reported net sales of $13.6 million, as compared to $43.4 million for the fiscal year 2019. The reduction reflected an inability to generate sufficient capital for metal supply purchases. The Debtor reported an operating loss of approximately $19.4 million in 2020.

### A. The Debtor's Consideration of Strategic Alternatives

30. Faced with ongoing and significant hurdles, the Debtor's Managers engaged Obermayer, Cowen and Company, LLC ("Cowen"), Winter Harbor, and Berwyn (collectively, the "Advisors"). Winter Harbor, along with other Advisors, (i) developed weekly cash flows; (ii) developed cash conservation measures and liquidity forecasting; (iii) developed strategic alternatives, financing and restructuring initiatives for maximizing the enterprise value of the Debtor; and (iv) engaged with the Prepetition Lender on increasing liquidity, obtaining covenant relief and various restructuring options.

31. Cowen was engaged as investment banker by the Debtor on June 18, 2021, to explore a sale of the Debtor's Business or Assets. Based on market feedback, the Debtor, in consultation with its Advisors, has determined that a continued operation of the Business by the Debtor is not viable or achievable under the current financial circumstances and has determined in

its business judgment, that a sale of the Business or Assets best serves the interests of all stake holders in the Chapter 11 Case.

### IV.     PROPOSED COURSE OF THE CHAPTER 11 CASE

32.     The Chapter 11 Case is intended to address the Debtor's funded debt, litigation overhang and to provide for a sale of the Business as a whole or its respective Assets.

33.     The Debtor is therefore seeking either a strategic purchaser for the Business or the Assets of the Debtor, with an expectation that a sale under a controlled environment under the bankruptcy process will maximize the value for all creditors.  The Debtor and its management and Advisors believe there is substantial value in the Business and Assets.

34.     At the same time, the Debtor was exploring options for increasing liquidity and a restructuring. The Debtor worked with Cowen, as investment banker, to conduct a marketing process. Cowen and the Debtor prepared a list of more than 140 potential investors (including various financial sponsors and strategic purchasers) that were considered likely participants in a sale process.

35.     Following the initial outreach to the identified parties, information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement ("NDA"). Approximately 40 parties executed NDAs, who were then granted access to a data room.

36.     The Debtor's advisors at Cowen have received a proposed Stalking Horse offer from Reich Brothers, LLC ("Reich Bros."), which will be further disclosed in connection with the Debtor's contemplated Sale Motion.  The Stalking Horse offer from Reich Bros. was facilitated by the Debtor's Prepetition Lender, Tiger.[2]

---

[2] A participant in the Prepetition Financing Documents (defined below) and the DIP Facility is Align Business Finance LLC (f/k/a Reich Bros Business Solutions LLC) is 100% owned by ABF Intermediate Holdings LLC which is then 100% owned by ABF Ultimate Holdings LLC. ABF Ultimate Holdings LLC is 50% owned by Jonathan and Adam Reich, who own [___%] of Reich Brothers, the proposed Stalking Horse under the Sale Motion.

37. The Debtor is entering into a proposed Asset Purchase Agreement with Reich Bros., which will serve as the Stalking Horse Bid for the Debtor's Assets. The Debtor's Assets will be sold at public auction to be conducted before the Bankruptcy Court (the "Auction") on bidding procedures approved pursuant to the Sale Motion.

38. The Debtor's investment bankers at Cowen have been diligently interviewing other prospective, competitive bidders, and are continuing to market the Business and Assets for sale. The Debtor and its Advisors will continue to work with the parties that have indicated an interest in the Business and Assets in an effort to obtain the highest or the best value for the Assets. Cowen continues to market for a Debtor in Possession loan.

39. Contemporaneous with the First Day Motions or soon thereafter, the Debtor will be filing its Sale Motion and seeking an order approving Bidding Procedures and the Auction format. With guidance from Cowen, the Debtor intends to conduct a sale process for its Assets over the next sixty (60) days, with the Auction expected to be conducted no later than October 15, 2021.

40. The Debtor will continue operations pending the sale process.

41. The Debtor believes, in the exercise of its business judgment, that the sale of the Business as a going concern over the next sixty (60) days or, alternatively, its Assets will provide the best process under the circumstances to maximize value for its stakeholders.

42. The Debtor will utilize cash collateral, having obtained the consent of its Prepetition Lender to do so, and will file a motion to obtain Debtor in Possession Financing (the "DIP Motion"). Consensual use of cash collateral and DIP Financing will provide the Debtor with sufficient liquidity to continue operations and pay the administrative expenses of the Chapter 11 Case. Pursuant to the DIP Motion the Debtor will repay the existing Prepetition Tiger Indebtedness

in full and additional advances will be made in accordance with the Budget, as reduced by cash receipts.

### A.     First Day Motions

43.     To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtor's ability to effectuate a timely and efficient Chapter 11 liquidation that will maximize the value of the Debtor's estate, the Debtor has filed a number of First Day Motions designed to facilitate its seamless transition into Chapter 11 and to ensure minimum disruption to its operations.

44.     These First Day Motions include a Motion for Expedited Consideration of First Day Matters; Motion to Extend the Time to File Schedules and Statements; Motion to Appoint EPIQ, LLC as Claims and Noticing Agent; Application of Retain Obermayer as Debtor's counsel; Application to Retain Cowen and Company, LLC; Application to Retain Winter Harbor LLC and Designate Dalton Edgecomb as Chief Restructuring Officer and Jordan Meyers as Interim Chief Financial Officer; Application to Retain Berwyn Capital and Designate Gerard Leimkuhler as Chief Plan and Transaction Officer; Motion to Pay Certain Pre-Petition Wages; Motion to Obtain DIP Financing and for Authorization to Use Cash Collateral; Motion to continue the Debtor's Insurance programs; Motion to pay Certain Pre-Petition Taxes; Ordinary Course Professional Motion; Utilities Motion; and a Motion to Authorizing Use of Prepetition Bank Accounts and Business Forms.

45.     I anticipate that the Bankruptcy Court will schedule a hearing soon as practicable after the filing of the Petition to consider the First Day Motions.

46.     The First Day Motions seek authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the

Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a Chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm."

47. In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay prepetition claims to instances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Other relief will be deferred for consideration at a subsequent or "second day" hearing. Some First Day Motions request interim relief pending a Final Hearing.

48. I have reviewed each of the First Day Motions with the Debtor and with Debtor's counsel, and the facts stated therein are true and correct to the best of my knowledge, information, and belief. I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above, is necessary and critical to the Debtor's sale efforts, and is in the best interests of the Debtor's estate and creditors.

49. A detailed discussion of the facts supporting and the relief requested in each of the First Day Motions is included in the attached **Exhibit "A"** hereto. I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

### VII. CONCLUSION

50. This Declaration describes the factors that have precipitated the commencement of the Chapter 11 Case and demonstrates the critical need for the Debtor to obtain the relief sought in the First Day Motions.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

14

OMC\4837-7060-5813.v5-8/15/21

Dated: August 15, 2021          By: _____
                                Jordan Meyers
                                Interim Chief Financial Officer

15