# Exhibit A

## Evidentiary Support for First Day Motions

OMC\4840-3900-4149.v6-8/15/21

# EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

## I. Administrative and Procedural First Day Motions

**A.** **Debtor's Application for Expedited Consideration of First Day Matters**

1. The Debtor has requested entry of an Order granting expedited consideration of its First Day Motions. I believe that the relief requested in this application is essential to avoid any disruption to the Debtor's operations as a result of the commencement of this Chapter 11 Case and will preserve the value of the Debtor's Business and Assets. Accordingly, I respectfully submit that the Debtor's request for Expedited Consideration of the First Day Motions be approved.

**B.** **Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 521(a)(1)(b) and Fed. R. Bankr. P. 1007(c) for Entry of an Order Extending Time to File Its Schedules of Assets and Liabilities and Statements of Financial Affairs**

2. The Debtor requests entry of an Order granting a fourteen (14) day extension of the time to file its Schedules and Statements, for a total of twenty-eight days after the Petition Date, without prejudice to its right to request additional time. Preparing the Schedules and Statements for the Debtor will require the Debtor's management and professionals to devote substantial time and effort to analyzing the Debtor's constituencies and verify balances. Given the size and complexity of its operations, the Debtor anticipates that it will be unable to complete its Schedules and Statements in the fourteen days provided under Bankruptcy Rule 1007(c) and that it would be unnecessarily burdensome to attempt to do so during the first fourteen days of this Chapter 11 Case.

3. I believe that the extension requested is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest, will enable the Debtor to continue to operate its Business in Chapter 11 without disruption. Accordingly, I respectfully submit that the Court should grant the Debtor's Motion seeking an extension of time in which to file its Schedules and Statements.

---

[1] All capitalized terms used but not otherwise defined in this Exhibit A shall have the meanings ascribed to them in the First Day Declaration and First Day Motions, as applicable.

1

C. **Debtor's Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of EPIQ, LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date**

4. The Debtor seeks entry of an Order appointing EPIQ, LLC as claims and noticing agent (the "Claims and Noticing Agent") in the Debtor's Chapter 11 Case because it has significant experience in both the legal and administrative aspects of large Chapter 11 Cases and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of Chapter 11 Cases and experience in matters of this size and complexity.

5. I believe that the Claims and Noticing Agent's appointment is the most effective and efficient manner of noticing creditors and parties-in-interest of the filing of and developments in this Chapter 11 Case. In addition, the Claims and Noticing Agent will transmit, receive, docket, and maintain proofs of claim filed in connection with this Chapter 11 Case.

6. Accordingly, I believe that the appointment of the Claims and Noticing Agent to act as an agent of this Court is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtor's Motion to Appoint the Claims and Noticing Agent.

**(A PORTION OF THIS PAGE INTENTIONALLY LEFT BLANK)**

## II. Operational First Day Pleadings

A. **Debtor's Application for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing (I) the Retention of Cowen and Company, LLC; (II) the Retention of Winter Harbor LLC and Designation of Dalton Edgecomb as Chief Restructuring Officer and Jordan Meyers as Interim Chief Financial Officer; and (III) the Retention of Berwyn Capital and Designate Gerard Leimkuhler as Chief Plan and Transaction Officer *Nunc Pro Tunc* to the Petition Date**

**(i). The Cowen Application**

7. The Debtor seeks the entry of an order authorizing it to retain and employ Cowen and Company, LLC ("Cowen") as its Investment Banker *nunc pro tunc* to the Petition Date pursuant to the terms of the Engagement Agreement between and among the Debtor and Cowen.

8. As set forth more fully in the Application, Cowen has extensive experience in investment banking and considerable experience working with complex businesses like the Debtor in a variety of in-court and out-of-court restructuring scenarios, including conducting the sale of debtors in Chapter 11.

9. Accordingly, I believe that the retention of Cowen as the Debtor's Investment Banker is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtor's Application and the requested relief.

**(ii). The Winter Harbor Application**

10. The Debtor also seeks entry of an Order authorizing it to (i) retain and employ Winter Harbor LLC ("Winter Harbor") and (ii) designate Dalton Edgecomb as CRO and me as ICFO *nunc pro tunc* to the Petition Date pursuant to the terms of the Engagement Agreement between and among the Debtor and Winter Harbor. As set forth in detail in the Declaration I submitted in support of that application, both Winter Harbor and I have considerable experience working with complex businesses like the Debtor's in a variety of in-court and out-of-court restructuring scenarios.

11. Additionally, Winter Harbor's prior experience working with the Debtor in a financial advisory capacity also makes it uniquely suited to serve in this Chapter 11 Case.

12. Accordingly, I believe that the retention of Winter Harbor as the Debtor's financial advisor and designation of Dalton Edgecomb as the Debtor's CRO and Jordan Meyers as the Debtor's ICFO is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest; and respectfully submit that the Court should grant the Debtor's Application and the requested relief.

**(iii). The Berwyn Capital Application**

13. The Debtor seeks the entry of an order authorizing it to retain and employ Berwyn Capital ("Berwyn") and designate Gerard Leimkuhler as Chief Transaction Officer *nunc pro tunc* to the Petition Date pursuant to the terms of the Engagement Agreement between and among the Debtor and Berwyn.

14. As set forth more fully in the Application, Berwyn has extensive experience in restructuring and considerable experience working with complex businesses like the Debtor in a variety of in-court and out-of-court restructuring scenarios.

15. Additionally, Berwyn's prior experience working with the Debtor in a financial advisory capacity also makes it uniquely suited to serve in this Chapter 11 Case.

16. Accordingly, I believe that the retention of Berwyn and designation of Gerard Leimkuhler as Chief Transaction Officer of the Debtor is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtor's Application and the requested relief.

**B.    Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 and 507(a) for Authority to (I) Pay Certain Prepetition Wages, Salaries and Reimbursable Employee Expenses; (II) Pay and Honor Employee Medical and Other Benefits; (III) Continue Employee Benefit Programs; and (IV) for Related Relief (the "Wages Motion")**

17. In the Wages Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to pay certain prepetition wages and reimbursable employee expenses.

18. As of the Petition Date, the Debtor employed approximately 111 employees, including approximately 50 full-time salaried employees (the "Salaried Employees") and 61 hourly employees (the "Hourly Employees," and collectively with the Salaried Employees, the "Employees").

19. The Debtor's Employees, described broadly, perform a variety of critical functions related to the Business, including line work (fabrication and processing), sales, customer service, information technology, purchasing, human resources, accounting, finance, and management-related tasks. Some of the Debtor's Employees are covered by collective bargaining agreements ("CBA") with Teamster's Local 107 (the "Union"). The CBA expires on June 30, 2022.

20. In the ordinary course of business, the Debtor pays its Union Employees on a weekly basis and their non-union Employees on a bi-weekly basis. All payments are made on Fridays. The last payroll for both union and non-union Employees before the Petition Date, was funded on August 12, 2021. The Debtor's payroll obligations generally include wages, salaries, and other compensation, including overtime, and payments on account of certain allowances. The Debtor's payroll is approximately $50,000.00 per week for the Union Employees and $200,000.00 every other week for non-Union Employees. Because the Petition Date was at the end of a payroll week, the unpaid prepetition wages are modest in amounts.

21. Certain Employees are entitled to reimbursement of expenses. Those expenses are predominately provided to the Debtor's management and include travel and other related expenses.

22.    As of the Petition Date, the Debtor estimates that it owes approximately $140,000.00 to Employees on account of prepetition payroll obligations, including accrued but unpaid wages, benefits, and reimbursements, (the "Unpaid Compensation").

23.    According to the Debtor's records, Employees that are owed unpaid compensation are owed amounts less than the $13,650.00 priority wage claim "cap" imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Wage Cap").

24.    The Debtor utilizes Paycom for the payment of payroll, and for related processing and reporting. On the Thursday before payroll, Paycom receives the funds needed for payroll from the Debtor's accounts and transfers funds to employees on Friday. Paycom ensures (i) payroll and deductions are appropriately accounted for (ii) Employees are paid on time, (iii) deductions are appropriately made; and (iv) taxes and other obligations are remitted as required under operative law.

25.    For each pay period, the Debtor makes a gross payroll payment to Paycom on behalf of each Employee, and Paycom deducts certain amounts from Employee wages, including Union dues and fees, garnishments for child support, and other pre-tax and post-tax deductions including 401(k), Health Savings Accounts ("HSAs"), and other deductions (collectively, the "Deductions").

26.    Some Hourly Employees are members of the Union. As participating members of the Union, those Employees are responsible for payment of union dues ("Union Dues"). Pursuant to the Debtor's CBA, the Debtor deducts Union Dues from the applicable Employee's payroll. In the aggregate, the Debtor believes that as of the Petition Date, it does not owe any amount for Union Dues on behalf of its unionized Employees.

27. In addition to the Deductions, the Debtor is required under state and federal law to withhold state and federal taxes and Social Security and Medicare taxes for remittance to the appropriate governmental authority (the "Withholdings"). The Debtor is likewise obligated under state and federal law, to provide its own contribution towards Social Security, and Medicare, and has to pay additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes"). As of the Petition Date, the Debtor believes it owes approximately $20,000.00 in Employer Payroll Taxes.

28. The Debtor offers employee benefit plans and policies including medical insurance, dental, vision, disability, 401(k) and paid time off ("PTO") as well as other benefits ("Employee Benefits").

29. The Debtor's Employees are the lifeblood of its Business, and the Debtor must protect their interests by making the required payments on account of Unpaid Compensation, Employee Benefits, and to make the necessary Deductions, Withholdings and Employee related payments as set forth herein. As of the Petition Date, the Debtor believes it owes approximately $70,000.00 in health premiums and $20,000.00 in employee 401(k) deductions that were withheld from Employee's payroll amounts.

30. As required by applicable law, the Debtor is required to comply with the state laws requiring Worker's Compensation.

31. Pursuant to its CBA, the Debtor has recognized the Union as agent for its Union Employees and has agreed to the maintenance of certain benefits.

32. In addition, the Debtor is a participant in the multiemployer Health and Welfare Plan. The Debtor is obligated to Teamsters Local 107 Fund, the Union 401(k) ("Union 401(k)").

As of the Petition Date, the Debtor estimates that it owes approximately $4,500.00 on account of the Union 401(k) payment.

33. The Debtor seeks authority, but not direction, to pay any prepetition amounts on account of the Union 401(k) as and when they come due during this Chapter 11 proceeding. The Debtor estimates these obligations at $4,500.00.

34. To maintain morale and enhance the Debtor's ability to retain Employees during this Chapter 11 Case, the Debtor requests authority to pay and honor these prepetition claims and obligations, continue programs and maintain funding, in the exercise of its discretion, relating to, among other things: (i) Unpaid Compensation, Payroll Maintenance, Deductions, Withholdings, Union Dues and Employer Payroll Taxes; (ii) Employee Benefits; (iii) Worker's Compensation Policies and Programs; and (iv) payments to the Union 401(k) (each as defined in the Wages Motion, and collectively, the "Employee Obligations").

35. I believe the Debtor's failure to satisfy Employee Obligations would jeopardize Employee morale and loyalty at a time when Employee support is most critical to the Debtor's Business, particularly during the reorganization process. Increased instability in the Debtor's workforce will undermine the Debtor's ability to complete the sales process.

36. To enable the Debtor to carry out the relief requested, the Debtor also requests that the Court authorize and direct financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent the Debtor has sufficient funds with such bank, whether such checks were presented or electronic requests were submitted before or after the Petition Date, and provide that all such financial institutions are authorized to rely on the Debtor's designation of any particular check or electronic

payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtor's instructions.

37. Accordingly, for the reasons set forth herein and in the Wages Motion, I respectfully submit that the relief requested in the Wages Motion is necessary and critical to the Debtor's ability to preserve value for the benefit of the Debtor's estate, its creditors, and all parties-in-interest, and will enable the Debtor to continue to operate its Business in this Chapter 11 Case within minimal disruption, thereby maximizing the value for the estates. Absent the relief sought in the Wages Motion, the Debtor and its estate would suffer immediate and irreparable harm.

C. **Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for Authority to (I) Maintain, Renew, and Continue its Insurance Policies and Programs and (II) Honor All Insurance Obligations (the "Insurance Motion")**

38. In connection with the operation of the Debtor's businesses, the Debtor maintains various insurance policies and workers' compensation programs (as renewed, amended, modified, endorsed, and/or supplemented from time to time, and including any exhibit or addenda thereto, collectively, the "Insurance Policies and Programs" and all insurance premiums, assessments, service providers' fees or broker's fees and other obligations related thereto, including any taxes or other fees, collectively, the "Insurance Obligations") through several different insurance carriers (the "Insurance Carriers"). A list of the Debtor's Insurance Policies and Programs by Insurance Carrier and coverage type is attached as Exhibit A to the Insurance Motion.

39. The Insurance Policies and Programs include various liability, property, and other insurance policies, which provide the Debtor with insurance coverage related to, among other things, general liability, excess liability, directors' and officers' liability, employment practices liability, workers' compensation, property, crime, automobile, international commercial, environmental and

9

umbrella policies (including several excess layers). True and correct copies of the Insurance Policies and Programs are attached as Exhibits B through K to the Insurance Motion.

40. The Debtor maintains the Insurance Policies and Programs to help manage and limit the risks associated with operating their businesses. The Insurance Policies and Programs are essential to the preservation of the value of the Debtor's businesses and property.

41. Some of the Insurance Policies and Programs are required by the various regulations, laws, and contracts that govern the Debtor's commercial activities.

42. Pursuant to the Insurance Policies and Programs, the Debtor pays premiums based upon a fixed rate established and billed by each Insurance Carrier (collectively, the "Insurance Premiums"). At times, the Debtor pays the Insurance Premiums in installments. For example, commercial general liability policy is paid 25% up front and 9 monthly installment payments thereafter.

43. The Debtor does not believe any prepetition amounts are currently due and owing on account of the Insurance Premiums, nevertheless, out of an abundance of caution, the Debtor seeks authority to pay any such prepetition Insurance Premiums when they become aware of them.

44. Included in their Insurance Policies and Programs, the Debtor maintains workers' compensation insurance as required by statute in each of the states in which they operate (the "Workers' Compensation Programs").

45. Although the Debtor does not believe any such amounts are outstanding, out of an abundance of caution, the Debtor seeks approval to pay any Insurance Obligation related to the prepetition period that may be owed to an insurance broker.

46. In the Insurance Motion, the Debtor seeks entry of an order authorizing, but not directing, it to: (i) continue to maintain, renew, and continue its prepetition Insurance Policies and

Programs and honor its Insurance Obligations in the ordinary course of business during the administration of this Chapter 11 Case, and (ii) pay any prepetition Insurance Obligations.

47. The Debtor's Insurance Policies and Programs are essential to the preservation of the value of the Debtor's Business. I understand that, in many instances, the insurance coverage provided by the Insurance Policies and Programs, including the Workers' Compensation Programs, is required by the various regulations, laws, and contracts that govern the Debtor's commercial activities as well as by the Bankruptcy Code and the U.S. Trustee. Accordingly, failure to honor the Insurance Obligations could have a significant negative impact on the Debtor's operations.

48. The Insurance Policies and Programs are essential to preserving the value of the Debtor's Business and Assets.

49. Accordingly, for the reasons set forth herein and in the Insurance Motion, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtor, its estate, and all parties-in-interest; and will enable the Debtor to continue to operate its Business and preserve the value of the Debtor's estate. Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

D. **Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service (the "Utilities Motion")**

50. Pursuant to the Utilities Motion, the Debtor seeks entry an order (i) approving the Debtor's proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii)

prohibiting utility providers from altering or discontinuing utility service on account of an outstanding prepetition invoice.

51. In the ordinary course of its business, the Debtor receives utility services from various Utility Companies for, among other things, electricity, natural gas, water, and telecommunications services. The Utility Companies include, without limitation, the entities set forth on the Utility Company List, a copy of which is attached as Exhibit A to the Utilities Motion.

52. On average, the Debtor spends approximately $134,000.00 each month on electric and gas utility costs.

53. The Debtor intends to pay post-petition obligations owed to the Utility Companies in a timely manner. The Debtor expects that cash flows from operations will be sufficient to pay post-petition utility obligations in the ordinary course of business.

54. Through the Utilities Motion, the Debtor seeks an order approving its proposed Determination Procedures for Utility Companies as adequate within the meaning of section 366 of the Bankruptcy Code. These Determination Procedures will prevent Utility Companies from discontinuing service and require that any Utility Company that requires additional adequate assurances of future performance within thirty (30) days of service of the order granting the Utility Motion. Any such request for adequate assurance must be negotiated between that Utility Company and the Debtor, the court's involvement is only necessary if no resolution can be reached, and the Debtor must file a Determination Motion.

55. These procedures will allow Utility Companies to request additional adequate assurance for unpaid utility services if they believe the proposed amount is insufficient.

56. Preserving utility services on an uninterrupted basis is essential to the Debtor's Business. Any interruption in utility services, however brief, would seriously disrupt the Debtor's

ability to continue operations and service its customers. This disruption would adversely impact customer relationships and would result in a decline in the Debtor's revenues. Such a result could jeopardize the Debtor's efforts to maximize value for the benefit of its creditors.

57. Therefore, it is critical that utility services continue uninterrupted during this Chapter 11 Case. I have been advised that if the Determination Procedures are not approved, the Debtor may be confronted with and forced to address numerous requests by its Utility Companies at a critical point in its Chapter 11 Case. Moreover, the Debtor's estate could be irreparably harmed if a Utility Company unilaterally decided that it is not adequately protected and either made an exorbitant demand for payment to continue service or elect to discontinue service to the Debtor altogether. Such an outcome could seriously jeopardize the Debtor's Business operations, Asset values, and ability to maximize recoveries to its stakeholders.

58. Accordingly, for the reasons set forth herein, and in the Utilities Motion, I respectfully submit that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtor's estate, its creditors, and all parties-in-interest and will enable the Debtor to continue to operate the Business and to safeguard the value of its estate.

E. **Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing The Debtor To Continue Using Existing Bank Accounts And Business Forms And For Related Relief ("Bank Accounts Motion")**

59. In the ordinary course of business, the Debtor utilizes various bank accounts at various financial institutions (the "Banks") for operations, checking and environmental escrow (collectively, the "Bank Accounts"). A schedule of each of the Debtor's Bank Accounts is attached as Exhibit A to the Bank Accounts Motion.

60. The Bank Accounts are located at Banks designated as authorized depositories by the Office of the United States Trustee for Region 3, pursuant to the U.S. Trustee's Operating

Guidelines for Chapter 11 Case. Therefore, the Banks are each party to a uniform depository agreement with the U.S. Trustee such that the Bank Accounts will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.

61. In the ordinary course of business, the Debtor uses several types of checks. Additionally, the Debtor uses a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders, and invoices (collectively, the "Business Forms").

62. To minimize expenses, the Debtor seeks authorization to continue using all checks substantially in the forms used immediately prior to the Petition Date, without reference to the Debtor's status as a debtor-in-possession; provided that in the event that the Debtor generates new checks during the pendency of this case other than from their existing stock of checks, such checks will include a legend referring to the Debtor as "DIP" or "Debtor In Possession." To the extent practicable, the Debtor also will print such legend on any checks electronically generated during this case. Additionally, the Debtor seeks authority to use all other Business Forms without reference to the Debtor's status as debtors in possession.

63. The Debtor has prepared communication materials to distribute to the various parties with whom they conduct business, which will, among other things, notify such parties of the commencement of this Chapter 11 Case. The vast majority of such parties will be included in the Debtor's Matrix either as creditors or for notice purposes and will be fully-informed regarding the bankruptcy filing. The Debtor believes that these direct communications plus notifications to Matrix parties will provide adequate notice of the Debtor's status as debtor-in-possession.

64. The Debtor believes that its chapter 11 case will be more orderly if they are permitted to maintain all Bank Accounts with the same account numbers during this chapter 11 case. By preserving business continuity and avoiding any disruption and/or delay to the Debtor's

disbursement obligations, all parties-in-interest, including employees, vendors, and customers, will be best served by the relief requested.

65. To minimize expenses, the Debtor further requests they be authorized to continue to use their Business Forms, substantially in the forms existing immediately before the Petition Date, without reference to their status as debtor-in-possession. The Debtor requests authority to utilize their existing checks and electronically generated forms, rather than obtain new checks and implement new electronic forms reflecting their status as debtors in possession. To the extent the Debtor uses all existing checks, any new checks ordered will reflect their status as debtors-in-possession. The Debtor will work with their systems personnel and outside consultants to determine what computer system changes are required to reflect their status as debtor-in-possession on electronically generated checks and will implement such changes as soon as reasonably practicable.

66. By virtue of the nature and scope of the Debtor's business operations and the large number of suppliers of goods and services with which the Debtor transacts, it is important that the Debtor be permitted to continue to use their existing Business Forms without alteration or change, except as requested herein.

67. Disruptions regarding the Bank Accounts – or the lack of clarity as to whether the Debtor must open new accounts – would cause delays in receipt or disbursement of funds. Late payments could frustrate the Debtor's relationships with employees and cause other severe and irreparable disruptions to the Debtor's business which would have a negative impact on all parties-in-interest.

**F. Debtor's Motion Pursuant To 11 U.S.C. §§ 105(A), 363(B), 506(B), 507(A), And 541 For Entry Of An Order Authorizing, But Not Directing, The Debtor To Make Post-**

15

**Petition Payments And Disbursements With Respect To Certain Prepetition Taxes ("Tax Motion")**

68. As part of its ownership of the Real Property, the Debtor pays quarterly ad valorem property taxes to the Township of Pennsauken, Camden County, New Jersey ("Pennsauken Township").

69. On July 1, 2021, the Debtor received notice from Pennsauken Township stating that, for the third (3rd) quarter of 2021, property tax on the Real Property would be assessed at a rate of $3.921 per every $100.00 of assessed valuation of the Real Property (the "Property Tax Notice"). A copy of the Property Tax Notice is attached as Exhibit A to the Tax Motion.

70. The Property Tax Notice further stated that third (3rd) quarter billing had a due date of August 1, 2021, with an interest free grace period that extended through August 10, 2021, after which date interest would become payable per statute based upon the original due date of August 1, 2021.

71. Enclosed with the Property Tax Notice was an estimated tax bill (the "Property Tax Bill"), which estimated real estate property taxes on the Real Property to be $66,186.36 for the third (3rd) quarter of 2021 (the "Prepetition Property Taxes"), and stated that interest would be charged at a rate of eight percent (8%) on the first $1,500.00 of past due property taxes and a rate of eighteen percent (18%) for past due property taxes after the first $1,500.00. A true and correct copy of the Property Tax Bill is attached to the Tax Motion.

72. The Debtor seeks to pay the Prepetition Property Taxes in order to, among other things, prevent Pennsauken Township from taking actions that might interfere with the Debtor's Business or the administration of its chapter 11 case, which include Pennsauken Township encumbering the Real Property by way of a tax lien and assessing significant, continually accruing, interest and penalties on past-due taxes. In addition, non-payment of the Prepetition Property Taxes

16

will give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, the Debtor submits that the proposed relief is in the best interest of the Debtor's estate.

73. The Debtor estimates that, of the date of the filing of this Motion, de minimis interest has already accrued with respect to the Prepetition Property Taxes. Interest will continue to accrue if the Prepetition Property Taxes are not paid. Additionally, Pennsauken Township will apply a six percent (6%) year-end penalty for any property tax delinquency in excess of $10,000.00 existing on December 31, 2021.

74. The Debtor, in the ordinary course of operating its business, withholds certain amounts from each of its employees' paychecks for the payment of employee wage taxes to the Internal Revenue Service (the "I.R.S.").

75. In July of 2020, the Debtor opted to change its payroll provider from UKG Inc. d/b/a UltiPro ("UltiPro") to Paycom. The Debtor's payroll provider is responsible for filing an IRC §941 return with the I.R.S. for the Debtor's employee wage taxes.

76. Unbeknownst to both the Debtor and Paycom, sometime after the Debtor had switched to Paycom as its payroll provider, despite no longer being the Debtor's payroll provider, in error, UltiPro took it upon itself to file an IRC §941 return with the I.R.S. reflecting zero (0) dollars being withheld or paid to the I.R.S. for the Debtor's third (3rd) quarter employee wage taxes (the "UltiPro Return").

77. Unaware that the UltiPro Return was filed, Paycom also proceeded to file an IRC §941 with the I.R.S. for the Debtor's third (3rd) quarter employee wage taxes, which correctly reflected the amount of employee wage taxes to be paid to the I.R.S. and included proper payment in the amount of $502,592.20.

78. As a result of these dual filings with the I.R.S. for the Debtor's third (3rd) quarter employee wage taxes, the I.R.S. mistakenly took Paycom's filing as an overpayment by the Debtor based on the erroneous filing of the UltiPro Return and proceeded to issue a refund check to the Debtor the amount of $504,382.12 (the "Refund Check"), representing the refund of the 2020 employee portion of the wage tax withholdings plus interest (the "Prepetition Withholdings").

79. The Prepetition Withholdings are not property of the Debtor or the Debtor's estate but, rather, are due to, and held in trust for, the I.R.S. for payment the Debtor's third (3rd) quarter employee wage taxes. The Debtor seeks to disburse the Prepetition Withholdings in order to, among other things, prevent the I.R.S. from taking actions that might interfere with the Debtor's Business or the administration of its chapter 11 case, which include, but are not limited to, assessing penalties and/or significant interest on past-due taxes, or other actions as to the Debtor's employees. Accordingly, the Debtor submits that the proposed relief is in the best interest of the Debtor's estate.

80. By this Motion, the Debtor request authority, but not the direction, to disburse the Prepetition Withholdings to the I.R.S. and to pay the Prepetition Property Taxes and any associated interest and penalties that may accrue or be incurred due to non-payment of the Prepetition Property Taxes, in the ordinary course of business.

81. Payment of the Prepetition Property Taxes and Prepetition Withholdings is in the best interest of the Debtor, will prevent irreparable harm to the Debtor and is well within the sound exercise of the Debtor's business judgment.

In sum, each of the Debtor's pending First Day Motions is a reasonable business decision and is supported factually. Therefore, I urge the Court to enter the Orders in connection with the First Day Motions as filed.

Respectfully Submitted,

Dated: 8/15/2021

Jordan Meyers
Interim Chief Restructuring Officer