| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| ***Caption in Compliance with D.N.J. LBR 9004-1(b)***<br>OBERMAYER REBMANN MAXWELL & HIPPEL LLP<br>Edmond M. George, Esquire<br>Michael D. Vagnoni, Esquire (pro hac vice)<br>Turner Falk, Esquire<br>1120 Route 73, Suite 420<br>Mount Laurel, NJ 08054-5108<br>Telephone: (856) 795-3300<br>Facsimile: (856) 482-0504<br>E-mail:   edmond.george@obermayer.com<br>            michael.vagnoni@obermayer.com<br>            turner.falk@obermayer.com<br><br>Proposed Counsel to the Debtor<br>and Debtor in Possession | |
| In re:<br><br>ALUMINUM SHAPES, LLC,<br><br>                            Debtor. | Chapter 11<br><br>Case No. 21-16520 (JNP) |

**DEBTOR'S MOTION FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS INCLUDING APPROVAL OF PROVISIONS FOR DESIGNATION OF A STALKING HORSE AND BID PROTECTIONS, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION; AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTOR'S BUSINESS OR  ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

Aluminum Shapes, L.L.C., as debtor and debtor in possession in the above-captioned

chapter 11 case (the "**Debtor**"), hereby files this motion (the "**Motion**") (A) for entry an Order,

substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**")[1], authorizing and approving (i) the proposed bidding procedures for soliciting bids for the Debtor's Assets (the "**Bidding Procedures**") in the form attached to the Bidding Procedures Order as **Exhibit 1**, including provisions authorizing and approving, but not directing Debtor's selection and designation of, a stalking horse bidder (the "**Stalking Horse**") and bid protections for a Stalking Horse, including, without limitation, a  break-up fee (the "**Break Up Fee**") and expense reimbursement (the "**Expense Reimbursement**", and together with the Break Up Fee the "**Bid Protections**"), and (ii) the form of Asset Purchase Agreement attached hereto as **Exhibit B** (the "**Asset Purchase Agreement**"), (iii) establishing notice procedures and approving the form of notice and manner of all procedures in connection with the proposed sale of the Debtor's Assets (the "**Sale**"), (iv) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases, (v) scheduling a hearing (the "**Sale Hearing**") to approve the Sale, (vi) granting expedited consideration shortened time and limited notice, and (vii) granting related relief.  In addition, by this Motion, the Debtor ultimately seeks entry of an order, substantially in the form attached hereto as **Exhibit C** (the "**Sale Order**"), (i) authorizing and approving, but not directing, the sale of the Assets, in each case with such Sale being free and clear of any and all liens, claims, encumbrances and interests, (ii) and the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale, and (iii) granting related relief.

In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Jordan Meyers in Support of Chapter 11 Petitions and First-Day Relief* [Docket No. 17] (the "**First Day Declaration**") and the Declaration of *Justin Magner of Cowen and*

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order.

*Company, LLC* in Support of the Sale Motion filed contemporaneously herewith (the "**Magner Declaration**"). In further support of the Motion, the Debtor respectfully represent as follows:

## PRELIMINARY STATEMENT

1.       As more fully described in the First Day Declaration, the Debtor filed this chapter 11 case on August 15, 2021 (the "**Petition Date**") with the intent to conduct a sale process ("**Sale**") of its business (the "**Business**") (as defined herein) and/or assets (the "**Assets**") (as defined herein).

2.       The Sale is necessary to conserve liquidity and maximize the value of the Debtor's Business or Assets in response to various economic and market challenges, including *inter alia* hampered liquidity, the skyrocketing price of metals, as well as the impact of the COVID-19 pandemic. By this Motion, the Debtor seeks to establish procedures related to the bidding and sale process for its Business, or alternatively, its Assets, including certain real estate.

## RELIEF REQUESTED

3.       Pursuant to sections 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the District of New Jersey (the "**Local Bankruptcy Rules**"), the Debtor first seeks entry of the Bidding Procedures Order, which will authorize and approve, but do not direct, among other things: (a) the proposed Bidding Procedures; (b) the provisions for selection of a Stalking Horse, and for the Bid Protections, including a Break Up Fee and Expense Reimbursement; (c) the notice procedures and the form of notice and manner of all procedures in connection with the auction (the "**Auction**") and the Sale; (d) the procedures for the assumption and assignment of certain executory contracts and/or unexpired leases; (d) the scheduling of the Sale Hearing to approve the Sale; and (e) related relief. Second, at the Sale Hearing, the Debtor

will seek entry of the Sale Order that will approve the sale of the Assets to the Successful Bidder, the assumption and assignment of certain executory contracts and unexpired leases and grant related relief.

4.      For the reasons set forth below and as follow, the Debtor submits that the relief requested herein is in the best interest of the Debtor, its estate, creditors, stakeholders, and all other parties-in-interest. The Motion, therefore, should be granted.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

I.      **The Chapter 11 Case.**

6.      On August 15, 2021 (the "**Petition Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its Business and manage its Assets as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "**Bankruptcy Code**")

7.      On September 1, 2021, the Office of the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**") in the Chapter 11 Case.  No trustee or examiner has been appointed.

8.      Information regarding the Debtor's Business, Assets, capital structure, and the circumstances leading to the commencement of this chapter 11 cases is set forth in the First Day

Declaration.

**II.      The Debtor's Business and Assets.**

9.      The Debtor is seeking authorization and approval of Bid Procedures in connection with the going concern sale of its Business, Assets or any components parts.    The Debtor's desire is to find a strategic purchaser for its Assets to preserve value and employment for its 111 employees.

10.      The Debtor is an aluminum processor.  The Debtor's operations began in 1948. The Debtor was founded by Ben Corson, as a supplier of extruded aluminum for his aluminum windows and door businesses. The Debtor is a predominate fabricator of aluminum east of the Mississippi, and one of only a few processors in the country capable of and in possession of a completely vertically integrated plant and operations for the processing, annealing, cutting, fabricating, welding and extruding of aluminum.

11.      The Debtor owns and operates a single location at 9000 River Road, Delair, NJ consisting of approximately 500,000 square feet of industrial space, including a cast house, foundry and processing area (the "**Real Property**").  The Real Property consists of buildings, substantial machinery, fixtures and equipment, including a valuable cast house and foundry furnace, several presses and processing equipment ("**FFE**" with the Real Property the "**Assets**"). At present, the Debtor is not operating the cast house.

**III.      The Sale Process.**

12.      On or about June 18, 2021, the Debtor engaged Cowen and Company, LLC ("**Cowen**") to provide investment banking services with respect to the Debtor's Business and Assets, including exploring all restructuring, financing and M&A alternatives with respect thereto.

5

13.     The Debtor instructed Cowen to find a purchaser who could continue the Debtor's Business as a going concern.  Upon its retention, Cowen immediately began conducting due diligence on the Business and Assets.

14.     In the period prior to the Petition Date, Cowen began significant outreach efforts and cast a wide net, on the Debtor's behalf, in soliciting interest from potential purchasers of the Business or Assets.

15.     Cowen contacted in excess of 160 potential buyers with more than 60 executing non-disclosure agreements ("**NDAs**"), and performed significant diligence on Business and Assets. The Debtor conducted numerous meetings with potential buyers. The Debtor has received indications of interest from multiple potential buyers and numerous other potential buyers are actively reviewing the Business and Assets as of the date of this Motion.

16.     Cowen continues to actively market the Business and Assets, to a wide spectrum of interested parties, including potential financial and strategic buyers.

17.     Cowen has, with the Debtor's management's assistance, set up an electronic data room that has been made available for potential bidders subject to their entry into NDAs, and Cowen has prepared and distributed presentations and confidential information memoranda regarding the Business and Assets.

18.     The Debtor and Cowen are and will continue their marketing process post-petition, which will afford the Debtor the best opportunity to maximize value for the sale of the Business or Assets at auction (the "**Auction**").

19.     Subject to the Bidding Procedures, and in consultation with its post-petition lender, Tiger Finance, LLC (the "**DIP Lender**"), its Advisors, and the official committee of unsecured creditors (the "**Committee**"; and together with the DIP Lender the "**Consultation Parties**"), the

Debtor and its Advisors retain the right to pursue any transaction or restructuring strategy that, in the Debtor's business judgment, will maximize the value of its estate. If the Debtor receives multiple offers for the Business or the Assets, the Debtor intends to conduct the Auction to determine the highest or best offer for the Business or Assets.

20.      No matter what the Debtor's financial obligations are, the Debtor and its officers will perform their fiduciary duties to maximize the value obtained for the Business or Assets.

21.      Accordingly, the Debtor believes that the sale of the Business or Assets will maximize the value of the Debtor's estate for the benefit of all its creditors, stakeholders, and other parties-in-interest.

**IV.      The Stalking Horse Provisions and Bid Protections.**

22.      The Debtor has received contingent offers for the Assets.  While the offerors continue their due diligence on the Debtor's Business and Assets, the Debtor seeks approval of the Stalking Horse Provisions and Bid Protections, each as described below.

22.      As of the time of filing the Motion, the Debtor has not selected a Stalking Horse Bidder.  It has agreed however to reimburse the expenses of the contingent bidder, in the event the bidder is not approved as a Stalking Horse, up to $75,000.00, in that the contingent bidder has agreed to share its due diligence with other bidders in such an event.

23.      By this Motion, the Debtor seeks to approve general provisions for the selection of a Stalking Horse Bidder, which provisions would be applicable to the chosen Stalking Horse, if any.

24.      The Stalking Horse would be selected based upon the highest and best non-contingent offer for the Debtor's Business or Assets.

25.      If a Stalking Horse is selected, the Stalking Horse Bidder's offer would constitute

the initial Qualified Bid (as defined in the Bidding Procedures).

## V.    Bidding Procedures.

26.      By this Motion, the Debtor seeks approval of the Bidding Procedures. The Bidding Procedures are designed to maximize value for the Debtor's estate, while ensuring an orderly sale process consistent with the timeline available to the Debtor under its debtor in possession loan with the DIP Lender.

27.      The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bidders become Qualified Bidders and bids become Qualified Bids (each as defined in the Bidding Procedures), the receipt and negotiation of bids received, the conduct of the Auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to accomplishing the foregoing.

28.      The Debtor believes that the Bidding Procedures afford the Debtor a sufficient and reasonable opportunity to maximize the value of a sale of the Business or Assets for the benefit of its estate.

29.      To further maximize the competitiveness of any bidding process, the Debtor also seeks authority, but not direction, to (a) select a bidder to serve as the Stalking Horse Bidder, and (b) in connection with any Stalking Horse Bidder and related agreement, provide a Breakup Fee and/or Expense Reimbursement, each as described in the Bidding Procedures.

30.      To the extent the Debtor designates a Stalking Horse Bidder and enters into a Stalking Horse Agreement, in each case subject to and following consultation with the Consultation Parties, the Debtor shall promptly upon execution of a Stalking Horse Asset Purchase Agreement, file with the Bankruptcy Court, a notice that contains information about the Stalking

Horse Bidder, the Stalking Horse Bid, and attaches the proposed Stalking Horse Asset Purchase

Agreement.

31.     The Bidding Procedures establish the following key dates:

a.      **Bid Deadline**: To participate in the bidding, each Potential Bidder, must

deliver to the notice parties enumerated in the Bidding Procedures a written offer, so as to be

received by no later than October 11, 2021 at 4:00 (EST) (the "**Bid Deadline**").

b.      **Auction**: If the Debtor receives two or more Qualified Bids, the Debtor will

conduct the Auction of the Business or Assets. If the Auction is held, it shall take place on October

15, 2021 at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, Suite

3400, 1500 Market Street, Philadelphia, PA 19103 or such other place and time as determined by

the Debtor in consultation with the Consultation Parties.  At the Auction, only those parties that

have been designated by the Debtor as Qualified Bidders and the Consultation Parties shall be

entitled to attend and participate in the Auction.

c.      **Sale Hearing**: The hearing to approve the sale of the Business or Assets to

the Successful Bidder (as defined in the Bidding Procedures) is scheduled to take place on October

18, 2021 at 11:00 a.m. (EST) before the Honorable Jerrold N. Poslusny, Jr., U.S.B.J. either

telephonically through Court Solutions or at the United States Bankruptcy Court for the District

of New Jersey, Mitchell  H. Cohen Courthouse, 400 Cooper Street, 4th floor, Courtroom 4C,

Camden, New Jersey, 08101, or at such time thereafter as counsel may be heard.

32.     Key terms of the Bidding Procedures are highlighted below:

a.      **Due Diligence Materials**: Any party that submits to the Debtor (i) an

executed confidentiality agreement in such form reasonably satisfactory to the Debtor, and (ii)

reasonable evidence demonstrating the party's financial ability to consummate a Sale as

4851-8471-7562.v1

reasonably determined by the Debtor (subject to and following consultation with the Consultation Parties), may be granted access to diligence materials.

      b.      **Form and Content of Qualified Bids**: A Qualified Bid is a written offer to purchase the entire Business, all of the Assets, the Debtor's interests in any real property ("**Real Property**"), or the Debtor's interests in its furniture, fixtures and equipment ("**FFE**"), in any combinations, submitted to the Debtor and its advisors, so as to be received by the Bid Deadline that satisfies each of the following conditions:

      i.      **Good Faith Offer**: Each Bid must constitute a good faith, bona fide, non-contingent offer to purchase all or certain of the Business Assets or other assets.

      ii.      **Good Faith Deposit**: Each Bid must be accompanied by a deposit in the amount of 7.5% of the proposed purchase price which will be held in a non-interest bearing escrow account.

      iii.      **Executed Agreement**: Each Bid must include an executed Asset Purchase Agreement as set forth in Exhibit "B".  In the event a Stalking Horse is selected, each Bid must include a modified form of the Asset Purchase Agreement pursuant to which the potential bidder proposes to effectuate the acquisition of the Debtor's Business or Assets (a "**Modified Asset Purchase Agreement**"), and any necessary transaction documents, signed by an authorized representative of such bidder.  Each Bid must also include a copy of the Modified Asset Purchase Agreement **marked against the Asset Purchase Agreement attached as Exhibit B hereto, to show all changes requested by the Potential Bidder** (including those related to the assumption and assignment of executory contracts and unexpired leases, and other material terms such that the Debtor may determine how such Bid compares to the terms of the Asset Purchase Agreement and competing Bids) and if less than all Assets indicate clearly which of the Assets are being bid upon.

4851-8471-7562.v1

Each Modified Asset Purchase Agreement must provide a commitment to close within two (2) business days after all closing conditions are met.

iv.    **Purchase Price**: Each Bid must clearly identify the purchase price to be paid (the "**Purchase Price**").  The Purchase Price must allocate between the Real Property and the FFE.  However, any Bid may be for the Real Property or FFE alone in an amount that is less than the Stalking Horse Bid, but in order to be considered an Overbid (as defined in the Bid Procedures), any such Bid must be combined with another Bid for the remainder of the assets that together exceed the Stalking Horse Bid in an amount sufficient to constitute an Overbid pursuant to the Bid Procedures.

v.    **Cash Requirements**: If there is a Stalking Horse Bidder, each Bid must provide for the payment of any applicable Break-Up Fee, Expense Reimbursement, and the Initial Increment (as defined below), in cash in full.

vi.    **Designation of Assigned Contracts and Leases**: A Bid must identify any and all executory contracts and unexpired leases of the Debtor that the potential bidder wishes to be assumed pursuant to a Sale (the "**Assigned Contracts**"). A Bid must specify whether the Debtor or the potential bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs.

vii.    **Designation of Assumed Liabilities**: A Bid must identify all liabilities which the potential bidder proposes to assume as part of the Sale.

viii.    **Corporate Authority**: A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the Sale; provided that, if the potential bidder is an entity specially formed for the purpose of effectuating the Sale, then the potential bidder must furnish written evidence reasonably

11

acceptable to the Debtor of the approval of the Sale by the equity or interest holder(s) of such potential bidder.

ix.    **Disclosure of Identity of Potential Bidder**: A Bid must fully disclose the identity of each entity that will be bidding on the Business or Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any relationships, connections, agreements, arrangements or understandings with the Debtor, or any other known, potential, prospective bidder, or potential bidder, or any officer, director, manager, or of the Debtor, or the Debtor's DIP Lender.

x.    **Disclosure of Connections**: A Bid must fully disclose any connections or agreements with the Debtor or its affiliates, any other known potential bidder and/or any officer or director, or member of the Debtor.

xi.    **Proof of Financial Ability to Perform**: A Bid must include written evidence that the Debtor may reasonably conclude, in consultation with their advisors and the Consultation Parties, that demonstrates that the Potential Bidder has the necessary financial ability to timely consummate a Sale including any Overbids necessary at an auction and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all executory contracts and unexpired leases to be assumed and assigned in such Sale.

xii.    **Contingencies**: Except as otherwise provided in the Asset Purchase Agreement, a Bid must not be subject to material conditions or contingencies to closing, including without limitation, obtaining financing, internal approvals or further due diligence.

xiii.    **Bid Irrevocable**: A Bid must provide that it is irrevocable until two (2) business days after the Closing of the Sale. Each potential bidder further agrees that its Bid, if

not chosen as the Successful Bid (as defined in the Bid Procedures), shall serve, without modification, as a Backup Bid (as defined in the Bid Procedures) as may be designated by the Debtor at the Sale Hearing, in the event the Successful Bidder (as defined in the Bid Procedures) fails to close as provided in the Successful Bidder's Asset Purchase Agreement and the Sale Order.[2]

xiv.    **As-Is, Where-Is**: A Bid must include the following disclaimer: EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY THE DEBTOR PURSUANT TO THIS AGREEMENT (I) THE DEBTOR MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE BUSINESS OR ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE DEBTOR MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE BUSINESS OR ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE BUSINESS OR ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY ONLY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY THE DEBTOR PURSUANT TO THIS AGREEMENT, THE DEBTOR MAKES NO REPRESENTATION OR

---

[2]    Pursuant to the Bidding Procedures, the Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final and best Overbid) open and irrevocable until two (2) business days after the closing of the Sale (the "**Outside Backup Date**").

WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

xv.    **Time Frame for Closing**: A Bid by a potential bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a timeframe acceptable to the Debtor, in consultation with the Consultation Parties, or by November 1, 2021.

xvi.    **Consent to Jurisdiction**: Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtor, the Bidding Procedures, the Auction, any Modified Asset Purchase Agreement, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtor, the Bidding Procedures, the Auction, any Modified Asset Purchase Agreement, or the construction and enforcement of documents relating to any Sale, and (iii) commit to the entry of a final order or judgment in any way related to the Debtor, the Bidding Procedures, the Auction, any Modified Asset Purchase Agreement, or the construction and enforcement of documents relating to any Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

xvii.    **Bid Protections**: In the event the Debtor chooses a Stalking Horse bidder, following consultation with the Consultation Parties, the Stalking Horse Bidder will be entitled to certain Bid Protections. In the event of an Overbid of the Stalking Horse Bid, the Stalking Horse shall be entitled to be receive Bid Protections: (a) a Break Up Fee equal to 2% of the total purchase price; and (ii) and an Expense Reimbursement of actual expenses incurred in due diligence up to $75.000.00. Except with respect to a Stalking Horse Bid, a Bid must not entitle

14

the potential bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement and, by submitting a Bid, the potential bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction. Each potential bidder presenting a Bid will bear its own costs and expenses (including advisor fees, broker fees, legal fees) in connection with any proposed Sale.

       c.     **Auction and Auction Procedures**: At the Auction, all Qualified Bidders may submit Overbids (as defined in the Bidding Procedures); provided, however, such Overbid shall be made in increments of not less than $100,000 ("**Initial Increment**") above the prior bid (with respect to bids other than the Stalking Horse Bid, the Overbid must exceed the Stalking Horse Bid, the Break Up Fee and the Expense Reimbursement, plus the Initial Increment). The Stalking Horse Bidder, if any, shall not permitted to credit bid its Beak Up Fee or reimbursement expense.  The Auction shall continue until there is one Qualified Bid that the Debtor determines, after consultation with the Consultation Parties, in its reasonable business judgment is the highest or otherwise best Qualified Bid at the Auction (the "**Successful Bid**," and the Qualified Bidder submitting such Successful Bid, the "**Successful Bidder**"), which shall be subject to approval by the Bankruptcy Court. In selecting the Successful Bid, the Debtor may consider any factors relevant to the value of the Qualified Bid, including the amount and nature of the consideration, including any assumed liabilities, the timing for Closing, the nature, number and type of changes to the Asset Purchase Agreement, if any, the extent to which such modifications are likely to delay the Closing of the Sale, the total consideration to be received by the Debtor, the likelihood of each Qualified Bidder's ability to close a transaction and the timing thereof, and the net benefit to the Debtor's estate. Promptly following the Debtor's selection of the Successful Bid and the

conclusion of the Auction, the Debtor shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

d.      **DIP Lender's Credit Bidding Rights**.  Pursuant to that certain "*Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, And 507 And Fed. R. Bankr. P. 2002, 4001 And 9014 (I) Authorizing Debtors And Debtors In Possession To Obtain Postpetition Financing, (II) Authorizing Use Of Cash Collateral, (III) Granting Liens And Super-Priority Claims, (IV) Granting Adequate Protection To Prepetition Secured Lenders; (V) Modifying the Automatic Stay; and (VI) Scheduling a Final Hearing*", dated August 19, 2021 [D.R. No. 47] (the "**Interim DIP Order**"), the DIP Lender was granted the right, pursuant to Section 363(k) of the Bankruptcy Code and the DIP Financing Agreements (as defined in the Interim DIP Order) to credit bid the full amount of the DIP Obligations (as defined in the Interim DIP Order) to acquire the Debtor's Assets and/or Business.

e.      **Reservation of Rights**: Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, and subject to the rights of the Consultation Parties, the Debtor reserves the right as it may reasonably determine to be in the best interest of its estate and in the exercise of its fiduciary duties to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtor and its estate; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein without consent; and (g) increase subsequent bid increments following the Overbid; or (h) remove any Asset from the auction, or continue or cancel

16

the Auction and/or Sale Hearing in open court without further notice. Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures will prevent the Debtor from considering any and all transactions, including, but not limited to, proposals to sponsor a plan of reorganization. Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures will prevent the Debtor from exercising its fiduciary duties under applicable law to maximize the value to be obtained for the Business or the Assets.

33.    The Bidding Procedures expressly recognize the Debtor's fiduciary obligations to maximize value. Accordingly, the Bidding Procedures preserve the Debtor's right to announce additional procedural rules for conducting the Auction as necessary or appropriate to maximize value for its estate and does not impair the Debtor's ability to consider any and all Qualified Bids.

**VI.    Form and Manner of Sale Notice.**

34.    Within three (3) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "**Mailing Date**"), the Debtor will cause the notice, substantially in the form attached hereto as **Exhibit D** (the "**Sale Notice**"), to be served on (a) any party that has filed a notice of appearance in these Chapter 11 cases; (b) any entity on the Master Service List; (c) any parties known or reasonably believed to have expressed interest in the Business or Assets or any portion thereof; (d) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in the Business or Assets; (e) all parties to executory contracts and unexpired leases to be assumed and assigned, or rejected as part of the Sale; (f) all applicable state and local taxing authorities; and (g) any governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder (the "**Notice Parties**").

35.     Additionally, on the Mailing Date or as soon as reasonably practicable thereafter, the Debtor proposes to publish the Sale Notice (as may be modified for publication purposes, the "**Publication Notice**"), on one occasion, in a paper of general circulation chosen in consultation with Cowen. The Debtor believe that the Publication Notice is sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtor.

36.     The Debtor avers that the Sale Notice and Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction; (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Motion and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Business or Assets for the Sale; (v) instructions for obtaining a copy of the Asset Purchase Agreement; (vi) representations describing the Sale as being free and clear of any and all liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching to the sale proceeds with the same validity and priority; and (vii) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder arising from the Auction, if any, and the procedures and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

## VII.    Assumption Procedures.

37.     The Debtor also seeks approval of the procedures for assuming and assigning executory contracts and unexpired leases (the "**Assumption Procedures**") to facilitate the fair and orderly assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale. The key provisions of the Assumption Procedures are:

      a.     **Contract Assumption Notice**: No less than twenty-one (21) days prior to

the Sale Objection Deadline (the "**Assumption and Assignment Service Deadline**"), the Debtor

shall serve a notice of contract assumption in substantially the form attached hereto as **Exhibit E**

(the "**Contract Assumption Notice**") via overnight delivery on all counterparties to all potential

Assigned Contracts and provide a copy of the same to the Consultation Parties. The Contract

Assumption Notice shall inform each recipient of the timing and procedures relating to such

assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or

unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or

unexpired lease, as applicable, (iii) the Debtor's good faith estimates of the Cure Payments

required in connection with the executory contract or unexpired lease, as applicable, and (iv) the

Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does

not constitute an admission that any contract is an executory contract or unexpired lease, as

applicable, or that the stated Cure Payment related to any executory contract or unexpired lease

constitutes a claim against the Debtor. Further, the inclusion of an executory contract or unexpired

lease, as applicable, on the Contract Assumption Notice is not a guarantee that such executory

contract or unexpired lease, as applicable, will ultimately be assumed and assigned.

      b.     **Cure Payments and Adequate Assurance of Future Performance**: The

payment of the applicable Cure Payments by Successful Bidder, the provision of adequate

assurance by the Successful Bidder(s), that they will promptly cure any non-monetary defaults

existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance

of future performance by the Successful Bidder(s) under the Assigned Contracts shall (i) effect a

cure of all defaults existing thereunder, and (ii) compensate for any actual pecuniary loss to such

counterparty resulting from such default.

      c.     **Supplemental Contract Assumption Notice**: Pursuant to the terms of the

Asset Purchase Agreement or the Modified Asset Purchase Agreement, as applicable, or as otherwise agreed by the Debtor and the Successful Bidder, at any time after the Assumption and Assignment Service Deadline and prior to one (1) business day before Closing, the Successful Bidder has the right to designate a (i) supplement the list of Assigned Contracts with previously omitted executory contracts and/or unexpired leases ("**Additional Assigned Contracts**"), (ii) remove Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that a Successful Bidder proposes to be assumed and assigned to it in connection with a Sale ("**Removed Assigned Contracts**"), and/or (iii) modify the previously stated Cure Payment associated with any Assigned Contracts. In the event the Debtor exercises any of these reserved rights, the Debtor will promptly serve a supplemental notice of executory contract and/or unexpired lease assumption (a "**Supplemental Assumption Notice**") on each of the counterparties to such Assigned Contracts and their counsel of record, if any, and the Consultation Parties; provided, however, the Debtor may not add an executory contract or unexpired lease to the list of Assigned Contracts that has been previously rejected by the Debtor by order of the Court. Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.

d.     **Objections**: Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by counsel to the Debtor on or before fourteen (14) days

4851-8471-7562.v1

after service of the Contract Assumption Notice (the "**Cure Objection Deadline**"), or such deadline set forth in the Supplemental Assumption Notice. The deadline to object to assumption and assignment solely with respect to the adequate assurance of future performance from the Successful Bidder, however, is the date that is two days after the conclusion of the Auction, but any such objection must be received before the start of the Sale Hearing, or such deadline set forth in the Supplemental Assumption Notice.

38.     Any party failing to timely file an objection to the cure amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or the Sale is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract (including the adequate assurance of future performance), (c) the relief requested in the Motion, and (d) the Sale. Such party shall forever be barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to the Successful Bidder, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder, as applicable, with respect to such party's Assigned Contract or Additional Assigned Contract.

## BASIS FOR RELIEF REQUESTED

39.     The Debtor submits that the Sale requested by this Sale Motion is authorized under section 363(b) of the Bankruptcy Code governing sales outside of the ordinary course of a debtor's business.

4851-8471-7562.v1

40.     Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

41.     This Court's power under section 363 is augmented by section 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. As set forth below, the Debtor submits it has satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code.

**VIII.    The Bidding Procedures Are Fair and Designed to Maximize Value for the Business or Assets.**

42.     The Debtor submits that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code, in that they are tailored to ensure that bidding is fair and reasonable and will yield the maximum value for the Debtor's Business or Assets, for the benefit of its estate, its creditors, stakeholders, and other parties-in-interest.

43.     The Bidding Procedures proposed herein are designed to maximize the value received for the Business or Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.

44.     The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire or obtain information necessary to submit a timely and informed bid. Accordingly, the Debtor and all parties-in-interest can be assured that the consideration obtained for the Business or Assets will be fair and reasonable and will achieve the highest or best value. At the same time, the Bidding Procedures provide the Debtor with the opportunity to consider all competing offers and to select, in their discretion, the highest and best offer for its Business or its Assets.

4851-8471-7562.v1

45.     Accordingly, the Debtor believes and therefore prays the Court should approve the Bidding Procedures, including the Bid Protections to be offered any Stalking Horse chosen by the Debtors.

**IX.     Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code Because a Sound Business Justification Exists.**

46.     Although the Bankruptcy Code does not articulate the standard for approving a sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit in the seminal case of *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the acquirer of a debtor's assets be a good faith purchaser. The Third Circuit construed the "good faith purchaser" standard to mean one who purchases "in good faith" and for "value." Id. at 147.

47.     As the court in *Abbotts Dairies* opined:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Id*. at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

48.     Traditionally, courts have held that "fair and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the appraised value of the assets." *Abbotts Dairies*, 788 F.2d at 149; *In re Karpe*, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988).

49.     Respectfully, the sale of the Business or Assets in accordance with the Bidding Procedures satisfies the *Abbotts Dairies* test. First, the Debtor has fully disclosed and requested the Court's approval of the Bidding Procedures and all the terms and conditions of the Sale and proposed Auction, and intend to provide comprehensive notice of the sale as discussed above. *See In re Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on

traditional equitable principles, including whether there has been full disclosure to the Bankruptcy Court). The Bid Procedures are specifically tailored to maximize the value to be obtained for the Business or Assets.

50.    In addition, the Debtor intends to continue to market the Sale of the Business and/or Assets. The Debtor and its Advisors at Cowen are hopeful that as a result of their intended notice of the Sale to all potentially interested parties, and the exhaustive marketing of the Business and Assets post-petition, interested purchasers will be encouraged to submit bids, attend the Auction and generate a spirited and robust Auction process.

51.    Courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

52.    Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. See *Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

53.    Consideration of the above factors here unequivocally establishes that the Sale

should be approved. As discussed above, the Debtor will continue its marketing efforts for the

Business or Assets, and solicit proposals for the purchase of the Business or Assets before the

proposed bid deadline and, based on the Debtor's and Cowen's marketing efforts, the Debtor will

have, under the circumstances, amply marketed the Business and Assets before the proposed date

of the Sale Hearing.

54.    The Debtor has proposed Bidding Procedures designed to maximize the purchase

price for its Business or Assets.  The Procedures allow for sale of all or part of the Debtor's Assets

to various purchasers. The proposed Bidding Procedures and the form and manner of notice of the

Sale have been submitted for approval to the Court and will ensure that any and all interested

parties will receive adequate notice of the Auction to allow for a competitive Sale process.

55.    Further, based upon initial interest in the Business or Assets, the Debtor avers that

there is a high likelihood of substantial distributions to unsecured creditors, and the prospect for a

consensual plan.

56.    For all these reasons, the Debtor respectfully submit that the Sale of the Business

or Assets is supported by sound business reasons and is in the best interests of the Debtor and its

estate. Accordingly, the Debtor requests approval of the Sale pursuant to Section 363(b) of the

Bankruptcy Code.

**X.    The Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of
All Liens, Claims, Encumbrances and Interests.**

57.    Section 363(f) permits a debtor to sell property free and clear of another party's

interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b)

the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds

the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the

interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of

4851-8471-7562.v1

its interest. *See* 11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, satisfaction

of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re*

*Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive,

authorizing a trustee or debtor-in-possession to sell property of the estate free and clear of all liens

"if any of the five conditions of § 363(f) are met"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re*

*Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under

section 363(f) as long as one of the five specified exceptions applies).

58.    In the Debtor's case, in addition to the DIP Liens (as defined in the Interim DIP

Order), there are various municipal liens for certain *ad valorem* taxes and municipal services, as

well as various filed pre-petition judgements[3] against the Debtor, and which may encumber one or

more of the Debtor's Assets.

59.    Here, the Debtor avers that sections 363(f)(2) and (5) are satisfied with respect to

all parties asserting liens including the Senior and Junior Lienholders. First, all parties known to

have asserted a lien or other encumbrance on the Business or Assets will receive notice of the Sale.

To the extent they have not objected to the Sale by the Sale Objection Deadline, they will be

deemed to have consented to the Sale free and clear of all liens, claims, encumbrances and interests

(other than Assumed Liabilities). The Debtor proposes to sell the Business or Assets in a

commercially reasonable manner and expects that the value of the proceeds from such sale will

adequately reflect the value of the property sold.   The Debtor believes that the Auction will result

in proceeds paying all parties asserting an encumbrance on the Assets in full after payment in full

of the DIP Obligations (as defined in the Interim DIP Order).   Second, the Debtor further proposes

that upon the closing, any party with a valid and enforceable lien or other encumbrance shall have

---

[3]    Certain judgments were taken within ninety (90) days of the Petition Date, and/or are disputed by the Debtor.

a corresponding security interest in the proceeds of the Sale, as such liens and encumbrances will attach to the proceeds of the Sale with the same validity, priority, and force and effect as such lien or encumbrance had immediately prior to the closing of the Sale. In addition, all such persons could be compelled to accept money satisfaction for their interests. As such, the requirements of section 363(f) of the Bankruptcy Code would be satisfied for the sale of the Business or Assets, free and clear of all liens, claims and encumbrances (other than the Assumed Liabilities).

60.   The Debtor also submits that it is appropriate to sell the Business or Assets free and clear of successor liability relating to the Business or Assets. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor's estate. If such relief is not granted, the purpose of an Order purporting to authorize the transfer of assets free and clear of encumbrances (other than the Assumed Liabilities) would be thwarted by the potential for holders of claims to thereafter use the transfer as a basis to assert claims against a buyer arising from the Debtor's conduct.

61.   Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In Matter of Motors Liquidation Co.*, No. 15-2844-BK(L), 2016 WL 3766237 (2d Cir. July 13, 2016) *12, *13 ("We agree that successor liability claims can be `interests' when they flow from a debtor's ownership of transferred assets" and holding that "a bankruptcy court may approve a § 363 sale `free and clear' of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including

any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale."); *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005), *rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) ("Where . . . a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met.").

63.     For these reasons, the Successful Bidder should not be liable under any theory of successor liability relating to the Business or Assets, but instead, should receive the Business or Assets free and clear of claims (other than the Assumed Liabilities) including successor liability claims.

## XI.    A Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code and the Sale Does Not Violate Section 363(n).

63.     Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m).

64.     "Although the Bankruptcy Code does not define the meaning of `good-faith buyer,' . . . most courts have adopted a traditional equitable definition: `one who purchases the assets for value, in good faith and without notice of adverse claims.'" *Licensing by Paolo v. Sinatra (In Re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997)). The "good faith component of the test under § 363(m) speaks `to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders.'" *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

65.    As will be demonstrated at the Sale Hearing, the Debtor's conduct of the sale process, and the selection of a Successful Bid, shall have been conducted in good faith and at arm's-length in accordance with the Bid Procedures, and following consultation with the Consultation Parties. Accordingly, the Debtor requests that the Sale Order include a provision that the Successful Bidder for the Business or Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code. The Debtor believes that providing the Successful Bidder with such protection will ensure that the maximum price will be achieved for the Business or Assets.

66.    Furthermore, as will be demonstrated at the Sale Hearing, neither the Debtor nor the Successful Bidder, once selected, shall have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. The Debtor will have negotiated the Asset Purchase Agreement in good faith and at arms' length and following consultation with the Consultation Parties. Moreover, the Bidding Procedures are designed to prevent the Debtor or the Successful Bidder from engaging in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

## XII.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

67.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). A debtor's decision to assume or reject an executory contract or unexpired lease is governed by the business judgment standard. *See Cinicola*

*v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (section 365 of the Bankruptcy Code "permits the trustee or debtor in possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide whether ones it would be beneficial to adhere to and which ones it would be beneficial to reject"). Once the debtor states a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

68.    Further, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).

69.    The meaning of "adequate assurance of future performance" is dependent on the facts and circumstances of each case. Adequate assurances may be provided, for example, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (quoting *Cinicola*, 248 F.3d at 120 n. 10 (3d Cir. 2001).

70.    The Debtor requests approval under section 365 of the Bankruptcy Code of the Debtor's assumption and assignment of certain executory contracts and unexpired leases to the

Successful Bidder. The Debtor further requests that the Sale Order provide that the Assigned

Contracts will be transferred to and remain in full force and effect for the benefit of the Successful

Bidder notwithstanding any provisions in such contracts or leases, including those described in

sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code that prohibit such assignment.

71.    To the extent necessary, the Debtor will present facts at the Sale Hearing to

demonstrate the financial wherewithal, willingness, and ability of the Successful Bidder to perform

under the Assumed Contracts.

72.    The Sale Hearing will afford the Court and other interested parties the opportunity

to evaluate the ability of the Successful Bidder to provide adequate performance under the

Assumed Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

73.    Further, the Debtor will give notice to all parties to the potentially Assigned

Contracts in substantially the form attached hereto as **Exhibit E**.  The Contract Assumption Notice

will include the amounts the Debtor believes are necessary to cure any defaults in accordance with

section 365(b) of the Bankruptcy Code.

74.    Accordingly, the Debtor submits that implementation of the proposed contract

assumption procedures is appropriate and should be approved by this Court.

**XIII.    The Expense Reimbursement and Breakup Fee Have a Sound Business Purpose and
Should Be Approved.**

75.    The Debtor also seeks authority, but not direction, pursuant to the Bidding

Procedures to pay a Breakup Fee and/or Expense Reimbursement (i.e., the Bid Protections), in an

aggregate amount to be negotiated with an proposed Stalking Horse following consultation with

the Consultation Parties.

76.    The Debtor seeks to utilize such authority only in its discretion if the Debtor

determines in its sole and reasonable business judgment (in consultation with the Consultation

4851-8471-7562.v1

Parties) that any such Bid Protection will facilitate a competitive bidding and Auction process.

77.    Although section 363 itself does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of estate property outside the ordinary course of business, applicable case law provides that a bankruptcy court should approve a transaction that is out of the ordinary course of a debtor's business if the debtor can demonstrate that it exercised sound business judgment in deciding to enter into the transaction. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996). Further, section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(1); *see also U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

78.    Based on the Debtor's and Advisors' experience, the Debtor reasonably expects that as part of any arm's length and good faith negotiations for the sale of the Business or Assets, the purchaser will expend considerable time, money and resources pursuing the Sale. To compensate the purchaser for serving as a "Stalking Horse" whose bid will be subject to higher and/or otherwise better offers, the Debtor seeks authority to offer and entice a "Stalking Horse" bidder with the Bid Protections.

79.    The Bid Protections are likely to be an essential inducement and condition relating to the stalking horse bidder's entry into, and continuing obligations under, the Stalking Horse Asset Purchase Agreement. The Debtor believes the Bid Protections: (i) are reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions and the considerable efforts and resources that will be expended by the stalking horse buyer; (ii) will be negotiated by the parties and their respective Advisors at arm's length and in good faith; and (iii)

4851-8471-7562.v1

will be necessary to induce the stalking horse buyer to continue to pursue the Sale and to continue to be bound by the Stalking Horse Asset Purchase Agreement.

80.    The Debtor seeks approval to designate, but not the obligation to designate, a Stalking Horse.

81.    The Debtor believes that the Bid Protections are necessary to preserve and enhance the value of its estate. The paramount goal in any proposed sale of property of a debtor is to maximize the proceeds received by the estate. *See generally In re Cont'l Airlines*, 91 F.3d 553, 565 (3d Cir. 1996) (acknowledging a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself ...").  To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

82.    Bankruptcy courts have approved bidding incentives similar to the Bid Protections under the "business judgment rule," which prescribes against judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re O'Brien Environmental Energy Inc.*, 181 F.3d 527, 533-35 (3d Cir. 1999) (noting that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions and by some bankruptcy courts, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context and, accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate).

83.    Approval of break-up fees in connection with the sale of significant assets has

become an established practice in this district and in others within the Third Circuit. *See, e.g., In re Revel AC, Inc.*, Case No. 14-22654 (GMB) (Bankr. D.N.J. Sept. 5, 2014); *In re Ashley Stewart Holdings, Inc.*, Case No. 14-14383 (MBK) (Bankr. D.N.J. Apr. 3, 2014); *In re RIH Acquisitions NJ, LLC*, Case No. 13-34483 (GMC) (Bankr. D.N.J. Nov. 19, 2013).

84.    Historically, courts have evaluated break-up fees by considering whether the parties engaged in self-dealing or manipulation of the bidding process, whether the fee encouraged or inhibited bidding, and whether the fee was reasonable in proportion to the contract purchase price. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657 (S.D.N.Y. 1992).

85.    The Third Circuit has stated that a break-up fee may be approved when it is necessary to preserve the value of a debtor's estate. *O'Brien*, 181 F.3d at 536. In *O'Brien*, the Third Circuit determined, *inter alia*, that a break-up fee provides an actual benefit to a debtor's estate if "assurance of a break-up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Alternatively, a break-up fee may be approved under *O'Brien* if it serves as a minimum or a floor bid upon which other bidders may rely, increasing the likelihood that the price at which the debtor sells its assets reflects their true worth. *O'Brien*, 181 F.3d at 537.

86.    A stalking horse buyer will provide a material benefit to the Debtor and its stakeholders by increasing the likelihood that the best possible purchase price for the assets will be received. Accordingly, the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtor's estate.

87.    The Debtor also intends to offer reimbursement of actual expenses incurred in performing due diligence (the "**Expense Reimbursement**") sufficient to enable the potential

stalking horse to make their Stalking Horse Offer.  The Debtor seeks approval to offer Expense

Reimbursement up to $75,000.00, which is quite modest in an expected transaction the size of the

Debtor's.

88.    Furthermore, the amount of the Bid Protections combined, as proposed herein

would within the market range, to be paid to the stalking horse buyer upon and subject to the

Debtor's entry into a binding Asset Purchase Agreement with a third party that is ratified, approved

and confirmed by an order from the Court. A break-up fee that is 2.0% of the purchase price is less

than or equal to established precedent established by bankruptcy courts within this circuit. *See,

e.g., In re Revel AC, Inc.*, Case No. 14-22654 (GMB) (Bankr. D.N.J. Sept. 5, 2014) (approving

break-up fee of $3 million, or 3.7% of purchase price of $82 million); *In re Ashley Stewart

Holdings, Inc.*, Case No. 14-14383 (MBK) (Bankr. D.N.J. Apr. 3, 2014) (approving break-up fee

of 3.0% of purchase price plus amount of certain assumed liabilities).

89.    In sum, the ability to offer Bid Protections to a stalking horse buyer permits the

Debtor to insist that competing bids for the Business or Assets be higher or otherwise better than

the Purchase Price under the Stalking Horse Asset Purchase Agreement, which is a clear benefit

to the Debtor and its estate.

90.    Accordingly, the Bid Protections should be approved.

## **IMMEDIATE RELIEF IS NECESSARY/WAIVER OF STAY**

91.    The Court may grant the relief requested in this Motion immediately if the "relief

is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. In explicating the

standards governing preliminary injunctions, courts have instructed that irreparable harm "'is a

continuing harm which cannot be adequately redressed by final relief on the merits' and for which

'money damages cannot provide adequate compensation.' "*Kamerling v. Massanari*, 295 F.3d 206,

214 (2d Cir. 2002). Further, the "harm must be shown to be actual and imminent, not remote or speculative." The Debtor submits that, for the reasons already set forth herein, and its liquidity issues, and DIP obligations to close by November 1, 2021, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

92.     The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

93.     Accordingly, the Debtor respectfully requests that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

94.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Debtor's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; or (d) granting third-party-beneficiary status or bestowing any additional rights on any third party.

## NOTICE

95.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for Region 3; (ii) the holders of the twenty (20) largest unsecured claims against the Debtor; (iii) counsel to the Committee; (iv) the Internal Revenue Service, and (v) all parties entitled to notice

pursuant to Local Bankruptcy Rule 9013-1(b). The Debtor submits that no other or further notice is required.

## NO PRIOR REQUEST

96.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

The Debtor respectfully request that this Court enter the Bidding Procedures Order, approve the authority of the Debtor to select a Stalking Horse Bidder, and Bid Protections, and, after the Sale Hearing, the Sale Order, substantially in the forms annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: September 14, 2021     By: */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire (*pro hac vice*)
Turner N. Falk, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
Telephone: (856) 795-3300
Facsimile: (856) 482-0504
E-mail:  edmond.george@obermayer.com
            michael.vagnoni@obermayer.com
            turner.falk@obermayer.com
*Proposed Counsel to Chapter 11 Debtor, Aluminum Shapes, L.L.C.*

4851-8471-7562.v1