**<u>EXHIBIT B</u>**
**Asset Purchase Agreement**

# ASSET PURCHASE AGREEMENT

### DATED AS OF **September 14, 2021** BY AND AMONG

## ALUMINUM SHAPES, LLC

### AS **SELLER,**

### AND

### [                    ]

### AS PURCHASER

# TABLE OF CONTENTS

SECTION 1 INTERPRETATION.................................................................1

    1.1. Definitions ...........................................................................1

SECTION 2 PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS.................7

    2.1. Sale of Assets........................................................................7

    2.2. Excluded Assets.....................................................................8

    2.3. Assumed Liabilities ...............................................................8

    2.4. Excluded Liabilities ...............................................................9

    2.5. Purchase Price.....................................................................10

    2.6. Purchaser Deposit ...............................................................10

    2.7. Allocation of Purchase Price .................................................10

    2.8. Sale at Closing Date.............................................................10

    2.9. Excluded Assets and Liabilities..............................................11

SECTION 3 REPRESENTATIONS AND WARRANTIES OF SELLER.................................11

    3.1. Organization and Good Standing.............................................11

    3.2. Authorization .....................................................................11

    3.3. No Conflicts .......................................................................11

    3.4. Consents and Approvals .......................................................11

    3.5. Compliance with Law...........................................................11

    3.6. Title to Assets ....................................................................12

    3.7. Environmental Matters. ........................................................12

    3.8. Litigation...........................................................................12

    3.9. Real Property .....................................................................12

OMC\4831-7361-7146.v1-9/8/21

3.10. No Broker or Finder.................................................................................................12

3.11. Insurance...........................................................................................................12

3.12. Taxes.................................................................................................................12

3.13. All Material Information....................................................................................13

3.14. Disclaimer of Other Representations and Warranties .......................................13

3.15. Collective Bargaining Agreements, Employment Agreements, Etc. .................13

SECTION 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................13

4.1. Organization and Good Standing........................................................................13

4.2. Authorization .....................................................................................................13

4.3. No Conflicts........................................................................................................14

4.4. Consents and Approvals......................................................................................14

4.5. Litigation.............................................................................................................14

4.6. Capital Resources ...............................................................................................14

4.7. Purchaser not a Plan...........................................................................................14

4.8. "AS IS" TRANSACTION ..................................................................................14

SECTION 5 CERTAIN COVENANTS OF SELLER ...............................................................15

5.1. Provision of Records...........................................................................................15

5.2. Receipt of Property Relating to Assets ...............................................................15

5.3. Access to Information..........................................................................................15

5.4. Bid Procedures Order .........................................................................................15

5.5. Transfer of Permits.............................................................................................16

5.6. Further Assurances..............................................................................................16

5.7. Assignment of Rights..........................................................................................16

5.8. Break-Up Fee......................................................................................................16

5.9. Cure Amounts.....................................................................................................16

iii

SECTION 6 CERTAIN COVENANTS OF PURCHASER. ........................................................16

6.1. Performance with Respect to the Assets and the Assumed Contracts............................16

6.2. Cure Amounts ................................................................................................................17

6.3. Financing .......................................................................................................................17

6.4. Further Assurances ........................................................................................................17

SECTION 7 CERTAIN MUTUAL COVENANTS .................................................................17

7.1. Mutual Cooperation. ......................................................................................................17

7.2. Approvals and Filings ....................................................................................................18

SECTION 8 CONDITIONS TO SELLER'S OBLIGATIONS ................................................19

8.1. Representations and Warranties .....................................................................................19

8.2. Compliance with Agreements.........................................................................................19

8.3. Approvals; No Injunctions..............................................................................................19

8.4. Purchaser's Closing Deliveries and Obligations ...........................................................19

8.5. Auction ..........................................................................................................................19

8.6. DIP Loan .......................................................................................................................19

SECTION 9 CONDITIONS TO PURCHASER'S OBLIGATIONS .........................................20

9.1. Representations and Warranties .....................................................................................20

9.2. Compliance with Agreements.........................................................................................20

9.3. Approvals.......................................................................................................................20

9.4. Seller's Closing Deliveries and Obligations ..................................................................20

9.5. Auction ..........................................................................................................................20

9.6. Title Insurance Policies and Surveys .............................................................................20

SECTION 10 CLOSING ; TERMINATION ..........................................................................20

10.1. The Closing....................................................................................................................20

10.2. Termination....................................................................................................................22

iv

10.3. Effects of Termination ..................................................................................23

SECTION 11 TAXES........................................................................................24

11.1. Taxes Related to Purchase of Assets ..................................................24

11.2. Cooperation...................................................................................24

SECTION 12 EXPENSES, EMPLOYEES, ATTORNEYS' FEES AND BROKERS' FEES ....24

12.1. Expenses ......................................................................................24

12.2. Attorneys' Fees; Brokers' Fees; Expenses ..........................................25

SECTION 13 MISCELLANEOUS ........................................................................25

13.1. Sale of Assets Subject to Bankruptcy Court Approval...........................25

13.2. Survival of Representations and Warranties........................................25

13.3. Entirety of Agreement; Amendments and Waivers................................25

13.4. Assignment ...................................................................................25

13.5. Successors and Assigns; No Third Party Beneficiaries .........................25

13.6. Governing Law; Jurisdiction ...........................................................26

13.7. Gender and Number........................................................................26

13.8. Headings .......................................................................................26

13.9. Construction..................................................................................26

13.10. Severability .................................................................................26

13.11. Negotiated Agreement ..................................................................26

13.12. Notices .......................................................................................26

13.13. Counterparts; Facsimile Copies......................................................27

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made as of this [   ] day of [                  ], 2021, by and among [                        ], a [          ] limited liability company ("Purchaser"), and Aluminum Shapes, L.L.C., a New Jersey limited liability company ("Seller" or "Debtor" or "Debtor-in-Possession").

## W I T N E S E T H :

WHEREAS, on August 15, 2021, Seller, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "Bankruptcy Code"), captioned In re Aluminum Shapes, L.L.C., Case No. 21-16520-JNP in the United State Bankruptcy Court for the District of New Jersey – Camden Vicinage (the "Bankruptcy Court"); and

WHEREAS, Seller is continuing in the possession of its assets and in the management of its business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, Seller is presently engaged in the business of fabrication and processing of aluminum by extrusion (the "Business"), and is the owner of certain commercial/industrial real estate located at 9000 River Road Delair, New Jersey 08110 consisting of approximately 468,594 square feet of industrial building, situated on 25.337 +/- acres, with state of the art cast house, and all improvements thereon (the "Real Property") and related furniture, fixtures, machinery and equipment ("FF&E" collectively with the Real Property, the "Assets"); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell, transfer and assign to Purchaser, the Assets in accordance with this Agreement and in accordance with Sections 363, of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1
## INTERPRETATION

1.1.    Definitions. Whenever used in this Agreement, the following words and phrases shall have the respective meanings ascribed to them as follows.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Asset Purchase Agreement and has the meaning set forth in the preamble.as may be subsequently amended or modified.

"Ancillary Agreements" means, together, the Assignment and Assumption Agreement, the Bill of Sale, the Deed, and the Deposit Escrow Agreement.

"APA Effective Date" means the date as of which this Agreement is fully executed by the Parties hereto as set forth on the first page hereof.

"Assets" means, other than the Excluded Assets, the Real Property and all of Seller's tangible and intangible assets, processes, designs, rights, claims and contracts owned, leased and/or licensed by any Seller of every kind, character and description, whether accrued, contingent or otherwise, including, causes of action and Avoidance Actions, as well as its FF&E existing as of the Closing (which Assets comprise substantially all of Seller's assets, properties, rights, claims and contracts), including, without limitation those Assets set forth in Section 2.1.

"Assignment and Assumption Agreement" means that certain assignment and assumption agreement to be executed at Closing with respect to the Assumed Contracts, in form to be agreed upon by Purchaser and Seller.

"Assumed Contracts" has the meaning set forth in Section 2.3.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction in connection with the sale of the Assets, as described in the Bid Procedures Order.

"Avoidance Actions" means all causes of action arising under chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of New Jersey (Camden Vicinage).

"Bid Procedures Motion" means the motion to be filed by Seller in the Case seeking the entry of the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the approval of Purchaser and Seller in its sole discretion.

"Bidders" has the meaning set forth in Section 10.1(d).

"Bids" has the meaning set forth in Section 10.1(d).

"Bill of Sale" means that certain bill of sale to be executed at Closing with respect to the Assets other than the Assumed Contracts, in form to be agreed upon by Purchaser and Seller.

"Breakup Fee" has the meaning set forth in <u>Section 5.8</u>.

"Business" means Seller's business of producing Aluminum ingots, fabricating, processing and extruding aluminum for uses in various industries.

"Business Day" means a day other than a Saturday, Sunday or any other day on which the principal national banks in the State of New Jersey are not open for business during normal banking hours.

"CBA" means the Seller's collective bargaining agreement with any union.

"Case" means the Chapter 11 cases of Seller filed in the Bankruptcy Court.

"Closing" has the meaning set forth in <u>Section 10.1</u>.

"Closing Date" has the meaning set forth in <u>Section 10.1</u>.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contracts" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which the Seller is a party or by which the Seller or any Assets is bound.

"Cure Amounts" means all amounts payable in connection with the cure of defaults of any of the Assumed Contracts as required by Section 365(b) of the Bankruptcy Code and/or any order of the Bankruptcy Court.

"Debtor" means the Debtor Aluminum Shapes, L.L.C. as described in the preamble.

"Debtor-in-Possession" has the meaning set forth in the preamble.

"Deed" has the meaning set forth in the <u>Section 10.1(a)(iii)</u>.

"Deposit Escrow Agent" has the meaning set forth in <u>Section 2.6</u>.

"Deposit Escrow Agreement" has the meaning set forth in <u>Section 2.6</u>.

"DIP Loan" means the Debtor-in-Possession financing facility provided by Tiger or such other DIP lender the Debtor deems necessary and/or appropriate, to the Debtor in the amount of $15,500,000.00 and approved by the Bankruptcy Court on an interim basis on or about August 19, 2021 [D.N. 47] plus any increases, amendments supplements, modifications, renewals, replacements, consolidations, substitutions or replacements as set forth in any final DIP order entered by the Bankruptcy Court subject to Section 364 of the Bankruptcy Code and as further set forth in <u>Section 8.6</u> hereof.

"DIP Order" means the Order of the Bankruptcy Court approving the DIP Loan on an interim basis entered on or about August 19, 2021 [D.N. 47].

"Encumbrances" means, with respect to any Asset, any mortgage, deed of trust, deed to service debt, pledge, security interest, lien, charge, lease, claim, encumbrance, option, right of first refusal, imperfection of title, covenant, encroachment, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, state of facts or any other restrictions or third party rights.

"Environmental Claim" means any action, governmental order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, release of, or exposure to, any Hazardous Materials; or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (ii) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"Environmental Condition" means any condition on the Real Property that may give rise to an Environmental Claim.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Expense Reimbursement" has the meaning set forth in Section 5.8.

"FF&E" means the Seller's machinery, furniture, fixtures and equipment located on the Real Property.

"Final Order" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Case substantially in the form of the Interim Order, with

only such modifications as are satisfactory in form and substance to Seller, which order shall (a) have been entered on such prior notice to such parties as may be satisfactory to Seller and (b) not have been vacated, reversed, modified, amended or stayed.

"GAAP" means accounting principles generally accepted in the United States of America, consistently applied.

"Governmental Authority" means any United States federal, state or local government or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"Hazardous Materials" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"Intellectual Property" means Seller's now owned and hereafter arising or acquired: patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable law with respect to Seller's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Law" means any federal, state, local or foreign statute, law, code, ordinance, order, rule or regulation or any common law requirement.

"Liability" means any debt, liability, duty, responsibility, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited

5

liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Permitted Encumbrances" means those Encumbrances set forth on Schedule 1.1(c), any other Encumbrances such as utility easements, zoning restrictions, tax liens (for taxes not yet due and payable), judgments, other exemptions noted on a current survey, or other customary covenants and restrictions of record that do not adversely affect the ownership or leasing of the Real Property and Encumbrances related to Assumed Liabilities.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Petition Date" means August 15, 2021.

"Pre-Closing Returns" has the meaning set forth in Section 3.11.

"Providing Party" has the meaning set forth in Section 7.1(b).

"Purchase Price" means the purchase price payable to Seller for the Assets provided for in Section 2.5.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Deposit" has the meaning set forth in Section 2.6.

"Qualifying Bid" has the meaning set forth in Section 10.1(e).

"Real Property" means all real property owned by Seller and all easements granted to Seller, located at 9000 River Road, Delair, NJ, 08110, which is legally described on Schedule 1.1(d), together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto.

"Requesting Party" has the meaning set forth in Section 7.1(b).

"Secured Creditor" means any creditor with a valid and allowed secured claim against the Assets of the Debtor.

"Seller" has the meaning set forth in the preamble.

"Superior Bid" has the meaning set forth in Section 10.1(d).

"Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment,

6

disability, real property, personal property, registration, alternative or add-on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including any interest, penalties or additions thereto, whether disputed or not, and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability, operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Authority" means any domestic (whether federal, state, or local) or foreign governmental authority having responsibility for taxation.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing required to be supplied to a taxing authority in connection with Taxes.

"Termination Date" has the meaning set forth in Section 10.2(b).

"Tiger" means the Debtor's Lender Tiger Finance, LLC which holds first priority mortgage and liens on all of the Debtor's Assets pursuant to a valid UCC-1 Financing Statement.

"Transactions" mean the transactions contemplated by this Agreement, the Ancillary Agreements and all other transactions and agreements contemplated hereby and thereby.

"Transaction Taxes" has the meaning set forth in Section 11.1.

## SECTION 2
## PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS

2.1.    Sale of Assets. Subject to the terms and conditions of this Agreement, at Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller' right, title and interest in the Assets, free and clear of all Encumbrances other than the Permitted Encumbrances, including all of Seller' right, title and interest in the following:

(a)    all Real Property, together with all buildings, structures, improvements and other appurtenances thereto and thereon;

(b)    all FF&E;

(c)    all interests of Seller in the Assumed Contracts;

(d)    all Permits that relate to the Real Property;

(e)    all rights of Seller relating to inventory purchased to complete contracts, work in progress, customer deposits and prepaid charges and expenses, and claims for refunds relating to the Assets;

(f)    all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals,

blueprints, research and development files, accounting and tax files, personnel records and other records of any Seller or related to the operations of any Seller and/or the Business;

2.2.  Excluded Assets.  Notwithstanding the generality of Section 2.1, the following assets are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Assets (collectively, the "Excluded Assets"):

(a)  all cash and cash equivalents of Seller, including receivables (other than the Restricted Cash);

(b)  any Contracts other than the Assumed Contracts;

(c)  the Purchase Price;

(d)  all prepaid assets including, but not limited to, insurance;

(e)  any and all refunds due on account of cancelled contracts and/or policies;

(f)  all rights, claims and causes of action of Seller relating to this Agreement;

(g)  all corporate minute books, stock transfer books, the corporate seal of Seller and all other corporate books and records relating to Seller' organization and existence; and

(h)  any equity interests in Seller.

2.3.  Assumed Liabilities.  Schedule 2.3 lists those Contracts that Purchaser may elect to assume and request Seller to assign to Purchaser at the Closing. No less than ten (10) days prior to the Sale Hearing, Purchaser shall designate which of such Contracts it wishes to have Seller assign to Purchaser (the "Assumed Contracts"), which appropriate deletions shall be made to Schedule 2.3 at the Closing and a schedule of Assumed Contracts and any Cure Amounts relating thereto, shall be filed by Seller with the Bankruptcy Court prior to the Sale Hearing. At Closing, Purchaser shall be required to provide adequate assurance of future performance with respect to any Assumed Contracts. Effective as of the Closing Date, Purchaser shall assume and thereafter in due course pay, fully satisfy, discharge and perform the Liabilities of Seller arising after the Closing under the Assumed Contracts and the other Liabilities of Seller referred to in this Section 2.3 (collectively, the "Assumed Liabilities"), as follows:

(a)  all accrued liabilities (including, without limitation, any accrued salaries, vacation pay or other compensation expense) and all deferred revenues as of the Closing Date that arose in the ordinary course of Seller's business;

(b)  all Liabilities relating to ownership or use of the Real Property or Assets or otherwise relating to the Business, in each case, arising prior the Closing;

(c)  all Cure Amounts with respect to the Assumed Contracts; and

(d)  all Liabilities to pay for, purchase or acquire assets, supplies or services ordered, but not received and/or consumed by Seller on or prior to the Closing

Date (whether pursuant to purchase orders or otherwise) in the ordinary course of Seller' business.

Notwithstanding the foregoing, on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order, Purchaser shall have the right to reject and not assume some or all of the following Liabilities: (i) Liabilities for any salary, accrued vacation or other employee compensation, benefit or payment obligation under clause (a) above, and/or (ii) Liabilities relating to Seller' ownership of the Real Estate under clause (b) above. Seller shall promptly provide all information and materials reasonably requested by Purchaser relating to these Liabilities and shall reasonably cooperate and assist Purchaser, at Purchaser's request, in evaluating these Liabilities. Purchaser shall deliver Seller written notice on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order of any Liability with respect to which it elects to exercise its rights under the preceding sentence to reject and not assume (in which case, any such Liability shall be an Excluded Liability).  To the extent not Assumed and paid for the Purchase Price will be increased to reflect the non-payment.

2.4.    <u>Excluded Liabilities</u>.   Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following liabilities, which shall be and remain Liabilities of Seller:

(a)    Liabilities which are not Assumed Liabilities;

(b)    Liabilities associated with any Excluded Assets;

(c)    Liabilities associated with any and all indebtedness of the Seller for borrowed money not included in the Assumed Liabilities;

(d)    Liabilities associated with the Seller's participation in the union Health and Welfare Fund.

(e)    Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date (other than as set forth in <u>Section 2.3(b)</u> hereof);

(f)    Penalties, fines, assessments, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by the Seller of any Law prior to the Closing Date;

(g)    All Liabilities for expenses (i) relating to the Seller's negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case to the extent incurred by Seller and including those related to legal counsel, accounting, brokerage and investment advisor's fees and disbursements;

(h)    All Liabilities relating to the Sellers violation of any Environmental Law, or any pending Environmental Claim existing at the time of Closing;

9

2.5.    Purchase Price.    The aggregate purchase price for the Assets shall equal $28,000.000.00 (the "Purchase Price"), exclusive of and in addition to the assumption of the Assumed Liabilities.  The Purchase Price shall be payable in immediately available funds to the Seller, in accordance with the wire instructions to be delivered by Seller to Purchaser prior to the Closing.

2.6.    Purchaser Deposit.  Simultaneously with the execution of this Agreement, pursuant to the terms of an escrow agreement substantially in the form attached hereto as Exhibit B (the "Deposit Escrow Agreement"), Purchaser is depositing with the escrow agent under the Deposit Escrow Agreement (the "Deposit Escrow Agent") the sum of $840,000.00 by certified check or wire transfer of immediately available funds (the "Purchaser Deposit Amount"), to be released by the Escrow Agent and delivered to either Purchaser or Seller in accordance with the provisions of the Deposit Escrow Agreement and the terms of this Agreement as follows:

(a)    If the Closing shall occur, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be applied in accordance with Section 10.1(b) below towards the Purchase Price payable by Purchaser under Section 2.5 hereof;

(b)    If this Agreement is terminated by Seller pursuant to Section 10.2(e), the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be delivered to Seller; and

(c)    If this Agreement is terminated for any reason other than by Seller pursuant to Section 10.2(e), the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to Purchaser and, if payable pursuant to the terms hereof, Purchaser shall be paid the Expense Reimbursement, in lieu of any and all other remedies that Purchaser may otherwise have against Seller on account of, and in full satisfaction of, any breach, violation or default by Seller under this Agreement.

2.7    Allocation of Purchase Price.  To the extent required by Law, promptly following the Closing Date, Purchaser and Seller shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the Treasury regulations thereunder and shall file such statements or forms with their respective applicable federal income Tax Returns due after the Closing Date. The parties shall prepare such statements or forms consistently with the allocation of all or a portion of the Purchase Price plus the Assumed Liabilities among the Assets as proposed by Purchaser and consented to by Seller (which such consent shall not be unreasonably withheld, conditioned, or delayed) prior to the Closing. Each party shall provide the other party with a copy of such statements or forms as filed. Each party agrees that it shall take no position with respect to the allocation of the Purchase Price that is adverse to the other party.

2.8    Sale at Closing Date.  The sale, transfer, assignment, conveyance and delivery by Seller of the Assets to Purchaser and the assumption by Purchaser of the Assumed Liabilities, as provided herein and in the Ancillary Agreements, shall be effected on the Closing Date by (i) the execution and delivery by Seller and Purchaser of the Assignment and Assumption Agreement with

respect to the Assumed Contracts and the Assumed Liabilities, (ii) the execution and delivery by Seller to Purchaser of Deeds with respect to the Real Property,

2.9    <u>Excluded Assets and Liabilities</u>.   Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

**SECTION 3**
**<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>**

Seller hereby represents and warrant to Purchaser as follows:

3.1.    <u>Organization and Good Standing</u>.   <u>Schedule 3.1</u> sets forth for the Seller its name and jurisdiction of organization. Seller is (a) validly existing and in good standing under the laws of the jurisdiction of its organization and (b) duly qualified to do business and in good standing in each jurisdiction in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing, or admission necessary.

3.2.    <u>Authorization</u>.   Subject to entry of the Sale Order, Seller has all requisite power and authority to execute and deliver, and carry out its obligations under, this Agreement and the Ancillary Agreements and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory, or otherwise, against doing so. This Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Seller and, assuming due authorization, execution, and delivery by Purchaser, constitutes or will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, subject to entry of the Sale Order.

3.3.    <u>No Conflicts</u>.   Other than as set forth on <u>Schedule 3.3</u> hereto, the execution, delivery and performance by Seller of this Agreement and each of the Ancillary Agreements and the consummation by Seller of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of such Seller, (ii) violate any Law to which such Seller is subject, (iii) conflict with, result in any violation of any term or condition of, result in a breach or termination of, or constitute a default under any Contract to which such Seller is a party or result in the creation of any Encumbrance upon any of the Assets (including any Assumed Contract), or (iv) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which such Seller is a party or by which such Seller is bound.

3.4.    <u>Consents and Approvals</u>.   Other than as set forth on <u>Schedule 3.4</u> hereto, the execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority.

3.5.    <u>Compliance with Law</u>.

(a)    Seller is in compliance with Seller' Organizational Documents.

(b)    <u>Schedule 3.5(b)</u> sets forth a true and complete list of all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, orders and registrations, together with all modifications, amendments, supplements and extensions

11

thereof, of all United States federal, state and local Governmental Authorities and any other Person that are necessary for Seller to own the Assets, if any (collectively, the "Permits").

3.6.    Title to Assets.    Except as set forth in Schedule 3.6 hereto, Seller is the owner of the Assets as of the date hereof. Subject to entry of the Sale Order, Seller has, and at the Closing, Purchaser shall receive, good, valid, and marketable title to the Assets, free and clear of any and all Encumbrances except for the Permitted Encumbrances. The Assets consisting of FF&E are in an "as is" condition, without any warranty express or implied as to merchantability or fitness and are located at the Real Property. At Closing, this Agreement and the Ancillary Agreements will effectively vest in Purchaser all of Seller's right, title and interest in the Assets and Purchaser will require no material assets other than the. No Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Seller.  Purchaser has had the opportunity to examine all of the FF&E prior to entering into this Agreement.

3.7.    Environmental Matters.  The Seller has operated the Acquired Assets in all respects in compliance with all applicable Environmental Law, and that other than as provided in Schedule 3.7 hereof, the Seller is aware of no other environmental conditions on the Real Property, other as identified in Schedule 3.7 herein.  Seller has pending claims in Litigation with the New Jersey Department of Environmental Protection as further set forth in Section 3.7.  Seller has on deposit in a New Jersey Remediation Trust Fund, moneys sufficient to address the Environmental Matters.

3.8    Litigation.   No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Seller' knowledge, has been threatened against any Seller, or any director or officer of any Seller in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions, or which relates to, or could have a Material Adverse Effect on, the Assets, other than as indicated in Schedule 3.8 hereof.

3.9.    Real Property.  Schedule 3.9 sets forth a list of Real Property currently owned by Seller and used in the operation of the Business.  Seller owns and has valid title to all of the Real Property used in the operation of the Business, free and clear of any and all Encumbrances (except for Permitted Encumbrances).

3.10.    No Broker or Finder.  No broker or finder has been engaged by any Seller in connection with the Transactions. Seller is utilizing the services of Cowen and Company, LLC, as its Investment Banker in this transaction, with compensation in accordance with its application for retention.

3.11.    Insurance.  All insurance policies maintained by Seller is with reputable insurance carriers and provide coverage appropriate in character and amount for the Assets. Each such insurance policy is in full force and effect, and all premiums due and payable in respect thereof have been paid.

3.12.    Taxes.    Seller has filed all Tax Returns required to be filed by it on or before the Closing Date with any Taxing Authority (collectively, the "Pre-Closing Returns"). Seller has timely paid, withheld or reserved all Taxes shown as due and payable in the Pre-Closing Returns except for such Taxes that are being contested in good faith by appropriate proceedings and which are listed on Schedule 3.11.

3.13.    <u>All Material Information</u>. No representation or warranty made herein by Seller and no statement contained in any schedule or certificate furnished or to be furnished to Purchaser by Seller in connection with the transactions contemplated by this Agreement contains or shall contain a knowingly untrue statement of a material fact or omits to state any material fact necessary in order to make any representation, warranty, or other statement of Seller not misleading.

3.15.    <u>Collective Bargaining Agreements, Employment Agreements, Etc</u>.

(a)    <u>Schedule 3.15</u> lists all employee benefit plans, all union, collective bargaining or other employee association agreements, and all other written agreements providing for any material salary, bonus, benefits, perquisites, severance, management fees or other compensation relating to service to be paid to any director, officer, employee, or independent contractor (other than for professional services) of Sellers.  Seller is a party to a Collective Bargaining Agreement ("CBA") with Teamsters Local 107, with respect to its Union employees and extended through and including June 30, 2022.

3.16    <u>Disclaimer of Other Representations and Warranties</u>. Except as expressly set forth in this <u>Section 3</u>, Seller make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Seller or any of their assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement. Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in this <u>Section 3</u>, Purchaser is purchasing the Assets on an "as-is, where-is" basis and "with all faults."

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

4.1.    <u>Organization and Good Standing</u>.  Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the [                ]  and has  full corporate power and authority to enter into and carry out its obligations under this Agreement.

4.2.    <u>Authorization</u>.  Purchaser has all requisite power and authority to execute and deliver and carry out its obligations under this Agreement and the Ancillary Agreements, and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so. Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by Seller, constitutes or will constitute the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other Laws affecting the rights of creditors generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding at law or in equity).

4.3.    <u>No Conflicts</u>.  Consummation by Purchaser of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of Purchaser, (ii) violate any Law to which Purchaser is subject, or (iii) conflict with, or

result in a breach or default under, any term or condition of any other agreement or other instrument to which Purchaser is a party or by which Purchaser is bound.

4.4.    <u>Consents and Approvals</u>.  The execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transaction do not require the consent or approval of, or filing with, any Governmental Authority.

4.5.    <u>Litigation</u>.   No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Purchaser's knowledge, has been threatened against Purchaser, or any director or officer of Purchaser in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or would otherwise have a material adverse effect on Purchaser's ability to finance or otherwise consummate the Transactions.

4.6.    <u>No Broker or Finder</u>.     No broker, finder or financial advisor has been engaged by Purchaser in connection with the Transaction.

4.7    <u>Capital Resources</u>.  Purchaser has the financial wherewithal to close the Transactions as contemplated under this Agreement.  To the extent financing is required, but not a condition of the obligations to close under this Agreement, true, accurate and complete copies of commitment letter(s) for the financing necessary to close the Transactions, in the form of <u>Exhibit C</u> hereto to provide equity financing to Purchaser to provide funding for the Purchase Price have been delivered to Seller prior to the date hereof. As of the date hereof, each of the foregoing commitment letters, in the form so delivered, is a legal, valid and binding obligation of the parties thereto.  As of the date hereof, the foregoing commitment letters is in full force and effect and has not been withdrawn or terminated (and no party thereto has indicated an intent to so withdraw or terminate) or otherwise amended or modified in any respect and Purchaser is not in breach of any of the terms or conditions set forth therein.

4.8.    <u>Purchaser not a Plan</u>.     Purchaser is not an "employee benefit plan" as defined in ERISA, whether or not subject to ERISA, or a "plan" as defined in Section 4975 of the Code and none of Purchaser's assets constitutes (or is deemed to constitute for purposes of ERISA or Section4975 of the Code, or any substantially similar federal, state or municipal law) "plan assets" for purposes of 29 CFR Section 2510.3-101, as amended by Section 3(42) of ERISA or otherwise for purposes of ERISA or Section 4975 of the Code.

4.9.    **"AS IS" TRANSACTION.** PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILTY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS AS PERMITTED IN THE SHORTENED TIME-FRAME OF THIS ASSET PURCHASE PROCESS

AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## SECTION 5
## CERTAIN COVENANTS OF SELLER

5.1.    <u>Provision of Records</u>. Seller shall arrange at Purchaser's cost as soon as practicable following the Closing Date for transportation to Purchaser of the documents in the possession of any Seller relating to the Assets, to the extent not previously delivered in connection with the Transactions, including all agreements and filings with Governmental Authorities, but excluding documents relating to the Excluded Assets or the Excluded Liabilities.

5.2.    <u>Receipt of Property Relating to Assets</u>. If the Seller, or any other Person acting for or in concert with any of the Seller, shall receive any money, check, note, draft, instrument, payment or other property as proceeds of the Assets or the Assumed Liabilities or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, immediately upon receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

5.3.    <u>Access to Information</u>. Upon reasonable notice by Purchaser, Purchaser and its representatives shall have reasonable access during normal business hours throughout the period from the date hereof through the Closing Date, or the earlier termination of this Agreement in accordance with its terms, to the Assets and documents relating thereto, and during such period Seller shall furnish promptly to Purchaser, at Purchaser's expense, all information concerning the Assets as Purchaser may reasonably request. Seller shall provide or cause to be provided to Purchaser, at Purchaser's expense, such copies or extracts of documents relating to the Assets as Purchaser may reasonably request. Any inspections, examinations and audits shall be conducted during normal business hours by Purchaser's employees or agents upon reasonable advance notice.

5.4.    <u>Bid Procedures Order</u>. Seller shall use its commercially reasonable efforts to obtain entry of the Bid Procedures Order by the Bankruptcy Court that provides, at a minimum, that: (a) all Competing Bidders must agree to be bound by all of the terms and conditions of this  Agreement except as modified as to price; (b) all Competing Bidders must provide adequate assurance of their ability to perform their obligations pursuant to any bid without contingency; (c) all Competing Bidders must provide value to the estate equal to the value in this Agreement plus $100,000 and the Break-up Fee (as defined below); (d) if the Bankruptcy Court does not otherwise approve the Purchase Agreement, or if the Company elects to withdraw the motion seeking the approval of the Purchase Agreement, the Company will immediately pay to Purchaser a breakup fee equal to [   ] percent ([    ]) of the Purchase Price plus an expense reimbursement for actual costs, up to a maximum of $[    ] (the "Break-up Fee") and the senior secured lender will subordinate its liens as necessary to effectuate this payment; and (e) the Purchaser shall be permitted to credit bid the Break-up Fee at any auction for the Assets.

5.5.    Transfer of Permits. Except for those Permits that are not transferable by Law, Seller shall use commercially reasonable efforts to cause the issuance or transfer at Purchaser's expense of all Permits relating to the Assets to Purchaser on or before the Closing Date. Seller shall give and make all notices and reports Seller is required to make to the appropriate Governmental Authorities and other Persons, each at Purchaser's expense, with respect to the Permits that may be necessary for the sale of the Assets to Purchaser at the Closing.

5.6.    Further Assurances. Upon the request of Purchaser, Seller shall, at Purchaser's expense, forthwith execute and deliver such documents as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

5.7.    Assignment of Rights. If, in connection with the Auction or sale referred to in the Bid Procedures Order, Seller enters into confidentiality or similar agreements with any Person ("NDAs"), Seller shall assign all rights under those NDAs to the extent relating to the Business or Assets to Purchaser at the Closing and to the extent such rights are assignable.

5.8.    Break-Up Fee. Seller hereby agrees, in the event that a Bankruptcy Court enters an order that becomes final approving a Transaction with a party other than Purchaser and such Transaction is consummated, Seller shall owe to Purchaser (a) a break-up fee (the "Breakup Fee") in the amount of [  ] percent ([  ]) of the Purchase Price, which such amount shall be earned and shall be paid upon consummation of such sale, and (b) an amount equal to all of the out-of-pocket expenses incurred by Purchaser or its Affiliates in connection with the transactions contemplated by this Agreement up to a maximum of $[    ] to the extent allowed by Final Order of the Bankruptcy Court (the "Expense Reimbursement"), which amounts shall be paid only upon consummation of such Transaction, without further order of the Bankruptcy Court. The Breakup Fee and Expense Reimbursement are intended to compensate Purchaser for the time and expense dedicated to this transaction and the value added by Purchaser in (i) establishing a bid standard or minimum for other bidders, (ii) placing Seller's estate property in a sales configuration mode attracting other bidders to the auction and (iii) for serving, by its name and its expressed interest, as a catalyst for other potential or actual bidders. The Breakup Fee and Expense Reimbursement shall constitute allowed super priority administrative claims against Seller's estate under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

5.9.    Cure Amounts. Within ten (10) business days of the date hereof, Seller shall provide Purchaser with a schedule of the true and correct monetary Cure Amounts with respect to each of the Contracts consistent with its books and records.

## SECTION 6
## CERTAIN COVENANTS OF PURCHASER.

6.1.    Performance with Respect to the Assets and the Assumed Contracts. Purchaser agrees that from and after the Closing Date, that it shall (i) assume all Assumed Liabilities, and (ii) take all actions necessary to satisfy its obligations and liabilities with respect to the Assumed Liabilities (including, without limitation, under the terms and conditions of each Assumed Contract).

6.2.    Cure Amounts. Purchaser shall pay all Cure Amounts with respect to the Assumed Contracts within five (5) Business Days from the Closing Date.

16

6.3.    <u>Financing</u>. On or prior to two (2) Business Days prior to the bidding deadline set forth in the Bid Procedures Order, Purchaser shall deliver to Seller (i) proof of cash deposits in an amount equal to the obligating at Closing on this Agreement; or (ii) an executed debt commitment letter(s) in form reasonably acceptable to Seller pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide on behalf of Purchaser the funds to Close.

6.4.    <u>Further Assurances</u>. Upon the request of Seller, Purchaser shall, at Seller' expense, forthwith execute and deliver such documents as Seller or its counsel may reasonably request to effectuate the purposes of this Agreement.

**SECTION 7**
**CERTAIN MUTUAL COVENANTS**

7.1.    <u>Mutual Cooperation</u>.

(a)    Seller, on one hand, and Purchaser, on the other hand, shall promptly give notice to the other upon becoming aware that any action is pending or threatened by or before any Governmental Authority with respect to the Transactions. Seller, on the one hand, and Purchaser, on the other hand, (i) shall cooperate with each other in connection with the prosecution, investigation or defense of any such action, (ii) shall supply promptly all information requested by the other, by any such Governmental Authority or by any party to any such action that is legally required to be produced, and (iii) shall each use commercially reasonable efforts to cause any such action to be determined as promptly as practicable and in a manner which does not impact adversely on, and is consistent with, the Transactions.

(b)    After the Closing Date, Seller and Purchaser shall use commercially reasonable efforts to provide to any other party to this Agreement (the "<u>Requesting Party</u>") such records and information and to make available to the Requesting Party such employees or other personnel, in each case as may be reasonably requested in writing by the Requesting Party, for the purpose of assisting the Requesting Party in responding to governmental inquiries, making required governmental filings or defending or prosecuting any action or other proceeding involving any Person other than the party providing such information or records or making available such employees or other personnel (the "<u>Providing Party</u>") and in resolving all claims, preparing all tax returns, and handling all matters necessary to administer and close the Cases; <u>provided</u>, <u>however</u>, that no Providing Party shall be required to (i) incur any out-of-pocket expenses, (ii) provide information, records or employees or other personnel under circumstances which the Providing Party believes in its sole reasonable determination may expose it to liability to any Person or may prejudice any commercial, legal or other interest of the Providing Party, or (iii) take any action that in the Providing Party's reasonable determination unreasonably interferes with its business.

(c)    Seller and Purchaser shall each use its reasonable best efforts to cooperate, assist and consult with each other to procure the entry of the Bid Procedure as promptly thereafter as practicable. Without limiting the generality of the foregoing, Seller shall (i) comply with all requirements under the Bankruptcy Code and Federal Bankruptcy Rules in

17

connection with obtaining any Final Orders, (ii) agree to proceed with the Case pursuant to and in accordance with the terms and provisions contemplated by the Orders, in each case after the order has been entered by the Bankruptcy Court and (iii) comply or cause the compliance with the notice requirements of any Final Orders, in each case after the order has been entered by the Bankruptcy Court, and any other applicable order of the Bankruptcy Court as they relate to the Cases, the Federal Bankruptcy Rules (including, without limitation, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure) and any applicable rules of the Bankruptcy Court with respect to the Transactions contemplated by this Agreement. In the event that the Orders or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such order), Seller and Purchaser will cooperate in taking such steps diligently to defend against such appeal, petition or motion and Seller and Purchasers shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion. Neither Purchaser nor Seller shall make any filing in the Bankruptcy Court with respect to the Orders (or otherwise take any position in the Bankruptcy Court proceedings with respect thereto) without the express written consent of the other party, which may not be unreasonably withheld, conditioned or delayed, or otherwise that would be reasonably likely to result in the failure of the transactions contemplated hereby. Notwithstanding anything to the contrary herein, however, nothing shall be deemed to prohibit or otherwise restrain Seller from accepting a Superior Bid in accordance with the terms of the Bid Procedures Order or Purchaser from making any filing in the Bankruptcy Court to challenge or object to the entry of an order by the Bankruptcy Court approving the entry by Seller into a Superior Bid.

(d)     Subject to the terms and conditions of this Agreement, Seller and Purchaser shall take all reasonable steps to close the sale of the Assets pursuant to this Agreement on or prior to the Termination Date.

7.2.    Approvals and Filings. (a) Subject to the terms and conditions of this Agreement, including the possible closing of a Superior Bid, each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate and make effective the Transactions, including using commercially reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, and effecting all necessary registrations and filings. Purchaser shall make or cause to be made all filings and submissions under Laws applicable to Purchaser, if any, as may be required for the consummation of the Transactions. Seller shall make or cause to be made all such other filings and submissions under Laws applicable to any Seller, if any, as may be required for the consummation of the Transactions. Purchaser, on the one hand, and Seller, on the other hand, shall coordinate and cooperate in exchanging such information and reasonable assistance as may be requested by either of them in connection with the filings and submissions contemplated by this Section 7.2. Purchaser, on the one hand, and Seller, on the other hand, shall each promptly provide the other or their respective counsel with copies of all filings made by such party with any Governmental Authority in connection with this Agreement and the Ancillary Agreements and the Transactions.

18

## SECTION 8
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the Transactions are subject to the satisfaction (unless waived in writing by Seller) of each of the following conditions on or prior to the Closing Date:

8.1.    <u>Representations and Warranties</u>. The representations and warranties of Purchaser contained in this Agreement that are not qualified shall be true and correct in all material respects on and as of the Closing Date.

8.2.    <u>Compliance with Agreements</u>. Purchaser shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

8.3.    <u>Approvals; No Injunctions</u>. Any material Permit or approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy. Such Permits or approvals shall be in full force and effect on the Closing Date. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

8.4.    <u>Purchaser's Closing Deliveries and Obligations</u>. Purchaser shall have delivered all items and satisfied all obligations pursuant to <u>Sections 10.1(b)</u> and <u>10.1(c)</u>.

8.5.    <u>Auction</u>. Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

8.6    <u>DIP Loan</u>.  Tiger has committed to provide Seller with a Debtor in Possession loan in an amount of up to $15,500,000.00 (the "DIP Loan"), the proceeds of which DIP Loan may be used to provide working capital to support operations through the Closing and pay certain administrative expenses.  The receipt of the DIP Loan or a similar facility from Tiger, or another lender in a like amount for that purpose, is a condition to the Seller's obligations under this Agreement.

## SECTION 9
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser to consummate the Transactions is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

9.1.    <u>Representations and Warranties</u>. The representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date.

19

OMC\4831-7361-7146.v1-9/8/21

9.2.    <u>Compliance with Agreements</u>.  Seller shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

9.3.    <u>Approvals</u>.  Any material Permit or approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy Court.

9.4.    <u>Seller' Closing Deliveries and Obligations</u>.  Seller shall have delivered all items and satisfied all obligations pursuant to <u>Sections 5.9</u> and <u>10.1(a)</u>.

9.5.    <u>Auction</u>.  Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

9.6.    <u>Title Insurance Policies and Surveys</u>.  Purchaser shall have received from a reputable title insurance company a commitment to issue as of the Closing Date an owner's title insurance policy for the real property in amounts, in a form and with such endorsements and surveys of the Real Property and improvements thereon, all as are generally customary for properties similar to the Real Property, and certified to Purchaser, the title insurance company and such other persons as Purchaser may designate.

9.7    <u>Certain Liabilities</u>.  Purchaser shall have determined in its sole and absolute discretion that its potential Liability under section 2.3 is acceptable to Purchaser; provided, however, that this condition shall be deemed to be satisfied at the Closing unless Purchaser provides written notice that it is not so satisfied by two Business Days prior to the bidding deadline set forth in the Bid Procedures Order.

**SECTION 10**
**CLOSING; TERMINATION**

10.1.    <u>The Closing</u>. The Closing of the purchase by Purchaser from Seller and sale by Seller to Purchaser of the Assets (the "<u>Closing</u>") shall be held on [November 1, 2021] assuming the satisfaction or waiver of the conditions set forth in <u>Sections 8</u> and <u>9</u> of this Agreement (excluding those conditions which by their nature are to be satisfied as part of the Closing), or at such other time as the parties hereto may agree (the "<u>Closing Date</u>"). The Closing shall be held at the offices of Obermayer Rebmann Maxwell& Hippel LLP, 1500 Market Street, Suite 3400, Philadelphia, Pennsylvania 19102 or at such other location as the parties hereto may agree. At the Closing, all of the transactions provided for in <u>Section 2</u> hereof shall be deemed to be consummated on a concurrent and simultaneous basis.

(a)    <u>Seller' Deliveries at Closing</u>. At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser the following:

(i)    the duly executed Assignment and Assumption Agreement;

(ii)    the duly executed Bill of Sale;

(iii)    the duly executed special warranty deed in form to be agreed upon by Purchaser and Seller (collectively, the "<u>Deed</u>") conveying to Purchaser good and

20

marketable fee title to the Real Property free and clear of all Encumbrances other than the Permitted Encumbrances;

(iv)     copies of each Assumed Contract;

(v)     certified resolutions of the governing body of Seller approving and authorizing the Transactions;

(vi)     officer's certificates, executed by a duly authorized officer of Seller to the effect that all conditions to Closing set forth in Section 9.1 and Section 9.2 have been satisfied;

(vii)     affidavits executed by Seller stating that such Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code; and

(viii)     such other documents as Purchaser or its counsel shall reasonably require in order to affect the Transactions.

(b)     Purchaser's Payment of Purchase Price.     At the Closing, Purchaser shall deliver (or cause to be delivered) the Purchase Price (less the Purchaser Deposit Amount, together with all accrued interest and investment income thereon (which shall be released by the Deposit Escrow Agent to Seller in accordance with Section 2.5.

(c)     Purchaser's Deliveries to Seller at Closing.     At the Closing, Purchaser shall deliver (or cause to be delivered) to Seller the following:

(i)     the duly executed Assignment and Assumption Agreement;

(ii)     certified resolutions of the governing body of Purchaser approving and authorizing the Transactions;

(iii)     a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to Closing set forth in Section 10.1 and Section 10.2 have been satisfied; and

(iv)     such other documents as Seller or its counsel shall reasonably require in order to effect the Transactions.

(d)     Other Bids.     Purchaser acknowledges that Seller will solicit higher or better bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of the Assets in accordance with Auction procedures to be set forth in the Bid Procedures Order. Each Bidder will submit two copies of this form of Asset Purchase Agreement marked (in redline) to show changes from this Agreement. Seller shall have the right to select the Bid or Bids which will create the highest and best net return to the bankruptcy estate (the "Superior Bid"). Seller acknowledges that Seller will strongly favor Bids for all of the Assets or for all of Seller's Assets or for such Assets which Seller determines, in its sole discretion, cannot otherwise be easily sold.

21

(e)     Overbid Protection. The Bid Procedures Order shall contain the following overbid protections: (i) a higher Bid will not be considered by Seller unless such Bid is more than the sum of (1) the Purchase Price set forth in this Agreement and the assumption of the Assumed Liabilities, (2) the Breakup Fee, (3) the Expense Reimbursement; and (4) $100,000.00 and (ii) any bids thereafter must be higher than the then existing highest or better bid (as determined in the reasonable discretion of Seller) by increments of at least $100,000 ((i) and (ii) constituting, as applicable, a "Qualifying Bid"); provided, however, that there shall be no overbid protection if Purchaser has not confirmed in writing that its condition set forth in Section 10.10 has been satisfied on or prior to the date of the Auction.

(f)     Breakup Fee. If Seller, (i) determines that a Qualifying Bid (or Bids) (which is not Purchaser's Bid) is the Superior Bid, and (ii) executes a definitive agreement embodying such Superior Bid, then upon consummation of the sale pursuant to the Superior Bid, Seller will pay to Purchaser the Breakup Fee and the Expense Reimbursement to the extent allowed by order of the Bankruptcy Court.

10.2.   Termination.   Anything in this Agreement to the contrary notwithstanding, this Agreement and the Transactions may be terminated in any of the following ways at any time before the Closing and in no other manner, subject to the provisions hereof:

(a)     at any time by mutual written consent of Purchaser and Seller;

(b)     by Purchaser or Seller, if the Closing shall not have occurred on or before November 1, 2021, or such later date as Seller and Purchaser agree or is necessary due solely to the scheduling and availability of the Bankruptcy Court (the "Termination Date"); provided, however, that Purchaser or Seller may not terminate this Agreement pursuant to this Section 10.2(b) if the Closing shall not have occurred on or before the Termination Date due to a breach by Purchaser or Seller, as the case may be, of any representations, warranties, covenants or agreements of Purchaser or Seller, as the case may be, contained in this Agreement;

(c)     by Seller, if any condition to the obligations of Seller set forth in Section 8, shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement;

(d)     by Purchaser, if any condition to the obligations of Purchaser set forth in Section 9 shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(e)     by Seller, if Purchaser is in breach in any respect of any of its representations made in this Agreement   any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Seller specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

22

(f)     by Seller, if in compliance with the terms of the Bid Procedures Order;

(g)     by Purchaser or Seller, if the Bid Procedures Order is not issued within 30 days of filing of the Bid Procedures Motion, which deadline can be extended by mutual agreement evidenced by a writing signed by both Parties or if the Bankruptcy Court denies the Bid Procedures Motion;

(h)     by Purchaser, if the Seller is in breach in any respect of any of its representations made in this Agreement that are qualified by materiality or in material breach in any respect of any of its representations not so qualified, or are in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(i)     by Seller or Purchaser if there shall be in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(j)     by Purchaser, if, as a result of an order of the Bankruptcy Court, the Cases are dismissed converted to chapter 7 and a chapter 7 trustee is appointed with respect to Seller;

(k)     automatically, if any Seller closes or consummates the sale of the Assets pursuant to a Superior Bid.

10.3    Effects of Termination.

(a)     If this Agreement is terminated pursuant to Section 10.2, this Agreement (other than Section 10.3 (Effects of Termination), Section 12 (Expenses, Employees, Attorneys' Fees and Brokers' Fees) and Section 13.6 (Governing Law; Jurisdiction), each of which shall remain in full force and effect) shall forthwith become null and void and no party hereto shall have any liability or further obligation to any other party hereto, except as provided in this Section 10.3.

(b)     Notwithstanding anything in Section 10.3(a) to the contrary, (x) if this Agreement is terminated by Seller pursuant to Section 10.2(e), Section 2.6(b) shall remain in full force and effect, and (y) if this Agreement is terminated for any reason other than by Seller pursuant to Section 10.2(e), Section 2.6(c) shall remain in full force and effect.

(c)     Seller' liability under or arising from this Agreement is and shall be limited to Seller' return of the Purchaser Deposit Amount and payment of the Breakup Fee and the Expense Reimbursement if payable pursuant to the terms hereof.

(d)     Purchaser's liability under or arising from this Agreement shall be limited to its forfeiture of the Purchaser Deposit Amount.

## SECTION 11
## TAXES

11.1.    <u>Taxes Related to Purchase of Assets</u>.    The parties recognize and acknowledge that the transaction herein, is a sale to be made under and pursuant to Section 363 of the Bankruptcy Code, and is therefore NOT exempt from taxes under section 1146(c) of the Bankruptcy Code.  Purchaser and Seller shall cooperate in preparing such forms and shall execute and deliver such affidavits and forms as are reasonably requested by the other party.  Purchaser shall pay all transfer taxes.

11.2.    <u>Cooperation</u>.    Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Taxes and for the answer of any governmental or regulatory inquiry relating to Taxes. Purchaser agrees to retain possession of all Tax files, books and records delivered to Purchaser by Seller for a period of at least five years from the Closing Date. If Purchaser determines to destroy or discard any of such files, books or records after the end of such five-year period, Purchaser shall give Seller reasonable notice thereof and shall allow Seller to take possession of such files, books and records at Seller' expense. From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Seller may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Assets.

## SECTION 12
## EXPENSES, ATTORNEYS' FEES AND BROKERS' FEES

12.1.    <u>Expenses</u>.    Except as otherwise provided under this Agreement, Seller shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing on or prior to the Closing, as applicable. Purchaser shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing after the Closing.

12.2.    <u>Attorneys' Fees; Brokers' Fees; Expenses</u>. Each party shall be responsible for the payment of its own attorneys', brokers' and other fees and expenses in connection with the Transactions.

## SECTION 13
## MISCELLANEOUS

13.1.    <u>Sale of Assets Subject to Bankruptcy Court Approval</u>.    This Agreement, the sale of the Assets and Seller's ability to perform under this Agreement is in all respects conditioned and contingent upon Bankruptcy Court approval of the Sale.

13.2.    <u>Survival of Representations and Warranties</u>.    Until the Closing, all representations and warranties herein shall be operative and in full force and effect, and the parties hereto shall be entitled to rely thereon, regardless of any investigation made by or for them. All representations warranties and covenants contained herein shall terminate and shall not survive the Closing.

13.3    <u>Entirety of Agreement; Amendments and Waivers</u>.    This Agreement (including all schedules and exhibits hereto), together with the Ancillary Agreements and certificates delivered hereunder, state the entire agreement of the parties with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement. Seller and Purchaser otherwise make no other representations or warranties including any implied representations or warranties. Each party agrees that in dealing with third parties no contrary representations shall be made. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

13.4.    <u>Assignment</u>.    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties without the prior written consent of the other party except, in the case of Purchaser, to an Affiliate (but only if such Affiliate becomes a party to this Agreement and agrees to be bound by the representations, warranties, covenants and obligations herein and Purchaser guarantees such Affiliate's obligations herein and; <u>provided</u>, <u>however</u>, that no such assignment shall relieve Purchaser of its obligations hereunder). No party shall be relieved of any liability hereunder in respect of any assignment pursuant to this <u>Section 14.4</u>, unless such assignor has received a written release expressly excepting such assignor from any liability that may arise hereunder.

13.5.    <u>Successors and Assigns; No Third Party Beneficiaries</u>.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective heirs, personal representatives, legatees, successors and permitted assigns.

13.6.    <u>Governing Law; Jurisdiction</u>.    This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey applicable to contracts made and to be entirely performed therein. In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court for the District of New Jersey, (ii) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in the Bankruptcy Court, (iii) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (iv) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under <u>Section 14.12</u> shall be deemed good, proper and effective service upon such party.

OMC\4831-7361-7146.v1-9/8/21

13.7.    <u>Gender and Number</u>.    In this Agreement, words importing the singular include the plural and vice versa and words importing a specific gender include all genders.

13.8.    <u>Headings</u>.    The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

13.9.    <u>Construction</u>.    In this Agreement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (v) any reference herein to a Section, Exhibit or Schedule refers to a Section of, or Exhibit or Schedule to, this Agreement, unless otherwise stated, (vi) any reference to "knowledge" shall mean, with respect to Seller the actual knowledge of Solomon Rosenthal and Douglas Bathauer, and with respect to Purchaser the actual knowledge of the investors of Purchaser and (vii) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

13.10.    <u>Severability</u>.    If any provision of this Agreement is held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the legality, validity and enforceability of the remaining provisions shall not be affected thereby, and in lieu of each such illegal, invalid or unenforceable provision, the parties shall negotiate in good faith to add a provision similar in terms to such illegal, invalid or unenforceable provision as may be possible while giving effect to the benefits and burdens for which the parties have bargained hereunder.

13.11.    <u>Negotiated Agreement</u>.    Seller and Purchaser acknowledge that each has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

13.12.    <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows:

    (a)    if sent by registered or certified mail in the United States return receipt requested, upon receipt;

    (b)    if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in Philadelphia, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. in Philadelphia and receipt is confirmed, on the following Business Day; and (e) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

OMC\4831-7361-7146.v1-9/8/21

Purchaser:          XXXXXXXXX

with a copy to:     XXXXXXXXX

Seller:            Aluminum Shapes
                      c/o Solomon Rosenthal
                      9000 River Road
                      Delair, NJ 08110

with a copy to:     Edmond M. George, Esquire
                      Obermayer Rebmann Maxwell & Hippel LLP
                      Centre Square West, Suite 3400
                      1500 Market Street
                      Philadelphia PA 19103.

Any party hereto may change its address for service from time to time by notice given to other parties hereto in accordance with the foregoing.

13.13.  <u>Counterparts; Facsimile Copies</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signed facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.

**(REMAINDER OF PAGE LEFT INTENTIONALLY BLANK – SIGNATURES ON FOLLOWING PAGE)**

OMC\4831-7361-7146.v1-9/8/21

ALUMINUM SHAPES, LLC

Dated:                              By  _____
                                        Solomon Rosenthal, CEO and Manager


                                        [                              ]


Dated:                              By  _____

28