UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
_____

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**Order Filed on September 29, 2021
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

| In Re: | Case No.: | _____ |
|--------|-----------|------------------------|
|        | Chapter: | _____ |
|        | Hearing Date: | _____ |
|        | Judge: | _____ |

**ORDER**

The relief set forth on the following pages, numbered two (2) through _____ is **ORDERED**.

..........

**DATED: September 29, 2021**

_____

Honorable Jerrold N. Poslusny, Jr.
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square
1500 Market Street
Philadelphia, PA 19102
Edmond George (Edmond.George@obermayer.com)
Michael Vagnoni (Michael.vagnoni@obermayer.com)
Brett Wiltsey (brett.wiltsey@obermayer.com)

*Proposed Attorneys for Debtor
and Debtor in Possession*

Chapter 11

In re:

ALUMINUM SHAPES L.L.C.,

Debtor.[1]

Case No. 21-16520 (JNP)

**Hearing Date and Time: September 22, 2021 at 11:30 a.m. ET**

### FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING , (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, AND (IV) MODIFYING THE AUTOMATIC STAY

Upon the Motion (the "*DIP Motion*")[2] of **ALUMINUM SHAPES, L.L.C.**, debtor and debtor-in-possession in the above-captioned case (the "*Debtor*"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, and 507 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "*Bankruptcy Code*"), and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (the "*Bankruptcy Rules*"), seeking entry of interim and final orders granting the following relief:

---

[1] The Debtor in this chapter 11 case and the last four digits of the Debtor's federal tax identification number is as follows: Aluminum Shapes L.L.C., 9000 River Road, Pennsauken, New Jersey 08110 (6288).

[2] Capitalized terms used in this Interim Order (defined below) but not defined herein shall have the meanings ascribed to such terms in the DIP Motion and/or the DIP Financing Agreements (as defined below), as the context makes applicable.

**(I)  DIP Financing**

(A)  Authorizing the Debtor to obtain up to $15,500,000.00 million in post-petition financing (the "***DIP Facility***") pursuant to (and in accordance with the terms of) that certain *Senior Secured Super-Priority Debtor-In-Possession Credit Agreement* (as may be amended, modified, or supplemented and in effect from time-to-time, the "***DIP Credit Agreement***"), substantially in the form as filed with the Court, by and among the Debtor, as borrower and Tiger Finance, LLC and such other financial institutions that are or may from time to time have "Commitments" (as defined in the DIP Credit Agreement (collectively, the "***DIP Lenders***"[3]), which may be used for the following in accordance with and as limited by the Approved Budget (as defined below) and subject to Paragraph 46 hereof (where applicable):

(i)  subject to the rights of parties-in-interest as set forth in Paragraphs 25-29, to repay with the first draw under the DIP Facility the entire outstanding balance of the Prepetition Debt under the Prepetition Financing Documents (each term as defined below);

(ii)  to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(iii)  for general operating and working capital purposes, including the payment of postposition obligations, and certain pre-petition priority wage and tax obligations as authorized by the court pursuant to Debtor's First Day Motions, and for the payment of transaction expenses, for the payment of fees, administrative expenses, and costs incurred in connection with the instant Chapter 11 Case (the "***Chapter 11 Case***"), and other proper corporate purposes of the Debtor not otherwise prohibited by the terms hereof for working capital and other lawful corporate purposes of the Debtor, in each case subject to any limitations provided by the Approved Budget (defined below);

(iv)  to fund the Prepetition Indemnity Account (as defined below) for the benefit of the Prepetition Lender (as defined below); and

(v)  to fund the Carve Out (as defined below).

(B)  Authorizing the Debtor to enter into the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed,

---

[3]  A participant in the Prepetition Financing Documents (defined below) and the DIP Facility is Align Business Finance LLC (f/k/a Reich Bros Business Solutions LLC) is 100% owned by ABF Intermediate Holdings LLC, which is then 100% owned by ABF Ultimate Holdings LLC. ABF Ultimate Holdings LLC is 50% owned by Jonathan and Adam Reich, who are principals of Reich Brothers, a potential stalking horse bidder for the Debtor's Assets.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

delivered, and/or ratified by the Debtor in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "***DIP Financing Agreements***");

(C)     Granting the DIP Lenders the following Liens (as defined in section 101(37) of the Bankruptcy Code) (the "***DIP Liens***") and claims:

(i)     first priority priming, valid, perfected, and enforceable Liens, subject only to the Carve Out (as defined below), in and upon all of the Debtor's assets, real and personal properties, and interests, including first-priority senior liens on the proceeds realized by the Debtor upon a sale, assumption, assignment, termination, rejection, surrender, and/or other disposition of Debtor's non-residential real property leasehold interests (collectively, "***Leases***"); provided, that for the avoidance of doubt, the foregoing DIP Liens shall exclude the Debtor's interests in (A) the Leases themselves, (B) any recoveries by settlement or otherwise, in respect of claims or causes of action to which the Debtor (or any successor or assign) may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the Debtor's estate under chapter 5 of the Bankruptcy Code; and (C) any recoveries by settlement or otherwise, in respect of fiduciary duty claims or causes of action to which the Debtor (or any successor or assign) may be entitled to assert against its directors and officers ("D&O Claims"), including in respect to any proceeds recovered under any applicable insurance policies;

(ii)     allowed superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject only to the Carve Out as provided herein.

**(II)**     **Use of Cash Collateral** – Authorizing the Debtor's use of "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***")) in which the DIP Lenders have an interest in order to fund certain amounts under the Approved Budget;

**(III)**     **Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and the Financing Orders (defined below); and

**(IV)**     **Waiving Any Applicable Stay –** Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Order.

And upon the *Declaration of Jordan Meyers in Support of First Day Motions* (the "***First Day Declaration***"),

and the *Declaration Of Justin Magner Of Cowen And Company, LLC In Support Of Motion Of Aluminum*

*Shapes, L.L.C. For The Entry Of: (I) An Order Scheduling Expedited Hearing, Reducing Notice Period*

*And Limiting Notice; And (II) An Order Granting (A) Authority To Obtain Postpetition Financing, (B) Liens*

*And Super Priority Administrative Expense Status Pursuant To 11 U.S.C. §§ 364(c)(1), (2) and (3) And*

*364(d)(1), (C) Relief from the Automatic Stay And (D) Authority To Enter Into Agreements With Tiger Finance, LLC* (the "***Magner Declaration***", which was filed contemporaneously with the DIP Motion; and this Court having reviewed the DIP Motion, the First Day Declaration, the Magner Declaration, and held an interim hearing with respect to the Motion on August 18, 2021 (the "***Interim Hearing***"); and the Court having entered its *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, And 507 And Fed. R. Bankr. P. 2002, 4001, 6003, 6004 And 9014 (I) Authorizing Debtor To Obtain Post-Petition Financing, (II) Granting Liens And Superpriority Claims, (III) Authorizing Use Of Cash Collateral, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief*, dated August 19, 2021 [D.R. No. 47] (the "***Interim Order***"; and together with this Final Order the "***Financing Orders***"), providing for approval of the DIP Motion on an interim basis; and notice of the Final Hearing (defined below) on the DIP Motion having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), and 9014 and as provided in the Interim Order; and a final hearing having been held and concluded on September 22, 2021 (the "***Final Hearing***"); and upon the DIP Motion, the First Day Declaration, the Magner Declaration, and the record of the Interim Hearing, the Final Hearing, and all objections, if any, to the entry of this Final Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

## I.  Procedural Findings of Fact

**A.     Petition Date.**  On August 15, 2021 (the "***Petition Date***"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Case.

**B.     Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

C.	**Statutory Predicates**.  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014.

D.	**Committee Formation**.  On September 1, 2021, the Office of the United States Trustee for the District of New Jersey (the "***U.S. Trustee***") appointed an official committee of unsecured creditors (the "***Committee***") in the Chapter 11 Case.  No trustee or examiner has been appointed.

E.	**Notice.**  The Final Hearing was held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and in accordance with the Interim Order.  Notice of the Final Hearing and the relief requested in the DIP Motion was provided by the Debtor to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those creditors holding the thirty (30) largest unsecured claims against the Debtor's estate; (iii) co-counsel to the DIP Lenders and the Prepetition Lender; and (iv) all other known secured creditors of record, with and no other or further notice need be given.

## II.	Debtor's Acknowledgements and Agreements (Prepetition Credit Facility)

F.	Without prejudice to the rights of parties-in-interest as set forth in Paragraphs 25-29 below, the Debtor admits, stipulates, acknowledges, and agrees (collectively, Paragraphs F(1) through F(7) hereof shall be referred to herein as the "***Debtor's Stipulations***") that:

(1)	**Prepetition Financing Documents.**  Prior to the commencement of the Chapter 11 Case, **the Debtor** was a party to that certain (A) Credit Agreement dated as of June 5, 2019 (the "***Prepetition Credit Agreement***"), between and among the Debtor, as "Borrower", and Tiger Finance, LLC, as "Lender" (the "***Prepetition Lender***"), and (B) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Prepetition Lender including, without limitation, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively with the Prepetition Credit Agreement the "***Prepetition Financing Documents***").

(2)	**Prepetition Debt Amount.**  As of the Petition Date, the Debtor was liable to the Prepetition Lender under the Prepetition Financing Documents in the approximate aggregate principal amount of $9,270,525.89, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations secured by the Prepetition Financing Documents (collectively the "***Prepetition Debt***").

(3)	**Prepetition Collateral.**  To secure the Prepetition Debt, the Debtor granted continuing security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition

Lender, upon substantially all of the Debtor's assets and property, including, without limitation, the following (collectively, the "***Prepetition Collateral***")[4]:

  (i)     all Accounts;
  (ii)    all Goods, including Equipment, Inventory and Fixtures;
  (iii)   all Documents (including, if applicable, electronic Documents), Instruments and Chattel Paper (whether tangible or electronic);
  (iv)    all Letters of Credit and Letter-of-Credit Rights;
  (v)     all Securities Collateral;
  (vi)    all Investment Property;
  (vii)   all Intellectual Property;
  (viii)  all Commercial Tort Claims;
  (ix)    all General Intangibles;
  (x)     all Deposit Accounts and Securities Accounts;
  (xi)    all Supporting Obligations;
  (xii)   all Real Property subject to the Mortgages;
  (xiii)  to the extent not otherwise described above, all Receivables;
  (xiv)   all books and records relating to the Collateral; and
  (xv)    to the extent not covered by clauses (i) through (xiv) of this sentence, all other personal property of such Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing.

(4)     **Prepetition Lien Priority.** The Prepetition Liens of the Prepetition Lender have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement (if any), are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement (if any), are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***").

(5)     Subject to paragraphs 25-29 hereof, as of the Petition Date:

        (iv)    the Prepetition Liens are valid, binding, enforceable, and perfected first priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

        (ii)    (a) the Prepetition Debt constitutes legal, valid, and binding obligations of the "Loan Parties" thereunder, enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect of the stay of

---

[4]     Each term as used in this subsection (3) has the meaning ascribed thereto in the applicable Security Agreement dated as of June 5, 2019 (as may be amended, modified, or supplemented and in effect from time-to-time, the "***Prepetition Security Agreement***"). The collateral set forth in the Prepetition Lender's filed UCC-1 financing statement is within the scope of New Jersey Uniform Code-Secured Transactions pursuant to N.J.S.A 12A:9-102.

enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Debt exists, and (c) no portion of the Prepetition Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(iii)     the Debtor has no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Lender with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code, and

(iv)     the Prepetition Debt constitutes an allowed secured claim under sections 502 and 506 of the Bankruptcy Code.

(6)     Subject to paragraphs 25-29 hereof, upon entry of the Interim Order, the Debtor waived, discharged, and released the Prepetition Lender, together with its respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "*Released Parties*"), of any right the Debtor may have (i) to challenge or object to any of the Prepetition Debt, (ii) to challenge or object to the Prepetition Debt and Prepetition Liens (or any other security for the Prepetition Debt), and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.  Subject to paragraphs 25-29 hereof, the Debtor does not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents, the Prepetition Debt, or the Prepetition Liens, or any claim of the Prepetition Lender pursuant to the Prepetition Financing Documents, or otherwise.

(7)     Cash Collateral.  As of the Petition Date the Prepetition Lender has a continuing security interest in and Lien on all or substantially all of the **Debtor's** Cash Collateral, including all amounts on deposit in the **Debtor's** banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Debt.

## III.     Findings Regarding the Post-Petition Financing.

G.     **Need for Post-Petition Financing**.  An immediate need exists for the Debtor to obtain funds from the DIP Facility and use of Cash Collateral in order to fund working capital, continue operations, pay administrative expenses of the Debtor incurred in the Chapter 11 Case, and to administer and preserve the value of its estate for the benefit of its various stakeholders.  The ability of the Debtor to finance its operations, to preserve and maintain the value of the Debtor's Assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral (in each case in the manner and in the amounts provided herein and in the Approved Budget, in the DIP

Credit Agreement, and the Financing Orders, including the Carve Out), the absence of which would immediately and irreparably harm the Debtor, its estate and its stakeholders.

**H.    No Credit Available on More Favorable Terms**. As set forth in the DIP Motion, the Debtor has been unable to obtain any of the following:

(1)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien,

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and the Financing Orders.  The Debtor is unable to obtain credit from the DIP Lenders without granting to the DIP Lenders the DIP Protections (as defined below).

**I.    Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Lien(s), or the Prepetition Liens or claims, is/are valid, senior, perfected, or unavoidable. Moreover, except as provided in Paragraphs 25-29 below, nothing shall prejudice the following:

(1)    the rights of any party-in-interest, including, but not limited to, the Debtor, the DIP Lenders, the Prepetition Lender, and/or the Committee to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

(2)    the rights of the Committee or any other party-in-interest (other than the Debtor) with requisite standing to challenge the validity, priority, perfection, and extent of the Prepetition Debt and/or Prepetition Liens as set forth in this Final Order.

**J.    Junior Liens**.  Nothing herein shall prejudice the rights of the Debtor, the Committee, or any other party-in-interest with requisite standing to challenge the validity, priority, perfection, and extent of any pre-petition liens or asserted liens junior to the Prepetition Liens ("***Junior Liens***").

**K.    Adequacy of the Approved Budget.**  The DIP Lenders and the Debtor have agreed that the budget, the short form of which is attached hereto as ***Exhibit "1"*** (as the same may be modified, supplemented, and/or updated from time to time consistent with the terms of the DIP Credit Agreement,

and this Final Order, the "***Approved Budget***")[5] is adequate considering all the available assets to pay the administrative expenses due and accruing during the Chapter 11 Case.

L. **Conditions Precedent to DIP Lenders' Extension of Financing.** The DIP Lenders have indicated a willingness to provide postpetition financing to the Debtor in accordance with the DIP Credit Agreement and the other DIP Financing Agreements, subject to the following:

(1) <u>First</u>, the entry of the Interim Order, followed by the entry of this Final Order, and

(2) <u>Second</u>, findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lenders are good faith financiers, and that the DIP Lenders' respective claims, superpriority claims, security interests, and DIP Liens and other protections granted pursuant to the Financing Orders, and further that the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

M. **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.** The extension of credit under the DIP Credit Agreement and the other DIP Financing Agreements, and the fees paid and to be paid thereunder, (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arms' length between the Debtor and the DIP Lenders, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lenders are each entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

N. **Relief Essential; Best Interest.** The relief requested in the DIP Motion, and as provided in the Financing Orders, is necessary, essential and appropriate for the continued operation of the Debtor's business (the "***Business***"), the management and preservation of the Debtor's assets during the Chapter 11 Case, and to avoid irreparable harm. It is in the best interest of the Debtor's estate that the Debtor be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP

---

[5]     All backup, schedules, and other detail contained in the Approved Budget is incorporated by reference, including accruals for professional fee estimates.

Financing Agreements, and to use Cash Collateral, in each case as provided in the DIP Financing Agreements and herein. The Debtor has demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

**I.**

**DIP FINANCING**

**A.** **Approval of Entry into the DIP Financing Agreements**

1.      The DIP Motion is GRANTED on a final basis as set forth herein.

2.      The Debtor is expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Final Order and the DIP Financing Agreements. In furtherance of the foregoing, the Debtor is hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as and when such become due, including, without limitation, the "Closing Fee", "Default Fee" and "Exit Fee" (each as defined in the DIP Financing Agreements), and, subject to the provisions of Paragraph 46 below, the DIP Lenders' reasonable attorneys', financial advisors', consultants, and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court.

**B.** **Authorization to Borrow**

3.      In order to enable it to continue to operate its Business during the Chapter 11 Case, and subject to the terms and conditions of this Final Order, the DIP Credit Agreement, the other DIP Financing Agreements, including the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement and this Final Order), the Debtor is hereby authorized under

10

the DIP Facility to borrow an amount up to $15,500,000.00 in accordance with the terms and conditions of this Final Order and the DIP Financing Agreements. Anything in the Approved Budget to the contrary notwithstanding, effective as of September 1, 2021 and continuing through and including the occurrence of a DIP Maturity Event the Committee's professional fee budget shall be $75,000 per week (the "<u>Committee Professional Fees</u>"), which amount shall be included in the Carve Out (as defined below) and treated as part of the Approved Budget for all intents and purposes stated in this Final Order.

## C.     <u>Application of DIP Facility Proceeds</u>

4.     The advances under the DIP Facility and uses of Cash Collateral shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement and this Final Order), solely as follows:

(a)     the initial loan/draw under the DIP Credit Agreement was used to satisfy in full, all outstanding Prepetition Debt under the Prepetition Financing Documents, which payment is hereby ratified;

(b)     to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(c)     for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Case, and other proper corporate purposes of the Debtor not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtor, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement and this Final Order);

(d)     to fund the Prepetition Indemnity Account; and

(e)     to fund the Carve Out (as defined below).

In the event that there is a timely and successful challenge to the validity, enforceability, extent, perfection, and (where appropriate) priority of the Prepetition Lender's claims or liens, or a determination that the Prepetition Debt was undersecured as of the Petition Date, the roll-up provided for in the Interim Order will be without prejudice to the rights of any third party, including, without limitation, the Committee, to seek an appropriate remedy from the Court.

**D.** **Conditions Precedent**

5.      The DIP Lenders shall not have any obligation to make any loan or advance under the DIP Credit Agreement unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

**E.** **The DIP Liens**

6.      In consideration of the DIP Lenders' making of loans and other advances under the DIP Credit Agreement and the consent to the Debtor's use of Cash Collateral, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and subject to the limitations set forth in Paragraph 7 below, the DIP Lenders are hereby granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the Carve Out), which DIP Liens constitute priming, first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens senior and superior in priority to all other secured and unsecured creditors of the Debtor's estates, upon and to all of the following (collectively, the "*DIP Collateral*"):

(a)      The Prepetition Collateral (as defined in the DIP Financing Agreements and as set forth in paragraph F(3) above);

(b)      Proceeds realized upon the sale, disposition and/or termination of any Lease(s), but not the Leases themselves, whether or not so perfected prior to the Petition Date; and

(c)      Any cash held in any escrow or other account of the Debtor in respect of accrued and/or accruing employee benefit obligations as provided for in the Approved Budget (solely to the extent of cash held in excess of such accrued obligations).

For the avoidance of doubt, the DIP Liens do not apply to and the DIP Collateral does not include:  (a) the Debtor's Leases; (b) any recoveries by settlement or otherwise, in respect of claims or causes of action to which the Debtor (or any successor or assign) may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the Debtor's estate under chapter 5 of the Bankruptcy Code; and (c) any recoveries by settlement or otherwise, in respect of fiduciary duty claims or causes of action to which the Debtor (or any successor or assign) may be entitled to assert against its directors and officers, including in respect to any proceeds recovered under any applicable insurance policies.

**F.**      **DIP Lien Priority**

    7.      The DIP Liens to be created and granted to the DIP Lenders, as provided herein, are:

    (a)      created pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code,

    (b)      other than as set forth in (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

    (c)      subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Credit Agreement, subject to the terms of this Final Order. The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case(s) under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Case. The DIP Liens shall not be subject to sections 510(c), 549, 550, or 551 of the Bankruptcy Code.

**G.**      **Enforceable Obligations**

    8.      The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtor, and shall be enforceable against the Debtor, its estate, and any successors thereto, and its creditors in accordance with their terms.

**H.**      **Protection of the DIP Lenders and Other Rights**

    9.      From and after the Petition Date, the Debtor shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Final Order, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement and this Final Order).

    10.      Upon the disposition of DIP Collateral and/or Prepetition Collateral, other than with respect to the sale of Inventory in the ordinary course of business (each such transaction a "***Sale***"), any such DIP

Collateral and/or Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Liens, and the DIP Liens; provided however, that such Prepetition Liens, Adequate Protection Liens, and DIP Liens shall attach to the proceeds of any such Sale ("*Sale Proceeds*") to the same extent, validity and priority as such Liens attached to the Prepetition Collateral and/or the DIP Collateral, respectively. Any such Sale Proceeds shall be promptly paid at closing on such Sale(s) (including if such Sale constitutes a DIP Maturity Event): first, to fund the Carve Out, including any accrued fees and expenses for Case Professionals provided in the Approved Budget (including the Committee Professional Fees) that have not yet been approved by the Court and paid to Case Professionals; and second, to the DIP Lenders for application to the allowed DIP Obligations in accordance with the terms of the DIP Credit Agreement.

11. The Debtor shall keep the DIP Lenders and the Committee fully informed of the Debtor's efforts to consummate a Sale(s) and any other sales of equity interests and/or assets of the Debtor after the Petition Date, and without limiting the generality of the foregoing, the Debtor shall (A) promptly provide to the DIP Lenders and the Committee copies of all offers for the purchase of any asset(s) and/or equity interests of any of the Debtor and copies of all bids from any potential purchaser, (B) provide, no less frequently than weekly, status updates on the Debtor's efforts to consummate a Sale(s) and/or any other sales, and (C) promptly advise the DIP Lenders and the Committee of any expressions of interest in any or all of the Debtor's assets and/or equity interests.

12. In connection with any sale or other dispositions of any assets of the Debtor, the DIP Lenders may seek to credit bid some or all of their claims, to extent of the outstanding DIP Obligations at the time of the credit bid, for the DIP Collateral (each a "*Credit Bid*") pursuant to section 363(k) of the Bankruptcy Code. A Credit Bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such Credit Bid holds a security interest. In all such instances, each of the DIP Lenders shall be considered a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

## I.  Access to Records; Reporting

13.    In addition to, and without limiting, whatever rights to access the DIP Lenders have under the DIP Financing Agreements, upon reasonable notice, at reasonable times during normal business hours, the Debtor shall permit representatives, agents, and employees of the DIP Lenders and the Committee: (i) to have access to and inspect the Debtor's properties, (ii) to examine the Debtor's books and records, (iii) to discuss the Debtor's affairs, finances, and condition with the Debtor's officers and financial advisors, and (iv) otherwise to have the full cooperation of the Debtor.  In addition, the Debtor shall provide to the DIP Lenders and the Committee all of the financial, collateral, and related reporting required under the DIP Financing Agreements as and when provided for therein, including weekly variance reports as set forth in section 7.16(c) of the DIP Credit Agreement.

## J.  Prepetition Indemnity Account

14.    Upon entry of this Final Order, the Debtor shall establish a segregated account in the control of the Prepetition Lender (the "***Prepetition Indemnity Account***"), into which the sum of $100,000.00 shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtor in favor of the Prepetition Lender under the Prepetition Financing Documents, including without limitation, the provisions of Section 11.5 of the Prepetition Credit Agreement (the "***Prepetition Indemnity Obligations***").

a)    The funds in the Prepetition Indemnity Account shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition Lender in connection with or responding to (a) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraphs 25-29 hereof, or (b) any Challenge Proceeding against any one or more of the Prepetition Lender related to the Prepetition Financing Documents, the Prepetition Liens, or the Prepetition Debt, whether in the Chapter 11 Case or independently in another forum, court, or venue; provided, that the interests of the Prepetition Lender in the funds deposited in the Prepetition Indemnity Account on account of the any Prepetition Indemnity Obligations shall be subject in all respects to the priority provisions set forth in the Prepetition Credit Agreement.

b)    The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and the funds therein and by a Lien on the Prepetition Collateral.

c)    The Prepetition Lender may apply amounts in the Prepetition Indemnity Account

against the Prepetition Indemnity Obligations as and when they arise, without further notice to or consent from the Debtor, the Committee, or any other parties in interest and without further order of this Court upon compliance with the provisions of Paragraph 46 below.

d)      In addition to the establishment and maintenance of the Prepetition Indemnity Account, until the Challenge Period Termination Date (as defined below) the Prepetition Lender, shall retain and maintain the Prepetition Liens as security for any the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account; provided, that (i) any such indemnification claim(s) shall (i) be subject to the terms of the Prepetition Financing Documents, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs 25-29 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).

e)      Upon the occurrence of the Challenge Period Termination Date, and provided that no Challenge Proceeding has commenced or any such Challenge Proceeding has been resolved by a final order of the Court in favor of the Prepetition Lender, the Prepetition Lender shall promptly return to the Debtor the remaining amount, if any, of the Prepetition Indemnity Account (if funded).

15.      Nothing herein shall impair or modify the Prepetition Lender's rights under section 507(b) of the Bankruptcy Code to seek additional or different adequate protection in addition to the establishment of the Prepetition Indemnity Account; provided, however, that (a) nothing herein shall impair the Debtor's or any other party in interest's right to seek to contest any request for additional or different adequate protection, and (b) any section 507(b) claim granted in the Chapter 11 Case to the Prepetition Lender shall be junior in right of payment to all DIP Obligations and subject to the Carve Out.

## K.      **Superpriority Administrative Claim Status**

16.      Subject to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

17.     Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations or with any other claims of the DIP Lenders arising hereunder.

## II.

### POST-PETITION LIEN PERFECTION

18.     This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.

19.     Notwithstanding the foregoing, the DIP Lenders may, in their respective discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.

20.     The Debtor shall execute and deliver to the DIP Lenders all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents as the DIP Lenders may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

21.     The DIP Lenders, in its sole discretion, may file a photocopy of the entered, docketed version of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtor has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Final Order.

22.     The DIP Lenders shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have co-equal rights with the Prepetition Lender and succeed to the rights of the Prepetition Lender with respect to all mortgages, security agreements, control agreements, and third party notifications in connection with the Prepetition Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of any Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

23.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

> (a)     permit the Debtor to grant the DIP Liens, and to incur all liabilities and obligations to the DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Final Order, and

> (b)     authorize the DIP Lenders to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Final Order.

## III.

### AUTHORIZATION FOR USE OF CASH COLLATERAL

24.     Pursuant to the terms and conditions of this Final Order, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtor is authorized to use Cash Collateral during Chapter 11 Case (and terminating upon notice being

126562684.1
OMC\4822-6654-8988.v1-9/24/21

provided by the DIP Lenders to the Debtor that a DIP Termination Event (as defined below) has occurred and is continuing), with any and all such Cash Collateral being available to the Debtor to satisfy obligations arising under and/or consistent with the Approved Budget and such other orders of the Court that may be entered upon consent of the DIP Lenders.

## IV.

### RESERVATION OF CERTAIN THIRD-PARTY RIGHTS AND BAR OF CHALLENGES AND CLAIMS

25.     Nothing in the Interim Order, the DIP Credit Agreement, the DIP Financing Agreements, or this Final Order shall prejudice whatever rights the Committee or any other party-in-interest (other than the Debtor) with requisite standing that has been sought and granted by this Court, including as granted in paragraph 27 herein, may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any one or more of the Prepetition Lender, the Prepetition Debt and/or the Prepetition Liens (collectively, a "***Challenge Proceeding***"), including, but not limited to, any of the following:

(a)     In the case of the Prepetition Lender, an objection to or challenge of the Debtor's Stipulations set forth in Paragraphs F(1) through F(7), including, but not limited to (i) the validity, extent, perfection, or priority of the security interests and Prepetition Liens of the Prepetition Lender in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Debt, or

(b)     a suit against the Prepetition Lender in connection with or related to the Prepetition Debt and/or Prepetition Liens, or the actions or inactions of the Prepetition Lender arising out of or related to the Prepetition Debt and/or Prepetition Liens;

provided however, that the Committee or any other party-in-interest with requisite standing that has been sought and granted by this Court, including as granted in paragraph 27 herein, must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against the Prepetition Lender in the nature of a setoff, counterclaim, or defense to the Prepetition Debt and/or Prepetition Liens (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code), by the later of (i) for the Committee, November 1, 2021, (ii) for any party-in-interest other than the Committee, October 31, 2021, or (iii) with respect to a chapter 11 trustee appointed

19

in the Chapter 11 Case, or any chapter 7 trustee appointed in a Successor Case prior to the expiration of the periods set forth in subsections (i) and (ii) above, no later than the date that is the later of (A) fourteen (14) days after the appointment of such trustee, or such other time as determined by the Court after motion and hearing, or (B) the expiration of the time periods set forth in the foregoing subsections (i) and (ii) above (the later of (i), (ii) or (iii), where applicable, the "*Challenge Period*"), and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge Proceeding has been commenced during the Challenge Period, shall be referred to as the "*Challenge Period Termination Date*."

26. The Challenge Period may only be extended (i) with the written consent of the Prepetition Lender prior to the expiration of the Challenge Period, and for the avoidance of doubt, any such extension shall only apply to the specific party as to whom such extension may be granted, or (ii) by further order of the Court after motion and a hearing on appropriate notice to the Prepetition Lender; <u>provided</u>, that the filing of a Challenge Standing Motion shall extend the Challenge Period with respect to that party only until two (2) business days after the Court approves the Challenge Standing Motion, or such other time period ordered by the Court in approving the Challenge Standing Motion. Nothing contained herein shall be construed as consent by the Prepetition Lender to any such extension or standing request, and the rights of the Prepetition Lender to oppose any such timely filed Challenge Standing Motion are fully preserved and reserved hereby, including, without limitation, any argument that a failure of the Committee or other third party to diligently and timely investigate either (i) the validity, extent, perfection, or priority of the security interests and Prepetition Liens in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Debt, to make a formal written request to the Prepetition Lender for information validating such prepetition claims and/or Liens prior to the expiration of the Challenge Period shall operate as a bar to any motion, application or other request by such party(ies) for an extension of the Challenge Period.  If upon consideration of the applicable Challenge Standing Motion the Court denies a grant of standing, the Challenge Period shall be deemed to have automatically and irrevocably expired effective as of such date.  If upon consideration of the applicable Challenge Standing Motion the Court grants the moving party standing to commence and prosecute a Challenge Proceeding, the Challenge Period

126562684.1
OMC\4822-6654-8988.v1-9/24/21

shall be deemed to have been automatically extended until the date that is the later of (x) two (2) business days after the grant of such standing, or (y) such other date as may be fixed by the Court in any order granting such standing.

27.     Upon entry of this Final Order, the Committee (but not any other party in interest) shall be vested and conferred with standing and authority to pursue any cause of action belonging to the Debtor or its estate in respect (i) of any Challenge Proceeding with respect to the Prepetition Financing Documents, the Prepetition Debt, and/or the Prepetition Liens; (ii) challenging the validity, priority, perfection, and extent of any pre-petition Junior Liens; and (iii) and D&O Claims.

28.     Only those parties in interest who commence a Challenge on or prior to the expiration of the Challenge Period may prosecute such Challenge Proceeding.  As to (x) any parties in interest, including the Committee, who fail to file a Challenge Proceeding on or prior to the expiration of the Challenge Period, or if any such Challenge Proceeding is filed and overruled or otherwise finally resolved or adjudicated in favor of the Prepetition Lender, or (y) any and all matters that are not expressly the subject of a timely Challenge Proceeding: (1) any and all such challenges by any party (including, without limitation, the Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtor's Chapter 11 Case, or a chapter 7 trustee, any examiner or any other estate representative appointed in a Successor Case), ***shall be deemed to be forever waived and barred***, (2) all of the findings, Debtor's Stipulations, waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the claims, liens, and interests of the Prepetition Lender shall be of full force and effect and forever binding upon the Debtor's estate and all creditors, interest holders, and other parties in interest in the Chapter 11 Case and any Successor Case, and (3) any and all claims or causes of action against the Prepetition Lender relating in any way to the Prepetition Financing Documents, Prepetition Debt, and Prepetition Liens, shall be deemed to have been released by the Debtor's estate, all creditors, interest holders, and other parties in interest in the Chapter 11 Case and any Successor Case.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

29.     To the extent any such Challenge Proceeding is commenced, the Prepetition Lender shall be entitled to include the costs and expenses, including, but not limited to, reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the Prepetition Debt and Prepetition Liens of the Prepetition Lender to the extent permitted pursuant to the applicable Prepetition Financing Documents.  To the extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Lender shall be entitled to include such costs and expenses, including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of such party's prepetition claim which shall be reimbursed by the Debtor, including (x) each month as provided for in Paragraph 46, below and (y) where applicable, out of the Prepetition Indemnity Account; provided, that (i) any such reimbursement and/or indemnification claim(s) shall (i) be subject to the terms of the Prepetition Financing Documents, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs 25-29 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).  In addition to any other provisions in the Interim Order and this Final Order, the Prepetition Indemnity Account shall be maintained until the final resolution of all such objections or claims against the Prepetition Lender.  The Debtor shall remain liable to the Prepetition Lender for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the Prepetition Indemnity Account is insufficient to satisfy the Prepetition Indemnity Obligations in full.

## V.

### CARVE OUT AND PAYMENT OF PROFESSIONALS.

30.     Carve-Out.

(a)     Subject to the terms and conditions contained in this Paragraph 30, the DIP Liens, and the DIP Lenders' Superpriority Claims are all subordinate to the following (collectively, the "Carve Out"):

1)     All fees required to be paid to the Clerk of the Bankruptcy Court and any quarterly or other fees payable to the United States Trustee pursuant to, inter alia, 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, and Section 3717 of title 31 of the United States Code, incurred before the Termination Declaration Date, defined below (collectively, the "Statutory Fees");

2)     professional fees of, and costs and expenses incurred by, professionals or professional firms retained by the Debtor and the Committee (collectively, the "Case Professionals") and allowed by the Bankruptcy Court (whether such approval occurs prior to or after the occurrence of the Termination Declaration Date (defined below) "Allowed Professional Fees") in an amount not to exceed the lesser of: (x) the actual Allowed Professional Fees incurred by each such Case Professional through the Termination Declaration Date, and (y) the amount reflected in the Approved Budget for each such Case Professional (and this Final Order in the case of the Committee Professional Fees), in each case, through the Termination Declaration Date (the lesser of (x) and (y) being the "Pre-Carveout Trigger Notice Cap")[6];

3)     the allowed professional fees and costs and expenses incurred by Case Professionals incurred after the occurrence of the Termination Declaration Date in an aggregate amount not to exceed $150,000 ("Post-Carveout Trigger Notice Cap"); and

4)     for the reasonable fees and expenses incurred by any Chapter 7 trustee appointed by the Court under section 726(b) of the Bankruptcy Code, not to exceed $25,000 in the aggregate;

For purposes of the foregoing, "Carveout Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to counsel to the Debtor, counsel to the Committee, and the U.S. Trustee, which notice (a) may be delivered following the occurrence of a DIP Termination Event (as defined below), and (b) must be delivered following either (i) the sale of all or substantially all of the Debtor's assets, or (ii) payment in full of all DIP Obligations stating that the Post-Carveout Trigger Notice Cap has been invoked.

(b)     Notwithstanding anything to the contrary in this Final Order, in no way shall the Approved Budget (including the Committee Professional Fees), the Carve Out, the Pre-Carveout Trigger

---

[6]     For the avoidance of doubt, to the extent that a particular Case Professional is over-budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under-budget in prior or subsequent periods prior to the delivery of a Carveout Trigger Notice; and to the extent a particular Case Professional is under-budget during any measurement period, it shall be entitled to carry-over such budget excess with any amounts such Case Professional is over-budget in any subsequent periods prior to the delivery of a Carveout Trigger Notice.

23

Cap, the Post-Carveout Trigger Notice Cap, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees or Statutory Fees due and payable by the Debtor. For the avoidance of doubt and notwithstanding anything to the contrary herein or the DIP Financing Agreements, the Carve Out shall be senior to all liens and claims securing the DIP Collateral and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)     Except as provided herein, the Carve Out shall exclude, and no proceeds of the DIP Facility, DIP Collateral, including any Cash Collateral, shall be used to pay, any fees and expenses incurred in connection with the investigation, assertion or joinder in any Challenge Proceeding or any other claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Liens, (iii) the Prepetition Debt, or (iv) the Prepetition Liens, or (B) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lenders' assertion or enforcement of the DIP Liens and security interests, or its efforts to realize upon any DIP Collateral; provided, however, that such exclusion does not encompass any investigative work conducted by the Case Professionals retained by the Committee, but only up to $100,000.00 of the Carve Out may be used for such investigative work.

(d)     Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or expenses of the Debtor, of the Committee, or of any other person or shall affect the right of the DIP Lenders, the U.S. Trustee, or any other party in interest, to object to the allowance and payment of such fees and expenses. Furthermore, nothing in this Final Order or otherwise shall be construed: (i) to obligate the DIP Lenders in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement, unless those professional fees and expenses are allowed and provided for in the Approved Budget or in this Final Order; or (ii) to increase the Carve Out if allowed fees and/or disbursements are higher in fact than the amounts subject to the Carve Out as set forth in this Final Order.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

# VI.

## MATURITY; DIP TERMINATION EVENTS; REMEDIES

### A.     Maturity

31.     All DIP Obligations shall be due and payable on the date that is the earliest to occur of any of the following (each, a "***DIP Maturity Event***"):

        (a)     November 1, 2021; or

        (b)     the occurrence of a DIP Termination Event.

32.     Unless and until the DIP Obligations has been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lenders, in its sole and exclusive discretion have been made) and all Commitments have been irrevocably terminated, the protections afforded to the DIP Lenders pursuant to this Final Order and under the DIP Credit Agreement, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan or reorganization or liquidation or converting the Chapter 11 Case into a Successor Case, and the DIP Liens, the DIP Superpriority Claims shall continue in the Chapter 11 Case and in any Successor Case, and such DIP Liens and DIP Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

### B.     DIP Termination Events

33.     All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (the earliest such date, herein defined as the "Termination Date"):

        (i)     the entry of an order of this Court terminating the right of the Debtor to use Cash Collateral;

        (ii)     without the prior written consent of the DIP Lenders, the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

        (iii)     without the prior written consent of the DIP Lenders, the appointment in the Chapter 11 Case of a trustee or an examiner with expanded powers;

        (iv)     this Final Order shall cease, for any reason, to be in full force and effect, or the Debtor shall so assert in any motion filed with the Bankruptcy Court, or any liens or claims created in favor of the DIP Lenders under this Final Order shall cease to be enforceable and of the same

effect and priority purported to be created hereby, or the Debtor shall so assert in any motion filed with the Bankruptcy Court;

(v) without the prior written consent of the DIP Lenders, the entry of an order of the Court sustaining any Challenge Proceeding with respect to the extent, validity, enforceability, priority, perfection and/or non-avoidability of the Prepetition Debt or the Prepetition Liens upon the Prepetition Collateral;

(vi) an order of this Court shall be entered reversing, staying, vacating or otherwise modifying this Final Order or any provision contained herein without the prior written consent of the DIP Lenders;

(vii) the actual amount of (a) "Cash Receipts"; (b) "Total Cash Disbursements"; and (c) "Professional Fees" in any Measurement Period deviates beyond the Permitted Variance as set forth in the DIP Credit Agreement or as otherwise agreed to by the DIP Lenders from the amounts set forth in the Approved Budget for such Measurement Period, without, in each instance, the prior written consent of the DIP Lenders;

(viii) any material misrepresentation by the Debtor in the financial reporting or certifications to be provided by the Debtor to the DIP Lenders under the DIP Credit Agreement and/or this Interim Order;

(x) without the prior written consent of the DIP Lenders, the Debtor proposes or supports any plan of reorganization or sale of all or substantially all the Debtor's assets or entry of any order confirming any such plan or sale that is not conditioned on the payment in full in cash, on the effective date of such plan or sale, of all DIP Obligations;

(xi) the Debtor fails to provide any additional adequate protection ordered by the Court and such failure shall continue unremedied for more than three (3) business days after written notice thereof;

(xii) without the prior written consent of the DIP Lenders, the Debtor fails to satisfy any Milestone (as defined in the DIP Credit Agreement);

(xiii) without the prior written consent of the DIP Lenders, the obtaining after the Petition Date of credit or the incurring of indebtedness that is (A) secured by a security interest, mortgage or other lien on all or any portion of the DIP Collateral that is equal to or senior to any security interest, mortgage or other lien of the DIP Lenders, or (B) entitled to priority administrative status which is equal or senior to that granted to the DIP Lenders herein, including, without limitation, the DIP Superpriority Claims;

(xiv) without the prior written consent of the DIP Lenders, the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on or security interest in any DIP Collateral that is senior to any liens or security interests of the DIP Lenders having a value greater than $10,000, or (B) the granting (whether voluntary or involuntary) of any lien on any DIP Collateral to any state or local environmental or regulatory agency or authority that is senior to any liens or security interests of the DIP Lenders;

(xv) without the prior written consent of the DIP Lenders, the return by the Debtor of more than $50,000 of the Debtor's inventory pursuant to section 546(h) of the Bankruptcy Code;

(xvi)    the Debtor's failure to perform, in any respect, any of its material obligations under the DIP Credit Agreement and/or this Final Order, and/or the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement;

(xvii)   without the prior written consent of the DIP Lenders, the entry of an order of the Court surcharging the DIP Collateral under section 506(c) of the Bankruptcy Code; or

(xviii)  the Debtor's failure to indefeasibly pay in full in cash all DIP Obligations on or prior to the occurrence of a DIP Maturity Event;

(each of the forgoing, a "DIP Termination Event").

## C.    Rights and Remedies Upon DIP Termination Event

34.    Any automatic stay otherwise applicable to the DIP Lenders is hereby modified so that after the occurrence of any DIP Termination Event, upon seven (7) days prior written notice (a "***Remedies Notice***") of such occurrence (the "***Remedies Notice Period***"), in each case given to each of (v) the Debtor, (w) counsel to the Debtor, (x) counsel to the Prepetition Lender, (y) counsel to the Committee, and (z) the U.S. Trustee, the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Credit Agreement.

35.    Upon the service of a Remedies Notice after the occurrence of a DIP Termination Event:

(a)    any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtor pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion and shall constitute part of the DIP Obligations for all purposes under the DIP Credit Agreement and hereunder;

(b)    the Debtor shall continue to deliver and cause the delivery of the proceeds of the DIP Collateral to the DIP Lenders as provided in this Final Order and in the DIP Credit Agreement;

(c)    the DIP Lenders shall continue to apply such proceeds in accordance with the provisions of this Final Order and the DIP Credit Agreement; and

(d)    the Debtor shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out, as provided in the DIP Credit Agreement and this Final Order.

36.    Following the giving of a Remedies Notice by the DIP Lenders, the Debtor and the Committee shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than five (5) business days' notice to the DIP Lenders.  If (x) the Debtor or the Committee do not

contest the occurrence of a DIP Termination Event and/or the right of the DIP Lenders to exercise their remedies, or (y) the Debtor or the Committee do timely contest the occurrence of a DIP Termination Event and/or the right of the DIP Lenders to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Lenders shall automatically terminate at the end of the Remedies Notice Period.

37.    Subject to the provisions of Paragraphs 34-36 above, upon the occurrence of a DIP Termination Event, the DIP Lenders are authorized to exercise their remedies and proceed under or pursuant to the DIP Credit Agreement; except that, (A) with respect to any of the Debtor's leasehold locations, if any, the DIP Lenders' rights shall be limited to such rights (i) as may be ordered by this Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Lenders; or (iii) which the DIP Lenders have under applicable non-bankruptcy law.

38.    Nothing included herein shall prejudice, impair or otherwise affect the DIP Lenders' rights to seek any other or supplemental relief from the Court in respect of the Debtor, nor the DIP Lenders' rights, as provided herein and in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

**D.    No Waiver of Remedies**

39.    The delay in or the failure of the DIP Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Lenders' rights and remedies. Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lenders to: **(i)** request conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case, or the appointment of a trustee in the Chapter 11 Case; **(ii)** propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan of reorganization or liquidation; or **(iii) subject to section 362 of the Bankruptcy Code** exercise any of the rights, claims, or

privileges (whether legal, equitable, or otherwise) the DIP Lenders may have.

## VII.

### CERTAIN LIMITING PROVISIONS

**A.    Section 506(c) Claims and Waiver**

40.     Nothing contained in this Final Order shall be deemed a consent by the DIP Lenders to any charge, Lien, assessment, or claim against the DIP Collateral or the DIP Liens under section 506(c) of the Bankruptcy Code or otherwise.

41.     As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Credit Agreement, upon entry of this Final Order the Debtor (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the DIP Lenders and the DIP Collateral.

**B.    Proceeds of Subsequent Financing**

42.     If at any time prior to the irrevocable repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtor, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately turned over <u>first</u> to the DIP Lenders to be applied in reduction of the DIP Obligations until paid in full, and <u>second</u>, to the Debtor to be used in accordance with and subject to the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

**C.    No Priming of DIP Facility**

43.     In entering into the DIP Financing Agreements, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Obligations have been irrevocably paid in full in cash (or other arrangements for payment of thereof satisfactory to the DIP Lenders, in their sole and exclusive discretion,

29

have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtor shall not (unless otherwise agreed to by the DIP Lenders, in their sole discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders under the Interim Order or this Final Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.

## VIII.

### OTHER RIGHTS AND OBLIGATIONS

**A.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order**

44.    Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created hereby.

45.    Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Final Order, any claim or protection granted to the DIP Lenders hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the DIP Lenders shall be governed in all respects by the original provisions of this Final Order, and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.    DIP Lenders' and Prepetition Lender's Expenses**

46.    Subject to the extent of a successful Fee Objection (defined below) as set forth below, the Debtor shall pay all reasonable out-of-pocket costs and expenses of the Prepetition Lender and the DIP

Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtor in any testing related to compliance with the Approved Budget).  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtor, the U.S. Trustee, or the Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Lenders and/or the Prepetition Lender be required to comply with the Bankruptcy Court's fee guidelines; provided, however, the Debtor shall promptly provide to the U.S. Trustee and the Committee a copy of any invoices received from the DIP Lenders and/or the Prepetition Lender for professional fees and expenses during the pendency of the Chapter 11 Case.  Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information).  If the Debtor, U.S. Trustee or the Committee object to the reasonableness of the invoices submitted by the DIP Lenders and/or the Prepetition Lender, and the parties cannot resolve such objection within fifteen (15) days of receipt of such invoices, the Debtor, U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the applicable DIP Lender or Prepetition Lender an objection (a "*Fee Objection*") limited to the issue of reasonableness of such fees and expenses.  The Debtor shall promptly pay, and/or the DIP Lenders are hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely received, the Debtor shall promptly pay, and/or the DIP Lenders are hereby authorized to make an advance under the DIP Facility to timely pay, the undisputed amount only of the invoice(s) that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice(s) if the parties are unable to resolve the Fee Objection.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

## C.     **Binding Effect**

47.     The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lenders, the Prepetition Lender, the Debtor, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estates of the Debtor), and the Committee (subject to the provisions of Paragraphs 25-29 above), whether in the Chapter 11 Case, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

## D.     **No Third Party Rights**

48.     Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtor and the DIP Lenders.

## E.     **No Marshaling**

49.     The DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

## F.     **Section 552(b) of the Bankruptcy Code**

50.     The DIP Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtor shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Lenders with respect to proceeds, product, offspring, or profits of any of the DIP Collateral.

## G.     **Amendments**

51.     The Debtor and the DIP Lenders may amend, modify, supplement, or waive any provision of the DIP Credit Agreement without further approval of this Court, but only after notice to the U.S. Trustee and the Committee; provided, however, that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court, and the U.S. Trustee, the Committee, and any party in interest shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; provided, further, that if the U. S. Trustee,

32

the Committee or any party in interest timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to a further order of this Court after notice and a hearing. For purposes of this Paragraph 51, a "material" amendment means: any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the DIP Commitments, (iii) changes the maturity date of the DIP Facility or any DIP Maturity Date to a date sooner than that which is provided under the DIP Credit Agreement and this Final Order as of the date hereof, (iv) amends any Event of Default under the DIP Credit Agreement to make same more restrictive than exists as of the date hereof, (v) revises any case or sale process milestone set forth in the DIP Credit Agreement in a manner that reduces or shortens the time periods provided for in the DIP Credit Agreement, or (vi) otherwise modifies the DIP Credit Agreement in a manner materially less favorable to the Debtor. All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtor and the DIP Lenders and, if required, approved by this Court.

## H. Survival of Final Order

52. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

(a) confirming any plan in the Chapter 11 Case,

(b) converting the Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code,

(c) dismissing the Chapter 11 Case,

(d) withdrawing of the reference of the Chapter 11 Case from this Court, or

(e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court.

53. The terms and provisions of this Final Order, including the DIP Protections granted pursuant to this Final Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of any order described in Paragraph 52 and such DIP Protections and protections for the Prepetition Lender shall maintain their priority as provided by this Final Order until all of the DIP

Obligations of the Debtor to the DIP Lenders pursuant to the DIP Credit Agreement has been irrevocably paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

**I.**     **Inconsistency**

54.     In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, the Interim Order, and this Final Order, the provisions of this Final Order shall govern and control.

**J.**     **Enforceability**

55.     This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry hereof.

**K.**     **Objections Overruled**

56.     All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

**L.**     **Waiver of Any Applicable Stay**

57.     Any applicable stay (including, without limitation, under Bankruptcy Rules 4001, 6003 or 6004(h)) is hereby waived and shall not apply to this Final Order.

**M.**     **Proofs of Claim**

58.     The Prepetition Lender and the DIP Lenders will not be required to file proofs of claim in the Chapter 11 Case or in any Successor Case.

**N.**     **Headings**

59.     The headings in this Final Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Final Order.

**O.**     **Retention of Jurisdiction**

60.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

**P.**     **DIP Credit Agreement Amendment**

34

61.     Anything in Section 7.15(b)(ii) of the DIP Credit Agreement to the contrary notwithstanding, the "Milestone" for the Debtor's receipt of an enforceable asset purchase agreement ("***Stalking Horse APA***") providing for the sale of all or substantially all of the Debtor's assets, which Stalking Horse APA must be acceptable to each of the DIP Lenders and the Committee, in their respective reasonable discretion, shall be 5:00 p.m. (prevailing Eastern time) on September 30, 2021 (the "***Stalking Horse Milestone***").  The Stalking Horse Milestone may be extended upon consent of the DIP Lenders without further order of the Court.  Upon satisfaction of the Stalking Horse Milestone as determined by the DIP Lender in its reasonable discretion (which reasonable discretion may be challenged by the Debtor or the Committee), the interest rate under the DIP Credit Agreement shall revert to the standard non-default interest rate (in the event that the default rate had been previously instituted).

62.     Solely in the event the Debtor executes a satisfactory Stalking Horse APA on or before the Stalking Horse Milestone, Section 7.15(b)(iii)-(vi) of the DIP Credit Agreement shall be amended and restated as follows:

> "(iii)    The Bankruptcy Court shall hold a hearing in respect of the Sale Motion at the earliest date consistent with the court's calendar and shall enter an order, in form and substance reasonably satisfactory to the Lender, establishing bidding procedures, which shall include, without limitation, a bid deadline of October 22, 2021;
>
> (iv)    On or before October 25, 2021, the Borrowers shall conduct an auction among all qualified bidders (the "Auction"), with the highest and best bid or combination of bids being selected, in consultation with the Lender and the Committee appointed in the Case (collectively, the "Successful Bids").  Any objections to the proposed sale shall be filed on or before October 27, 2021;
>
> (v)    On or before October 28, 2021 (provided that the court calendar can accommodate), the Bankruptcy Court shall hold a hearing (the "Sale Approval Hearing") in respect of the Successful Bids and shall enter one or more orders, each in form and substance reasonably satisfactory to the Lender, approving the Successful Bids (each a "Sale Approval Order"); and
>
> (vi)    On or before November 1, 2021, the closing of the transactions contemplated by the Successful Bids and approved pursuant to the Sale Approval Order shall be consummated and the Borrowers and/or other Loan Parties shall have indefeasibly paid in full in cash all Loans (and to the extent not previously paid in full, all Existing Liabilities), plus any accrued and unpaid interest and fees thereon, and irrevocably terminated the Commitments."

126562684.1
OMC\4822-6654-8988.v1-9/24/21

63.     Except as otherwise provided in this Section P, the DIP Credit Agreement shall remain in full force and effect in accordance with its terms and this Final Order.

126562684.1
OMC\4822-6654-8988.v1-9/24/21

**Exhibit "1"**

**Approved Budget**

**Aluminum Shapes LLC**
**DIP Budget**
**13 Week Cash Flow**
**(000s)**
**DRAFT - FOR DISCUSSION PURPOSES ONLY**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending 8/20/21 | Week Ending 8/27/21 | Week Ending 9/3/21 | Week Ending 9/10/21 | Week Ending 9/17/21 | Week Ending 9/24/21 | Week Ending 10/1/21 | Week Ending 10/8/21 | Week Ending 10/15/21 | Week Ending 10/22/21 | Week Ending 10/29/21 | Week Ending 11/5/21 | Week Ending 11/12/21 | 13 Week Total |
| Sales - Lbs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales - Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Receipts** | | | | | | | | | | | | | | |
| Existing AR | 14 | 57 | 110 | 108 | 48 | 11 | 8 | 10 | 327 | - | - | - | - | 692 |
| Forecasted AR | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Scrap Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Funding | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 650 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **64** | **107** | **160** | **158** | **98** | **61** | **58** | **60** | **377** | **50** | **50** | **50** | **50** | **1,342** |
| Metal Purchases - Lbs | 40 | - | - | - | - | - | - | - | - | - | - | - | - | 40 |
| Metal Purchases - $ | 65 | - | - | - | - | - | - | - | - | - | - | - | - | 65 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll & Benefits | 124 | 232 | 216 | 232 | 66 | 231 | 144 | 300 | 65 | 230 | 71 | 373 | 65 | 2,350 |
| Insurance | 39 | - | - | 45 | - | 27 | - | - | - | 27 | - | - | - | 138 |
| Utilities | | 125 | | | | | 175 | | | | | 175 | | 475 |
| Repairs and Maintenance | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 130 |
| Taxes | - | 66 | - | - | - | - | - | - | - | - | - | - | - | 66 |
| Legacy Payables | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 650 |
| **Total Operating Disbursements** | **223** | **483** | **276** | **337** | **126** | **318** | **379** | **360** | **125** | **317** | **131** | **608** | **125** | **3,809** |
| **Net Cash Flow from Operations** | **(224)** | **(376)** | **(116)** | **(180)** | **(27)** | **(258)** | **(321)** | **(301)** | **251** | **(267)** | **(81)** | **(558)** | **(75)** | **(2,532)** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| CAPEX | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest and Fees | 620 | - | 123 | - | - | - | 152 | - | - | - | - | 175 | - | 1,070 |
| Utility Deposits | - | 200 | - | - | - | - | - | - | - | - | - | - | - | 200 |
| D&O Tail Policy | - | 500 | - | - | - | - | - | - | - | - | - | - | - | 500 |
| Professional Fees | - | 118 | 153 | 118 | 218 | 268 | 253 | 118 | 168 | 268 | 118 | 218 | 158 | 2,176 |
| **Total Non-Operating Disbursements** | **620** | **818** | **276** | **118** | **218** | **268** | **405** | **118** | **168** | **268** | **118** | **393** | **158** | **3,946** |
| **Total Net Cash Flow** | **(844)** | **(1,194)** | **(392)** | **(298)** | **(245)** | **(526)** | **(726)** | **(419)** | **83** | **(535)** | **(199)** | **(950)** | **(233)** | **(6,477)** |
| Beginning Cash | 49 | (795) | (1,989) | (2,381) | (2,679) | (2,924) | (3,450) | (4,176) | (4,594) | (4,511) | (5,046) | (5,245) | (6,195) | 49 |
| Ending Cash | (795) | (1,989) | (2,381) | (2,679) | (2,924) | (3,450) | (4,176) | (4,594) | (4,511) | (5,046) | (5,245) | (6,195) | (6,429) | (6,429) |
| AR Balance | 699 | 642 | 531 | 424 | 376 | 365 | 357 | 347 | 21 | 21 | 21 | 21 | 21 | 21 |
| **Loan Balance** | | | | | | | | | | | | | | |
| Beginning Balance | 9,271 | 10,066 | 11,260 | 11,652 | 11,949 | 12,195 | 12,721 | 13,446 | 13,865 | 13,781 | 14,317 | 14,515 | 15,466 | 9,271 |
| Plus: Advances | 795 | 1,194 | 392 | 298 | 245 | 526 | 726 | 419 | (83) | 535 | 199 | 950 | 233 | 6,429 |
| Less: Paydowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Balance** | **10,066** | **11,260** | **11,652** | **11,949** | **12,195** | **12,721** | **13,446** | **13,865** | **13,781** | **14,317** | **14,515** | **15,466** | **15,699** | **15,699** |