**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

*Caption in Compliance with D.N.J. LBR 9004-1(b)*

**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**

Edmond M. George, Esquire
Michael D. Vagnoni, Esquire (pro hac vice)
Turner N. Falk, Esquire
1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
Telephone: (856) 795-3300
Facsimile: (856) 482-0504
E-mail:   edmond.george@obermayer.com
          michael.vagnoni@obermayer.com
          turner.falk@obermayer.com

Proposed Counsel to the Debtor
and Debtor in Possession

| | |
|---|---|
| In re: | Chapter 11 |
| ALUMINUM SHAPES, L.L.C., | Case No. 21-16520-JNP |
| Debtor. | |

**DEBTOR'S EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PLAN, (II) APPROVING DEBTOR'S KEY EMPLOYEE INCENTIVE PLAN, AND (III) GRANTING RELATED RELIEF**

Debtor Aluminum Shapes, L.L.C. (the "Debtor"), by and through its undersigned counsel, hereby moves this Court for entry of an Order pursuant to sections 105(a), 363(b), 503(b), 503(c) and 507(a)(2) of Title 11 of the United States Code (the "Bankruptcy Code"): (a) authorizing, but not directing, the Debtor to implement the proposed key employee retention plan (the "KERP"), (b) authorizing, but not directing, the Debtor to implement the proposed key employee incentive plan (the "KEIP"), (c) granting administrative expense priority status to the retention and incentive payments associated with the KERP and the KEIP, respectively, and (d) granting such other relief as the Court deems appropriate (the "Motion"). In support of the Motion, the Debtor relies upon and incorporates by reference the Declarations of Solomon Rosenthal and Justin Magner in

Support of Debtor's Motion for Entry of an Order Approving Debtor's Key Employee Retention Plan and Key Employee Incentive Plan (the "Declaration"), attached respectively as **Exhibits "A" and "B"** hereto. In further support of the Motion, the Debtor respectfully represents as follows:

## I.    JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105(a), 363(b), 503(b), 503(c), and 507(a)(2).

## II.    BACKGROUND

### A.    General Debtor Background

4.      On August 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage (the "Court").

5.      No request has been made for the appointment of a trustee or examiner; an official committee of unsecured creditors has been established in this case.

6.      The Debtor is an industry leader in the fabrication, processing, and extruding of aluminum metals and operates out of a single facility located at 9000 River Road, Delair, New Jersey (the "Business"), consisting of approximately 500,000 square feet, including a cast house, foundry, and processing area (the "Real Property"). See First Day Declaration of Jordan Meyers if Support of First Day Motions. (Bkr. DI #17)

7.      As of the Petition Date, the Debtor employed approximately 111 employees, including approximately fifty (50) full-time salaried employees and sixty-one (61) hourly

employees (collectively, the "Employees").

8.      On June 18, 2021, the Debtor engaged Cowen and Company, LLC ("Cowen") as investment banker to explore a sale of the Debtor's Business or assets (the "Assets"). Based on market feedback, the Debtor, in consultation with its advisors, has determined that a continued operation of the Business by the Debtor is not viable or achievable under the current financial circumstances.

9.      Since the Petition Date, the Debtor has been engaged in negotiations to sell substantially all of its Assets, either to a strategic purchaser or a real estate purchaser.  To that end, the Debtor filed a motion to approve bid procedures.  This Court approved the bid procedures by a September 30, 2021 order (DI #122).

10.     The Debtor's Assets are presently scheduled to be auctioned on October 25, 2021.

11.     While the Debtor has provided due diligence information to all interested purchasers, the Debtor submits that a strategic purchaser that will buy the Business as a going concern will likely offer the highest and best price and preserve the jobs of the Employees.

12.     In order to attract the highest and best offer from a strategic purchaser, the Debtor desires to retain certain specific employees whose expertise is essential to the smooth operation of a going-concern Business. Further, certain Employees critical to the Debtor's sale efforts must be retained to allow full exposure of the Debtor's Assets to the many prospective purchasers who tour the Debtor's facility on a near daily basis.

13.     The Declaration of Justin Magner, attached hereto, is being filed under seal, by separate motion, due to the sensitive nature of the KERP and the KEIP, and due the sensitive nature of Cowen's calculations in designing the KERP and the KEIP.

B.      **The Proposed KERP**

14.     As a necessary step to ensure that the Debtor's key Employees are adequately

compensated and retained, so as to achieve the Debtor's operational sales goals, and to financial

targets and implement the Debtor's strategic priorities including the sale process, the Debtor

developed the KERP.

15.     In developing the KERP, the Debtor worked closely with Cowen to create a KERP

that would provide the most value to the Debtor's estate by keeping key Employees working

through a sale of the Debtor's Assets.

16.     In addition to providing value to the Debtor's estate, the goals of the KERP are also

to keep key Employees working through the sale of the Debtor and also assuage concerns many

Employees have concerning their compensation during the Debtor's sale process.

17.     The KERP covers nine (9) Employees, none of whom are insiders or managers, and

all of whom the Debtor believes are essential to the Debtor's continued operation and success prior

to, during, and after the Debtor's sale (the "KERP Participants"). The KERP Participants have

been and continue to be a vital part of the Debtor's sale process.  These Employees actively

participate in the sales process by demonstrating processes, walking prospective purchasers

through inquiries about the Debtors operations, while continuing to control the Debtor's regular

business. These additional undertakings are important to the sales process.

18.     The KERP includes payout to the KERP Participants for Paid Time Off ("PTO"),

as PTO payout has been a hotly discussed topic among Employees since the Petition Date, and

Employees have been taking an increased amount of PTO since the petition date.

19.     In addition, preservation of employees is important for a strategic purchaser. The

KERP is necessary as, since the Petition Date, Employees have been resigning, and the Debtor

4

wishes to implement the KERP in order to assure strategic purchasers that Employees will not resign or otherwise leave.

20.      Certain strategic purchasers have indicated a potential desire to keep the Debtor's workforce intact. Though, these parties may or may not bid, ensuring the employees are retained preserves the Debtor's ability to attract these parties and achieve going concern value.

21.      Specifically, the Debtor believes the KERP Participants are essential to the Debtor's Business for the following reasons:

a.      **Marie Feeney, Janet Divencentis, Cianel Palmer**

Key to maintaining customer contacts and orders. Retention will result in net receipts, which will add cash and value to the Debtor's estate. Additionally, retention is needed with respect to meetings with prospective strategic buyers in order to provide historic, present, and future customers and sales.

b.      **Susan Agin**

Retention is needed to ensure staffing is appropriate to fulfill orders. Retention is especially needed given the increased usage of PTO by the Debtor's employees since the Petition Date.  Additionally, retention is needed so as to assist in the hosting of the many site visits with potential strategic and real estate purchasers.

c.      **Larry Bobrowski**

Retention is necessary due to extensive knowledge of the history of the building and grounds. Additionally, retention is needed to answer questions of potential strategic and real estate purchasers related to the history of

5

construction and equipment and to co-host site visits by potential real estate

purchasers

d.     **<u>Jim Whitaker</u>**

Retention needed to procure and facilitate metal for customer orders

resulting in added cash and value to the Debtor's estate.  Additionally,

retention is needed in meetings and calls with potential strategic purchasers

regarding the availability of scrap, prime, and raw materials so potential

strategic purchasers can better understand the prospects and requirements

of operating the foundry.

e.     **<u>Cheryl Drach</u>**

Retention needed for consulting with potential purchasers' counsel

regarding environmental and permitting for the real estate.

f.     **<u>Lori Scarfo</u>**

Retention needed for invoicing and billing as well as processing incoming

invoices and accounting entries.

g.     **<u>Cameron Colston</u>**

Responsible for maintaining the condition of the grounds, buildings,

vehicles, and facility. This includes care and maintenance of the facilities,

and having the facility prepared for ongoing regulatory inspections.

Additionally serves as host to all potential real estate and strategic

purchaser site visits, which has, along with the rest of the sales process,

resulted in numerous extra hours of time worked.

22.     The KERP is further broken down and explained in the document attached as

**Exhibit "A"** to the Declaration of Justin Magner.

23.     Both the Debtor and Cowen submit the KERP, as proposed, is reasonable, made

in the best business judgment of the Debtor, and in line with industry standards.

**C.     The Proposed KEIP**

24.     As a necessary step to ensure that the Debtor's key Employees are adequately

incentivized to achieve the Debtor's operating and financial targets and implement the Debtor's

strategic priorities including the sale process, the Debtor developed the KEIP.

25.     The Debtor worked closely with Cowen in order to create a KEIP that would

provide the most value to the Debtor's estate by achieving the best possible sale price for the

Debtor.

26.     In addition to providing value to the Debtor's estate, the goal of the KEIP is to

incentivize key Employees to rise to the occasion up until and through the sale of the Debtor in

order to reach certain targeted sale prices (the "KEIP Targets").

27.     The KEIP consists of four (4) employees, all of whom the Debtor believes are

essential to the Debtor's continued operation and success prior to, during, and after the Debtor's

sale, and are essential to effectuating a successful sale (the "KEIP Participants"). The KEIP

Participants are instrumental in maximizing the Debtor's sale price, thus providing the most value

to the Debtor's estate and its creditors.

28.     Throughout the Debtor's sale process, the KEIP Participants have taken on

numerous extra duties and responsibilities, including, but not limited to marketing the Debtor for

sale, and guiding potential purchasers on tours of the Debtor's facilities, negotiation of sales terms,

Employee retention issues; and addressing substantial creditor pressure.

29.     Specifically, the Debtor believes the KEIP Participants are essential to the Debtor's business and to effectuating a successful sale for the following reasons:

a.     **<u>John Anning</u>**

The technical expert of the Debtor, and as such, is vital in discussions with strategic buyers regarding the Debtor's capabilities. He has over thirty (30) years of industry experience and is well known and respected throughout the aluminum industry. Additionally, he is one of the hosts in potential strategic purchaser site visits.

b.     **<u>Joe Stockette</u>**

Integral in computing and completing the Debtor's financials including monthly operating reports.  Additionally, he is key with respect to strategic buyers to help them better understand the Debtor's financials, models, and explain key metrics that affect financial results.

c.     **<u>Doug Bathauer</u>**

Chief Operating Officer ("COO") of the Debtor and has an in depth understanding of the Debtor's finances and operations. Since filing, his responsibilities have substantially increased. He provides forecasting and operational guidance to both the Debtor and potential purchasers.

d.     **<u>Solomon Rosenthal</u>**

Chief Operating Officer ("CEO") of the Debtor. Since filing, his responsibilities have significantly increased. Solomon is the Debtor's principal negotiator for transactions involving potential purchasers. He directs the activities of the Debtor's numerous professionals and advisors.

OMC\4830-6080-6141.v3-10/19/21

30.     The KEIP consists of two (2) tiers of incentives (the "KEIP Bonuses" or individually a "KEIP Bonus") for the KEIP Participants, based upon the KEIP Target, the sale price, achieved.

31.     The KEIP first incentivizes the KEIP Participants to achieve a baseline KEIP Target (the "Baseline Target"), providing a KEIP Bonus if the Baseline Target is achieved; and then further incentivizes the KEIP Participants to achieve higher KEIP Targets, providing additional KEIP Bonuses for every dollar above the Baseline Target achieved.

32.     Generally, the KEIP provides at a purchase price of the Baseline Target, each KEIP Participant shall receive, on a pro-rata basis, "X" percent (X%) of their total salary; and thereafter, each KEIP Participant shall receive "N" percent (N%) of the net proceeds for every dollar ($1.00) over the Baseline Target not to exceed one hundred percent (100%) of each KEIP Participant's individual total salary.

33.     The KEIP is further broken down and explained in the document attached as **Exhibit "B"** to the Declaration of Justin Magner.

34.     Both the Debtor and Cowen submit the KEIP, as proposed, is reasonable, made in the best business judgment of the Debtor, and is in line with industry standards.

### III.      RELIEF REQUESTED

35.     By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b), 503(b), 503(c), and 507(a)(2) of the Bankruptcy Code approving the KERP and the KEIP and granting related relief.

36.     For the reasons set forth herein, the Debtor submits that the relief requested is in the best interest of the Debtor, the estate, creditors, stakeholders, and other parties-in-interest and should be granted.

OMC\4830-6080-6141.v3-10/19/21

## IV.    <u>BASIS FOR RELIEF REQUESTED</u>

37.    As here, a company's decision to file for chapter 11 necessarily created difficulties for its Employees and has led to some retention problems and reduced productivity. These negative consequences impair a Debtor's ability to continue normal operations and maximize value during a reorganization.

38.    For this reason, bankruptcy courts have long authorized retention plans designed to reduce disruption to employees while improving morale and incentivizing job performance. Courts have routinely approved payments under these plans pursuant to section 363(b) of the Bankruptcy Code as a prudent exercise of a debtor's business judgment. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 did not eliminate the use of these plans and continues to permit payments and added protections that are offered to employees.

39.    The Debtor seeks approval of the KERP and KEIP to maintain its business operations, improve and preserve its financial condition, facilitate its sales process and reorganization efforts, all while ultimately meeting its debtor-in-possession obligations and its debtor-in-possession duties during the pendency of the Debtor's Bankruptcy. These goals cannot be met without the support of the Employees.  It is crucial to the Debtor's efforts to preserve and maximize value that the Debtor retains certain key Employees to deliver their best performance throughout the Debtor's Bankruptcy. The Employees covered by the KERP and the KEIP were identified after substantial, careful consideration and only after it was determined that each was critical to the maintenance of the Debtor's operations and the success of the Debtor's restructuring efforts. To that end, such the KERP Participants and the KEIP Participants are highly skilled, and their skill, institutional knowledge, and work ethic are crucial to the Debtor's restructuring efforts.

OMC\4830-6080-6141.v3-10/19/21

40.    For these reasons and others, the Debtor submits that implementation of the KERP

and the KEIP is critical and aligns the interests of the KERP Participants and the KEIP Participants

with those of the Debtor's stakeholders with the intent to maximize the value of the Debtor's

estate.

A.    **The KERP and the KEIP Should be Approved as a Reasonable Exercise of the Debtor's Business Judgment**

41.    The KERP and the KEIP have been designed by the Debtor, in consultation with its

advisors (as described above), to incentivize performance and ensure continued employment of the

eligible Employees within the parameters of sections 363(b) and 503(c) of the Bankruptcy Code.[1]

The prohibitions and restrictions in section 503(c)(1) and (2) do not apply to the KERP, as those

provisions restrict the ability of "insiders" to receive payments as part of retention or severance plans.

As described below, the KERP applies solely to non-insiders.

---

[1]    (c) Notwithstanding subsection (b), there shall neither be allowed, nor paid –
(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that-
    (A)    the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
    (B)    the services provided by the person are essential to the survival of the business; and
    (C)    either-
    (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

    (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such management employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
(2) a severance payment to an insider of the debtor, unless-
    (A)    the payment is part of a program that is generally applicable to all full-time employees; and
    (B)    the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or
(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

**(i)      The KERP Applies Only to Non-Insiders and is Not Prohibited by Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code**

42.      The KERP is not subject to section 503(c)(1) or (c)(2) of the Bankruptcy Code, both of which apply to insiders exclusively. Section 101(31)(B) of the Bankruptcy Code defines an "insider" as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor. See 11 U.S.C. §101(31)(B). None of the KERP Participants meets this definition of "insider."

43.      Although any person holding an officer's title is presumptively an officer and, thus, an insider, that presumption can be rebutted. In re Foothills Texas, Inc., 408 B.R. 573 (Bankr. D. Del. 2009). Specifically, "[a] party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, *i.e.*, he or she is not taking part in the management of the debtor." Id. at 574-75.

44.      The KERP Participants, to the extent they hold "officer" titles, are officers in name only. None of the KERP Participants are managers of the Debtor or appointed to their position by the owner of the Debtor.

45.      The KERP Participants have no authority to make company-wide decisions for the Debtor. See In re Global Aviation Holdings Inc., 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of the board, participated in corporate governance, attended board meetings, or reported to the board). Furthermore, the KERP Participants' duties do not extend to the Debtor's Business operations as a whole. Rather, their duties are restricted to a particular aspect or division of the Debtor's Business.

12

46.    Finally, the titles of the KERP Participants reflect their individual functions and roles, but do not reflect "insider" status as the court discussed in <u>Foothills</u>. <u>See</u> <u>In re NMI Systems, Inc.</u>, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that vice president was not an insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions.").

47.    Accordingly, the Debtor submits that certain KERP Participants are officers in name only, do not take part in the management of the Debtor, and therefore are not "insiders." For the balance of the KERP Participants, the Debtor submits that both their titles and roles performed dictate that they are not "insiders" and, therefore, not precluded from participating in the KERP.

     **(ii)**     **The KEIP Is Not Prohibited by Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code.**

48.    The KEIP is permissible under section 503(c) of the Bankruptcy Code. Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business," essentially "pay to stay" plans. 11 U.S.C. § 503(c)(1); <u>see</u> <u>also</u>, <u>In re Global Home Prods., LLC</u>, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "The fact that . . . all compensation has a retention element" did "not reduce the Court's conviction" that the debtors' primary goal in approving the incentive plans was "to create value by motivating performance").

49.    The Debtor recognizes the KEIP Participants are insiders. The KEIP, however, is an incentive plan with appropriate targets that will be challenging to meet. The KEIP is not simply a retention plan meant to ensure continued employment for insiders, which is prohibited by section 503(c)(1) of the Bankruptcy Code, nor a severance plan prohibited by section 503(c)(2) of the Bankruptcy Code. On the contrary, the KEIP is an incentive plan for key senior executives designed

13

to motivate them to improve sales and company performance and consummate a Restructuring Transaction. Consequently, the KEIP is not prohibited under section 503(c)(1) or (2), but, rather, is "justified by the facts and circumstances" of this chapter 11 case, consistent with section 503(c)(3) of the Bankruptcy Code.

50.     More specifically, achieving any of the KEIP Targets, especially those above the Baseline Target, will require significant efforts by the KEIP Participants and is difficult to attain given the complexity of the Debtor's Bankruptcy, and the effects thereof on the Debtor's business operations.

51.     The KEIP Targets are aggressive, and as a result, the KEIP Participants will need to focus their sales and operations efforts to preserve liquidity and drive the Debtor's sales. Due to the bankruptcy process, the Debtor is constantly challenged to preserve its limited funding in such a manner that customer demands are satisfied. The KEIP Participants have succeeded thus far through their daily efforts across the Debtor's supply chain, sales, trade marketing, and finance and accounting organizations to manage this process within the limits of its DIP Budget. Approval of the KEIP will motivate them to continue this process during the pendency of the Debtor's Bankruptcy, through the sale, and perhaps beyond.

52.     Although the KEIP might encourage the KEIP Participants to remain with the Debtor through the consummation of a sale, that effect does not mean that the KEIP is solely a retention-driven plan. See, e.g., In re Global Homes Prods., LLC, 369 B.R. at 786. A plan that indirectly causes its participants to remain employed does not detract from the KEIP's primary purpose, which is to motivate the KEIP Participants to maximize value for the Debtor's estate and, in turn, motivate the workforce at large to ensure that recoveries are maximized for all stakeholders.

OMC\4830-6080-6141.v3-10/19/21

53.      A court "must examine a proposed [incentive plan] . . . and determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work." In re Patriot Coal Corp., 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013).

54.      In Global Home Products, the bankruptcy court set forth various factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a management incentive plan under Bankruptcy Code section 503(c)(3). These factors include: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or whether it discriminates unfairly; (d) whether the plan is consistent with industry standards; (e) whether the debtor employed appropriate due diligence efforts in developing the plan; and (f) whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation. See In re Glob. Home Prods., 369 B.R. at 786 (citing In re Dana Corp., 358 B.R. at 576–77).

55.      Additionally, KEIPs previously approved by bankruptcy courts may serve as a basis for, and have been looked to in analyzing the sound business judgment of, proposed KEIPs. In re Alpha Nat. Res., Inc., 546 B.R. 348, 353, 362 (Bankr. E.D. Va. 2016).

56.      The KEIP is a reasonable exercise of the Debtor's sound business judgment because it was carefully designed, with input from the Debtor's advisors, Cowen, and seeks to incentivize certain senior executives' performance to continue the Debtor's day-to-day operations, focus on improving performance, and ensure a timely and successful exit from chapter 11 by way of sale. Thus, as set forth below, the Global Home Products factors strongly weigh in favor of approval of the Debtor's KEIP.

OMC\4830-6080-6141.v3-10/19/21

57.    The KEIP is calculated to achieve desired performance. It creates a reasonable relationship between the proposed award and the results to be obtained: the program awards incentive compensation based on the KEIP Participants' ability to achieve any of the KEIP Targets. The KEIP Targets, and even the Baseline Target, can only be achieved through the dedication and effort of the KEIP Participants.

58.    The incentive payments contemplated in the KEIP are reasonable and fair. It is common for companies of the Debtor's size to have an incentive program. The KEIP is reasonable and fair as the KEIP Participants are being asked not just to report to work and continue with their everyday duties but to rise to the challenge and assist in the transition to the Debtor's eventual purchaser. This is true both for a real estate purchaser, in which case the KEIP Participants will be essential to the disposal and/or sale of the Debtor's specialized assets; or for a strategic purchaser, in which case the KEIP Participants' knowledge and experience will be essential to keep the Debtor's operations running in a smooth and continuous fashion. The KEIP was not developed for purposes of retaining executives during the Debtor's Bankruptcy.

59.    The KEIP is reasonable in scope as the KEIP Participants are a carefully selected group of individuals who have institutional knowledge and skills essential to drive performance of the Debtor's Business, and their performance will have the greatest impact on the maximization of value of the Debtor's estate. The Debtor, in consolation with Cowen, determined that the KEIP is necessary and appropriate to properly motivate the KEIP Participants to drive performance of the Debtor's business while operating in chapter 11 and attempting to consummate a sale.

60.    The Debtor worked closely with its advisors at Cowen to develop the KEIP. The version of the KEIP submitted herein for approval is the latest iteration, which reflects the reasoned opinions and comments of the various professionals whose input was considered in designing the

16

program. In developing the KEIP, both the Debtor and Cowen examined KEIP plans implemented

throughout the Debtor's industry to ensure that the KEIP is consistent with industry standards.[2] The

KEIP is, the Debtor submits, a reasonable exercise of their sound business judgment.

61.     The Debtor and Cowen reviewed multiple incentive plans implemented in other

comparable chapter 11 proceedings filed in the District of New Jersey. The Debtor and Cowen

creating numerous versions of the KEIP before reaching the KEIP proposed herein.

62.     The KEIP was carefully created, and the KEIP Participants were carefully selected,

with input from the Debtor, Cowen, and other advisors. In conjunction therewith, the KEIP was

designed with consideration of comparable programs and the incentive objectives that the Debtor

seeks to establish in order to protect, preserve, and maximize the value of the Debtor's estate.

63.     Finally, the Debtor submits that meeting any of the KEIP Targets, even the Baseline

Target, would be a significant achievement meriting the payment of the KEIP Bonuses. To earn

their KEIP Bonuses, the KEIP Participants must continue business operations in a manner that

ensures the continued success of the Debtor, and go above and beyond in their efforts to market

to and work with potential purchasers. As a result, KEIP Participants have a strong incentive to

generate substantial value for the Debtor's estate.

64.     For these reasons, the Debtor submits that the KEIP is justified by the facts and

circumstances of the Debtor's Bankruptcy, the standards set in Debtor's industry, and the Debtor's

consolation with Cowen and other outside advisors; and, therefore, should be approved.

---

[2] In developing the KEIP, Cowen could find no direct District of New Jersey chapter 11 industrial comparables similar to the Debtor. A breakdown of chapter 11 proceedings Cowen used as comparables are attached as Exhibit "C" to the Declaration of Justin Magner.

OMC\4830-6080-6141.v3-10/19/21

(iii)     **The KERP and KEIP Should be Approved Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code**

65.     Because the KERP and KEIP are not prohibited by sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code, the Debtor submits that the Court should authorize the Debtor to implement the KERP and KEIP under sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

66.     The standard for approving payments under section 503(c)(3) is essentially the same "business judgment" standard for approving similar transactions under section 363(b)(l) of the Bankruptcy Code. See, e.g., In re Nellson Nutraceutical, Inc., 369 B.R. 787, 804 (Bankr. D. Del. 2007); In re Global Home Products, LLC, 369 B.R. at 787.

67.     Section 363(b)(1) of the Bankruptcy Code allows a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing, in the exercise of the Debtor's business judgment. 11 U.S.C. §363(b)(1); see also, e.g., In re Martin, 91 F.3d 389, 395 (3d. Cir. 1996) (stating that under normal circumstances, courts will defer to debtor's judgment in using property under section 363(b) if there is legitimate business justification).

68.     Therefore, the estate's property may be used other than in the ordinary course of business if the debtor can show a "sound business purpose" for such use. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him...a good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991). If a debtor shows a valid business purpose, the court applies the "business judgment rule," a presumption "that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).

18

69.     Applying the business judgment rule in chapter 11 cases, courts have routinely permitted employee payments that are outside the normal course of business. See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court's authorization of key employee compensation program, holding "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); In re Global Home Products, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); see also In re Martin, 91 F.3d at 395 (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)).

70.     The KERP and KEIP each represent a sound business purpose and satisfy the business judgment rule. The KERP and KEIP will facilitate the Debtor's restructuring goals by retaining crucial Employees to ensure that regular business operations thrive, giving the Debtor the best possible opportunity to consummate a value-maximizing strategic sale.  These goals cannot be met if skilled key Employees depart prematurely or do not assist in potential purchasers by providing tours, explanations of operations, and other business information necessary for due diligence.  Payments under the KEIP directly incentivize key executives. The KERP serves another important purpose by offering non-insider Employees security and a reward for remaining loyal to the Debtor during this critical period.

71.     For the foregoing reasons, the Debtor submits that approval of both the KERP and the KEIP is in the best interest of the Debtor's estate, creditors, and all parties in interest and should therefore be granted.

OMC\4830-6080-6141.v3-10/19/21

## **RESERVATION OF RIGHTS**

72.     Nothing in this Motion should be construed as:

    a.     Authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same;

    b.     An admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Debtor's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law;

    c.     A promise to pay any claim; or

    d.     Granting third party-beneficiary status or bestowing any additional rights on any third party.

73.     By separate and contemporaneously filed application, the Debtor has requested the Motion be considered on an expedited basis.

## **NOTICE**

74.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for Region 3; (ii) Tiger Finance, LLC; (iii) counsel to the Committee; (iv) the Internal Revenue Service; and (v) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b). The Debtor submits that no other or further notice is required.

## **NO PRIOR REQUEST**

75.     No previous request for the relief sought herein has been made to this Court.

OMC\4830-6080-6141.v3-10/19/21

## **CONCLUSION**

76.    The the Debtor respectfully requests that this Court enter the Order approving the

KERP and the KEIP, as requested in the Motion and detailed in the Certification of Justin Magner,

granting the relief requested herein, and such other and further relief as may be just and proper.


Respectfully Submitted,

Dated: October 19, 2021    By: */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire (*pro hac vice*)
Turner N. Falk, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
Telephone: (856) 795-3300
Facsimile: (856) 482-0504
E-mail:  edmond.george@obermayer.com
michael.vagnoni@obermayer.com
turner.falk@obermayer.com
*Proposed Counsel to Chapter 11 Debtor*
*Aluminum Shapes, L.L.C.*

21