# Exhibit A

| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| *Caption in Compliance with D.N.J. LBR 9004-1(b)* |
| OBERMAYER REBMANN MAXWELL & HIPPEL LLP |
| Edmond M. George, Esquire |
| Michael D. Vagnoni, Esquire (pro hac vice) |
| Turner Falk, Esquire |
| 1120 Route 73, Suite 420 |
| Mount Laurel, NJ 08054-5108 |
| Telephone: (856) 795-3300 |
| Facsimile: (856) 482-0504 |
| E-mail:   edmond.george@obermayer.com |
|          michael.vagnoni@obermayer.com |
|          turner.falk@obermayer.com |
| |
| Counsel to the Debtor and Debtor in Possession |

| | |
|---|---|
| In re: | Chapter 11 |
| ALUMINUM SHAPES, L.L.C., | Case No. 21-16520 (JNP) |
| Debtor. | |

## DECLARATION OF SOLOMON ROSENTHAL IN SUPPORT OF MOTION TO MODIFY FINAL DIP ORDER, BID PROCEDURES AND BID PROTECTIONS

I, Solomon Rosenthal, make this declaration (this "**Declaration**") under 28 U.S.C. § 1746:

1. I am the CEO of Aluminum Shapes, L.L.C., the debtor in the above-captioned chapter 11 case (the "**Debtor**"). I make this declaration in support of the Debtor's Motion to Modify Final DIP Order, Bid Procedures and Bid Protections (the "**Motion**") filed contemporaneously herewith.

2. On August 15, 2021 (the "**Petition Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its Business and manage its Assets as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Debtor is an industry leader in the fabrication, processing, and extruding of aluminum metals for use in, inter alia, the swimming pool, trucking, trailer, and outdoor storage industries (the "**Business**"). See First Day Declaration of Jordan Meyers in Support of First Day Motions. (DI #17)

5. On September 1, 2021, the Office of the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**") in the Chapter 11 Case. No trustee or examiner has been appointed.

6. The Debtor owns and operates a single location at 9000 River Road, Delair, NJ, consisting of approximately 500,000 square feet of industrial space, including a cast house, foundry, and processing area (the "**Real Property**"). The Real Property consists of buildings, substantial machinery, fixtures, and equipment, including a valuable cast house and foundry furnace, several presses, and processing equipment ("**FFE**" with the Real Property the "**Assets**"). At present, the Debtor is not operating the cast house.

7. On or about June 18, 2021, the Debtor engaged Cowen and Company, LLC ("**Cowen**") to provide investment banking services with respect to the Debtor's Business and Assets, including exploring all restructuring, financing, and M&A alternatives with respect thereto.

8. The Debtor instructed Cowen to find a purchaser who could continue the Debtor's Business as a going concern. Upon its retention, Cowen immediately began conducting due diligence on the Business and Assets.

2

9.     In the period prior to the Petition Date, Cowen began significant outreach efforts and cast a wide net, on the Debtor's behalf, in soliciting interest from potential purchasers of the Business or Assets.

10.    Cowen contacted in excess of 160 potential buyers with more than 60 executing non-disclosure agreements ("**NDAs**") and performed significant diligence on Business and Assets. The Debtor conducted numerous meetings with potential buyers.

11.    To enable it to continue operations through a Sale, the Debtor sought post-petition DIP lending from its prepetition lender, Tiger Finance LLC (the "**DIP Lender**").

12.    Pursuant to the Debtor's motion for DIP lending (DI #15) this Court entered a final DIP order (the "**Final DIP Order**") on September 29, 2021.  (DI #116).

13.    The Final DIP Order provided, in relevant part, that the DIP Lender was granted an administrative superpriority and first-priority priming liens on all Debtor assets pursuant to 11 U.S.C. §364(c) and (d), and was authorized to provide DIP financing in an amount up to $15,500,000.00, including a roll-up of $9,270,525.89 of prepetition debt owed to the DIP Lender.

14.    The Final DIP Order provided that the Debtor's failure to meet any milestone in the underlying credit agreement – including the Sale timeline – would constitute a default.

15.    Pursuant to the underlying credit agreement, the DIP Lender is entitled to a default fee of $250,000.00 upon the occurrence of a default.  The DIP Lender is also authorized to cease distributions and demand payment in full upon default, and assess substantially higher interest on the amount due.

16.    The Debtors filed a motion to approve certain bid procedures for an auction and Sale of the Debtor's Business or Assets (the "**Bid Procedures**").

17. The Bid Procedures set forth the following milestone dates, which were approved by the DIP Lender:

    a. Deadline to Submit Qualified Bids: October 22, 2021

    b. Auction: October 25, 2021

    c. Sale Objection Deadline: October 27, 2021

    d. Sale Hearing: October 28, 2021

18. By a September 30, 2021 order, this Court approved the form and substance of the Bid Procedures. (DI #122).

19. The Debtor subsequently entered into an asset purchase agreement with CGPN, LLC (the "**Stalking Horse**"), whereby the Stalking Horse would act as the stalking horse bidder for the Debtor's Assets.

20. Upon the Debtor's motion (DI #136) the Court approved certain bid protections, including break-up fees (the "**Bid Protections**") (DI #158) on October 8, 2021.

21. Several bidders have qualified to participate in the Auction.

22. On the eve of the Auction, a strategic purchaser contacted the Debtor and is willing to offer significant consideration for a going-concern sale, that preserves an ongoing business in the same location and safeguards the approximately 110 employees' jobs.

23. Believing that obtaining an offer from this strategic was in the Debtor's best interest, and in the best interest of its estate and creditors, the Debtor adjourned the Auction date without first securing the requisite prior consent of the DIP Lender. The Debtor's failure to conduct the Auction in accordance with the milestones contained in the DIP Credit Agreement and Final DIP Order constituted a default and Event of Default ("**Milestone Default**") under the DIP Credit Agreement and Final DIP Order.

24. As a result of the existence and continuation of the Milestone Default, on October 25, 2021 the DIP Lender provided the debtor with written notice of default, the occurrence of the DIP Termination Event, and its declaration of the DIP Termination Declaration Date, among other things (the "**Default Letter**").

25. Notwithstanding the existence and continuation of the Milestone Default, the Debtor has requested that the DIP Lender agree to, among other things, (i) withdraw the Default Letter, and in doing so restore the parties to the *status quo ante* immediately prior to the delivery of the Default Letter, (ii) waive the Milestone Default, (iii) amend the DIP Credit Agreement and Final DIP Order (and to the extent necessary, the Bidding Procedures Order), to provide for certain modified milestones concerning the Debtor's ongoing sales process, and (iv) provide certain other or additional financial accommodations.

26. Notwithstanding that the DIP Lender is under no obligation to provide the requested waivers, amendments, or other financial accommodations, the DIP Lender is prepared to make certain accommodations to the Debtor, in each case subject to entry of an order approving this Motion and providing, among other things, the following new auction and sale timeline:

    a. Auction: 10:00 AM, November 10, 2021

    b. Sale Objection Deadline: 4:00 PM, November 11, 2021

    c. Sale Hearing: 10:00 AM, November 12, 2021

    d. Sale Closing date: No later than December 1, 2021

27. In consideration for the additional risks it bears under this extended timeline, the Debtor has agreed to provide the DIP Lender with the following enhancements:

    a. The DIP Lender shall be paid a $250,000.00 default fee ("**Default Fee**") in accordance with the DIP Credit Agreement, which amount shall be added to DIP Obligations and be paid at a closing on the Sale of the Debtor's Business or Assets.

5

b.  The Debtor has agreed to pay the DIP Lender a $1,250,000.00 extension fee (the "**Extension Fee**"), which amount shall be added to DIP Obligations and be paid at a closing on the Sale of the Debtor's Business or Assets. In the event the DIP Lender is entitled to be paid any portion of the Exit Fee attributable to the gross sale proceeds realized by the Debtor upon a sale of its assets (as provided in the DIP Credit Agreement), the Extension Fee shall be credited against solely that portion of the Exit Fee (and not the fixed amount of the Exit Fee).

28.  As a condition of agreeing to move the milestones, the DIP Lender also requested that the Stalking Horse agree to extend its bid to the new auction date.

29.  In consideration for the Stalking Horse's extension of its bid consistent with the new milestones, the Debtor seeks to pay the Stalking Horse an extension fee of $250,000.00 upon approval of this Motion plus an additional $250,000.00 at closing on the Sale of the Debtor's Business or Assets, whether or not the Stalking Horse is the successful bidder (the "**Stalking Horse Extension Fee**").

30.  The strategic purchaser has agreed to advance the initial $250,000.00 towards the Stalking Horse Extension Fee at no cost to the Debtor, and without making the Debtor liable for repayment of that amount.

31.  The initial $250,000.00 towards the Stalking Horse Extension Fee shall be non-refundable.

32.  The Debtor believes that granting the Default Fee, Extension Fee and Stalking Horse Extension Fee is beneficial to the Debtor, its estate, and its creditors because these enhancements allow the extended sale process that can potentially generate a higher net return for unsecured creditors, while preventing the DIP Lender from calling a full default.

33. The Sale is necessary to conserve liquidity and maximize the value of the Debtor's Business or Assets in response to various economic and market challenges, including *inter alia* hampered liquidity, the skyrocketing price of metals, as well as the impact of the COVID-19 pandemic.

34. The Committee and the DIP Lender, the relevant parties in interest, consent to the modifications requested in the Motion.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

By: _____
Solomon Rosenthal
CEO, Aluminum Shapes, L.L.C.

Dated: 01 November 2021