| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>*Caption in Compliance with D.N.J. LBR 9004-1(b)*<br><br>**FOX ROTHSCHILD LLP**<br>1301 Atlantic Avenue<br>Midtown Building, Suite 400<br>Atlantic City, NJ 08401-7212<br>Michael J. Viscount, Esq.<br>Martha B. Chovanes, Esq.<br>Joseph J. DiPasquale, Esq.<br>Michael R. Herz, Esq.<br>mviscount@foxrothschild.com<br>mchovanes@foxrothschild.com<br>jdipasquale@foxrothschild.com<br>mherz@foxrothschild.com<br>Telephone:  (609) 348-4515<br>Facsimile:  (609) 348-6834<br><br>*Counsel to the Official Committee of Unsecured Creditors* |

| | |
|---|---|
| In Re:<br><br>ALUMINUM SHAPES, L.L.C.,<br><br>                                            Debtor. | Chapter 11<br><br>Case No. 21-16520-JNP<br><br>Hon. Jerrold N. Poslusny, Jr. |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PLAN, (II) APPROVING DEBTOR'S KEY EMPLOYEE INCENTIVE PLAN, AND (III) GRANTING RELATED RELIEF**[1]

---

[1]  This Objection was originally filed under seal on November 11, 2021 pending the Court's ruling on the Committee's motion for entry of an order authorizing the filing of the Objection under seal [D.I. 261]. This unsealed version of the Objection is being filed consistent with the Court's instructions at the hearing held on November 23, 2021. Both the Debtor and the United States Trustee were provided with advanced notice of the filing of this unsealed version of the Objection and an opportunity to comment on any potential confidential or sensitive information. No such comments were received by the Committee. The Committee reserves the right to supplement this Objection based on any developments since the Objection was originally filed under seal or that may arise going forward, including in response to any supplemental filings made by the Debtor.

127351763.2

The Official Committee of Unsecured Creditors (the "Committee") for Aluminum Shapes, L.L.C. (the "Debtor"), by and through its counsel, Fox Rothschild LLP, submits this Limited[2] Objection and Reservation of Rights (the "Objection") to the Debtor's *Expedited Motion for Entry of an Order (I) Approving Debtor's Key Employee Retention Plan, (II) Approving Debtor's Key Employee Incentive Plan, and (III) Granting Related Relief* (the "Employee Plan Motion") [D.I. 185],[3] and respectfully submits as follows:

## PRELIMINARY STATEMENT

1. Through the Employee Plan Motion, the Debtor seeks authority to provide incentive bonuses to four (4) "key" employees (the "KEIP Participants") tied to the sale of the Debtor's assets starting at a baseline price of $30,000,000. Based on the $32 million high bid for the Debtor's assets at the November 10, 2021 auction, the KEIP Participants stand to be paid a total of $350,000, equal to 35% of their aggregate annual salary. The Employee Plan Motion, however, is largely devoid of any specifics with respect to how each of the KEIP Participants bolstered the sale and helped the Debtor achieve the ultimate bid price. Further, the Debtor has retained outside professionals, most notably Cowen and Company, LLC ("Cowen"), to specifically oversee the sale process. In particular, Cowen's marketing efforts, which began months prior to the Petition Date (defined below) and are described in detail throughout the Debtor's filings, produced a stalking horse bidder and set the table for the auction. Cowen and other professionals

---

[2] The Committee is only objecting to the KEIP portion of the Employee Plan Motion at this time. With respect to the KERP, based on discussions with the Debtor's counsel, the Committee understands that the KERP Participants will receive compensation for unused vacation/PTO time, and that any priority wage claim by any KERP Participant will be reduced by the corresponding amount, such that there is no double recovery by a KERP Participant. To the extent that this understanding is incorrect, the Committee reserves the right to object to the KERP at the hearing.

[3] Unless otherwise defined in this Objection, capitalized terms shall have the same definition as set forth in the Employee Plan Motion.

already stand to be generously compensated for their efforts. It is thus unclear why there is a need to incentivize the KEIP Participants - from proceeds that would otherwise go to the estate - on top of the compensation already to be paid to the Debtor's professionals that were specifically retained to manage the sale process. Additionally, the Employee Plan Motion was filed more than two months after the Petition Date, and just days before the then-scheduled bid deadline, auction, and sale hearing. It is unclear what value the KEIP Participants could contribute to the sale process at such a late stage that would justify the KEIP, let alone at 35% of the KEIP Participants' annual salaries.

2. All told, the KEIP appears to really be a KERP, designed to amply reward the KEIP Participants for continuing to work through the Debtor's bankruptcy case rather than advancing specific significant and difficult to achieve goals related to the sale of the Debtor's assets. Even if the KEIP were a true incentive plan, the Debtor has failed to justify the need and scope for the plan as an appropriate exercise of its business judgment. This is particularly true in light of the lack of details in the Employee Plan Motion, the presence of Cowen and other professionals, and the late stage that the Employee Plan Motion was filed.

## JURISDICTION

3. This Court has jurisdiction to consider the Employee Plan Motion and this Objection pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. §§157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The Committee has standing to bring this Objection pursuant to § 1109(b) of title 11 of the United States Code.

## BACKGROUND

**A.    Procedural History and Overview of the Debtor's Sale Process**

5. On August 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"). No trustee or examiner has been appointed in the Debtor's case and the Debtor continues to operate its businesses as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

6. Effective as of August 30, 2021, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") appointed five members to the Committee pursuant to section 1102(a) of the Bankruptcy Code. The members of the Committee are: (i) Public Service Electric and Gas Company, (ii) Energy Power Investment Company, LLC (EPIC), (iii) Indigo Global, LLP, (iv) Nathan H. Kelman, Inc., and (v) Southeastern Extrusion & Tool, Inc.

7. According to the Debtor's filings, the Debtor is an aluminum processor (the "Business"), and one of only a few processors in the country capable of, and in possession of, a completely vertically integrated plant and operations for the processing, annealing, cutting, fabricating, welding, and extruding of aluminum. *See Declaration of Jordan Meyers in Support of Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [D.I. 17] at ¶ 10. The Debtor owns, and uses in its Business, substantial machinery, fixtures, and equipment, including a valuable cast house and foundry furnace, several presses, and processing equipment (the "FFE") which are state of the art. *Id*.

8. The Debtor also owns and operates its business at a single site located at 9000 River Road, Delair, New Jersey, consisting of approximately 500,000 square feet of industrial space, including a cast house, foundry, and processing area (the "Real Property" and together with the FFE, the "Assets"). *Id*. at ¶ 12.

9. As of the Petition Date, the Debtor valued its Assets at $28,472,000 and its total liabilities as being in excess of $29,270,526. *Id*. at ¶¶ 17, 21, and 22.

10. Prior to filing for bankruptcy, the Debtor engaged Cowen as investment banker on or about June 18, 2021, to explore a sale of the Debtor's business and Assets. *Id*. at ¶ 31. As detailed in the First Day Declaration, Cowen conducted a marketing process to procure participants for a sale of the Debtor's Assets. Cowen's efforts included: (i) working with the Debtor to prepare a list of more than 140 potential investors; (ii) receiving a proposed stalking horse bid; (iii) diligently interviewing prospective bidders and continuing to market the Debtor's business and Assets for sale. *See id*. at ¶¶ 34, 36, and 38. On October 8, 2021, the Court entered an order authorizing the Debtor to retain Cowen as investment banker in the bankruptcy case [D.I. 160]. The Debtor's application to retain Cowen makes clear that Cowen's role is to assist and advise the Debtor with respect to the sale process [*see* D.I. 3 and 146].

11. On the Petition Date, the Debtor filed a *Combined Motion of Aluminum Shapes, L.L.C. for the Entry of an Order Granting (A) Authority to Obtain Post-Petition Financing, (B) Liens and Super Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 364(c)(1), (2) and (3) and 364(d)(1), (C) Relief from the Automatic Stay, (D) Authority to Enter Into Agreements With Tiger Finance, LLC, (E) Authorization to Use Cash Collateral Pursuant to 11 U.S.C. §§ 361 and 363, Bankruptcy Rule 4001 and D.N.J. LBR 4001-4 and to Provide Adequate Protection to Parties With an Interest in Cash Collateral and (F) Related Relief* (the "DIP Motion") [D.I. 15]. The DIP Motion sought approval for the Debtor to enter into a post-petition facility (the "DIP Facility") with its pre-petition secured lender, Tiger Finance, LLC ("Tiger"), to borrow up to $15.5 million, including a roll-up of $9,270,525.89 in pre-petition secured debt pursuant to a Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated August 15, 2021 (the "DIP

Agreement"). The Court entered a final order approving the DIP Facility on September 29, 2021 [D.I. 116].

12. As a condition to the DIP Facility, the Debtor agreed to certain milestones for the sale process of its business and Assets, including obtaining an executed stalking horse agreement to sell its Assets by August 28, 2021 (the "Stalking Horse Bid Deadline"). *See* DIP Motion at ¶ 31.

13. The Debtor's filings on the Petition Date indicated that it had procured a stalking horse bidder and that a sale motion would be "forthcoming." *See* First Day Declaration at ¶ 36; DIP Motion ¶ 19, n. 3. In actuality, the Debtor did not have a stalking horse bidder in place on the Petition Date, and despite Tiger agreeing to extend the Stalking Horse Bid Deadline to September 15, 2021, the Debtor failed to procure a stalking horse bidder before the deadline, thereby triggering a default under the DIP Agreement. As a consequence, the Debtor became obligated to pay a default fee to Tiger of $250,000 plus a default interest rate that is 5% higher than the regular rate under the DIP Agreement.

14. On September 14, 2021, approximately one month into the Debtor's case, the Debtor filed a *Motion for (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Certain of the Debtor's Assets Including Approval of Provisions For Designation of a Stalking Horse and Bid Protections, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration; and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtor's Business or Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* (the "Sale Procedures Motion"). The Sale Procedures Motion provided additional details regarding Cowen's efforts to market the Debtor's business and Assets, including noting that: (i) "[t]he Debtor instructed Cowen to find a purchaser who could continue the Debtor's business as a going concern"; (ii) Cowen cast a wide net in soliciting interest from potential purchasers, including contacting "in excess of 160 potential buyers with more than 60 executing non-disclosure agreements"; and (iii) continuing to actively market the Debtor's business and Assets "to a wide spectrum of interested parties." *See* Sale Procedures Motion at ¶¶ 13-16.

15. On September 30, 2021, the Court entered an order approving the Sale Procedures Motion (the "Sale Procedures Order") [D.I. 122]. The Sale Procedures Order contained revised milestones for the Debtor's sale process, including scheduling a bid deadline of October 22, 2021, an auction on October 25, 2021, and a sale hearing on October 28, 2021.

16. On October 1, 2021, the Debtor filed *Notice of Debtor's Selection of Stalking Horse Bidder for the Sale of Substantially all of the Debtor's Assets Pursuant to 11 U.S.C. § 363 of the Bankruptcy Code* (the "Stalking Horse Notice") [D.I. 127]. The Stalking Horse Notice advised that it had entered into an asset purchase agreement with CGPN, LLC for the sale of substantially all of the Debtor's Assets. The Committee understands that the stalking horse bid was for $20 million. The Committee further understands that the stalking horse bidder was largely procured through Cowen's marketing efforts.

17. On October 19, 2021, more than two months into the case and less than a week before the auction scheduled for October 25, 2021, the Debtor filed the Employee Plan Motion seeking approval of the KEIP.

18. Due to interest from a potential strategic purchaser, the Debtor did not conduct the auction as scheduled on October 25, 2021.[4] After consultation with the Committee and Tiger on the eve of the scheduled auction, it was agreed that the auction would be postponed to November 10, 2021 and that the sale hearing would be adjourned to November 12, 2021. However, the failure to conduct the auction as scheduled constituted another breach under the DIP Agreement. Ultimately, the Debtor agreed to pay an additional default fee to Tiger in the amount of $250,000 plus an "extension fee" of $1.25 million in consideration for Tiger agreeing to have the auction and sale hearing rescheduled, as memorialized in the *Order Modifying Final Order Authorizing Debtor To, Among Other Things, (I) Obtain Post-Petition Financing, (II) Granting Liens and Superpriority Claims, (III) Authorizing Use of Cash Collateral, and (IV) Modifying the Automatic Stay* entered on November 5, 2021 [D.I. 230]. In total, the Debtor's defaults have resulted in $1.75 million in additional fees plus the default interest in favor of Tiger.

19. On November 1, 2021, the Debtor filed a *Motion for an Order Modifying the Final DIP Order, Bid Procedures and Bid Protections* (the "Modified Bid Protections Motion)" [D.I. 219]. The Modified Bid Protections Motion restated Cowen's contributions to the sale process that were previously set forth in the Sale Procedures Motion. Modified Bid Protections Motion at ¶¶ 7-10. The Modified Bid Protections Motion further noted that on the eve of the auction scheduled for October 25, 2021, a strategic purchaser contacted the Debtor and advised that it "is willing to offer significant consideration for a going-concern sale." *Id*. at ¶ 26. Other than reiterating Cowen's efforts in the sale process, the Modified Bid Protections Motion and its

---

[4] Unfortunately, an agreement with the strategic purchaser was not reached.

supporting declarations do not identify any other entities or individuals as being involved in the sale process.

20.     The auction was held on November 10, 2021 and resulted in a high bid of $32 million for the Debtor's Assets.

21.     For its efforts, Cowen is to be compensated with (i) a monthly flat fee of $75,000, plus (ii) a non-refundable fee upon the consummation of any sale of the Debtor's Assets equal to $850,000 plus 5% of the "aggregate consideration" of such sale in excess of $30,000,000. Cowen is thus in line to be substantially compensated for its efforts in connection with the sale of the Debtor's Assets.

22.     The Debtor has also retained Berwyn Capital Interests ("Berwyn") as "Restructuring Agent." [*See* D.I. 159].[5] As set forth in the Debtor's application to retain Berwyn, the services to be rendered by Berwyn include assisting the Debtor "in developing the plan of resolution for the sale and intended pre-packaged bankruptcy and all steps which are deemed necessary for the plan." *See* Berwyn Retention Application at ¶ 5(a) [D.I. 4]. Berwyn's retention application includes specific mention of its experience in "industrial assets sales" and that its retention will cease on the closing of sale of the Debtor's assets unless the Committee otherwise requests Berwyn's continued retention. *See Modified Certification of Professional In Support of Application for Retention of Professional* ¶¶ 2 and 10 [D.I. 134]. For its services, Berwyn received a retainer of $35,000 plus a monthly flat fee of $35,000.

**B.     The Proposed KEIP**

---

[5]     The Debtor has also retained Riveron Management Services, LLC as Interim Company Management.

23. The Debtor filed the Employee Plan Motion on October 19, 2021, more than two (2) months after the Petition Date and just three (3) days before the bid deadline, six (6) days before the auction, and nine (9) days before the then-scheduled sale hearing.

24. As set forth in the Declaration of Justin Magner (the "Magner Declaration"), filed under seal in support of the Employee Plan Motion, the KEIP Participants consist of four (4) "key" employees of the Debtor, including its Chief Operating Officer, Chief Executive Officer, Controller, and Director of Extrusion / Technical Director. *See* Magner Declaration at Exhibit B. The proposed KEIP would provide the KEIP Participants with "KEIP Bonuses" if certain sale benchmarks are achieved. Specifically, in the event a baseline sale price of $30 million is realized for the Debtor's Assets, each KEIP Participant shall receive, on a pro-rata basis, 25% of their total annual salary. Thereafter, each KEIP Participant shall receive 5% of the net proceeds for every dollar over $30 million, not to exceed 100% of each KEIP Participant's total annual salary. *See* Magner Declaration at ¶ 23-25. At a sale price of $30 million, a total of $250,000 would be paid to the KEIP Participants, and an additional $50,000 would be paid for each additional $1 million above $30 million (e.g. a payout of $31 million would result in total KEIP Bonuses of $300,000, while a payout of $32 million would result in total KEIP Bonuses of $350,000, and so on). *See* Magner Declaration at ¶ 26 and Exhibit B. If the $32 million sale price from the auction is approved and consummated, the KEIP Participants will thus receive a total of $350,000, comprising 35% of their annual aggregate salaries.

25. The Employee Plan Motion states that the purpose of the KEIP (and the KERP) is "to maintain [the Debtor's] business operations, improve and preserve its financial condition, facilitate its sale process and reorganization efforts…" Employee Plan Motion at ¶ 39. However, the Employee Plan Motion and its supporting declarations are short on details of the correlation

10

127351763.2

between the KEIP Participants efforts and maximizing the success of the Debtor's sale, particularly at this very late stage of the sale process. There is also no information regarding any historical bonuses that the KEIP Participants received for comparison to the amounts to be paid under the KEIP. The Magner Declaration also notes that Cowen could not find KEIPs comparable to the KEIP proposed by the Debtor. Magner Declaration at ¶ 21.

## OBJECTION

### A.    The KEIP is a Disguised KERP

26.    A debtor's implementation of a proposed KEIP is subject to section 503(c) of the Bankruptcy Code. Section 503(c)(1) prohibits payments, transfers, or incurring obligations "for the benefit of an insider of the debtor for the purpose of inducing such person to remain with the debtor's business absent a finding by the court based on evidence in the record that" (i) the payment is essential to retain the insider because he or she has a bona fide job offer from another business at the same or greater rate of compensation; (ii) the insider's services are essential to the debtor's survival; and (iii) the amount of payment complies with the caps set forth in section 503(c)(1)(C). *See In re Global Home Prods., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007). The specific evidentiary standards of section 503(c)(1) "must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business…" *See In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006).

27.    Section 503(c)(1) of the Bankruptcy Code is designed to "eradicate the notion that executives were entitled to bonuses simply for staying with the company through the bankruptcy process." *In re Global Home Prods., LLC*, 369 B.R. at 784. With this in mind, courts should examine bonus plans "mindful of the practice that Congress sought to eradicate … and determine

11

whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).

28. A debtor bears the burden of demonstrating that a KEIP is truly incentivizing, and therefore subject to section 503(c)(3), rather than being a disguised retention plan subject to the stricter standards of section 503(c)(1). *See In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012). To this end, "the Debtors must establish by a preponderance of the evidence that the [KEIP] is primarily incentivizing and not primarily retentive." *Id*. For a bonus plan to be incentivizing, it should be tied to significant goals that are difficult to achieve. *In re Hawker Beechcraft, Inc.*, 479 B.R. at 315; *In re Dana Corp.*, 358 B.R. 567, 583 (Bankr. S.D.N.Y. 2006). Further, the fact that participants in a proposed plan may be undertaking additional work or duties is not sufficient reason for increased pay. *See, e.g.*, *In re Residential Capital, LLC*, 478 B.R. at 168.

29. Based on the limited and vague information in the Employee Plan Motion and accompanying declarations, the proposed KEIP does not appear to be incentivizing the KEIP Participants to work towards significant goals in furtherance of the sale process, but is compensating them for their continued retention. As noted, the Employee Plan Motion states that the purpose of the KEIP is "to maintain [the Debtor's] business operations, improve and preserve its financial condition, facilitate its sale process and reorganization efforts…" Employee Plan Motion at ¶ 39. This purpose would appear to be entirely retentive in that the KEIP Participants are to be compensated for merely continuing their employment with the Debtor through the reorganization process, rather than undertaking specific tasks tied to significant and specific goals that are difficult achieve. To the extent that there may be specific performance objectives to be met by the individual KEIP Participants in furtherance of the sale of the Debtor's Assets, such is

not evident from the Employee Plan Motion. Consequently, the KEIP appears to actually be a key employee retention plan (a "KERP"), and should therefore be subject to the strict evidentiary standards of section 503(c)(1) of the Bankruptcy Code before allowing any payments to be made.

30. Notably, the Employee Plan Motion does not state how each of the KEIP Participants specifically have helped or will help the Debtor achieve the sale price for the Debtor's Assets. The contributions of the KEIP Participants to the sale process are further clouded by the fact that the Debtor has retained multiple outside professionals in Cowen and Berwyn to specifically oversee the Debtor's sale process. Cowen, in particular, has helmed the Debtor's marketing efforts for several months, and it is these efforts that have led to the stalking horse bid and set the table for auction that ultimately exceeded the baseline price. Given the significant contributions of the Debtor's retained professionals specifically tasked with assisting and advising the Debtor with respect to the sale process, it is unclear what notable additional contributions the KEIP Participants could make, particularly at this late stage.

B. **The Debtor Has Not Established that the KEIP is an Appropriate Exercise of Business Judgment or Otherwise Justified**

31. Even if the KEIP is truly an incentivizing plan rather than a retention plan, the Debtor has failed to establish that the plan is justified under section 503(c)(3),[6] or that it is an appropriate exercise of the Debtor's business judgment under section 363(b). Courts consider the following factors (the "Dana Factors") in assessing a debtor's business judgment in formulating an employee compensation proposal:

> (i) whether there is a reasonable relationship between the plan proposed and the results to be obtained; (ii) whether the cost of the

---

[6] Section 503(c)(3) provides: "Notwithstanding subsection (b), there shall neither be allowed, nor paid – other transfers or obligations that are outside the ordinary course of business and not justified by the facts of circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."

127351763.2

>plan is reasonable in the context of the debtor's assets, liabilities and earning potential; (iii) whether the scope of the plan is fair and reasonable; whether it applies to all employees; whether it discriminates unfairly; (iv) whether the plan or proposal is consistent with industry standards; (v) the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, and what is generally applicable in a particular industry; and (vi) whether the debtor received independent counsel in performing due diligence and in creating an authorizing the incentive compensation.

*In re Glob. Home. Prods., LLC*, 369 B.R. at 786 (*citing In re Dana Corp.,* 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006)).

32. The KEIP, based on the information in the Employee Plan Motion and supporting declarations, is decidedly deficient with regard to several of these factors. First, it is unclear at best if there is a reasonable relationship between the KEIP and enhancing the sale process. The KEIP Bonuses are contingent on the Debtor achieving a baseline sale price of $30 million. However, the Employee Plan Motion fails to explain how the KEIP Participants specifically have helped or will help obtain (or exceed) such a price, particularly given that the Debtor has already retained outside professionals in Cowen and Berwyn to oversee the sale process, and that the Debtor did not seek approval of the KEIP until very late in the sale process. Indeed, the Debtor's filings are rife with details with respect to Cowen's pre- and post-petition efforts in marketing the Debtor's assets over several months, which process resulted in procuring the stalking horse bidder and setting the table for the auction. Cowen's substantial contributions to the sale process were most recently highlighted in the Modified Bid Protections Motion. There is little mention in the Employee Plan Motion, the Modified Bid Protections Motion, or elsewhere, of what role any of the KEIP Participants played in the process, and why incentivizing them is necessary in addition to the services of Cowen and Berwyn. Additionally, the lateness of the filing of the Employee

Plan Motion relative to the state of the sale process, calls into question what specific value the KEIP Participants could contribute to the sale process at this late stage.

33. Second, the cost of the KEIP, which now stands at $350,000 based on the auction results, is unduly expensive given the lack of details in the Employee Plan Motion and that Cowen and Berwyn are already being compensated substantially for their efforts in connection with the sale process. It is unclear why the estate should incur the additional costs of rewarding the KEIP Participants in addition to Cowen and Berwyn. Further, the baseline amount of the KEIP constitutes 25% of the KEIP Participants' annual salaries and has risen to 35% based on the auction price (and could have potentially risen to 100%). This is a significant portion of the KEIP Participants' annual compensation that appears incongruous with their limited contributions to the sale process. In this vein, in addition to lacking details on the specific efforts undertaken by the KEIP Participants in connection with the sale, the Employee Plan Motion lacks any historical bonus data for the KEIP Participants to determine if the KEIP is reasonable and consistent with past compensation. The fact that the Debtor only sought approval of the KEIP very late in the sale process further calls into the question the propriety of the size of the KEIP.

34. Furthermore, the Debtor has twice defaulted on its obligations under the DIP Agreement, which resulted in the Debtor owing $1.75 million in additional fees plus extra interest to Tiger. These extra fees will come directly from sale proceeds that otherwise would have gone to the estate. These failures can at least in part be attributed to the Debtor's management, which includes the KEIP Participants (including the Debtor's CEO, CFO, and Controller). Accordingly, they should not be in line to receive additional compensation to the further detriment of the estate.

35. Third, it is unclear if the KEIP applies to the KEIP Participants fairly. While each KEIP Participant would receive a pro-rata bonus, it is unclear how any of the KEIP Participants

are necessary to bolster the sale, what specific efforts any individual KEIP Participants will undertake to achieve the baseline sale price, and why they should receive equal compensation on a pro rata basis. Absent further information, it is possible that certain KEIP Participants could receive payments not commensurate with their contributions to the sale in comparison to other KEIP Participants.

36. Fourth, with respect to whether the KEIP is consistent with industry standards, there is little information and data analysis in the Employee Plan Motion. Although the Magner Declaration acknowledges that Cowen could not find any comparable KEIPs, the lack of comparable data might be an indication that the KEIP is inconsistent with industry standards.

37. Lastly, the Employee Plan Motion only superficially discusses the Debtor's due diligence efforts in investigating the need for the KEIP. There are few specifics as to how and why the particular KEIP Participants were determined to be incentivized and what actual value they will deliver to the estate. To the contrary, the Debtor's filings indicate that Cowen has played an overwhelmingly large role in guiding the sale process. The Debtor has failed to establish, particularly at this late stage, how incentivizing the KEIP Participants is necessary on top of the efforts of Cowen and Berwyn.

38. Accordingly, the Debtor has failed to demonstrate that the KEIP is an appropriate exercise of its business judgment.

## RESERVATION OF RIGHTS

39. The Committee expressly reserves all of its rights, claims, defenses and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections during the hearing.

127351763.2

## **CONCLUSION**

40. Based on the foregoing, the Committee respectfully requests that the Court deny the KEIP Motion and grant such other relief as the Court deems just and appropriate.

Dated: December 2, 2021

**FOX ROTHSCHILD LLP**

*/s/ Michael J. Viscount*
Michael J. Viscount, Esq.
Martha B. Chovanes, Esq
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq