| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>*Caption in Compliance with D.N.J. LBR 9004-1(b)*<br>**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**<br>Edmond M. George, Esquire<br>Michael D. Vagnoni, Esquire (pro hac vice)<br>Turner N. Falk, Esquire<br>1120 Route 73, Suite 420<br>Mount Laurel, NJ 08054-5108<br>Telephone: (856) 795-3300<br>Facsimile: (856) 482-0504<br>E-mail:  edmond.george@obermayer.com<br>          michael.vagnoni@obermayer.com<br>          turner.falk@obermayer.com<br><br>Counsel to the Debtor<br>and Debtor in Possession |

| | |
|---|---|
| In re:<br><br>ALUMINUM SHAPES, L.L.C.,<br><br>    Debtor. | Chapter 11<br><br>Case No. 21-16520-JNP |

**SUPPLEMENTAL DECLARATION OF SOLOMON ROSENTHAL IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PLAN, (II) APPROVING DEBTOR'S KEY EMPLOYEE INCENTIVE PLAN, AND (III) GRANTING RELATED RELIEF**

I, Solomon Rosenthal, make this Supplemental Declaration (this "Declaration") under 28 U.S.C. § 1746:

1.    I am a Manager of Aluminum Shapes, L.L.C., the debtor in the above-captioned chapter 11 case (the "Debtor"). I make this declaration in support of the Debtor's Motion: (a) authorizing, but not directing, the Debtor to implement the proposed key employee retention plan (the "KERP"), (b) authorizing, but not directing, the Debtor to implement the proposed key employee incentive plan (the "KEIP"), (c) granting administrative expense priority status to the

1

retention and incentive payments, and (d) granting such other relief as the Court deems appropriate (the "Motion") filed contemporaneously herewith.

2. On August 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage (the "Court").

3. The Debtor continues to manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. No request has been made for the appointment of a trustee or examiner.

5. An Official Committee of Unsecured Creditors has been appointed by the United States Trustee.

6. On November 10, 2021, substantially all of the Debtor's business and assets were sold at auction for a total price of $31,987,000.00 to VV9000 LLC ("Velocity"), and was subsequently approved by the Court on November 12, 2021.

7. On November 24, 2021, the sale to Velocity officially closed (the "Closing Date").

**In Support of the KEIP**

8. Between the Petition Date and the Closing Date, I was asked to go, and went, above and beyond the normal duties of my job in order to obtain the highest possible sales price for the Debtor's business or assets.

9. During this time, I worked upwards of fifteen (15) hours a day, seven (7) days a week, in an attempt to achieve the highest sales price possible for the Debtor business or Assets. It was a delicate balance keeping the Debtor operating while attempting to sell. It was my sincere desire to save jobs by continuing operations during the sales process.

4868-1937-7414 v5

Document    Page 3 of 11

10. The work I performed during this time was in addition to, and not in duplication of, the work done by the Debtor's investment banker, Cowen, and Company, LLC ("Cowen"), in facilitating the sale.

11. I have extensive industry contacts developed over many years through customers, suppliers, and competitors.

12. While Cowen was responsible for facilitating the sale, including qualification of bidders and conducting the auction, the work I did between the Petition Date and Closing Date directly contributed to the sale price achieved, which was significantly above estimates and projections.

13. I personally worked with numerous potential purchasers, including helping them strategize and flesh out potential plans for acquiring the Debtor's business and assets. This involved an in-depth discussion of the Debtor's facilities, equipment, operations, and opportunities. To be clear, the Debtor's operations had value as an operating entity.

14. With regard to one specific potential purchaser, I even flew out to Texas to meet with them, answer any questions, and strategize a potential going concern purchase of the Debtor.

15. With regards to another potential purchaser, Norse Hydro ("Hydro"), I was involved in numerous twenty-four (24) hour-long negotiations with counsel, which did not include back-channeling I did to keep the deal moving forward when it nearly fell apart four (4) times. Because Hydro is a Norwegian company, discussions routinely continued through the night.

16. While the deal with Hydro ultimately did not go through, its potential served to extend operations and preserve jobs for an interim period, and provided the Debtor with $2,250,000.00 in working capital at no cost to the estate, which moneys were used to fund operations, pay administrative expenses, and negated the need for further borrowings from Tiger

4868-1937-7414 v5

Finance, LLC, under the Debtor's DIP Loan Facility. The Hydro transactions fanned interest in the Debtor from other potential purchasers, and drove up the ultimate sales price.

17. With regard to Velocity, the ultimate buyer of the Debtor's assets, I personally contributed a great deal of work to facilitate the sale and the closing. Doug Bathauer ("Bathauer") and I had a great deal of institutional knowledge about the facility, the Debtor having previously sold 8600 River Road to Velocity.

18. Velocity's interest in the Debtor's assets directly resulted from the pre-existing relationships that both myself and Bathauer had with them.

19. Cowen played little part in attracting Velocity to bid for the Debtor's business and assets.

20. I used my personal and industry connections throughout the process to help set market expectations of value, and attracted numerous other potential purchasers and bidders at the auction.

21. Additionally, both Bathauer, myself, the Debtor's counsel, and the relevant third parties played a significant role in handling the Debtor's environmental issues, including creating environmental reports and quantifying environmental risk.

22. Evaluating the Debtor's environmental situation, including quantifying any environmental risk, was extremely important to Velocity and other potential purchasers. As such, being able to coordinate with the Debtor's attorneys, and prior owners, and assess and properly detail the Debtor's environmental situation played a significant role in achieving the Debtor's ultimate sale price.

23. Cowen played a minor role with respect to the Debtor's environmental issues.

24. My goal through the entire sales process, including the time between the Petition Date and the Closing Date, was to attempt to sell the Debtor on a going concern basis and maximize the value of the Debtor.

25. I wanted to keep the Debtor's employees in jobs and give the Debtor's vendors a chance to continue working with the Debtor on that same going concern basis, which would, in turn, help their businesses, the Debtor, and the Debtor's employees.

26. To that end, the Debtor's employees, Bathauer, and I worked tirelessly, without the promise of additional remuneration other than as provided in the KEIP before the Court, to attract as much interest as possible from potential purchasers to buy the Debtor on a going concern basis.

27. While Cowen was responsible for the logistics of the Debtor's sale, it was ultimately these efforts that lead to the achieved sales price of the Debtor of nearly $32 Million.

28. I firmly believe that without the efforts of the Debtor's employees, Bathauer, and myself, the Debtor's purchase price would have been several million dollars less.

29. This declaration describes not only the Debtor's need for the implementation of the KEIP, but also to justify the KEIP due to the great amount of work that both myself and Bathauer undertook, work well beyond the work that Cowen performed, to achieve the sales price of nearly $32 Million.

## In Support of the KERP

30. When the Debtor filed this Chapter 11 case, many of the Debtor's employees voluntarily began to leave the Debtor.

31. The KERP was developed in order to retain employees who were key to the Debtor's business and operations, and prevent them from leaving like other of the Debtor's employees did.

4868-1937-7414 v5

32. While the Committee objects to the request, arguing it comes late in the case, I determined that the request, made months ago, be held in abeyance while the sale process moved through. The promised retentions were made at the onset of the case, and line employees relied on management's good faith efforts to gain approval.

33. Each KERP employee, worked their way out of a job, working to the very end and even after the sale to ensure a smooth transition. These efforts resulted in a handsome estate with initial distributions likely to exceed sixty percent (60%).

34. The KERP consists of nine (9) Employees: Marie Feeney ("Feeney"), Cameron Colston ("Colston"), Susan Agin ("Agin"), Lawrence Bobrowski ("Bobrowski"), James Whittaker ("Whittaker"), Cheryl Drach ("Drach"), Lori Scarfo ("Scarfo"), Janet Devincentis ("Devincentis"), and Cianel Palmer ("Palmer" and collectively with Feeney, Colston, Agin, Bobrowski, Whittaker, Drach, Scarfo, and Devincentis the "KERP Participants").

35. The KERP Participants titles and duties were as follows:

| Name | Title | Duties |
|---|---|---|
| Marie Feeney | Vice President of Sales | Maintain customer contacts and manage orders. Develop new customers relationships. Manage existing customer relationships. |
| Cameron Colston | Facilities Manager | Maintain the condition of the grounds, buildings, vehicles, and facility. Care and maintenance of the facilities, and having the facility prepared for ongoing regulatory inspections. |
| Susan Agin | Operations Manager | Interact with employee unions regarding personnel issues, track production and orders, assist with staffing, publish daily plant activity |

| | | |
|---|---|---|
| | | reports, and manage the customer contact system. |
| Lawrence Bobrowski | Plant Engineer | Track and maintain large parts inventory, maintain catalogue of machinery assets, coordinate with utilities providers, monitor function of power equipment plant wide, and schedule large scale facility maintenance projects, such as roofing, paving etc. |
| James Whittaker | Metal Buyer & Purchasing Manager | Procure and facilitate metal for customer orders. Procure scrap, prime, and raw materials. |
| Cheryl Drach | ESH Director | Oversee and manage employee safety including OSHA reporting and general accident documentation, handle workers compensation claims, oversee the submission and maintaining of all environmental permits, interact with local state and federal environmental agencies, and work with environmental consultants and counsel regarding ongoing remediation. |
| Lori Scarfo | Account Manager | Prepare invoices for and bill current and past customers. Process incoming invoices and accounting entries. |
| Janet Devincentis | Regional Sales | Maintain customer contacts and manage orders. Develop new customers relationships. Manage existing customer relationships. |

7

| Cianel Palmer | Regional Sales | Maintain customer contacts and manage orders. Develop new customers relationships. Manage existing customer relationships. |

36. With respect to each of the KERP Participants, Debtor's counsel has explained to me what an "insider" is pursuant to § 101(31)(B) of the Bankruptcy Code. With counsel's assistance, I have concluded that none of the KERP Participants were "insiders" of the Debtor as that term is defined by the Bankruptcy Code and relevant case law.

37. None of the KERP Participants were an officer, director, manager, or controlling party of the Debtor.

38. None of the KERP Participants were a relative of a general partner, director, officer, or person in control of the Debtor.

39. None of the KERP Participants are Managers of the Debtor or appointed to their position by the owner of the Debtor.

40. Though some of the KERP Participants held titles such as "vice president," these individuals are not insiders. There was no delegation of duties with respect to their relative positions with the Debtor. These titles were in name only, and the titles were often given in lieu of monetary increases in salary, in recognition of seniority or value to the Debtor. The putative titles did not create in any of the KERP Participants, any right to control the Debtor's business decisions, operations or, more importantly, to have input into or influence the KERP negotiations.

41. The Debtor's organizational documents show there are only Managers (the "Managers") who control the Debtor's operations. See Exhibit "A" at 3.1. and 4.1. Though the

organizational documents permit the delegation to designated "officers" by the Managers, no such delegation occurred in this case with respect to any of the KERP Participants.

42. As stated, the titles of the KERP Participants, if any, reflected their individual functions and roles with the Debtor, but did not create an "insider" status.

43. None of the KERP Participants' duties extended to the Debtor's Business operations as a whole or to the negotiation of financial matters, including matters like the KERP. Rather, their duties were restricted to a particular aspect or division of the Debtor's Business.

44. For example, Feeney was not an insider, despite holding the title "Vice President of Sales."

45. As described, Feeney's job and duties were substantially the same as those of Devincentis and Palmer. The title "Vice President of Sales" was given to Feeney simply because she was the Debtor's most senior salesperson in the sales department.

46. As such, Feeney was a vice president in name only, and did not have any ability to influence the Debtor's business operations, or the negotiation of the KERP.

47. Similarly, despite holding titles that include the name "manager" in them, Colston, Agin, Whittaker, and Scarfo, were only managers of their respective divisions of the Debtor, and were not part of the Managers vested with the authority to make business decisions for the Debtor.

48. Accordingly, Colston, Agin, Whittaker, and Scarfo did not have any ability to influence the Debtor's business decisions or operations, or had any ability to participate in or drive the negotiation of the KERP.

49. None of the KERP Participants had the authority to make operational or financial decisions with respect to the Debtor, unless reviewed and approved by me as Manager and CEO.

4868-1937-7414 v5

50. All transactions and dealings between the Debtor and the KERP Participants, and each of them, involved no influence or control by the KERP Participants. As stated above, none of the KERP Participants participated in or influenced the KERP negotiations as an officer of the Debtor or otherwise.

51. All transactions and dealings between the Debtor and the KERP Participants, and each of them, in the negotiations for the KERP, were at arm's length. None of the KERP Participants was in a position to influence the outcome of the KERP program negotiations. The KERP was developed solely through the efforts of the Debtor, the Managers, and Cowen.

52. To the extent any of the KERP Participants' relationships made them "close" to the Debtor or the Managers, such closeness neither brought about any influence or control over the Debtor's actions, nor did it cause transactions and dealings between the KERP Participants and the Debtor not to be at arm's length.

53. None of the KERP Participants (a) aided the Debtor in its decision to file this case; (b) controlled the Debtor's operations or finances (c) can influence the course of the Debtor's operations, (d) had the authority to incur debt; (e) had the power to make decisions about the Debtor's course of action in this Chapter 11 case; (f) decided which creditors would be paid by the Debtor; (g) negotiated the KERP; (h) negotiated the Plan; or (i) has any opportunity to deal with the Debtor on other than an arm's length basis.

54. The KERP was developed without any input from the KERP Participants, further cementing that the KERP Participants are not "insiders."

55. This Declaration describes not only the Debtor's need for the implementation of the KERP, but also demonstrates without serious question that none of the KERP Participants are

statutory or non-statutory "insiders" pursuant to § 101(31)(B) of the Bankruptcy Code, or otherwise.

56. I, therefore, believe that (a) none of the KERP participants is an insider of the Debtor pursuant to § 101(31)(B) of the Bankruptcy Code, or otherwise; (b) that the KERP is reasonable under the circumstances and very modest in amount; (c) that the KERP was not the product of collusion or bad faith, but were negotiated at arm's length; and (d) that the KERP should be authorized by this court.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

By: _____
**Solomon Rosenthal**
**Manager**
**Aluminum Shapes, L.L.C.**

Dated: 2-11-2022

11

4868-1937-7414 v5