| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** <br> *Caption in Compliance with D.N.J. LBR 9004-1(b)* <br> OBERMAYER REBMANN MAXWELL & HIPPEL LLP <br> Edmond M. George, Esquire <br> Michael D. Vagnoni, Esquire (pro hac vice) <br> Turner N. Falk, Esquire <br> 1120 Route 73, Suite 420 <br> Mount Laurel, NJ 08054-5108 <br> Telephone: (856) 795-3300 <br> Facsimile: (856) 482-0504 <br> E-mail:  edmond.george@obermayer.com <br>         michael.vagnoni@obermayer.com <br>         turner.falk@obermayer.com <br><br> Counsel to the Debtor and Debtor in Possession |

| | |
|---|---|
| In re: <br><br> ALUMINUM SHAPES, L.L.C., <br><br> Debtor. | Chapter 11 <br><br> Case No. 21-16520 (JNP) |

## DEBTOR'S MOTION OBJECTING TO THE CLAIM OF ENERGY POWER INVESTMENT COMPANY, LLC

Debtor Aluminum Shapes, L.L.C. (the "Debtor"), by and through its counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby moves, pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules 3001, 3007, 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 3007-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules") objecting to the rejection damages claim of Energy Power Investment Company, LLC (the "Motion"), and states as follows:

**I.   JURISDICTION**

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

2. Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are section 502 of the Bankruptcy Code, Bankruptcy Rules 3001, 3007 and 9014, and Local Rule 3007-1.

4. The Debtor consents to the entry of a final order or judgment by the court if it is determined that the court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## II. BACKGROUND

5. On August 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage.

6. No request has been made for the appointment of a trustee or examiner; an official committee of unsecured creditors has been established in this case.

7. The Debtor was an industry leader in the fabrication, processing, and extruding of aluminum metals and operates out of a single facility located at 9000 River Road, Delair, New Jersey (the "Business"), consisting of approximately 500,000 square feet, including a cast house, foundry, and processing area. See First Day Declaration of Jordan Meyers of Support of First Day Motions. (DI #17).

8. The Debtor engaged professionals to explore a sale of the Debtor's Business or assets (the "Assets").

9. After the Petition Date, the Debtor engaged in negotiations to sell substantially all of its Assets, either to a strategic purchaser or a real estate purchaser. To that end, the Debtor filed

4893-3950-0321 v3-5/26/22

a motion to approve bid procedures. This Court approved the bid procedures by a September 30, 2021 order, as modified on November 5, 2021. (DI #122, 229).

10. Pursuant to these bid procedures, the Debtor conducted an auction of its Assets on November 10, 2021.

11. On November 12, 2021, this Court approved the Debtor's request to sell its Assets to the winning bidder VV9000 LLC for $32 million.

12. The sale to VV9000 LLC closed on November 24, 2021.

13. The Debtor currently has no business operations and will only retain select employees through the end of 2021.

14. On September 13, 2010, the Debtor entered a base contract with PPL EnergyPlus LLC and its successor Talen Energy Marketing, LLC to purchase natural gas and electricity (the "Base Contract"), attached as **Exhibit A**.

15. The Base Contract does not purport to waive the duty to mitigate.

16. The Base Contract elects Pennsylvania law. Id. ¶12.6 and at page 1.

17. The Base Contract provides that if it is terminated early, then Talen Energy Marketing, LLC's assignee Energy Power Investment Company ("EPIC") "shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due)…for which payment has not been made." Ex. A ¶7.1.

18. EPIC may then compare this "Contract Value" of the remaining performance to the "Market Value": the "amount of Gas or Electricity remaining to be delivered or purchased under a transaction multiplied by the market price for a similar transaction at the Delivery Point determined by the non-defaulting party in a commercially reasonable manner." Id.

3

19. Finally, EPIC must determine the difference between the Contract Value and Market Value, and discount that difference "to present value in a commercially reasonable manner as of the Early Termination Date (to take account of the period between the date of liquidation and the date on which such amount would otherwise have been due pursuant to the relevant Terminated Transactions." Id.

20. This contractual computation determines the "Early Termination Damages."

21. The Base Contract was renewed through February 7, 2026 via a May 13, 2015 Transaction Confirmation, attached as **Exhibit B**.

22. The Transaction Confirmation provides that the Uniform Commercial Code as adopted in Pennsylvania applies, and the Base Contract is for a sale of goods. Ex. B at 3.

23. On July 13, 2015, this renewed contract with the Debtor was assigned to EPIC.

24. The Debtor filed a motion to reject executory contracts, including the as-modified Base Contract.

25. This Court granted the Debtor's motion to reject by a December 28, 2021 order. (DI. #334).

26. Within the time set forth in that order, EPIC filed a rejection damages claim (the "Claim") pursuant to 11 U.S.C. §365(g). (POC #10038).

27. The Claim includes a purported liquidation of the Early Termination Damages in the amount of $1,358,118.95, attached as **Exhibit C**.

28. This calculation of Early Termination Damages alleges that power generated by the "Pennsauken Landfill" will remain stable at 5,000,000 kWH through the year 2026.

29. The pumps in the landfill that generate this power are already generating less than they have historically, as the usable landfill materials are depleted and pumps cease to operate.

4893-3950-0321 v3-5/26/22

30. The calculation also alleges that solar production will remain stable through 2026 at 2,100,000 kWH a year.

31. The solar panels were installed prior to 2010.

32. Upon information and belief, it is not commercially reasonable to assume these panels will continue to generate the same capacity without any maintenance costs.

33. This purported liquidation was not performed in a commercially reasonable manner, and does not include all calculations required under the Base Contract.

34. The Early Termination Damages sought in the Claim are liquidated damages, but are not appropriately tied to the actual harm suffered as required by Pennsylvania law.

35. Under Pennsylvania law, EPIC has a duty to mitigate its damages.

36. Upon information and belief, EPIC has mitigated its damages by selling the natural gas and electricity originally committed to the Debtor to VV9000 LLC as the purchaser of the Debtor's Assets, and to other power purchasers.

37. The Claim must be partially disallowed pursuant to applicable law.

### III. RELIEF REQUESTED

#### A. Disallowance of Unenforceable Claim Pursuant to 11 U.S.C. §502(b)(1)

38. A proof of claim is allowed unless "a party in interest" objects. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000); 11 U.S.C. §502(a).

39. Pursuant to 11 U.S.C. §502(b)(1), a party in interest may object to a claim if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." Such an objectionable claim must be disallowed to the extent it is unenforceable.

5

      i. <u>EPIC has not computed the Early Termination Damages consistent with the Base Contract</u>

40. To the extent that the Early Termination Damages are not unenforceable as against public policy (discussed below), they are enforceable only to the extent laid out in the Base Contract.

41. The Base Contract provides a specific mechanism to compute the Early Termination Damages: the Contract Value minus the Market Value, discounted to net present value. See Ex. A ¶7.1.

42. The Contract Value, Market Value and present value discount rate must be determined in a commercially-reasonable manner per the Base Contract. <u>Id</u>.

43. The Claim does not discount the future amounts to net present value, implicitly claiming that the value of a dollar today is exactly equal to the value of a dollar in 2026. See Ex. C.

44. In fact, the United States is currently experiencing inflation that reduces the purchasing power of a dollar by 7-8% per year.

45. It is commercially unreasonable to assume no net present value discount.

46. The Contract Value is the amount of power "remaining to be delivered or purchased under a transaction" time the applicable contract price.

47. The Claim alleges that production will be literally identical each year between now and 2026.

48. Power production from the landfill is falling as useable materials are depleted.

49. It is not commercially reasonable to assume that landfill power production will remain stable.

50. The solar equipment is over twelve (12) years old.

6

51. It is not commercially reasonable to assume that the solar equipment will consistently produce the same quantity of power each year through 2026 without incurring any maintenance costs.

52. The Market Value means the amount of power to be delivered times the market price for delivery of that power.

53. The Claim asserts that the per-unit price used to determine Market Value will remain stable at $0.031 per kWH.

54. In fact, a February 2022 survey by the United States Energy Information Administration, attached as **Exhibit D**, indicates that the average market rate for commercial electric power in New Jersey is $0.1305 per kWH.

55. The Market Value was thus not computed in a commercially reasonable manner, as it assumes an unchanging low market price where the current market price is 420.96% higher.

56. At the current average market price, EPIC will not suffer any lost profits at all due to the Debtor's rejection: instead EPIC will be able to sell the power for approximately twice the price it was obligated to sell to the Debtor, netting approximately ten cents per kWH instead of three.

57. The Claim must be disallowed, as it was not computed in a commercially reasonable manner.

58. If computed in a commercially reasonable manner as required by the Base Contract, EPIC has lost no profits and suffered no damages.

    ii. <u>EPIC has a duty to mitigate the Early Termination Damages</u>

59. Rejection of an executory contract is deemed to be a breach by the Debtor on the Petition Date. 11 U.S.C. §365(g).

60. "A party who suffers a loss due to a breach of contract has a duty to make reasonable efforts to mitigate his losses." Turner Construction Co. v. First Indemnity of America Insurance Co., 829 F.Supp. 752, 761 (E.D.Pa.1993) quoting State Public School Bldg. Authority v. W.M. Anderson Co., 49 Pa.Cmwlth. 420, 410 A.2d 1329 (1980).

61. "As a matter of general contract law, the Pennsylvania Supreme Court has held that a plaintiff's duty to mitigate its damages arises upon the defendant's breach of the contract." Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1448 (3d Cir. 1996) citing Bafile v. Borough of Muncy, 527 Pa. 25, 588 A.2d 462, 464 (1991).

62. Mitigation is an affirmative defense that reduces a breaching party's liability. Williams v. Masters, Mates and Pilots of Am., 384 Pa. 413, 120 A.2d 896, 901 (1956).

63. In a bankruptcy proceeding, "the duty to mitigate damages prevents a party from recovering damages which the injured party could have avoided without undue risk, burden or humiliation." In re Rowland, 292 B.R. 815, 820 (Bankr. E.D. Pa. 2003).

64. The Base Contract provided that the Debtor would purchase a certain amount of power from EPIC.

65. When the Debtor rejected the Base Contract, the power committed to the Debtor could be sold elsewhere.

66. The Claim seeks the lost profits due to EPIC through the Base Contract's end date of February 7, 2026.

67. By reselling the previously-committed power to other buyers, EPIC can mitigate or even eliminate its damages without undue risk, burden or humiliation.

68. EPIC is indeed selling the previously-committed power to VV9000 LLC (or its successor) and actively mitigating its damages.

8

69. Any power not purchased by VV9000 LLC can be sold to other purchasers either by direct contract or by feeding the excess power back into the grid, which New Jersey law requires utility companies to accept and credit EPIC for.

70. The Claim must be disallowed to the extent that EPIC's damages are or can be mitigated.

### iii. The Early Termination Damages are an unenforceable penalty

71. EPIC stipulated in the Base Contract that the Uniform Commercial Code Article 2 for Sales of Goods applies.

72. Pursuant to UCC Article 2, "Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty." 13 Pa.C.S. §2718(a).

73. "In Pennsylvania, liquidated damages are defined as 'the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable ... if the breach occurs.'" D.A. Nolt, Inc. v. Philadelphia Mun. Auth., 463 F. Supp. 3d 539, 543–44 (E.D. Pa. 2020) quoting Benson v. Budget Rent A Car Sys., Inc., No. 08-4512, 2011 WL 4528334, at *5 (E.D. Pa. Sept. 29, 2011) (citations omitted).

74. "[C]ontracting parties may provide for pre-determined liquidated damages in the event one party fails to perform, particularly in circumstances where actual damages would be difficult to estimate in advance or to prove after a breach occurs." Pantuso Motors, Inc. v. Corestates Bank, N.A., 568 Pa. 601, 798 A.2d 1277, 1282 (2002) (citations omitted).

4893-3950-0321 v3-5/26/22

75. "'To be enforceable, liquidated damages must be a reasonable forecast to the possible harm to the non-breaching party' rather than an unlawful penalty." D.A. Nolt, Inc. v. Philadelphia Mun. Auth., 463 F. Supp. 3d 539, 543–44 (E.D. Pa. 2020) quoting Palmieri v. Partridge, 853 A.2d 1076, 1080 (Pa. Super. Ct. 2004).

76. The Base Contract does not provide a reasonable forecast of the possible harm. Instead, it provides a mechanism to compute possible harm based on the conditions in place at the time of breach.

77. The Base Contract provides that the non-breach party may liquidate a number in a commercially-reasonable manner, in accordance with the state of the market at the time of computation.

78. This provision is inconsistent with the law on liquidated damages in two ways: first, it requires a reasonably-certain calculation of damages when liquidated damages are only proper if actual damages are too difficult to estimate. That is, the calculation requires market information if it is to be commercially reasonable. But if market information can be used to calculate the damages, then the damages are not too difficult to prove upon a breach and are inappropriate for a liquidated damages clause.

79. Second, it gives the non-breaching party wide discretion to decide for itself the liquidated amount, giving neither party any actual guidance on the amount of damages until after a breach has occurred.

80. Liquidated damages clauses are intended to provide both parties certainty and efficiency, and the Base Contract does neither.

4893-3950-0321 v3-5/26/22

81. Where the Early Termination Damages calculation requires market inputs, it merely replicates a normal breach calculation and serves no purpose as a "liquidated damages" clause.

82. Where the calculation gives EPIC discretion, it promotes the choice of inputs that exaggerate damages in order to maximize them – punishing the breaching party for the breach instead of compensating for it.

83. As discussed elsewhere in this Motion, EPIC has in fact employed its discretion to maximize the claimed amount by making commercially-unreasonable (and in some cases impossible) assumptions.

84. If the Base Contract is examined as of the time the parties entered into it, it fulfills none of the roles of a liquidated damages clause.

85. If examined as of the time EPIC performed the calculation, the as-applied Base Contract has a punitive impact totally unconnected with the actual harm suffered by EPIC.

86. The amounts sought in the Claim are punitive and void. The Claim must be disallowed.

## IV. CONCLUSION

For the reasons discussed above, this Court must grant the Motion disallowing the Claim.

Respectfully Submitted,

Dated: May 26, 2022

By: /s/ Edmond M. George
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire (*pro hac vice*)
Turner N. Falk, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
Telephone: (856) 795-3300

11

        Facsimile: (856) 482-0504
        E-mail:  edmond.george@obermayer.com
               michael.vagnoni@obermayer.com
               turner.falk@obermayer.com
*Counsel to Chapter 11 Debtor Aluminum Shapes, L.L.C.*

12

4893-3950-0321 v3-5/26/22