**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

*Caption in Compliance with D.N.J. LBR 9004-1(b)*

FOX ROTHSCHILD LLP
2 South Biscayne Boulevard, Suite 2750
Miami, FL 33131
Telephone: (305) 442-6543
Robert F. Elgidely, Esq. (Admitted *Pro Hac Vice*)
relgidely@foxrothschild.com
-and-
Joseph J. DiPasquale, Esq.
jdipasquale@foxrothschild.com
Michael J. Viscount, Esq.
mviscount@foxrothschild.com
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800

*Counsel to the Aluminum Shapes Liquidating Trust*

| | |
|---|---|
| In Re:<br><br>ALUMINUM SHAPES, L.L.C.,<br><br>          Debtor. | Chapter 11<br><br>Case No. 21-16520-JNP<br><br>Hon. Jerrold N. Poslusny, Jr. |
| ADVISORY TRUST GROUP, LLC,<br>AS LIQUIDATING TRUSTEE OF THE<br>ALUMINUM SHAPES LIQUIDATING TRUST,<br><br>          Plaintiff,<br><br>v.<br><br>JACKY CHEUNG,<br>SOLOMON A. ROSENTHAL,<br>CHARLES POK A/K/A<br> SEONG LOK CHARLES POK,<br>LISA W. JOHNSON,<br>ROBERT OTTERBEIN, and<br>DOUG BATHAUER,<br><br>          Defendants. | Adv. Proc. No. |

**ADVERSARY COMPLAINT FOR DAMAGES**
**AND DEMAND FOR JURY TRIAL**

153318682.1

Plaintiff, ADVISORY TRUST GROUP LLC, as Liquidating Trustee of the Aluminum Shapes Liquidating Trust (the "<u>Plaintiff</u>" or "<u>Liquidating Trustee</u>"), by counsel, files this Adversary Complaint for Damages and Demand for Jury Trial, against Defendants, JACKY CHEUNG, an individual; SOLOMON A. ROSENTHAL, an individual; CHARLES POK a/k/a SEONG LOK CHARLES POK, an individual; LISA W. JOHNSON, an individual; ROBERT OTTERBEIN, an individual; and DOUG BATHAUER, an individual ("<u>Cheung</u>," "<u>Rosenthal</u>," "<u>Pok</u>," "<u>Johnson</u>," "<u>Otterbein</u>," and "<u>Bathauer</u>," respectively, or collectively the "<u>Defendants</u>"),[1] and alleges as follows:

## PROCEDURAL BACKGROUND

1.      On August 15, 2021 (the "<u>Petition Date</u>"), Aluminum Shapes LLC ("<u>Aluminum Shapes</u>," "<u>Company</u>," or "<u>Debtor</u>") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of New Jersey.

2.      On August 11, 2022, the Court entered an Order confirming the Official Committee of Unsecured Creditors' Plan of Liquidation (the "<u>Chapter 11 Plan</u>"), approving provisions concerning the establishment of a Liquidating Trust upon the effective date of the Chapter 11 Plan and retaining jurisdiction over any matters arising out of, or related to, the bankruptcy case and the Chapter 11 Plan (D.E. 619 - the "<u>Confirmation Order</u>").

3.      On August 24, 2022, the Chapter 11 Plan became effective in accordance with its terms (the "<u>Effective Date</u>").

---

[1] In compliance with Fed. R. Bankr. P. 7020 regarding the joinder of multiple parties in a single action, the claims asserted against the named Defendants arise out of the same series of transactions, acts, and omissions and involve common issues of law and fact.

## PARTIES

4.      Plaintiff is the Liquidating Trustee and fiduciary responsible for administering the Liquidating Trust for the benefit of the Debtor's creditors.  Plaintiff is the representative of the Debtor's estate with exclusive standing and authority to enforce, sue on, prosecute, settle, or compromise "Causes of Action" assigned and transferred to the Liquidating Trust including "Avoidance Actions" and "D&O Claims" (each as being defined in the Chapter 11 Plan) including the claims asserted herein.

5.      At all or certain times material hereto, the below-named Defendants were managers, officers, and/or control persons of the Debtor holding *de facto* and/or *de jure* titles and positions with the Debtor:

      a.    Defendant Cheung is an Australian national and resident of Vietnam.  Cheung was a President, Manager, and Member of Aluminum Shapes from at least November 17, 2015 through the Petition Date.  At all times material hereto, Cheung had full and complete authority, power, and discretion to manage and control the business, property, and affairs of Aluminum Shapes, to make all decisions regarding those matters, and to perform all other acts or activities customary or incident to the management of the Company's business, property, and affairs.  In his positions as President and Manager, Cheung was or should have been involved in and otherwise had knowledge or should have had knowledge of all material aspects of the business, operational, and financial affairs of the Company.  At all times material hereto, Cheung was acting within the scope of his duties as President and Manager of the Company, and in such positions, owed the Company the fiduciary duties of loyalty, good faith, and

153318682.1

care. During the same period of time he occupied the foregoing roles with the Company, Cheung was also the sole shareholder, Director, President, Chief Executive Officer, Chief Financial Officer, and Secretary of Perfectus Aluminum, Inc. ("Perfectus Aluminum") and the sole manager of Perfectus Aluminum Acquisitions LLC ("Perfectus Acquisitions").

b. Defendant Rosenthal is a citizen of the State of New Jersey. Rosenthal was the Chief Executive Officer ("CEO") and Co-Manager of Aluminum Shapes from at least May 1, 2018 and August 10, 2021 respectively through the Petition Date. Additionally, Rosenthal held *de facto* and/or *de jure* titles and positions with the Company. At all or certain times material hereto, Cheung gave Rosenthal full and complete authority, power, and discretion to manage and control the business, property, and affairs of the Company, to make all decisions regarding those matters, and to perform all other acts or activities customary or incident to the management of the Company's business, property, and affairs, with decisions of the Managers to be made jointly by the Managers. In his positions as CEO and Co-Manager, Rosenthal was or should have been involved in and otherwise had knowledge or should have had knowledge of all material aspects of the business, operational, and financial affairs of the Company. At all times material hereto, Rosenthal was acting within the scope of his duties as CEO and Co-Manager of the Company, and in such positions, owed the Company the fiduciary duties of loyalty, good faith, and care.

c. Defendant Pok is a citizen of the State of California. Pok was Co-Manager of Aluminum Shapes from at least August 10, 2021 through the Petition Date.

4

153318682.1

Additionally, Pok held *de facto* and/or *de jure* titles and positions with the Company. At all or certain times material hereto, Pok was Cheung's agent and had actual authority to act on his behalf vis-à-vis the Company and was delegated full and complete authority, power, and discretion to manage and control the business, property, and affairs of the Company, to make all decisions regarding those matters, and to perform all other acts or activities customary or incident to the management of the Company's business, property, and affairs, with decisions of the Managers to be made jointly by the Managers. In the position of Co-Manager, Pok was or should have been involved in and otherwise had knowledge or should have had knowledge of all material aspects of the business, operational, and financial affairs of the Company. At all times material hereto, Pok was acting within the scope of his duties as Co-Manager of the Company, and in such position, owed the Company the fiduciary duties of loyalty, good faith, and care.

d.    Defendant Johnson is a citizen of the State of Pennsylvania. Johnson was the Chief Financial Officer ("CFO") of Aluminum Shapes from at least 2018 through December 26, 2019. Additionally, Johnson held *de facto* and/or *de jure* titles and positions with the Company at all or certain times material hereto. Johnson had such duties and responsibilities as determined by and such authority as delegated by the Managers. In her position as CFO, Johnson was or should have been involved in and otherwise had knowledge or should have had knowledge of all material aspects of the business, operational, and financial affairs of the Company. At all times material hereto, Johnson was acting within

5

the scope of her duties as CFO of the Company, and in such position, owed the Company the fiduciary duties of loyalty, good faith, and care.

e.  Defendant Otterbein is a citizen of the State of Florida.  Otterbein was the Vice President of Finance and CFO of Aluminum Shapes from at least March 2012 through April 2018.  Additionally, Otterbein held *de facto* and/or *de jure* titles and positions with the Company at all or certain times material hereto. Otterbein had such duties and responsibilities as determined by and such authority as delegated by the Managers.  In his positions as Vice President of Finance and CFO, Otterbein was or should have been involved in and otherwise had knowledge or should have had knowledge of all material aspects of the business, operational, and financial affairs of the Company.  At all times material hereto, Otterbein was acting within the scope of his duties as Vice President of Finance and CFO of the Company, and in such positions, owed the Company the fiduciary duties of loyalty, good faith, and care.

f.  Defendant Bathauer is a citizen of the State of Indiana.  Bathauer was the Chief Operating Officer ("COO") of Aluminum Shapes from at least April 24, 2019 through the Petition Date.  Additionally, Bathauer held *de facto* and/or *de jure* titles and positions with the Company at all or certain times material hereto. Bathauer had such duties and responsibilities as determined by and such authority as delegated by the Managers.  In his position as COO, Bathauer was or should have been involved in and otherwise had knowledge or should have had knowledge of all material aspects of the business, operational, and financial affairs of the Company.  At all times material hereto, Bathauer was acting

6

within the scope of his duties as COO of the Company, and in such position,

owed the Company the fiduciary duties of loyalty, good faith, and care.

g.   The below chart summarizes the terms of service of each Defendant:

| D&O | Position/Title | Start Date | End Date |
|---|---|---|---|
| Cheung | President, Manager, and Member | 11/17/15 | 08/15/21 |
| Rosenthal | Chief Executive Officer and Co-Manager | 05/01/18 | 08/10/21 |
| Pok | Co-Manager | 08/10/21 | 08/15/21 |
| | *De facto* officer, Manager, and Control Person | 2012 | 08/15/21 |
| Johnson | Chief Financial Officer | 2018 | 12/26/19 |
| Otterbein | Vice President of Finance | 2012 | April 2018 |
| Bathauer | Chief Operating Officer | 04/24/19 | 08/15/21 |

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).  In the Confirmation Order, the Court retained jurisdiction over the Chapter 11 case and all matters arising out of or related to the Chapter 11 case and the Chapter 11 Plan notwithstanding entry of such order and the occurrence of the Effective Date.  This action holds a close nexus to the Chapter 11 Plan, in that it affects the interpretation, consummation, execution, or administration thereof.

7.      This is a core and a non-core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O).  Plaintiff consents to the entry of final orders and judgment by the Bankruptcy Court, subject to Plaintiff's demand for and right to a trial by jury before the District Court.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

7

9.      All conditions precedent to the filing of this action have been performed, waived, satisfied, or have otherwise occurred.

## <u>MATERIAL NON-PARTIES TO THIS ACTION</u>

10.     The material non-parties to this action and referenced in this Complaint are:

a.  CHINA   ZHONGWANG   HOLDINGS   LIMITED   ("<u>CZHL</u>"),   was headquartered in the People's Republic of China ("<u>PRC</u>").  CZHL was the largest aluminum extrusion manufacturer in Asia and the second largest in the world.

b.  ZHONGTIAN LIU ("<u>Chairman Liu</u>") was a lawful permanent resident of the United States and a citizen of the PRC.  At all or certain times material hereto, Chairman Liu was the controlling shareholder, President, and Chairman of the Board of Directors of CZHL.  Upon information and belief, Chairman Liu effectively owned and controlled the Perfectus Predecessor Entities, Perfectus Aluminum, Perfectus Acquisition, Aluminicaste, and GVA entities referenced below.

c.  XIANG CHUN SHAO a/k/a "Johnson Shao" ("<u>Shao</u>") was a resident of the State of California.  At all or certain times material hereto, Shao managed the following entities at the direction of Chairman Liu (a) Pengcheng Aluminum Enterprise, Inc.; (b) Century American Aluminum, Inc.; (c) Global Aluminum (USA), Inc.; (d) American Apex Aluminum, Inc.; (e) Aluminum Source, Inc.; (f) Transport Aluminum, Inc.; and (g) Aluminum Industrial, Inc. (together, the "<u>Perfectus Predecessor Entities</u>"); as well as (h) Perfectus Aluminum Inc. ("<u>Perfectus Aluminum</u>").

8

d.  PERFECTUS ALUMINUM ACQUISITIONS LLC ("Perfectus Acquisitions")
was a Delaware limited liability company, was the wholly-owned subsidiary of
Perfectus Aluminum, and was the entity with and into which the Perfectus
Predecessor Entities merged on or about December 31, 2014.  Before May 22,
2019, Aluminum Shapes was indirectly owned by Cheung through Perfectus
Aluminum and Perfectus Acquisitions.

e.  ALUMINICASTE FUNDICION DE MEXICO ("Aluminicaste") was an
aluminum company headquartered in Mexico.

f.  GLOBAL VIETNAM ALUMINUM ("GVA") was an aluminum company
headquartered in Vietnam.

g.  ZUOPENG LIU a/k/a Zo Pong Liu ("ZP Liu") was Chairman Liu's son and
who, upon information and belief, has a son named "Alston".  ZP Liu
incorporated Perfectus Aluminum, was an officer of each of the Perfectus
Predecesor Entities, and was the Manager of Perfectus Acquisitions.

h.  ZHIJIE WANG a/k/a Jasmine Wang ("Wang") was Chairman Liu's ex-wife
and mother of ZP Liu.  Wang is an individual who, at all or certain times
material hereto, purported to own or operate Alston International (defined
below).

i.  ALSTON INTERNATIONAL INC. ("Alston International") is a California
corporation which was purportedly owned or operated by Wang.  At all or
certain times material hereto, Cheung and Pok were closely affiliated with
Alston International and obtained loans, management services, and tax
preparation services from Alston International for the benefit of Aluminum

9

Shapes.  At all or certain times material hereto, Rosenthal also utilized an Alston

International email address for Company business.

## GENERAL ALLEGATIONS

**A.      Preliminary Statement**

11.     The Debtor was an aluminum processer having a completely vertically integrated

plant and operations for the processing, annealing, cutting, fabricating, welding, and extruding of

aluminum located in Pennsauken, New Jersey.

12.     From November 2012 through April 2019, the Debtor was heavily dependent on

unsecured insider loans totaling tens of millions of dollars in order to sustain operations despite a

long history of negative operating cash flows, negative gross margins, declining revenues, and

substantial operating losses.

13.     After the federal government issued an indictment against other parties in the

aluminum industry on May 7, 2019, Cheung informed the other Defendants that he was not going

to provide unsecured investor loans to the Debtor in the future.

14.     At that point, the Defendants should have evaluated potential value-maximizing

transactions that could reasonably be in prospect and which could be consummated within a

reasonable time for the benefit of all stakeholders.

15.     Instead, the Defendants breached and/or abdicated their fiduciary duties of loyalty,

good faith, and care under New Jersey law and caused the Debtor's insolvency to deepen by over

$20 million over the following two years.

16.     The breach of fiduciary duty claims at issue involve acts and omissions that

primarily fall into the following categories – (i) claims against the Defendants for complete and

utter abdication of their duties by the failure to implement and/or follow adequate systems,

safeguards, and controls, or to otherwise fully and properly monitor or supervise the Company's operations, i.e., liability premised on "unconsidered inaction," as opposed to affirmative decisions to act or not act, in regard to multiple material financial, business, and operational functions of the Company; and (ii) claims against the Defendants for (a) causing, participating, allowing, or otherwise acquiescing in certain improper acts and omissions, failing to prevent same, and improperly failing to disclose same, (b) causing, allowing, or otherwise acquiescing in the dissemination of materially inaccurate financial, business, and operational information to the Company's lenders and/or other third parties and/or otherwise failing to disclose certain material negative information about the Company, (c) failing to properly, fully, and timely consider options and effectuate an action plan to maximize the value of the Company, (d) acting or failing to act in conscious disregard for their respective fiduciary duties and the best interests of the Company, and (e) acting or failing to act to advance a purpose other than the best interests of the Company.

17.     The Defendants' respective breaches of their fiduciary duties of loyalty, good faith, and care, among other things, caused the Company to incur debt in excess of $20 million while the Company's assets were depleted or otherwise materially decreased in value and suppressed the true, critically impaired and defective financial, business, and operational condition of the Company, which allowed the Company to continue to operate well past the point of insolvency causing substantial harm and damage to the Company.

18.     As a direct and proximate result of the acts and omissions committed by the Defendants in breach of their respective fiduciary duties of loyalty, good faith, and care alleged herein, the Debtor has suffered damages that include, but that are not necessarily limited to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the

Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims filed or asserted against the Debtor's estate; and (vi) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law.

### B.    Anti-Dumping & Countervailing Duties

19.    The United States Department of Commerce ("DOC") and the United States International Trade Commission ("USITC") regulated commerce in the United States, and, as part of their responsibilities, had the authority to impose duties on certain foreign imports.

20.    Upon information and belief, the PRC has historically subsidized its aluminum extrusion industry, making it advantageous for PRC aluminum exporters to deliver extruded aluminum into the United States at below their actual cost of production, thereby undercutting and damaging the United States aluminum extrusion industry.  As a result, there has been a substantial incentive for PRC aluminum exporters to bring as much subsidized aluminum extrusion as possible into the United States.

21.    In March 2010, the United States domestic producers of aluminum extrusions filed a petition with the USITC for an investigation into whether PRC aluminum extruders were receiving countervailing government subsidies and whether the resulting aluminum extrusions from these PRC extruders were being "dumped" into the United States and harming the United States aluminum extrusion industry.

22.    In the 2010 USITC action, the United States named three PRC companies as mandatory respondents. One of those companies was CZHL's parent company, which was founded by Chairman Liu.

12

23.     In or about April 2010, the USITC and DOC initiated an investigation of whether anti-dumping and countervailing duties ("AD/CVD") should be imposed on imports of certain aluminum extrusions from the PRC.

24.     After the investigation and preliminary findings by the USITC and DOC, Commerce issued preliminary anti-dumping and countervailing duty determination orders effective September 7, 2010 for countervailing duties, 75 Fed. Reg. 54,302 (Sept. 7, 2010), and November 12, 2010 for antidumping duties, 75 Fed. Reg. 69,403 (Nov. 12, 2010). More specifically, the DOC and USITC imposed AD/CVD duties.

25.     AD/CVD orders were formal determinations issued by the DOC and USITC that AD/CVD duties should be collected by U.S. Customs and Border Protection ("CBP") on imports of a particular product from specified countries and companies. AD/CVD orders were intended to ensure fair competition between United States companies and foreign industry, and to counter international price discrimination that caused injury to United States domestic industries.

26.     These preliminary dumping and countervailing duty orders anticipated final orders would be in place in early 2011, and put parties on notice that substantial dumping duties and countervailing duties would likely soon be imposed on PRC extruded aluminum imported into the United States.

27.     On May 26, 2011, the DOC issued an AD order and a CVD order ("2011 AD/CVD Orders") that imposed enhanced CVD duties of 374.15% on certain aluminum extrusions imported from wholly-owned subsidiaries of CZHL and AD duties of 33.28% on certain aluminum extrusions imported from the PRC. *See* 76 Fed. Reg. 30653 (May 26, 2011).

28.     Notably, the 2011 AD/CVD Orders exempted from AD/CVD duties any finished merchandise, which was defined by DOC as products that were fully and permanently assembled

13

and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels.

29.    In order to enforce the 2011 AD/CVD Orders, CBP was responsible for examining merchandise entering the United States through ports and other points of entry to ensure that the merchandise was admissible under, and in compliance with United States laws; and the assessment and collection of all applicable taxes, fees, and duties, including AD/CVD duties, on imported merchandise.

30.    CBP Form 7501 ("Form 7501" or "Entry Summary") required importers, or their agents, to provide truthful information relating to imported merchandise, including: a description of the merchandise; the identity of the merchandise's manufacturer, its value, and country of origin; the entry type; and the AD/CVD rate, if any.

31.    A customhouse broker or agent normally handled the process of entering goods into the United States on behalf of an importer, which process included completing entry documents, including Form 7501, based on information provided by the importer, and filing the completed Form 7501 with CBP on behalf of the importer.

32.    Entry type "01" was the entry type to be used when the goods at issue in the Form 7501 were free and dutiable. Entry type "03" was the entry type to be used when the goods at issue in the Form 7501 were subject to applicable AD/CVD orders.

33.    In an effort to avoid liability for the AD/CVD duties, CZHL and its affiliates started to tack weld aluminum extrusions into the shape of pallets and exported 2.2 million pallets to the United States as "finished merchandise" in order to claim they were exempt from the 2011 AD/CVD Orders in the period 2011 through 2014.

14

153318682.1

34.     Notably, however, the aluminum pallets had no purpose, no commercial value, no domestic market, and none were ever sold in the United States.

35.     After the aluminum pallets had entered the United States through ports and other points of entry, CZHL's affiliates (acting as importers) as well as their customshouse brokers or agents would provide false information on the CBP Form 7501 in order to avoid liability for the substantial AD/CVD duties.

36.     Thereafter, the aluminum pallets were melted down into billets so that they would be useable/saleable in the United States or would be stockpiled in warehouses in order to maintain the pretense that they were sold to customers in the United States.

37.     The actions referenced above at paragraphs 33 through 36 enabled CZHL and its affiliates to avoid liability for $1.8 billion in AD/CVD duties from 2011 through 2014.

38.     On May 7, 2019, the federal government indicted Chairman Liu, CZHL, Shao, Perfectus Aluminum, Perfectus Acquisitions, four warehouse owners, and other individuals for this AD/CVD avoidance scheme (the "Federal Indictment").  *See United States v. Perfectus Aluminum, Inc., et al.*, United States District Court for the Central District of California, Case No. 2:19-cr-00282-RGK.   No charges were asserted against Aluminum Shapes or any of the Defendants in the Federal Indictment.

39.     On August 23, 2021 (or eight days after the Petition Date), a federal jury found Perfectus Aluminum, Perfectus Acquisitions, and the four warehouse defendants guilty of the AD/CVD avoidance scheme (the "Jury Verdict"). The claims against Lui, CZHL, Shao, and other individuals were not tried because they failed to appear and defend against the charges in the Federal Indictment.

15

### C.     Aluminum Shapes is formed and commences operations

40.     On November 16, 2012 (or approximately one year after the DOC issued the 2011 AD/CVD Orders), Shao filed a Certificate of Formation for Delair Aluminum LLC ("Delair") with the State of New Jersey Division of Revenue and provided the same principal business address as the one being utilized by the Perfectus Predecessor Entities in California.

41.     On December 18, 2012, Shao filed a New Jersey limited liability company amendment in order to formally change Delair's name to Aluminum Shapes LLC.

42.     On December 21, 2012, Shao registered Shapes, L.L.C. as an alternate or "doing business as" name for Aluminum Shapes, LLC.

43.     At or about the time of the foregoing corporate filings, Aluminum Shapes purchased substantially all of the assets of an operating aluminum processing company by the name of Shapes L.L.C. consisting of (among other things) real property located at 8600 and 9000 River Road, Pennsauken, NJ, machinery, fixtures, and equipment, a cast house and foundry furnace, several presses, and aluminum processing equipment.

44.     For the following nine years, Aluminum Shapes operated as an aluminum processor that fabricated, processed, and extruded aluminum metals until its assets were sold in the bankruptcy case on or about November 23, 2021.

### D.     Aluminum Pallets, Administrative Proceedings, Negative Publicity, and FCA Claims

45.     The sale of aluminum pallets was never part of its predecessor's business and Aluminum Shapes had no legitimate need, use or purpose for the pallets.

46.     However, Aluminum Shapes began to receive shipments of aluminum pallets in 2013 and was the importer of record for pallets from China in 2014 (using its importer of record

16

number 46-140628800).

47.      In order to avoid liability for AD/CVD duties at the time of these imports, Aluminum Shapes provided false information in twenty two CBP Forms 7501 by (i) falsely omitting the countervailing duties case number in Column 29; (ii) falsely omitting the countervailing duties rate of 374.15 percent in Column 33; (iii) falsely omitting the resulting countervailing duties owed in Block 34; (iv) falsely stating in Block 34 an incorrect total duty owed that did not include the applicable countervailing duty; and (v) falsely certifying that the statements in the filed Form 7501 Entry Summary were true and correct.

48.      On December 9, 2014, Aluminum Shapes received notification that it was going to be audited by CBP regarding the AD/CVD duties.  Notably, Pok and Otterbein acknowledged in the audit questionnaire that Aluminum Shapes did not have written policies and procedures to assure AD/CVD duties were declared when appropriate.  Additionally, Shao, Pok, and Otterbein provided materially false information to CBP during the course of the audit including the identity of the manufacturer of the aluminum pallets, their suitability for use in chemical and metal industries, and that they had fully-sealed welds.

49.      On April 13, 2015, one or more relators filed a *qui tam* suit against Aluminum Shapes alleging that the Company had violated the False Claims Act, 31 U.S.C. §§ 3729, et seq. (the "FCA") by importing $26 million of extruded aluminum from CZHL's parent company in the PRC to the port of New York on twenty two separate occasions and falsifying CBP Forms 7501 in connection therewith.  *See United States ex rel. [Under Seal] v. Pengcheng Aluminum Enterprise, Inc. USA, et al.*, Case No. 5:15-cv-00712 (C.D. Cal.) (the "FCA Action").  The relators sought $70,258,760.08 in damages and $140,759,519.90 in penalties from Aluminum Shapes as a result of its  alleged violations of the FCA.

50.     Since it was filed, the FCA Action has been under seal. However, the FCA Action came to the attention of the Liquidating Trustee through the United States Department of Justice's filing of proof of claim number 10041 for $211,018,280.00 in Aluminum Shapes' bankruptcy case on February 11, 2022 (the "FCA Claim").

51.     Unfortunately, the Defendants had failed to reserve any funds for payment of AD/CVD duties from 2013 through the Petition Date.  Nevertheless, the Liquidating Trustee settled the FCA Claim in April 2023 for a cash payment of $1 million at the expense and detriment of the unsecured creditor body.

52.     On or about October 22, 2015, the Aluminum Extrusions Fair Trade Commission filed a petition with the Aluminum Extruders Council alleging that CZHL improperly avoided AD/CVD duties by claiming the aluminum pallets were "final finished products" exempt from the 2011 AD/CVD Orders and that Aluminum Shapes was melting the pallets in its cast house furnace in order to reconfigure them into a form with commercial value.  A witness, by the name of Jeffrey Henderson ("Henderson") provided testimony to the United States Department of Commerce corroborating the facts alleged in the petition.

53.     Thereafter, Aluminum Shapes filed suit against Henderson on November 2, 2016 (as well as a separate suit against an individual by the name of Garry Goehring on October 7, 2016) with the Superior Court of New Jersey, Camden County alleging that their representations to the Department of Commerce (and by Goehring to the Wall Street Journal on September 15, 2016) concerning its knowing involvement in the scheme to avoid AD/CVD liabilities were false, defamatory, and caused it to suffer significant damages.  In those actions, Henderson and Goehring denied the material allegations of the complaints and asserted counterclaims against Aluminum Shapes.

54.     Apart from filing the foregoing defamation actions, the Defendants failed to exercise good faith and diligence or an appropriate standard of care in responding to and mitigating the impact of the negative publicity surrounding Aluminum Shapes' alleged involvement in the scheme to avoid AD/CVD liabilities in the period 2013 through the Petition Date.

55.     As set forth above, one or more of the Defendants (i) acknowledged Aluminum Shapes' failure to have policies and procedures to ensure compliance with DOC and USITC orders regarding foreign imports (including the 2011 AD/CVD Orders) and the collection of AD/CVD duties; (ii) caused Aluminum Shapes to import aluminum pallets from China in 2014; (iii) provided false information to CBP on Form 7501/Entry Summary on twenty two separate occasions in 2014; (iv) provided false information to CBP in connection with the 2014 audit; (v) allowed aluminum pallets to be stored/stockpiled in Aluminum Shapes' warehouse although they had no purpose, no commercial value, no domestic market, and none were ever sold in the United States; (vi) melted at least 100,000 lbs. of aluminum pallets in Aluminum Shapes' cast house; (vii) shipped the remaining pallets from Aluminum Shapes to Vietnam; and (viii) failed to reserve funds for payment of AD/CVD duties from 2013 through the Petition Date.

**E.     The Company's financial condition from November 2012 through April 2019**

56.     From November 2012 through March 2019, Aluminum Shapes' operations were funded through tens of millions of dollars in unsecured insider loans.

57.     More specifically, Aluminum Shapes' "Notes Payable Schedule at 04/30/21" reflected related party payables totaling $94,844,256.39, consisting of the following: (i) "Due to Alston International Funding $9,081,780.00"; (ii) "Due to Mexico [Aluminicaste] $73,795,000.00"; (iii) "Due to Shareholder Metal $2,353,748.05"; and (iv) Due to Mexico [Aluminicaste] – Metal Payments $9,613,728.34".

19

58.     Despite these significant cash infusions, Aluminum Shapes was a highly distressed business from November 2012 through March 2019 due to a severe liquidity crisis, negative gross margins, declining revenues, long history of operating losses, and negative operating cash flows.

59.     In the period 2013 through 2018, Aluminum Shapes had EBIDTA losses of ($10.1MM), ($15.9MM), ($11.7MM), ($10.4MM), ($18.1MM) and ($21.4MM), or a cumulative ($87.6MM).

60.     To make matters worse, the Federal Indictment was issued on May 7, 2019 charging Perfectus Aluminum, Perfectus Acquisitions, and others with a scheme to evade AD/CVD duties.

61.     Shortly thereafter, Cheung informed the other Defendants that he was not going to provide unsecured investor loans to Aluminum Shapes in the future and quickly sought to sever the ties between Aluminum Shapes, Perfectus Aluminum, and Perfectus Acquisitions.

62.     For instance, on May 22, 2019, Cheung signed a series of consents, assignments and assumption agreements, and an amended and restated operating agreement making him the direct owner of Aluminum Shapes (rather than the indirect owner through Perfectus Aluminum and Perfectus Acquisitions).

63.     By May 2019, Aluminum Shapes was hopelessly insolvent and on the brink of bankruptcy.

**F.     Failure to Explore Value-Maximizing Transactions**

64.     Despite the Company's heavy dependency on substantial unsecured insider loans from November 2012 through April 2019 and Cheung's refusal to make any additional loans in the future, the Defendants failed to evaluate potential value-maximizing transactions that could reasonably be in prospect and which could be consummated within a reasonable time for the benefit of all stakeholders.

65.     The Defendants had an obligation to properly, fully, and timely consider options and effectuate an action plan to maximize the value of the Company given its critically impaired and defective financial, business, and operational condition in May 2019.

66.     For instance, Aluminum Shapes owned unencumbered real property located at 8600 and 9000 River Road, Pennsauken, NJ (together, the "Real Property") from December 2012 through April 2019.  The property located at 8600 River Road consisted of a 19.38-acre parcel of land improved with a 345,829-square foot industrial building and the property located at 9000 River Road consisted of a 25.37-acre parcel of land improved with a 488,131-square foot industrial building plus a 69,511-square foot industrial building.

67.     On January 24, 2017, the Real Property was appraised and determined to have an "as is" market value of $29,000,000.

68.     If the Defendants had sold the Real Property and shut down operations in or about May 2019, they would have generated substantial funds to repay the claims of general unsecured creditors and avoided a deepening of the Company's insolvency by more than $20 million over the course of the next two years.

69.     Additionally, the Defendants failed to file bankruptcy before August 15, 2021 (or eight days before the Jury Verdict).

70.     The Defendants' failure to evaluate potential value-maximizing transactions that could reasonably be in prospect and which could be consummated within a reasonable time for the benefit of all stakeholders was in breach, abdication, and conscious disregard of their fiduciary duties of loyalty, good faith, and care and the best interests of the Debtor.

71.     In bad faith, the Defendants failed to take such action in conscious disregard for their respective fiduciary duties and best interests of the Debtor, failed to implement and/or follow

21

adequate safeguards and controls to ensure proper, full, and timely consideration of options and effectuation of an action plan to maximize the value of the Debtor, and failed to properly monitor and oversee the Company to ensure proper, full, and timely consideration of options and effectuation of an action plan to maximize the value of the Debtor.

72.     By failing to act as required, the Defendants caused, allowed, or otherwise acquiesced in the continued financial, business, and operational decline of the Debtor and caused or allowed the Debtor to continue to operate well past the point of insolvency, causing substantial harm and damage to the Debtor, including but not limited to substantial increase in the Debtor's liabilities and depletion of assets and enterprise value.

## G.     Actions & Events from May 2019 through the Petition Date

### I.     The Tiger Loan

73.     Instead, Cheung, Pok, Johnson, Rosenthal and Bathauer opted to enter into the following loan transaction with Tiger Finance that was nothing more than a "Hail Mary" pass that materially threatened creditor recoveries.

74.     On or about June 5, 2019 (or approximately one month after the Federal Indictment), Cheung, Pok, Johnson, Rosenthal, and Bathauer caused Aluminum Shapes to obtain a $7,685,000 senior secured term loan from Tiger Finance LLC (the "Tiger Loan").

75.     Among other things, the Tiger Loan required Aluminum Shapes' payment of a $550,000 closing fee plus payment of $557,121.14 in settlement charges for the following unpaid obligations which the Defendants allowed to accumulate due to the Company's lack of funds:

a.  Pennsauken Township (Taxes 2019 1st & 2nd 1/4s):           $127,319.98
b.  Pennsauken Sewer Authority (Sewer Bal to 4/30/19):         $9,460.41
c.  Camden County MUA (County Sewer 12/1-8/31/19):            $159,111.06
d.  Merchantville-Pennsauken Water Co. (Bankruptcy Water):    $64,534.47
e.  Pennsauken Township (Tax Sale Charges-CCMUA):             $119,906.18

153318682.1

76.     The Tiger Loan was secured by a first priority lien on substantially all of Aluminum Shapes' assets, including, the Company's accounts (including receivables), inventory, machinery and equipment, the 9000 River Road property, deposit accounts, cash, and cash equivalents.

77.     As reflected in Schedule 8.1 of the Tiger Loan Credit Agreement, Aluminum Shapes was indebted to (among others) vendors in the amount of $14,000,000, to Cheung in the amount of $79,257,728.00, to Alston International, Inc. in the amount of $1,000,000, and to Signature Aluminum Canada Inc. in the amount of $3,330,741.00 at the time of the transaction.

78.     In order to induce Tiger Finance to make the loan to Aluminum Shapes, Cheung executed a Subordination Agreement on behalf of Perfectus Aluminum and Perfectus Acquisitions as subordinated creditors.

79.     At the time they caused the Debtor to enter into the Tiger Loan, Cheung, Pok, Johnson, Rosenthal, and Bathauer knew or should have known the Tiger Loan proceeds were woefully insufficient for the Company's needs and of the high probability for a default and foreclosure of the Company's assets.

80.     Indeed, Aluminum Shapes defaulted on the Tiger Loan within four months, resulting in the execution of seven forbearance agreements on October 25, 2019, December 23, 2019, September 25, 2020, February 17, 2021, April 29, 2021, June 24, 2021, and July 27, 2021 (the "Forbearance Agreements").

81.     The Forbearance Agreements specified the following events of default:

   a.   First Forbearance Agreement (signed by Johnson as CFO):  Aluminum Shapes' "breach of (i) Sections 5.4(b) and 10.1(a) of the Credit Agreement as a result of the aggregate amount of the Term Loans outstanding exceeding the Maximum Term Loan Amount; (ii) Sections 7.4 and 10.1(a) of the Credit Agreement as a result of [Aluminum Shapes'] failure to timely pay certain Taxes on [Aluminum Shapes'] Real Property; and (iii) Sections 6.7, 6.14, 6.21, 10.1(b) and 10.1(i) of the Credit Agreement as a result of the certain actual and/or threatened litigation, ERISA

23

and/or labor matters affecting [Aluminum Shapes] as disclosed to the Lender subsequent to the Closing Date [as referenced on Schedule 6.7 thereto] (collectively, the "Specified Events of Default")."

b.  Second Forbearance Agreement (signed by Rosenthal as CEO): Aluminum Shapes' "further breach of Sections 5.4(b) and 10.1(a) of the Credit Agreement as a result of the aggregate amount of the Term Loans outstanding exceeding the Maximum Term Loan Amount (the "Additional Event of Default"; the definition Specified Events of Default (as defined in the First Amendment) shall hereinafter be amended to include the Additional Event of Default)."

c.  Third Forbearance Agreement (signed by Rosenthal as CEO): Aluminum Shapes' " continued breach of Sections 9.1 (as amended by the Second Amendment) and 10.l(a) of the Credit Agreement given the failure by [Aluminum Shapes] to maintain Liquidity of not less than $3,000,000 at all times from and after the Forbearance Termination Date on January 31, 2020, (ii) [Aluminum Shapes' breach of Sections 7.1 and 10.l(a) of the Credit Agreement given the failure by [Aluminum Shapes] to duly and timely deliver certain financial statements, reports and/or Borrowing Base Certificates, (iii) [Aluminum Shapes'] breach of Sections 6.21, 7.4, and 10.l (a), (b), (i) and/or (k) of the Credit Agreement given the failure by [Aluminum Shapes] to make certain employee benefit payments resulting in a work stoppage by a material portion of [Aluminum Shapes'] employees, and (iv) [Aluminum Shapes'] further breach of Sections 5.4(b) and 10.l(a) of the Credit Agreement given that the aggregate amount of the Term Loans outstanding exceeds the Maximum Term Loan Amount (collectively, the "Additional Events of Default"; the definition of Specified Events of Default (as amended in the Second Amendment) shall hereinafter be amended to include the Additional Events of Default)."

d.  Fourth Forbearance Agreement (signed by Bathauer as COO): "Specified Events of Default have occurred and are continuing, and have not been cured by [Aluminum Shapes] or waived by the Lenders as of the date hereof.

e.  Fifth Forbearance Agreement (signed by Bathauer as COO): "[A]dditional Events of Default occurred and are continuing under the Credit Agreement as a result of [Aluminum Shapes'] failure to (i) implement cash management arrangements in form and substance satisfactory to Lender (including pursuant to a Control Agreement) as required by Section 7.10(b) of the Credit Agreement, which constitutes an Event of Default under Section 10.1(a) of the Credit Agreement, and (ii) deliver on the first Tuesday of March 2021 a Budget along with a budget-to-actual performance report for the previous month with respect to such Budget, which constitutes an Event of Default under the Credit Agreement (as amended by Section 5(d) of the Fourth Amendment) (collectively, the "Additional Events of Default"; the definition of Specified Events of Default (as amended in the Fourth Amendment) shall hereinafter be amended to include the Additional Events of

Default).”

     f.   Sixth Forbearance Agreement (signed by Bathauer as COO): “[A]n additional Event of Default occurred and is continuing under the Credit Agreement as a result of [Aluminum Shapes’] failure to deliver to Lender, on or before May 31, 2021, a term sheet executed by [Aluminum Shapes] and a lender providing for the refinancing on or before June 30, 2021 of the Obligations with the Lender, which constitutes an Event of Default under the Credit Agreement (as amended by Section 5(e) of the Fifth Amendment) (the “Additional Event of Default”; the definition of Specified Events of Default (as amended in the Fifth Amendment) shall hereinafter be amended to include the Additional Event of Default).”

     g.   Seventh Forbearance Agreement (signed by Bathauer as COO): “[A]s of the date hereof, the Specified Events of Default (as defined in the Sixth Amendment) have neither been cured by [Aluminum Shapes] nor waived by the Lender.”

     82.    These Forbearance Agreements required Aluminum Shapes to, among other things, pay a higher interest rate, pay amendment and termination fees totaling $1,500,000, provide additional collateral in the form of cash and a mortgage on the 8600 River Road property, pay Tiger Finance’s forbearance related expenses, provide additional financial reporting, hire restructuring professionals, and commence a bankruptcy proceeding by August 16, 2021.

     83.    As reflected in the Forbearance Agreements, Cheung, Pok, Johnson, Rosenthal, and Bathauer (i) provided or caused materially inaccurate information or representations to be disseminated or made to Tiger Finance in connection with the Tiger Loan; (ii) omitted to state material facts known to them when such statements were necessary; or (iii) failed to implement and/or follow adequate safeguards or controls in regard to the financial reporting function, thereby causing Aluminum Shapes’ existence as a going concern to be artificially and wrongfully prolonged. Such actions resulted in exorbitant fees, forbearance fees and other significant charges to the detriment of the Debtor’s unsecured creditor body.

## II.   The Sale of 8600 River Road

84.     On or about December 23, 2019, Aluminum Shapes sold its real property located at 8600 River Road, Pennsauken, NJ, to a third party for $10,100,000.00.

85.     At the time of closing, Aluminum Shapes received approximately $1,290,559 from the sale of the 8600 River Road property.

86.     Like the settlement statement for the Tiger Loan,  Aluminum Shapes sales proceeds were reduced to satisfy unpaid obligations which the Defendants allowed to accumulate due to the Company's lack of funds (e.g., 2019 real estate taxes to Township of Pennsauken in the amount of $207,186.34; Judgment Payoff to State of New Jersey in the amount of $88,735.00, etc.).  The foregoing deductions from the proceeds of the sale of the 8600 River Road property were made at the expense and to the detriment of the Debtor's unsecured creditor body.

87.     In February 2020, Aluminum Shapes received additional sales proceeds totaling $972,927 as a partial reimbursement of a bulk sales tax escrow established at the time of the closing of the 8600 River Road property.

88.     In October 2020, the buyer of 8600 River Road paid an additional $4,881,263 to repay seller financing extended at the time of the sale of the property, with Aluminum Shapes receiving $2,181,263.14 of such amount and Tiger Finance receiving $2,700,000 in satisfaction of its mortgage on the property.  Approximately $642,590.77 of the seller financing continued to be set aside in escrow to satisfy post-closing obligations to terminate a Solar Agreement and remove a Central Solar Plant from the property.

## III.   The PPP Loans

89.     On or about May 1, 2020, Aluminum Shapes obtained a Paycheck Protection Program loan ("PPP Loan") from Wells Fargo in the amount of $4,951,241.

26

153318682.1

90.    On March 12, 2021, Aluminum Shapes obtained a PPP Loan from Customer Bank in the amount of $1,918,744.

91.    The Defendants provided or caused materially inaccurate information or representations to be disseminated or made to these PPP lenders in connection with such loans, omitted to state material facts known to them when such statements were necessary, and/or failed to implement and/or follow adequate safeguards or controls in regard to the financial reporting function, thereby causing the Company's existence as a going concern to be artificially and wrongfully prolonged.

### IV.    Defendants' Transfer of Loan Proceeds & Sales Proceeds to Related Parties

92.    Despite the dire financial condition of the Company from May 2019 through the Petition Date and the Subordination Agreement executed by Cheung in favor of Tiger Finance, all or certain of the Defendants caused Aluminum Shapes to make the following transfers totaling $6,823,651 to related parties in the period March 2020 through November 2020: (i) $1,018,495 to Global Vietnam Aluminum in March 2020; (ii) $235,000 to Alston International Inc. in May 2020; (iii) $1,060,284 to Global Vietnam Aluminum in July 2020; (iv) $265,351 to Global Vietnam Aluminum in September 2020; (v) $3,253,318 to Global Vietnam Aluminum in October 2020; and (vi) $991,203 to Global Vietnam Aluminum in November 2020  (the "Related Party Transfers").

93.    Upon information and belief, the Defendants used Aluminum Shapes' loan proceeds and sales proceeds to make the Related Party Transfers at the expense and to the detriment of the Debtor's unsecured creditor body.

### V.    Neglect of Workplace Safety

94.    As a result of the Company's poor financial condition, the Defendants made the conscious decision to save the expense associated with ensuring workplace safety.

95.    According to the United States Department of Labor – Occupational Safety and Health Administration ("OSHA"), the Company persistently disregarded its legal responsibility to comply with safety and health standards over a period of several years including 2016 through 2020.

96.    Among other things, OSHA issued serious, repeat, and willful citations to the Company on account of its failure to:

- Implement a comprehensive safety and health management system
- Record each injury on its injury log
- Provide appropriate personal protective equipment
- Conduct air monitoring prior to permit-required confined space entry
- Have an attendant during permit-required confined space entry
- Complete a required confined space entry permit to identify, evaluate and control hazards in the space
- Provide confined space training
- Utilize proper lockout/tagout (control of hazardous energy) procedures
- Provide workers with locks and hardware to lock out equipment being serviced, maintained or repaired
- Have specific procedures for the use of blocking devices
- Utilize group lockout procedures
- Train workers in lockout/tagout
- Resolve repeat violations, including fall hazards, lack of stair rails and machine guarding, and electrical hazards
- Utilize adequate ladders, appropriate respiratory and hearing protection, sufficient entry permits, machine guarding and provide hazardous chemical training.

97.    As a result of these violations, Company employees suffered amputations, lung damage, broken bones, severe chemical burns, and one employee died from his injuries.

98.    Due to the repeated safety failures, OSHA placed the Company in the Severe Violator Enforcement Program.

99.    In the bankruptcy case, OSHA filed a proof of claim against Aluminum Shapes in the amount of $2,017,958.00 for penalties arising from violations of the Occupational

Safety and Health Act. Thereafter, the Liquidating Trustee negotiated a reduced claim amount of $1,000,000.

## VI.    Failure to Pay Aluminum Shapes' Obligations As They Arose In The Ordinary Course of Business

100.    As a result of the Company's poor financial condition, the Defendants made the conscious decision to stop paying certain material obligations as they arose in the ordinary course of business.

101.    As reflected in the settlement statements for the Tiger Loan and sale of the 8600 River Road property, the Defendants allowed unpaid real estate taxes and other municipal assessments to accumulate such that they reduced the net amount of loan proceeds and sales proceeds payable to Aluminum Shapes at the time of the closing of those transactions.

102.    Additionally, the net proceeds from Aluminum Shapes' sale of the 9000 River Road property were diminished by a redemption payment of $1,032,394.41 to clear an unpaid $7,878.67 tax lien purchased by a Lakewood tax lien investor for $113,100 plus subsequent taxes and municipal charges the Defendants' chose not to pay and which accrued interest at 18% per annum.  These priority payments diminished the funds which would have otherwise been available for the repayment of general unsecured claims.

103.    Additionally, the Defendants failed to pay the Teamsters Local 107 and 837 benefit plans: (i) unpaid health and welfare fund contributions for union members totaling $2,470,122.86 for the period October 2018 through December 2018; (ii) unpaid 401(k) contributions for union members totaling $128,832.13 for the period November 2019 through January 2021; and (iii) unpaid accrued vacation entitlements for union members totaling $187,931.18.

153318682.1

104.   The Defendants' failure to pay other Company obligations also resulted in litigation and the entry of over $7 million in judgments (several of which were entered by default) in the following actions:

a.   Teamsters Local 837 v. Aluminum Shapes LLC, U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:19-cv-04739-RBS/Palmer (Local 837) v. Aluminum Shapes LLC, Case No. 2:21-cv-00326-RBS: Judgment amount=$4,470,122.86 (failure to make health fund contributions);

b.   Eastern Lift Truck Co. v. Aluminum Shapes LLC, Case No. BUR-L-1685-20: Judgment amount=$73,122.61;

c.   General Chemical & Supply v. Aluminum Shapes LLC, Case No. CAM SC-000770-20: Judgment amount=$2,948.83;

d.   A.C. Shultes, Inc. v. Aluminum Shapes LLC, Case No. CAM L-003398-20: Judgment amount=$30,176.56;

e.   UGI Energy Services, LLC v. Aluminum Shapes LLC, Case No. CAM L-000671-20: Judgment amount=$395,345.43;

f.   Talen Energy Marketing LLC v. Aluminum Shapes LLC, U.S. District Court for the Eastern District of Pennsylvania, Case No. 5:19-cv-04303-HSP: Judgment amount sought=$1,711,955.03 (breach of contract claim for unpaid balances under a Retail Electricity Agreement);

g.   Combined Metal Industries Inc. v. Aluminum Shapes LLC, Case No. CAM L-002982-20: Judgment amount=$320,780.87;

h.   Direct Energy Business Marketing LLC v. Aluminum Shapes LLC, Case No. CAM L-003390-19: Judgment amount=$834,252.47 (failure to pay natural gas bills);

30

i.   <u>Euler Hermes North America Ins. v. Aluminum Shapes LLC</u>, Case No. CAM L-003551-20: Judgment amount=$184,195.37;

j.   <u>IFM Efector Inc. v. Aluminum Shapes LLC</u>, Case No. CAM DC-002545-21: Judgment amount=$4,302.15;

k.   <u>Equipment Depot Pennsylvania, Inc., et al v. Aluminum Shapes LLC</u>, Case No. CAM L-2360-20: Judgment amount=$30,039.20;

l.   <u>Pyrotek Inc. v. Aluminum Shapes LLC</u>, Case No. CAM L-003963-20: Judgment amount=$97,658.54;

m.   <u>Mardinly Industrial Power, LLC v. Aluminum Shapes LLC</u>, Case No. MJ-32124-cv-0000007-2021: Judgment amount=$6,599.51; and

n.   <u>Melton Truck Lines Inc. v. Aluminum Shapes Inc.</u>, Case No. CJ-2020-1276: Judgment amount=$47,277.90.

105.   The Liquidating Trustee resolved Talen's claim to a $1.5 million judgment lien (springing from the litigation referenced above at subparagraph f) through a cash payment in the amount of $500,000 and an allowed general unsecured claim in the amount of $959,239.  This payment diminished the funds which would have otherwise been available for repayment of general unsecured claims.

**VII.   <u>Corporate Waste</u>**

106.   Despite their knowledge of the Company's severe financial distress, Rosenthal, Otterbein and Bathauer charged substantial personal expenses to the Company's American Express cards in the period 2017 through the Petition Date.

107.   For instance, the Liquidating Trustee has identified over 200 personal charges by Rosenthal, Otterbein and Bathauer to the Company's American Express card for Restoration

31

Hardware to furnish Rosenthal's home at a cost of approximately $12,969.42, jewelry, airline tickets, a guitar, purchases from Boyd's Men's Clothing in Philadelphia, payments totaling $33,000 to the law firm of Hofstein Weiner & Meyer, P.C. for Rosenthal's divorce proceedings, and Jewish Community Center summer camp expenses.

108.    The personal charges of Rosenthal and Otterbein to the Company's American Express cards total at least $346,151.23 and $372,854,53 respectively.

109.    The Defendants also caused Aluminum Shapes to pay for their personal vacations. For instance, Aluminum Shapes paid for Rosenthal's vacation with his wife Cianel Palmer, Michelle Palmer, and Rosann Rosenthal (Rosenthal's mother) at Big Bass Lake, Pennsylvania in November 2019 and paid for Bathauer's vacation with his wife in Marco Island, Florida in January 2020.

110.    Certain of the Defendants also caused their relatives to become employed at the Company and to receive excessive compensation for their duties.  For instance, Rosenthal's mother-in-law was given a job as an advisor/consultant to the Company at what appears to be excessive compensation.

**H.    The Company's Financial Condition as of the Petition Date & Unauthorized Post-Petition Transfers to Rosenthal and Bathauer**

111.    As of the Petition Date, the Debtor had $50,047.99 in cash on hand.  As of the October 25, 2021 bar date, over 300 claims were scheduled and filed in the Debtor's estate totaling approximately $29 million.

112.    Shortly before the Effective Date of the Chapter 11 Plan in August 2022 (or after the Debtor's assets had been sold and its operations terminated), Rosenthal and Bathauer caused the Debtor to pay them an additional $190,384.61 and $115,384.61 respectively for purported back

32

pay from November 19, 2021 through April 15, 2022.  Rosenthal and Bathauer also filed proofs

of claim prior to the bar date, seeking additional monies from the Debtor and, upon information

and belief, obtained payment for certain or all of such claims, despite the fact that such claims

were thereafter disallowed and expunged by the Court.  The foregoing transfers were contrary to

title 11 of the United States Code in that they were not authorized pursuant to the agreed upon

winddown budget, were not for actual, necessary costs and expenses of preserving the estate, and

were made outside the ordinary course of business, without court authorization, and without

evidentiary support therefor (together, the "Unauthorized Post-Petition Transfers").

113.    As a direct and proximate result of the acts and omissions committed by the

Defendants in breach of their respective fiduciary duties of loyalty, good faith, and care alleged

herein, the Debtor has suffered damages that include, but that are not necessarily limited to: (i) the

loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the

decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the

Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy

case related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims

filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable

and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under

New Jersey or other applicable state law; and (viii) other damages as may be ascertained though

discovery.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

33

I.      **Claims against the Defendants**

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**AGAINST CHEUNG**

The Liquidating Trustee sues Cheung and alleges:

114.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

115.    This is a claim under New Jersey statutory and common law, and/or under other applicable law, by the Liquidating Trustee against Cheung for breach of his fiduciary duties of loyalty, good faith, and care based upon his acts and omissions as manager, officer, and/or control person of the Debtor.

116.    During the time periods alleged above, Cheung was a manager, officer, and/or control person of the Company and, as such, owed the Company a fiduciary duty to discharge his duties in good faith, with the care an ordinarily prudent manager or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

117.    Specifically, the duty of loyalty and good faith under New Jersey law required Cheung to put the interests of the Company above his own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest.  In addition, in discharging his duty of loyalty and good faith, Cheung was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities.  Cheung was also required to ensure that he did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to his decisions, such that it was qualitatively more culpable than gross negligence.

34

118.    Further, in discharging his duties of loyalty and good faith, managers, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act.  The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

119.    A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.  Thus, "oversight" liability is characterized by a lack of good faith.

120.    The necessary conditions predicate for oversight liability include: (a) the managers, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the managers, officers, and/or control persons knew that they were not discharging their fiduciary obligations.  Where managers, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

121.    Additionally, the duty to exercise due care under New Jersey law required Cheung to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available.  In exercising the duty

35

of due care, Cheung could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences.  Moreover, under New Jersey law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives.  To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

122.    In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, Cheung exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for his knowing, conscious, and reckless disregard of the facts, he should have known of the risk of damage that ultimately befell the Company.

123.    Specifically, Cheung engaged in breaches and abdication of, and conscious disregard for, his fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

36

(i)      Causing, acquiescing in, or otherwise allowing the Company to fail to fully or adequately reserve funds for payment of AD/CVD duties;

(ii)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly respond to or mitigate negative reputational impact of alleged involvement in scheme to avoid AD/CVD liabilities;

(iii)    Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly evaluate potential value maximizing transactions;

(iv)     Causing, acquiescing in, or otherwise allowing the Company to enter into and perform under the improvident Tiger Loan;

(v)      Causing, acquiescing in, or otherwise allowing the Company to make the Related Party Transfers from the Company's Loan Proceeds and Sales Proceeds;

(vi)     Causing, acquiescing in, or otherwise allowing the Company to engage in the OSHA violations and failing to fully or adequately reserve sufficient funds for payment of OSHA penalties;

(vii)    Causing, acquiescing in, or otherwise allowing the Company to fail to pay obligations as they arose in the ordinary course of business; and

(viii)   Causing, acquiescing in, or otherwise allowing the Company to engage in corporate waste.

124.   Cheung knew that his acts and omissions as described herein were in breach, abdication, and/or conscious disregard of his respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtor, and as a result, breached his duty of loyalty by failing to discharge such fiduciary obligations in good faith.

37

125.    Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Cheung and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Cheung for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Cheung and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

153318682.1

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**AGAINST ROSENTHAL**

The Liquidating Trustee sues Rosenthal and alleges:

126.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

127.    This is a claim under New Jersey statutory and common law, and/or under other applicable law, by the Liquidating Trustee against Rosenthal for breach of his fiduciary duties of loyalty, good faith, and care based upon his acts and omissions as a manager, officer, and/or control person of the Debtor.

128.    During the time periods alleged above, Rosenthal was a manager, officer, and/or control person of the Company and, as such, owed the Company a fiduciary duty to discharge his duties in good faith, with the care an ordinarily prudent manager or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

129.    Specifically, the duty of loyalty and good faith under New Jersey law required Rosenthal to put the interests of the Company above his own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest.  In addition, in discharging his duty of loyalty and good faith, Rosenthal was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities.  Rosenthal was also required to ensure that he did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to his decisions, such that it was qualitatively more culpable than gross negligence.

153318682.1

130.    Further, in discharging his duties of loyalty and good faith, managers, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act.  The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

131.    A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.  Thus, "oversight" liability is characterized by a lack of good faith.

132.    The necessary conditions predicate for oversight liability include: (a) the managers, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the managers, officers, and/or control persons knew that they were not discharging their fiduciary obligations.  Where managers, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

133.    Additionally, the duty to exercise due care under New Jersey law required Rosenthal to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available.  In exercising the duty

40

of due care, Rosenthal could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, under New Jersey law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

134.    In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, Rosenthal exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for his knowing, conscious, and reckless disregard of the facts, he should have known of the risk of damage that ultimately befell the Company.

135.    Specifically, Rosenthal engaged in breaches and abdication of, and conscious disregard for, his fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

41

(i)      Causing, acquiescing in, or otherwise allowing the Company to fail to fully or adequately reserve funds for payment of AD/CVD duties;

(ii)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly respond to or mitigate negative reputational impact of alleged involvement in scheme to avoid AD/CVD liabilities;

(iii)    Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly evaluate potential value maximizing transactions;

(iv)     Causing, acquiescing in, or otherwise allowing the Company to enter into and perform under the improvident Tiger Loan;

(v)      Causing, acquiescing in, or otherwise allowing the Company to make the Related Party Transfers from the Company's Loan Proceeds and Sales Proceeds;

(vi)     Causing, acquiescing in, or otherwise allowing the Company to engage in the OSHA violations and failing to fully or adequately reserve sufficient funds for payment of OSHA penalties;

(vii)    Causing, acquiescing in, or otherwise allowing the Company to fail to pay obligations as they arose in the ordinary course of business; and

(viii)   Causing, acquiescing in, or otherwise allowing the Company to engage in corporate waste.

136.   Rosenthal knew that his acts and omissions as described herein were in breach, abdication, and/or conscious disregard of his respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtor, and as a result, breached his duty of loyalty by failing to discharge such fiduciary obligations in good faith.

137.    Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Rosenthal and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Rosenthal for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Rosenthal and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## AGAINST JOHNSON

The Liquidating Trustee sues Johnson and alleges:

138.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

139.    This is a claim under New Jersey statutory and common law, and/or under other applicable law, by the Liquidating Trustee against Johnson for breach of her fiduciary duties of loyalty, good faith, and care based upon her acts and omissions as a manager, officer, and/or control person of the Debtor.

140.    During the time periods alleged above, Johnson was a manager, officer, and/or control person of the Company and, as such, owed the Company a fiduciary duty to discharge her duties in good faith, with the care an ordinarily prudent manager or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

141.    Specifically, the duty of loyalty and good faith under New Jersey law required Johnson to put the interests of the Company above her own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest.  In addition, in discharging her duty of loyalty and good faith, Johnson was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for her responsibilities.  Johnson was also required to ensure that she did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to her decisions, such that it was qualitatively more culpable than gross negligence.

44

142.     Further, in discharging her duties of loyalty and good faith, managers, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act.  The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

143.     A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.  Thus, "oversight" liability is characterized by a lack of good faith.

144.     The necessary conditions predicate for oversight liability include: (a) the managers, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.   In either case, imposition of liability requires a showing that the managers, officers, and/or control persons knew that they were not discharging their fiduciary obligations.  Where managers, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

145.     Additionally, the duty to exercise due care under New Jersey law required Johnson to use that amount of care which ordinarily careful and prudent persons would use in similar circumstances and to consider all material information reasonably available.  In exercising the duty

of due care, Johnson could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences.  Moreover, under New Jersey law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives.  To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

146.    In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, Johnson exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for her knowing, conscious, and reckless disregard of the facts, she should have known of the risk of damage that ultimately befell the Company.

147.    Specifically, Johnson engaged in breaches and abdication of, and conscious disregard for, her fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

46

(i)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or adequately reserve funds for payment of AD/CVD duties;

(ii)    Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly respond to or mitigate negative reputational impact of alleged involvement in scheme to avoid AD/CVD liabilities;

(iii)   Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly evaluate potential value maximizing transactions;

(iv)    Causing, acquiescing in, or otherwise allowing the Company to enter into and perform under the improvident Tiger Loan;

(v)     Causing, acquiescing in, or otherwise allowing the Company to engage in the OSHA violations and failing to fully or adequately reserve sufficient funds for payment of OSHA penalties;

(vi)    Causing, acquiescing in, or otherwise allowing the Company to fail to pay obligations as they arose in the ordinary course of business; and

(vii)   Causing, acquiescing in, or otherwise allowing the Company to engage in corporate waste.

148.    Johnson knew that her acts and omissions as described herein were in breach, abdication, and/or conscious disregard of her respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtor, and as a result, breached her duty of loyalty by failing to discharge such fiduciary obligations in good faith.

149.    Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of

47

the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Johnson and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Johnson for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Johnson and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**AGAINST OTTERBEIN**

The Liquidating Trustee sues Otterbein and alleges:

150.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

48

151.    This is a claim under New Jersey statutory and common law, and/or under other applicable law, by the Liquidating Trustee against Otterbein for breach of his fiduciary duties of loyalty, good faith, and care based upon his acts and omissions as a manager, officer, and/or control person of the Debtor.

152.    During the time periods alleged above, Otterbein was a manager, officer, and/or control person of the Company and, as such, owed the Company a fiduciary duty to discharge his duties in good faith, with the care an ordinarily prudent manager or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

153.    Specifically, the duty of loyalty and good faith under New Jersey law required Otterbein to put the interests of the Company above his own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest.  In addition, in discharging his duty of loyalty and good faith, Otterbein was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities.  Otterbein was also required to ensure that he did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to his decisions, such that it was qualitatively more culpable than gross negligence.

154.    Further, in discharging his duties of loyalty and good faith, managers, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act.  The duty to monitor includes the ability to assure that information and reporting systems exist in the

49

organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

155.    A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.  Thus, "oversight" liability is characterized by a lack of good faith.

156.    The necessary conditions predicate for oversight liability include: (a) the managers, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.   In either case, imposition of liability requires a showing that the managers, officers, and/or control persons knew that they were not discharging their fiduciary obligations.  Where managers, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

157.    Additionally, the duty to exercise due care under New Jersey law required Otterbein to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available.  In exercising the duty of due care, Otterbein could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an

50

unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences.  Moreover, under New Jersey law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives.  To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

158.    In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, Otterbein exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for his knowing, conscious, and reckless disregard of the facts, he should have known of the risk of damage that ultimately befell the Company.

159.    Specifically, Otterbein engaged in breaches and abdication of, and conscious disregard for, his fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

(i)      Causing, acquiescing in, or otherwise allowing the Company to fail to fully or adequately reserve funds for payment of AD/CVD duties;

(ii)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly respond to or mitigate negative reputational impact of alleged involvement in scheme to avoid AD/CVD liabilities;

51

153318682.1

(iii)    Causing, acquiescing in, or otherwise allowing the Company to make the Related

Party Transfers from the Company's Loan Proceeds and Sales Proceeds;

(iv)    Causing, acquiescing in, or otherwise allowing the Company to engage in the

OSHA violations and failing to fully or adequately reserve sufficient funds for

payment of OSHA penalties; and

(v)    Causing, acquiescing in, or otherwise allowing the Company to engage in corporate

waste.

160.    Otterbein knew that his acts and omissions as described herein were in breach,

abdication, and/or conscious disregard of his respective responsibilities, respective fiduciary duties

of loyalty, good faith, and care, and the best interests of the Debtor, and as a result, breached his

duty of loyalty by failing to discharge such fiduciary obligations in good faith.

161.    Each of the above breaches adversely impacted and conferred no benefit to the

Company, and as a direct and proximate result of same, caused damage to the Company consisting

of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of

the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the

increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's

estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of

Otterbein and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi)

corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*,

Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii)

other damages as may be ascertained though discovery.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Otterbein

for compensatory damages, consequential damages, and special damages including, but not limited

to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Otterbein and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**AGAINST BATHAUER**

The Liquidating Trustee sues Bathauer and alleges:

162.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

163.    This is a claim under New Jersey statutory and common law, and/or under other applicable law, by the Liquidating Trustee against Bathauer for breach of his fiduciary duties of loyalty, good faith, and care based upon his acts and omissions as a manager, officer, and/or control person of the Debtor.

164.    During the time periods alleged above, Bathauer was a manager, officer, and/or control person of the Company and, as such, owed the Company a fiduciary duty to discharge his duties in good faith, with the care an ordinarily prudent manager or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

165.    Specifically, the duty of loyalty and good faith under New Jersey law required Bathauer to put the interests of the Company above his own interests and those of others, and was

53

not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging his duty of loyalty and good faith, Bathauer was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities. Bathauer was also required to ensure that he did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to his decisions, such that it was qualitatively more culpable than gross negligence.

166.    Further, in discharging their duties of loyalty and good faith, managers, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act. The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

167.    A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability. Thus, "oversight" liability is characterized by a lack of good faith.

168.    The necessary conditions predicate for oversight liability include: (a) the managers, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or

54

oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the managers, officers, and/or control persons knew that they were not discharging their fiduciary obligations. Where managers, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

169.     Additionally, the duty to exercise due care under New Jersey law required Bathauer to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available. In exercising the duty of due care, Bathauer could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, under New Jersey law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

170.   In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, Bathauer exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for his knowing, conscious, and reckless disregard of the facts, he should have known of the risk of damage that ultimately befell the Company.

171.   Specifically, Bathauer engaged in breaches and abdication of, and conscious disregard for, his fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

(i)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or adequately reserve funds for payment of AD/CVD duties;

(ii)    Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly respond to or mitigate negative reputational impact of alleged involvement in scheme to avoid AD/CVD liabilities;

(iii)   Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly evaluate potential value maximizing transactions;

(iv)    Causing, acquiescing in, or otherwise allowing the Company to enter into and perform under the improvident Tiger Loan;

(v)     Causing, acquiescing in, or otherwise allowing the Company to make the Related Party Transfers from the Company's Loan Proceeds and Sales Proceeds;

(vi)    Causing, acquiescing in, or otherwise allowing the Company to engage in the OSHA violations and failing to fully or adequately reserve sufficient funds for payment of OSHA penalties;

56

(vii)    Causing, acquiescing in, or otherwise allowing the Company to fail to pay obligations as they arose in the ordinary course of business; and

(viii)   Causing, acquiescing in, or otherwise allowing the Company to engage in corporate waste.

172.    Bathauer knew that his acts and omissions as described herein were in breach, abdication, and/or conscious disregard of his respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtor, and as a result, breached his duty of loyalty by failing to discharge such fiduciary obligations in good faith.

173.    Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Bathauer and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Bathauer for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate

153318682.1

during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Bathauer and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

### COUNT VI
### BREACH OF FIDUCIARY DUTY
### AGAINST POK

The Liquidating Trustee sues Pok and alleges:

174.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

175.    This is a claim under New Jersey statutory and common law, and/or under other applicable law, by the Liquidating Trustee against Pok for breach of his fiduciary duties of loyalty, good faith, and care based upon his acts and omissions as a *de facto* manager, officer, and/or control person of the Debtor.

176.    During the time periods alleged above, Pok was a *de facto* manager, officer, and/or control person of the Company and, as such, owed the Company a fiduciary duty to discharge his duties in good faith, with the care an ordinarily prudent manager or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

177.    Specifically, the duty of loyalty and good faith under New Jersey law required Pok to put the interests of the Company above his own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging his duty of loyalty and good faith, Pok was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing

58

the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities.  Pok was also required to ensure that he did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to his decisions, such that it was qualitatively more culpable than gross negligence.

178.    Further, in discharging their duties of loyalty and good faith, managers, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act.  The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

179.    A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.  Thus, "oversight" liability is characterized by a lack of good faith.

180.    The necessary conditions predicate for oversight liability include: (a) the managers, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the managers, officers, and/or control persons knew that they were not discharging their fiduciary obligations.  Where managers, officers, and/or control persons fail to act in the face of a known

59

duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

181.    Additionally, the duty to exercise due care under New Jersey law required Pok to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available.  In exercising the duty of due care, Pok could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences.  Moreover, under New Jersey law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives.  To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

182.    In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, Pok exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for his knowing, conscious, and reckless disregard of the facts, he should have known of the risk of

60

damage that ultimately befell the Company.

183.    Specifically, Pok engaged in breaches and abdication of, and conscious disregard for, his fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

(i)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or adequately reserve funds for payment of AD/CVD duties;

(ii)    Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly respond to or mitigate negative reputational impact of alleged involvement in scheme to avoid AD/CVD liabilities;

(iii)   Causing, acquiescing in, or otherwise allowing the Company to fail to fully or properly evaluate potential value maximizing transactions;

(iv)    Causing, acquiescing in, or otherwise allowing the Company to enter into and perform under the improvident Tiger Loan;

(v)     Causing, acquiescing in, or otherwise allowing the Company to make the Related Party Transfers from the Company's Loan Proceeds and Sales Proceeds;

(vi)    Causing, acquiescing in, or otherwise allowing the Company to engage in the OSHA violations and failing to fully or adequately reserve sufficient funds for payment of OSHA penalties;

(vii)   Causing, acquiescing in, or otherwise allowing the Company to fail to pay obligations as they arose in the ordinary course of business; and

(viii)  Causing, acquiescing in, or otherwise allowing the Company to engage in corporate waste.

61

153318682.1

184.    Pok knew that his acts and omissions as described herein were in breach, abdication, and/or conscious disregard of his respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtor, and as a result, breached his duty of loyalty by failing to discharge such fiduciary obligations in good faith.

185.    Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Pok and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Pok for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtor; (ii) increased liabilities of the Debtor; (iii) the decrease in the asset values and enterprise value of the Debtor; (iv) the increased insolvency of the Debtor; (v) administrative fees and expenses incurred by the Debtor's estate during the bankruptcy case related to mitigating and/or rectifying the acts and omissions of Pok and the other Defendants, and claims filed or asserted against the Debtor's estate; (vi) corporate waste; (vii) the value of all avoidable and other improper transfers pursuant to, *inter alia*, Chapter 5 of the Bankruptcy Code or under New Jersey or other applicable state law; and (viii) other

153318682.1

damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest,

costs and for any other relief the Court deems appropriate.

**COUNT VII**
**(ALTERNATIVE CLAIM AGAINST POK)**
**AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY**

The Liquidating Trustee sues Pok and alleges:

186.     The Liquidating Trustee realleges paragraphs 1 through 113 above.

187.     Cheung, Rosenthal, Johnson, Otterbein and Bathauer owed fiduciary duties to the

Company.

188.     Cheung, Rosenthal, Johnson, Otterbein and Bathauer were required to discharge

their fiduciary duties to the Company in good faith, with ordinary care, and in a manner reasonably

believed to be in its best interests.

189.     The following actions and inactions by Cheung, Rosenthal, Johnson, Otterbein and

Bathauer constituted breaches of fiduciary duty to the Company:

(i)      Causing, acquiescing in, or otherwise allowing the Company to fail to fully or

adequately reserve funds for payment of AD/CVD duties;

(ii)     Causing, acquiescing in, or otherwise allowing the Company to fail to fully or

properly respond to or mitigate negative reputational impact of alleged involvement

in scheme to avoid AD/CVD liabilities;

(iii)    Causing, acquiescing in, or otherwise allowing the Company to fail to fully or

properly evaluate potential value maximizing transactions;

(iv)     Causing, acquiescing in, or otherwise allowing the Company to enter into and

perform under the improvident Tiger Loan;

63

(v)     Causing, acquiescing in, or otherwise allowing the Company to make the Related

Party Transfers from the Company's Loan Proceeds and Sales Proceeds;

(vi)    Causing, acquiescing in, or otherwise allowing the Company to engage in the

OSHA violations and failing to fully or adequately reserve sufficient funds for

payment of OSHA penalties;

(vii)   Causing, acquiescing in, or otherwise allowing the Company to fail to pay

obligations as they arose in the ordinary course of business; and

(viii)  Causing, acquiescing in, or otherwise allowing the Company to engage in corporate

waste.

190.    Cheung, Rosenthal, Johnson, Otterbein and Bathauer's breaches of fiduciary duty

actually and proximately caused financial injury to the Company.

191.    Pok had actual knowledge of Cheung, Rosenthal, Johnson, Otterbein and

Bathauer's breaches of fiduciary duty to the Company.

192.    Notwithstanding, Pok (directly and indirectly through Alston International, Inc.)

consciously rendered substantial assistance to, and aided and abetted Cheung, Rosenthal, Johnson,

Otterbein and Bathauer's breaches of fiduciary duty to the Company.   Among other things, Pok

(directly and indirectly through Alson International, Inc.) substantially assisted and aided and

abetted Cheung, Rosenthal, Johnson, Otterbein and Bathauer' actions and inactions concerning the

Company's material business, financial, legal, accounting, operational, and regulatory matters

including those referenced above at paragraph 189.

193.    Pok is therefore liable for all damages actually and proximately caused to the

Company as a result of Cheung, Rosenthal, Johnson, Otterbein and Bathauer's breaches of

fiduciary duty.

WHEREFORE, the Liquidating Trustee demands judgment against Pok for (i) actual compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post-judgment interest and costs as allowed by law; and (iv) such other and further relief as the Court may deem just and proper.

### COUNT VIII
### (Avoidance and Recovery of Prepetition Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a))

The Liquidating Trustee sues Rosenthal, Otterbein, and Bathauer and alleges:

194.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

195.    During the two year period preceding the Petition Date, the Debtor transferred approximately $578,787.63 to American Express to pay personal charges of Rosenthal, Otterbein, and Bathauer, as more particularly set forth in **Exhibit A** hereto (the "2 Year Personal Expense Transfers").

196.    At all relevant times, the Debtor had an interest in the 2 Year Personal Expense Transfers to American Express for the benefit of Rosenthal, Otterbein and Bathauer.

197.    The Debtor did not receive any benefit from the 2 Year Personal Expense Transfers to American Express for the benefit of Rosenthal, Otterbein, and Bathauer.

198.    The Debtor harbored the actual intent to hinder, delay or defraud creditors at the time the 2 Year Personal Expense Transfers were made to American Express for the benefit of Rosenthal, Otterbein and Bathauer.

WHEREFORE, the Liquidating Trustee demands judgment against Rosenthal, Otterbein and Bathauer as follows:

A.      Avoiding the 2 Year Personal Expense Transfers pursuant to 11 U.S.C. §

153318682.1

548(a)(1)(A);

B.    Recovering the 2 Year Personal Expense Transfers or the value thereof, plus
pre-judgment interest, pursuant to 11 U.S.C. § 550(a); and

C.    For such other and further relief as the Court deems just and proper.

**<u>COUNT IX</u>**
**<u>(Avoidance and Recovery of Prepetition Transfers</u>**
**<u>Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a))</u>**

The Liquidating Trustee sues Rosenthal, Otterbein, and Bathauer and alleges:

199.    The Liquidating Trustee realleges paragraphs 1 through 113 and 195 through 197
above.

200.    The Debtor received less than reasonably equivalent value in exchange for the 2
Year Personal Expense Transfers.

201.    At the time of the 2 Year Personal Expense Transfers, (i) the Debtor was insolvent
or became insolvent as a result of the transfers; (ii) the Debtor was engaged or was about to engage
in a business or transaction for which any property remaining with the Debtor was an unreasonably
small capital; (iii) the Debtor intended to incur, or believed that it would incur, debts that would
be beyond the Debtor's ability to pay as such debts matured; and/or (iv) the Debtor made each of
the transfers to or for the benefit of an insider, namely Rosenthal, Otterbein and Bathauer.

WHEREFORE, the Liquidating Trustee demands judgment against Rosenthal, Otterbein
and Bathauer as follows:

A.    Avoiding the 2 Year Personal Expense Transfers pursuant to 11 U.S.C. §
548(a)(1)(B);

B.    Recovering the 2 Year Personal Expense Transfers or the value thereof, plus
pre-judgment interest, pursuant to 11 U.S.C. § 550(a); and

C.    For such other and further relief as the Court deems just and proper.

66

153318682.1

## COUNT X
### (Avoidance and Recovery of Prepetition Transfers
### Pursuant to 11 U.S.C. § 544 and N.J.S.A 25:2-25(a))

The Liquidating Trustee sues Rosenthal, Otterbein, and Bathauer and alleges:

202.   The Liquidating Trustee realleges paragraphs 1 through 113 above.

203.   During the four (4) year period preceding the Petition Date, the Debtor transferred approximately $719,005.76 to American Express to pay personal charges of Rosenthal, Otterbein, and Bathauer, as more particularly set forth in **Exhibit B** hereto (the "4 Year Personal Expense Transfers").

204.   The 4 Year Personal Expense Transfers were not made on account of any benefits received by the Debtor, and were made at the expense of paying the Debtor's creditors.

205.   The Debtor did not receive any benefit in consideration for the 4 Year Personal Expense Transfers.

206.   The Debtor harbored the actual intent to hinder, delay or defraud creditors at the time the 4 Year Personal Expense Transfers were made to American Express for the benefit of Rosenthal, Otterbein and Bathauer.

WHEREFORE, the Liquidating Trustee demands judgment against Rosenthal, Otterbein and Bathauer as follows:

A.   Avoiding the 4 Year Personal Expense Transfers pursuant to 11 U.S.C. § 544 and N.J.S.A. 25:2-25(a) and 25:2-29.

B.   Recovering of the 4 Year Personal Expense Transfers or the value thereof, plus pre-judgment interest, pursuant to 11 U.S.C. § 550(a); and

C.   For such other and further relief as the Court deems just and proper.

153318682.1

## COUNT XI
### (Avoidance and Recovery of Prepetition Transfers
### Pursuant to 11 U.S.C. § 544 and N.J.S.A 25:2-25(b))

The Liquidating Trustee sues Rosenthal, Otterbein, and Bathauer and alleges:

207.    The Liquidating Trustee realleges paragraphs 1 through 112 and 203 through 205 above.

208.    The Debtor did not receive reasonably equivalent value in exchange for the 4 Year Personal Expense Transfers to American Express for the benefit of Rosenthal, Otterbein, and Bathauer.

209.    At the time of the 4 Year Personal Expense Transfers, the Debtor (i) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; and/or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

210.    The 4 Year Personal Expense Transfers to American Express were made for the benefit of Rosenthal, Otterbein and Bathauer.

WHEREFORE, the Liquidating Trustee demands judgment against Rosenthal, Otterbein and Bathauer as follows:

A.    Avoiding the 4 Year Personal Expense Transfers pursuant to 11 U.S.C. § 544 and N.J.S.A. 25:2-25(b) and 25:2-29.

B.    Recovering the 4 Year Personal Expense Transfers or the value thereof, plus pre-judgment interest, pursuant to 11 U.S.C. § 550(a); and

C.    For such other and further relief as the Court deems just and proper.

68

**COUNT XII**
**(Avoidance and Recovery of Prepetition Transfers**
**Pursuant to 11 U.S.C. § 544 and N.J.S.A 25:2-27(a) and (b))**

The Liquidating Trustee sues Rosenthal, Otterbein, and Bathauer and alleges:

211.    The Liquidating Trustee realleges paragraphs 1 through 113 and 203 through 205 above.

212.    The Debtor did not receive reasonably equivalent value in exchange for the 4 Year Personal Expense Transfers to American Express for the benefit of Rosenthal, Otterbein and Bathauer.

213.    The Debtor was insolvent or became insolvent as a result of the 4 Year Personal Expense Transfers.

214.    Alternatively, the 4 Year Personal Expense Transfers were made on account of an antecedent debt owed by Rosenthal, Otterbein and Bathauer while the Debtor was insolvent, for which Rosenthal, Otterbein and Bathauer had reasonable cause to believe that the Debtor was insolvent.

215.    The 4 Year Personal Expense Transfers to American Express were made for the benefit of Rosenthal, Otterbein, and Bathauer.

WHEREFORE, the Liquidating Trustee demands judgment against Rosenthal, Otterbein and Bathauer as follows:

A.    Avoiding the 4 Year Personal Expense Transfers pursuant to 11 U.S.C. § 544 and N.J.S.A. 25:2-27(a) and/or (b) and 25:2-29.

B.    Recovering the 4 Year Personal Expense Transfers or the value thereof, plus interest, pursuant to 11 U.S.C. § 550(a); and

C.    For such other and further relief as the Court deems just and proper.

69

153318682.1

## COUNT XIII
## AVOIDANCE OF UNAUTHORIZED POST-PETITION TRANSFERS
## FROM ROSENTHAL AND BATHAUER

The Liquidating Trustee sues Rosenthal and Bathauer and alleges:

216.    The Liquidating Trustee realleges paragraphs 1 through 113 above.

217.    The Debtor's funds constituted property of its estate at all relevant times.

218.    Bankruptcy Code Section 549 provides, in pertinent part, as follows:

    (a)    Except as provided in subsection (b) or (c) of this section, the Trustee may avoid a transfer of property of the estate –

    (1)    that occurs after the commencement of the case; and
    (2)    (A)  that is authorized only under §303(t) or 542(c) of this title; or
          (B)  that is not authorized under this title or by the Court.

219.    The Unauthorized Post-Petition Transfers to Rosenthal and Bathauer were contrary to title 11 of the United States Code in that they were not authorized pursuant to the agreed upon winddown budget, were not for actual, necessary costs and expenses of preserving the estate, and were made outside the ordinary course of business, without court authorization, and without evidentiary support therefor.

220.    The Unauthorized Post-Petition Transfers to Rosenthal and Bathauer were ineffective and void as improper and unauthorized post-petition transfers of property of the Debtor's estate under Bankruptcy Code Section 541.

221.    The Liquidating Trustee is entitled to recover the Unauthorized Post-Petition Transfers to Rosenthal and Bathauer for the benefit of the creditor-beneficiaries of the Liquidating Trust.

153318682.1

WHEREFORE, the Liquidating Trustee demands judgment against Rosenthal and Bathauer (i) determining and declaring that the Unauthorized Post-Petition Transfers were ineffective and/or avoidable as unauthorized post-petition transfers; (ii) avoiding the Unauthorized Post-Petition Transfers and preserving them or the value thereof for the benefit of the creditor-beneficiaries of the Liquidating Trust pursuant to Bankruptcy Code Sections 549, 550 and 551; (iii) awarding the Liquidating Trustee the amount or value of the Unauthorized Post-Petition Transfers, plus pre-judgment and post-judgment interest and costs; and (iv) for such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**
**AND NON-CONSENT TO A JURY TRIAL**
**<u>BY AND BEFORE THE BANKRUPTCY COURT</u>**

222. The Liquidating Trustee hereby: (i) demands a trial by jury on all claims and issues triable by such; and (ii) requests in regard to such demand that the reference to the Bankruptcy Court not be withdrawn, if at all, unless and until all discovery and all pre-trial motions and matters, including case dispositive motions, are disposed of and otherwise adjudicated by the Bankruptcy Court. The Liquidating Trustee specifically does not consent to a jury trial by and before the Bankruptcy Court.

Respectfully submitted this 28th day of December, 2023.

**FOX ROTHSCHILD LLP**

By:*/s/ Robert F. Elgidely*
  Robert F. Elgidely, Esq.
  (Admitted *Pro Hac Vice*)
  One Biscayne Tower
  2 South Biscayne Boulevard, Suite 2750
  Miami, Florida 33131
  Telephone: (305) 442-6543
  Email: relgidely@foxrothschild.com
  -and-

71

153318682.1

Joseph J. DiPasquale, Esq.
jdipasquale@foxrothschild.com
Michael J. Viscount, Esq.
mviscount@foxrothschild.com
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800

*Attorneys for Advisory Trust Group, LLC, as
Liquidating Trustee of the Aluminum Shapes
Liquidating Trust*

153318682.1